UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| BRITTANY IRISH, individually and as personal representative of the estate of KYLE HEWITT, deceased, and KIMBERLY IRISH, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:15-cv-00503-JAW |
| STATE OF MAINE, STATE POLICE OF THE STATE OF MAINE, and JOHN AND/OR JANE DOES, STATE POLICE OFFICERS 1-10, | ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER ON MOTION TO DISMISS

This case arises out of a terrible tragedy that took place in Aroostook and Penobscot Counties, Maine, in July of 2015, when the former boyfriend of Brittany Irish entered her house, shot and killed her new boyfriend, shot and grievously wounded her mother, and abducted her.  Ms. Irish, her mother, and the estate of her deceased boyfriend filed a civil action against the state of Maine, the Maine State Police, and a number of police officers on the ground that, despite explicit warnings from Ms. Irish, the police notified her old boyfriend that she had gone to the police to complain that he had sexually assaulted her and then the Defendants had failed to protect them from the ensuing harm.  Even though the facts in this case are especially compelling, the Court has concluded that the law does not allow the Plaintiffs' lawsuit

to continue against these governmental Defendants and therefore grants the Defendants' motion to dismiss.

## I.   BACKGROUND

### A.   Procedural History

On December 10, 2015, Brittany Irish, individually and as personal representative of the estate of Kyle Hewitt, deceased, and Kimberly Irish (Plaintiffs) filed a three-count complaint in this Court, bringing a civil rights action against the state of Maine, the Maine State Police, and ten certain known and unknown state of Maine police officers (Defendants).   *Compl.* at 1 (ECF No. 1) (*Compl.*).   The Defendants filed a motion to dismiss the Complaint on February 19, 2016.   *Defs.' Mot. to Dismiss Compl.* (ECF No. 4) (*Defs.' Mot.*).   On February 22, 2016, the Plaintiffs filed a response to the Defendants' motion.   *Pls.' Opp'n to Defs.' Mot. to Dismiss [Dkt. No. 4]* (ECF No. 5) (*Pls.' Opp'n*).   The Defendants filed a reply to the Plaintiffs' response on February 24, 2016.   *Defs.' Reply in Supp. of Mot. to Dismiss Compl.* (ECF No. 6) (*Defs.' Reply*).

### B.   Factual Background[1]

Brittany Irish met Anthony Lord over four years ago, at which time Mr. Lord was a registered sex offender.   *Compl.* ¶¶ 9-10.   In 2011, for herself and on behalf of her son, J., Ms. Irish obtained a Protection from Abuse (PFA) order against Mr. Lord; the PFA lasted two years and expired in 2013.   *Id.* ¶ 11.   Also in 2013, Ms. Irish began

---

[1]      In considering a motion to dismiss, the Court assumes the truth of the complaint's well-pleaded facts and draws all reasonable inferences in the plaintiff's favor.   *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).

residing with Kyle Hewitt. *Id.* ¶ 12. Later in 2013, Ms. Irish reconciled with Mr. Lord and began living with him in Millinocket, Maine. *Id.* ¶ 13. In approximately May, 2013, Ms. Irish and her son resumed living with Mr. Hewitt in Old Town, Maine; in March, 2014, Ms. Irish's son, J., Ms. Irish, Mr. Hewitt, and their newborn son, B., moved to Bangor, Maine. *Id.* ¶ 14-15.

In March, 2015, while separated from Mr. Hewitt, Ms. Irish "reconnected with Lord and remained in a friendship relationship with Lord for a number of weeks." *Id.* ¶ 16. However, by late April or early May, 2015, Mr. Lord began threatening and harassing Ms. Irish and conveyed to her his desire for the relationship to become intimate, including using explicit sexual communications. *Id.* Ms. Irish immediately contacted the Bangor Police Department, which recommended that she stay away from and obtain a PFA order against Mr. Lord. *Id.* ¶ 17. On or about July 6, 2015, as she "made plans" to obtain a PFA order, Ms. Irish resumed living with Mr. Hewitt. *Id.* ¶ 18. On July 14, 2015, Ms. Irish met with Mr. Lord at his request at a local IGA food store; there, Mr. Lord abducted Ms. Irish and drove her to rural Aroostook County, Maine, where he repeatedly sexually assaulted her, strangled her with a seatbelt, and threatened to kill her. *Id.* ¶ 20. Mr. Lord specifically threatened to kill her if she reported the sexual assaults. *Id.* Ms. Irish believed Mr. Lord was sexually obsessed with her, and Mr. Lord indicated to Ms. Irish he was suicidal. *Id.* ¶ 21.

The following day, July 15, 2015, Ms. Irish went to her local hospital and submitted to a rape kit evaluation. *Id.* ¶ 22. Later that day, Ms. Irish reported to the Bangor Police Department that she had been sexually assaulted by Mr. Lord;

because the abduction and assault occurred in two counties (Penobscot and Aroostook) the Bangor Police Department referred Ms. Irish to the Maine State Police. *Id.* The Maine State Police asked Ms. Irish to drop off a written statement the next day. *Id.*

On July 16, 2015, Mr. Lord asked Ms. Irish to meet with him to "talk about what had happened." *Id.* ¶ 24. Ms. Irish advised the Maine State Police of the conversation and asked that she meet with Mr. Lord to "elicit a confession from him," and that she "could wear a wire or be otherwise monitored," believing she could "keep him stable and herself safe." *Id.* The Maine State Police refused Ms. Irish's request, stating "that's not the way we do it." *Id.* ¶ 25. Instead, the Maine State Police told Ms. Irish that they were going to call Mr. Lord, tell him that she had alleged that he sexually assaulted her, and ask Mr. Lord to meet with the Maine State Police "to give his side of the story." *Id.* Ms. Irish told the Maine State Police that "she was afraid that that would incite Lord to terrible violence and that she would not thereupon be safe." *Id.* ¶ 26. Later that day, unidentified members of the Maine State Police told Ms. Irish that they had left a voice message for Mr. Lord advising him of her accusations and "asking him to come to the local State Police barracks." *Id.* ¶ 27.

Approximately two hours later, on July 16, 2015, Ms. Irish learned that her parents' barn in Benedicta, Maine was on fire, and Ms. Irish "immediately suspected that Lord had set the fire." *Id.* ¶¶ 28-29. Ms. Irish contacted the Maine State Police and, with Mr. Hewitt, traveled to her parents' home in Benedicta. *Id.* ¶ 30. In Benedicta later that day, Ms. Irish met with two state troopers. *Id.* ¶ 31. While she

was meeting with the state troopers, Ms. Irish received a telephone call from her brother's friend. *Id.* ¶ 32.  The friend stated that a friend of Mr. Lord's had stated that when Mr. Lord received the voice message from the Maine State Police he became "immediately incensed and agitated and had indicated that 'someone was going to die tonight,'" and had "expressly stated that he was going to kill someone that night due to the State Police call." *Id.*  Ms. Irish then asked the state troopers to assign someone to protect her and her children overnight. *Id.* ¶ 33.  The state troopers told her that "they could not spare the manpower to protect anyone but would, rather, 'keep an eye on the situation.'" *Id.*  Ms. Irish's mother, Kimberly Irish, asked the state troopers to park a police car outside of their house overnight because "she felt that that ruse, at least, would keep Lord away"; the state troopers replied "that they could not even spare a car." *Id.* ¶ 34.

That evening, on July 16, 2015, "several State Police cars were observed approximately eleven miles away 'dumpster diving,' apparently looking for accelerant from the Benedicta fire." *Id.* ¶ 35.  Later that evening, Ms. Irish called the Maine State Police "to inquire, again, why no State Police officer or car was stationed at the home when it was obvious that Lord was incensed by the State Police call which he had received advising him of Brittany Irish's claim of rape and which had inspired his death threats." *Id.* ¶ 36.  Early on the morning of July 17, 2015, while Ms. Irish, her mother, Kimberly Irish, and Mr. Hewitt were asleep in the Benedicta home, Mr. Lord entered the house, shot and killed Mr. Hewitt, shot and grievously wounded Kimberly Irish, and again abducted Brittany Irish. *Id.* ¶ 37.  While driving in his

vehicle with Ms. Irish as a hostage, Mr. Lord engaged in a shoot-out which left another individual dead; Mr. Lord was later apprehended. *Id.* ¶ 38.

## C.    The Complaint

The Plaintiffs' Complaint alleges generally that the Defendants are liable under 42 U.S.C. § 1983[2] for violating the Plaintiffs' constitutional rights, including their substantive due process rights.   Applying United States Supreme Court precedent,[3] the Court finds that 42 U.S.C. § 1983 provides a potential cause of action for the Plaintiffs' claims.[4]

Count I alleges that the state of Maine, the Maine State Police, and the ten individual John and/or Jane Doe state of Maine police officers directly violated the Plaintiffs' constitutional rights by "refusing and/or failing to provide protection" to the Plaintiffs and putting them in danger, and alternatively that the Defendants violated a "special duty" owed to the Plaintiffs because of the Defendants' "implicit and/or express promise to protect" the Plaintiffs. *Id.* ¶¶ 39-44.

---

[2]    42 U.S.C. § 1983 states in relevant part:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

[3]    The Supreme Court found that "[a] broad construction of § 1983 is compelled by the statutory language, which speaks of deprivations of '*any* rights, privileges, or immunities secured by the Constitution and laws.'" *Dennis v. Higgins*, 498 U.S. 439, 443 (1991) (emphasis in original). Moreover, the Supreme Court has "given full effect to [the statute's] broad language, recognizing that § 1983 'provide[s] a remedy, to be broadly construed, against all forms of official violation of federally protected rights.'" *Id.* at 445 (internal citations omitted).

[4]    Although the Plaintiffs allege that this Court has pendent jurisdiction over state law tort claims pursuant to 28 U.S.C. § 1367(a), *Compl.* ¶ 1, the Plaintiffs failed to assert any tort claims in the Complaint.   The Court does not consider the pendent jurisdiction argument over unasserted state claims.

Count II alleges a violation of the Plaintiffs' substantive constitutional rights resulted from the failure of some of the John and/or Jane Doe State Police Officer Defendants to "properly supervise, educate, instruct, train, and/or control" other Doe Defendants. *Id.* ¶¶ 45-50.

Count III alleges that the state of Maine and the Maine State Police are liable, either vicariously or under a theory of respondeat superior, for the acts of the individual John and/or Jane Doe Defendants. *Id.* ¶¶ 51-53.

## II.   THE PARTIES' POSITIONS

### A.   The Defendants' Motion to Dismiss

The Defendants contend that the claims against the state of Maine and the Maine State Police should be dismissed because states and their agencies are not "persons" within the meaning of 42 U.S.C. § 1983 and thus are not subject to § 1983 liability. *Defs.' Mot.* at 5-6 (collecting cases). Moreover, the Defendants argue that even if the state of Maine and the Maine State Police are "persons" within the meaning of § 1983, they are protected from suit by the doctrine of sovereign immunity and by the Eleventh Amendment, as Maine has not consented to this lawsuit and, in enacting § 1983, Congress has not abrogated the States' sovereign immunity. *Id.* at 6.

Next, citing the Supreme Court's decision in *DeShaney v. Winnebago County, Department of Social Services*, the Defendants argue the Plaintiffs have failed to state a claim that any police officer is responsible for the harms caused by Mr. Lord, as generally "a State's failure to protect an individual against private violence simply

does not constitute a violation of the Due Process Clause." *Id.* at 7 (citing 489 U.S. 189, 197 (1989)). The Defendants also deny that any exceptions to *DeShaney* apply to the Plaintiffs. *See id.* 8-12. Specifically, the Defendants maintain that as alleged, the facts do not suggest that any officer made any promise to protect the Plaintiffs from Mr. Lord, and more specifically that "[w]hile officers allegedly told [Ms. Irish] that they would 'keep an eye on the situation,' this was in no way an implicit or express promise of protection, especially given that the officers allegedly told [Ms. Irish] expressly that they 'could not spare the manpower to protect anyone.'" *Id.* at 8. Again citing *DeShaney*, in addition to First Circuit caselaw, the Defendants contend that even if police officers promised to protect the Plaintiffs,[5] there was no "special duty" placed on the police officers because "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him," but only when the state takes a person into its custody and holds him against his will. *Id.* at 8-9 (quoting 489 U.S. at 200).

Additionally, the Defendants submit that none of the unidentified police officers created or substantially contributed to the danger posed by Mr. Lord, heading off assertions of a constitutional violation against the police officers' failure to protect against private violence under the "state-created danger theory." *Id.* at 9. The Defendants contend this theory applies only if the "state actors have taken affirmative acts to create or exacerbate the danger posed by third parties," *id.* at 10

---

[5]     The Defendants note that "[e]ven if telling [Ms. Irish] that they would 'keep an eye on the situation' could be construed as a promise to protect her, plaintiffs do not allege that [Ms. Irish's] mother (Kimberly Irish) or Hewitt participated in, or we [sic] even aware of, that conversation," and "[t]hus, no promise was made to either of them." *Defs.' Mot.* at 8 n.4.

(emphasis provided by Defendants), and that the First Circuit case of *Rivera v. Rhode Island*, 402 F.3d 27 (1st Cir. 2005), forecloses any liability for the police officers' affirmative act of calling Mr. Lord and informing him of Ms. Irish's sexual assault allegations, as the First Circuit concluded that identifying witnesses and taking their statements does not impose constitutional liability on the state, even if it enhances the danger to the witness. *Id.* at 10-11 (citing *Rivera*, 402 F.3d at 37).

The Defendants further argue that in order to be successful on a substantive due process claim, the First Circuit requires that a state actor's conduct be "so egregious as to shock the conscience" and the Plaintiffs have not alleged sufficient facts to satisfy this element. *Id.* at 12 (collecting cases). Specifically, they assert that "it is impossible to see how police engage in conscience-shocking conduct simply by conducting the routine investigatory step of seeking to interview the alleged perpetrator of a serious crime." *Id.* at 13.

Furthermore, the Defendants contend that even if the Plaintiffs have stated a substantive due process claim, the state police officers, as government officials, are entitled to qualified immunity. *Id.* The Defendants explain that government officials "are entitled to qualified immunity unless (1) 'the facts that a plaintiff has alleged or shown make out a violation of a constitutional right' and (2) 'the right at issue was 'clearly established' at the time of their alleged misconduct,'" and note that the second, "clearly established" prong has two aspects: (1) the "clarity of the law at the time of the alleged civil rights violation," and (2) "the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the

9

plaintiffs' constitutional rights." *Id.* at 14 (citing *Walden v. City of Providence*, 596 F.3d 38, 52 (1st Cir. 2010)). The Defendants argue that if the Court were to find an alleged constitutional violation, given that "neither the Supreme Court nor the First Circuit has ever recognized the state-created danger theory or held that promises of protection give rise to a constitutional duty," "the officers could not possibly have had fair warning [that their actions] were somehow violating plaintiffs' substantive due process rights," particularly because the Defendants could not have understood that their decisions rose to the level of "conscious-shocking" behavior. *Id.* at 15.

As to the supervisory liability claim, the Defendants assert that without a valid substantive due process claim there can be no vicarious liability, but even if the Court were to find a constitutional violation and that qualified immunity did not apply, the Plaintiffs' claim still must fail because "[i]t is well established that 'vicarious liability is inapplicable to . . . § 1983 suits,'" as it must be pleaded "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 15-16 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Moreover, the Defendants argue that the Plaintiffs' allegations of certain officers' failure to train and supervise are vague and insufficient to support a supervisor liability claim. *Id.* at 17. Lastly, regarding the respondeat superior and vicarious liability claims, Defendants submit that the state of Maine and the Maine State Police could not be liable, as neither can be subject to § 1983 claims, and even if they could, respondeat superior and vicarious liability do not apply under § 1983. *Id.* at 17.

### B.   The Plaintiffs' Response

The Plaintiffs respond that, whereas a state's failure to protect an individual against private violence does not ordinarily constitute a constitutional violation, "that general principle is not absolute and an affirmative, constitutional duty to protect arises where the State, as here, creates the danger to an individual," and "that general principle may be obviated where a 'special relationship' exists between the parties which requires that the State provide reasonable protection." *Pls.' Opp'n* at 7.

The Plaintiffs maintain that "when the state enters into a special relationship with a particular citizen, it may be held liable for failing to protect him or her from the private actions of third parties," and they argue "[a]ppellate (and trial) courts from across the country have found a 'special relationship' to exist in circumstances analogous to those presented here." *Id.* at 8-9 (collecting cases).

Further, the Plaintiffs contend that their Complaint should be allowed to proceed under the state-created danger doctrine, "which has long recognized a viable civil rights claim where state actor(s) create a foreseeable, direct danger in willful disregard of the safety of the plaintiff." *Id.* at 9. The Plaintiffs contend that a relationship existed between Ms. Irish and the state police officers because "by communicating the rape allegations to the state police, who then communicated same on to Lord, [Ms. Irish] had abdicated the relative safety of her own controlled relationship with Lord in favor of the state police," *id.* at 11, and that the state police officers:

> created the peril . . . by contacting Lord over Plaintiff Brittany Irish's objections and advising him of Brittany's rape allegations thereby

investing him with great anger, refusing to allow Brittany to contact
Lord directly and thereby control his anger, failing to respond to the
ensuing fire at her parents' property in close proximity to Brittany (and
the other Plaintiffs), ignoring Lord's direct death threat and failing and
refusing to provide protection, or even the appearance of protection (an
unoccupied state police cruiser).

*Id.* at 10.

As to the conscious-shocking test requirement for substantive due process
claims, Plaintiffs assert the facts alleged in the Complaint "tell a shocking tale." *Id.*
at 11. Lastly, in addressing the Defendants' qualified immunity claim, the Plaintiffs
argue the test outlined by the Defendants is "one of 'fair warning' and nothing more,"
that that "[t]o the extent that the constitutionally-protected civil right at issue
involves the 'failure to protect,' the parameters of the governing law was long well
settled in the First Circuit . . . as of July 16, 2015." *Id.* at 12-13.

## C.   The Defendants' Reply

The Defendants contend the Plaintiffs failed to distinguish the most direct
case on point – *Rivera v. Rhode Island* – which forecloses their arguments that a
promise of protection gives rise to any duty to protect. *Defs.' Reply* at 1. In addition,
the Defendants distinguish *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) from the
facts here and note the First Circuit in *Rivera* cited the Ninth Circuit decision for the
proposition that other courts "have recognized the existence of a constitutional
violation when, on particular facts, the state fails to protect against private violence
under this state created danger theory," *id.* at 2 (quoting *Rivera*, 402 F.3d at 35), but
the First Circuit nevertheless held "that promises of protection and the performance
of routine law enforcement activities do not give rise to a state-created danger claim."

*Id.*  The Defendants also assert that *Rivera* demonstrates that the police officer Defendants are entitled to qualified immunity, as "[a]ny reasonable police officer reading *Rivera* would have understood that interviewing an alleged perpetrator does not violate principles of substantive due process, even when doing so might increase the risk to the accuser," and moreover that the Plaintiffs have cited no caselaw from the United States Supreme Court, the First Circuit, or this Court "that possibly could have given the [D]efendants 'fair warning' that they would violate [Ms. Irish's] constitutional rights by seeking to obtain a statement from Lord."  *Id.* at 2-3.

Lastly, the Defendants note that in their response to the motion to dismiss, the Plaintiffs did not address the argument that neither the state of Maine nor the Maine State Police is subject to § 1983 liability, nor the argument that the Plaintiffs failed to allege a basis for supervisory or respondeat superior liability, and thus, even if the Plaintiffs alleged a due process claim, the state of Maine, the Maine State Police, and any individual supervisory Defendants are still entitled to dismissal.  *Id.* at 3.

## III.  LEGAL STANDARD

### A.  Subject Matter Jurisdiction

The Defendants moved to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure.  "A motion to dismiss an action under Rule 12(b)(1) . . . raises the fundamental question whether the federal district court has subject matter jurisdiction over the action before it."  *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 8 n.6 (1st Cir. 2005) (internal citation omitted).  "The burden falls on the plaintiff to clearly allege facts demonstrating that he is a proper party to

invoke federal jurisdiction." *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1281 (1st Cir. 1996) (citation and internal quotation marks omitted).   In ruling on a Rule 12(b)(1) motion, the Court "must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." *Aversa v. United States*, 99 F.3d 1200, 1209-10 (1st Cir. 1996).   "If the Court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  FED. R. CIV. P. 12(h)(3).

## B.    Failure to State a Claim

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1, 7 (1st Cir. 2011) (citing FED. R. CIV. P. 12(b)(6)).  A court need not assume the truth of conclusory allegations, and the complaint must state at least a "plausible claim for relief."  *Iqbal*, 556 U.S. at 678-79.  However, "[n]on-conclusory factual allegations in the complaint must . . . be treated as true, even if seemingly incredible."  *Ocasio–Hernández,* 640 F.3d at 12. A court may not "attempt to forecast a plaintiff's likelihood of success on the merits." *Id.* at 12-13.

In 2007, the United States Supreme Court issued *Twombly*, which emphasized the need for a plaintiff's complaint to marshal sufficient facts to demonstrate a "plausible entitlement to relief."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559

(2007).  Two years later, in *Iqbal*, the United States Supreme Court refined the dismissal standard:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

556 U.S. at 678 (internal quotation marks and citations omitted).  The *Iqbal* Court suggested that courts, when considering motions to dismiss, could "choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 679.  Having isolated "the well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.*

In 2013, the First Circuit described the *Twombly* and *Iqbal* decisions as "watershed cases."  *García-Catalán v. United States*, 734 F.3d 100, 101 (1st Cir. 2013).  The "plausibility standard," the First Circuit wrote, has become "the 'new normal' in federal civil practice."  *Id.* (quoting *A.G. v. Elsevier, Inc.*, 732 F.3d 77, 78-79 (1st Cir. 2013)).  The First Circuit explained that "[t]he plausibility inquiry necessitates a two-step pavane."  *Id.* at 103 (citing *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  *Id.* (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)).  "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is

liable for the misconduct alleged.'"  *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)).

Lastly, "[t]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  If a § 1983 complaint fails to state a constitutional claim, it is subject to dismissal under Rule 12(b)(6).  *Doe v. Metro. Police Dep't*, 445 F.3d 460, 467 (D.C. Cir. 2006).  Moreover, in substantive due process cases, "the Supreme Court has held that such claims must be carefully scrutinized to determine if the alleged facts support the conclusion that the state has violated an individual's constitutional rights."  *Rivera*, 402 F.3d at 33 (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

## IV.  DISCUSSION

### A.  Section 1983 Liability

The Supreme Court held that a state is not a "person" within the meaning of § 1983 and not subject to § 1983 liability.[6]  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989); 42 U.S.C. § 1983 ("Every *person* who, under color of any statute,

---

[6]

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties.  The Eleventh Amendment bars such suits unless the State has waived its immunity, or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity. That Congress, in passing § 1983, had no intention to disturb the States' Eleventh Amendment immunity and so to alter the federal–state balance in that respect was made clear in our decision in [*Quern v. Jordan*, 440 U.S. 332 (1979)].

*Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989).

ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . .") (emphasis added).  As the First Circuit explained, "[n]o cause of action for damages is stated under 42 U.S.C. § 1983 against a state, its agency, or its officials acting in an official capacity."  *Nieves-Márquez v. Puerto Rico*, 353 F.3d 108, 124 (1st Cir. 2003) (citing *Will*, 491 U.S. at 71); *Brown v. Newberger*, 291 F.3d 89, 92 (1st Cir. 2002) ("The claims under 42 U.S.C. § 1983 fail because a state and its agencies are not 'persons'"); *Hutchins v. Maine State Hous.*, No. 1:14-CV-00491-JAW, 2015 WL 2250672, at *6 n.13 (D. Me. May 13, 2015) ("Section 1983 provides a cause of action against 'persons' acting under color of state law.  The State of Maine and its agencies are not persons and cannot be sued under § 1983"); *Marcello v. Maine*, 464 F. Supp. 2d 38, 44 (D. Me. 2006) (same).  The Plaintiffs' claims against the state of Maine and the Maine State Police are not cognizable under federal law.

### B.   Sovereign Immunity

The doctrine of sovereign immunity presents a second rationale for dismissing the state of Maine and the Maine State Police from this action.  The doctrine is grounded in the Eleventh Amendment to the United States Constitution, which provides: "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.  In practice, "[t]he Eleventh Amendment bars such suits unless

the State has waived its immunity, or unless Congress . . . override[s] that immunity." *Will*, 491 U.S. at 66 (internal citation omitted); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54-55 (1996).   Moreover, sovereign immunity extends to agents and instrumentalities of the state.   *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).

The state of Maine "regards the immunity from suit as 'one of the highest attributes inherent in the nature of sovereignty,'" *Cushing v. Cohen*, 420 A.2d 919, 923 (Me. 1980) (quoting *Drake v. Smith*, 390 A.2d 541, 543 (Me. 1978)), and adheres to the general rule that "a specific authority conferred by an enactment of the legislature is requisite if the sovereign is to be taken as having shed the protective mantle of immunity." *Cushing*, 420 A.2d at 923; *see also Doyle v. State*, No. 2:15-CV-00078-JAW, 2015 WL 5813312, at *5 (D. Me. Oct. 5, 2015).   In the Complaint, the Plaintiffs have not established, nor attempted to establish, a waiver of immunity under this standard, and as such the Court concludes, in the absence of specific authority conferring waiver, the state of Maine has not consented to suit.   Because the state of Maine has not waived its immunity with respect to § 1983 actions, and because Congress has not overridden that immunity, the Plaintiffs' claims against the state must be dismissed.   *See Maysonet-Robles v. Cabrero*, 323 F.3d 43, 54 (1st Cir. 2003) ("Section 1983, although enacted pursuant to the Fourteenth Amendment, did not abrogate the immunity of the States because there was insufficient evidence of Congress' desire to make States liable under that statute") (citing *Quern v. Jordan*, 440 U.S. 332, 345 (1979)).   Likewise, because the Maine State Police, as part of the

18

state executive branch of government, is an instrumentality of the state of Maine, it too is cloaked with immunity, and must also be dismissed. *See Marcello*, 464 F. Supp. 2d at 44.

## C.    Substantive Due Process Claims

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.  In order to establish a substantive due process claim, the Plaintiffs must first show a deprivation of a protected interest in life, liberty, or property. *Rivera*, 402 F.3d at 33-34; *see also Rhode Island Bhd. of Correctional Officers v. Rhode Island*, 357 F.3d 42, 49 (1st Cir. 2004); *Macone v. Town of Wakefield*, 277 F.3d 1, 9 (1st Cir. 2002).  Second, the Plaintiffs must show that "the deprivation of this protected right was caused by governmental conduct." *Rivera*, 402 F.3d at 34.

The Supreme Court established that the Due Process Clause of the Fourteenth Amendment does not require a state to "provide its citizens with particular protective services" and that "the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *DeShaney*, 489 U.S. at 196-97.  The *DeShaney* Court concluded that, generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."[7]  *Id.* at 197.  However, the Court also acknowledged that "in certain

---

[7]       [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.  The Clause is phrased as a limitation on the State's power to act, not as a guarantee of

limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198.

The Defendants argue the circumstances here gave rise to this affirmative duty to protect. But the *DeShaney* Court found this duty arises only when "the State takes a person into its custody and holds him there against his will,"[8] and that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 199-200; *see also Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 991-92 (1st Cir. 1992) (finding a constitutional duty to protect may exist when an individual is incarcerated or is involuntarily committed to the custody of the state). In *Rivera*, relying on *DeShaney*, the First Circuit found there is no duty to protect against private harm when state actors have knowledge of a danger to a person, promise to protect that person, the person relies on the promise, and the state actors fail to keep the promise,

---

certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).

[8]

The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*DeShaney*, 489 U.S. at 200.

20

resulting in the person's death.[9]  *Rivera*, 402 F.3d at 37-38; see *also Hill-Spotswood v. Mayhew*, No. 1:14-CV-00206-GZS, 2015 WL 403931, at *4 (D. Me. Jan. 29, 2015) ("Nonfeasance by a state actor, including unfulfilled or unkept promises to protect, does not deprive an individual of their liberty or ability to act").

The holdings in *DeShaney* and *Rivera* forestall the Plaintiffs' argument that any promises of protection made by state police officers created a "special duty" to protect.  Moreover, the Court notes that the only alleged "promise" made by the state police officers to the Plaintiffs occurred when the officers told Ms. Irish that "they could not spare the manpower to protect anyone but would, rather, 'keep an eye on the situation.'" *Compl.* ¶ 33.  Regardless of whether the statement made by the state police officers to Ms. Irish amounts to a promise to protect her, no substantive due process violation occurred.[10]

The *Rivera* Court recognized that in *DeShaney*, the Supreme Court suggested that it is only when the state creates the danger to an individual that an affirmative duty to protect may arise:

> [w]hile the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.  [By returning the

---

[9]     In *Rivera*, Jennifer Rivera witnessed a murder and twice went to the local police station to make a statement and identify the murderer.  402 F.3d at 31.  Thereafter, Ms. Rivera was continually threatened with death if she agreed to testify about the murder.  *Id.*  The threats were conveyed to the police department, which repeatedly assured her that she would be safe in order to secure her testimony.  *Id.* at 31-32.  The day before Ms. Rivera was scheduled to testify, she was killed in front of her house.  *Id.*

[10]    The Court is doubtful whether, even assuming the facts alleged in the Complaint are true, the statement by the state police may be fairly construed as a promise of protection, especially given that the state police also allegedly stated that "they could not even spare a car" to park outside of the house overnight as a "ruse" to "keep Lord away."  *Compl.* ¶ 34.  If the statement is not such a promise, this would constitute a separate basis to conclude that the Plaintiffs' Complaint is subject to dismissal.

> plaintiff's child to his abusive father, the State] placed him in no worse
> position than that in which he would have been had it not acted at all.

*Rivera*, 402 F.3d at 34-35 (quoting *DeShaney*, 489 U.S. at 201).  Other courts have identified this exception and have determined that in limited situations and under particular facts, a state actor may be found to have committed a substantive due process violation where the state actor creates the danger to an individual and fails to protect that individual from the danger.  *Hill-Spotswood*, 2015 WL 403931, at *3 (citing *Rivera*, 402 F.3d at 34-35 (at least three circuit courts have recognized a constitutional violation when the state fails to protect an individual against private violence under the state created danger theory)); *see Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066-67 (6th Cir. 1998); *Reed v. Gardner*, 986 F.2d 1122, 1125-26 (7th Cir. 1993); *Ostrander*, 879 F.2d at 589-90.

The First Circuit has addressed the state-created danger theory but has never found it applicable to a case before it.  *See e.g.*, *Rivera*, 402 F.3d at 38; *J.R. v. Gloria*, 593 F.3d 73, 79 n.3 (1st Cir. 2010) ("This case does not involve the state-created danger theory, which this circuit has never, in any event, found applicable"); *Bennett v. Wainwright*, 548 F.3d 155, 163 n.2 (1st Cir. 2008) ("Since the Estate failed to meet the threshold pleading requirement of identifying the deprivation of a recognized interest, we need not reach the question of whether this circuit recognizes a state-created danger theory of liability"); *Coyne v. Cronin*, 386 F.3d 280, 287 (1st Cir. 2004) ("[W]e have recognized that the Due Process Clause may be implicated where the government affirmatively acts to increase the threat to an individual of third-party private harm or prevents that individual from receiving assistance"); *Souza v. Pina*,

22

53 F.3d 423, 427 (1st Cir. 1995) (finding that actions taken by a prosecutor implicating plaintiff in murders were not the type of affirmative acts that give rise to a constitutional duty to protect under the state created danger theory).

The state-created danger theory applies only if, inter alia, a state actor takes affirmative acts to create or exacerbate the danger posed by third parties. *See Ramos-Piñero v. Puerto Rico*, 453 F.3d 48, 55 n.9 (1st Cir. 2006) ("To the extent plaintiffs attempt to ground liability in the so-called 'state-created danger' theory, the absence of an affirmative act by the state in creating the danger is fatal to the claim"); *Rivera*, 402 F.3d at 35; *Robbins v. Maine Sch. Admin. Dist. No. 56*, 807 F. Supp. 11, 13 (D. Me. 1992) ("A state may be held liable if it can fairly be said to have affirmatively acted to create or exacerbate a danger to the victims.  Mere nonfeasance has been held insufficient to constitute the requisite state action") (citation omitted).

Ms. Irish alleges that the state police officers affirmatively acted to create or exacerbate the danger to her when they called Mr. Lord and informed him that she had alleged that he sexually assaulted her, despite her objections to the officers that this would "incite Lord to terrible violence and that she would not thereupon be safe." *Compl.* ¶¶ 25-27.  *Rivera* provides guidance here.[11]  In *Rivera*, the First Circuit

---

[11]     The Plaintiffs cite caselaw from the Third and Tenth Circuit that outlines four- and five-part tests, respectively, for evaluating state-created danger claims.  *Pls.' Opp'n* at 9-10, 10 n.2 (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996); *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995); *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995)).  The First Circuit has cited both *Kneipp* and *Uhlrig* with apparent approval.  *See Ramos-Piñero v. Puerto Rico*, 453 F.3d 48, 54 (1st Cir. 2006); *Enwonwu v. Gonzales*, 438 F.3d 22, 30 (1st Cir. 2006).   The First Circuit has not, however, formally adopted these tests.   *See Rivera*, 402 F.3d at 37.

        The four-factor Third Circuit standard for imposing constitutional liability for a state-created danger requires (1) the harm ultimately caused was foreseeable and direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; and (4) the state actors used their authority to create an opportunity that otherwise

rejected the argument that the defendants' actions in identifying Ms. Rivera as a witness and taking her witness statement in the course of investigating a murder – despite having knowledge of threats against her because of her cooperation as a witness – compelled her to testify and thus enhanced the danger to her.  *Rivera*, 402 F.3d at 37.  The *Rivera* Court found "[b]oth are necessary law enforcement tools, and cannot be the basis to impose constitutional liability on the state."  *Id.*  Similarly, the First Circuit rejected the argument that the defendants increased the risk to Ms. Rivera by issuing her a subpoena to testify at trial, describing a subpoena as a "vital prosecutorial tool," and concluding that "[w]hile requiring [Ms. Rivera's] testimony may in fact have increased her risk, issuance of a subpoena did not do so in the sense of the state created danger doctrine."  *Id.*  Here, it follows that seeking to interview Mr. Lord, an alleged perpetrator of a sexual assault, was a "necessary law enforcement tool" and is not a basis to impose constitutional liability on the state police officers.  Indeed, for the police officers not to investigate these accusations would be a dereliction of their duties as law enforcement.[12]

---

would not have existed for the third party's crime to occur.  *Kneipp*, 95 F.3d at 1208.  In *Kneipp*, the Third Circuit explained that the relationship element requires that the plaintiff allege a "relationship between the state and the person injured . . . during which the state places the victim in danger of a foreseeable injury."  *Id.* at 1209.

The Tenth Circuit standard is that the Plaintiff must demonstrate that "(1) [the plaintiff] was a member of a limited and specifically definable group; (2) Defendants' conduct put [the plaintiff] and the other members of that group at substantial risk of serious, immediate and proximate harm; (3) the risk was obvious or known; (4) Defendants acted recklessly in conscious disregard of that risk; and (5) such conduct, when viewed in total, is conscience shocking."  *Uhlrig*, 64 F.3d at 574.

The only allegation that could arguably meet Third and Tenth Circuit requirements is the voice message to Mr. Lord, but in *Rivera* the First Circuit exempted the use of "necessary law enforcement tools", such as contacting a witness or a potential defendant, from the imposition of constitutional liability.  *Id.* at 37.

[12]    Moreover, the Court is not persuaded by the Plaintiffs' argument that "by communicating the rape allegations to the state police, who then communicated same on to Lord, [Ms. Irish] had abdicated the relative safety of her own controlled relationship with Lord in favor of the state police."  *Pls.' Opp'n*

Moreover, to maintain a substantive due process claim against the Defendants, the Plaintiffs must allege "conduct . . . so extreme as to 'shock the conscience.'" *Cummings v. McIntire*, 271 F.3d 341, 344 (1st Cir. 2001) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998)); *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006); *Berry v. RSU 13 Sch. Bd.*, No. 2:15-CV-00146-JAW, 2016 WL 742901, at *19 (D. Me. Feb. 24, 2016); *Rivera*, 402 F.3d at 33-34 (explaining that "it is not enough to claim the governmental action shocked the conscience" but a plaintiff must also show a deprivation of a protected interest). The First Circuit observed that this standard was "deliberately . . . set high to protect the Constitution from demotion to merely a 'font of tort law.'" *McIntire*, 271 F.3d at 344 (quoting *Lewis*, 523 U.S. at 847 n.8, 848).

In this Court's view, the facts alleged here fall short of examples of conduct that the First Circuit and other circuit courts have concluded meet this high standard. *See Marrero-Rodriguez v. Municipality of San Juan*, 677 F.3d 497, 502 (1st Cir. 2012) (finding that a police officer who during a training exercise took out a firearm, placed it to the unprotected back of an unarmed, face down, motionless, and under control prone officer, and shot the firearm, resulting in the officer's death, had engaged in conduct shocking to the conscience); *Neal ex rel. Neal v. Fulton Cty. Bd. of Educ.*, 229 F.3d 1069, 1076 (11th Cir. 2000) (student blinded in one eye when teacher

---

at 11. To argue that Ms. Irish had a "controlled relationship" with Mr. Lord is inconsistent with the facts alleged by the Plaintiffs: in 2011, Ms. Irish obtained a Protection from Abuse (PFA) order against Mr. Lord, *Compl.* ¶ 11, in late April or early May, 2015, Mr. Lord began threatening and harassing Ms. Irish and conveyed to her his desire for the relationship to become intimate, including using explicit sexual communications, *Compl.* ¶16, and on July 14, 2015, Mr. Lord abducted Ms. Irish and repeatedly sexually assaulted her, strangled her, and threatened to kill her. *Compl.* ¶ 20. Under the *Twombly* plausibility standard, the Court is required to accept the facts alleged by the plaintiff, but not legal argument in the guise of facts. *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013).

intentionally struck him with a metal weight); *Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999) (teacher fabricated sexual abuse charges against a father causing loss of contact with his child for three years); *Rogers v. City of Little Rock*, 152 F.3d 790, 797 (8th Cir. 1998) (rape by police officer in connection with a car stop). Furthermore, as the First Circuit noted in finding that a state actor's conduct did not shock the conscience, "[e]ven where the government is aware of specific dangers . . . it must perform a triage among competing demands." *Ramos-Piñero v. Puerto Rico*, 453 F.3d 48, 54 (1st Cir. 2006). The Defendants did not commit conscious shocking behavior by contacting Mr. Lord about the sexual assault allegations, nor by failing to affirmatively comply with the Plaintiffs' requests for protection.

### D. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Glik v. Cunniffe*, 655 F.3d 78, 81 (1st Cir. 2011) (public officials are entitled to "qualified immunity from personal liability arising out of actions taken in the exercise of discretionary functions"). In determining questions of qualified immunity, courts must apply the following two prong analysis: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Rocket Learning, Inc. v. Rivera-Sánchez*, 715 F.3d 1, 9 (1st Cir.

26

2013) (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)); *Walden v. City of Providence*, 596 F.3d 38, 52 (1st Cir. 2010).   The "clearly established" analysis itself divides into two parts.   *Rivera-Sánchez*, 715 F.3d at 9.   For a plaintiff to overcome qualified immunity, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal quotations and citations omitted).   Next, considering the specific facts of the case at bar, it must have been "clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."   *Id.* (alteration in original).

This Court has already determined that the Plaintiffs failed to make a substantive due process claim against the state police officers, and thus under the test outlined in *Rivera-Sanchez*, the Defendants are entitled to qualified immunity. 715 F.3d at 9.   Moreover, any reasonable state police officer reading *Rivera* would determine that contacting and interviewing a person accused of sexual assault would not violate the accuser's substantive due process rights, even if doing so could increase the risk to the accuser.

### E.    Supervisory Liability Claims

Because the Plaintiffs failed to state a substantive due process claim, their claims in Count II of the Complaint against any unnamed state police officer for supervisory liability and for failure to train fail.   *See Rivera*, 402 F.3d at 38-39; *see also City of Canton v. Harris,* 489 U.S. 378, 391 (1989) (holding that the city's constitutional liability for failure to train or for inadequately training its employees is premised on there being an underlying constitutional violation of the harmed

individual's rights); *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581–82 (1st Cir. 1994) (explaining that to establish supervisory liability, the plaintiff must show an underlying constitutional violation); *Hill-Spotswood*, 2015 WL 403931, at *5 ("Because Plaintiff has failed to state a constitutional claim . . . her claim for supervisory liability based on that underlying constitutional claim also fails").

### F.   Respondeat Superior and Vicarious Liability

In Count III, the Plaintiffs allege that the state of Maine and the Maine State Police "are liable as principals for all violations of civil rights, torts or other wrongs committed by their respective agents and/or employees." *Compl.* ¶ 53.  However, as discussed, the state of Maine and the Maine State Police are protected from suit under sovereign immunity, nor are they subject to § 1983 liability.  *See supra* Sections IV.A.-B.  Moreover, vicarious and respondeat superior liability do not apply to Section 1983 claims.  *Iqbal*, 556 U.S. at 676 ("[V]icarious liability is inapplicable to . . . § 1983 suits"); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable under Section 1983 on a respondeat superior theory").

## V.   CONCLUSION

The Court GRANTS the Defendants' Motion to Dismiss (ECF No. 4).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 12th day of September, 2016