# United States Court of Appeals
## For the First Circuit

No. 16-2173

BRITTANY IRISH, Individually and as Personal Representative of
the Estate of KYLE HEWITT, and KIMBERLY IRISH,

Plaintiffs, Appellants,

v.

STATE OF MAINE; STATE POLICE OF THE STATE OF MAINE; and
JOHN and/or JANE DOES, STATE POLICE OFFICERS 1-10,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Thompson, and Barron,
Circuit Judges.

David J. Van Dyke, with whom Lynch & Van Dyke, P.A. was on
brief, for appellants.
Christopher C. Taub, Assistant Attorney General, with whom
Janet T. Mills, Attorney General, was on brief, for appellees.

March 1, 2017

LYNCH, **Circuit Judge**.  Plaintiffs Brittany and Kimberly Irish (together, "the Irishes") brought this 42 U.S.C. § 1983 action against Maine State Police officers after Anthony Lord, a former boyfriend of Brittany Irish ("Irish"), broke into her parents' home, fatally shot her boyfriend (Kyle Hewitt), shot and grievously wounded her mother (plaintiff Kimberly Irish), abducted her, and engaged in a shootout with Maine State Police officers during which another individual was fatally shot.

The complaint alleges that Lord commenced this violent rampage after and because a State Police officer left Lord a voice message, which notified him that Irish had made a complaint about Lord's serious violent crimes against her earlier, and then did little more than ask Lord to come to the local State Police barracks to be interviewed.  The officer left Lord this message despite Irish's explicit request that the State Police refrain from doing so out of her fear that this action would incite further violence from Lord.  The timing of the events suggests that she was correct in her fears.  The complaint alleges that the Irishes' losses "ar[o]se out of failures by Defendants to protect them from dangers which Defendants themselves created."

On motion by the defendants, the district court dismissed the Irishes' complaint at the 12(b)(6) stage, holding that their factual allegations did not amount to a state-created danger as would be necessary to maintain a substantive due process

claim on these facts.  The court heavily relied on <u>Rivera</u> v. <u>Rhode Island</u>, 402 F.3d 27 (1st Cir. 2005), to explain its decision.[1]  The court also found that qualified immunity shielded from liability the ten unidentified State Police officers named as defendants.

We cannot conclude at this very early stage of the proceedings that, in consequence of our decision in <u>Rivera</u>, the plaintiffs either failed to state a substantive due process claim or that the defendants are entitled to qualified immunity.  All we have are a bare-bones complaint and a 12(b)(6) motion.  We have many questions to which we would prefer to have answers.  While both of these issues can certainly be decided at the motion to dismiss stage, <u>see</u> <u>Wood</u> v. <u>Moss</u>, 134 S. Ct. 2056, 2066 (2014); <u>Rivera</u>, 402 F.3d at 31, they are often decided after some factual development or at summary judgment, <u>Plumhoff</u> v. <u>Rickard</u>, 134 S. Ct. 2012, 2017 (2014); <u>DeShaney</u> v. <u>Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 193 (1989).  As to qualified immunity, we

---

[1]   In <u>Rivera</u>, fifteen-year-old Jennifer Rivera was shot dead the day before she was scheduled to testify as an eyewitness in a murder trial.  For months preceding the trial, Rivera continually received threats that she would be killed if she testified.  When she notified the police of the death threats, they repeatedly "promised to protect her in order to secure her testimony." <u>Id.</u> at 32.  Rivera's estate brought suit against the police officers, alleging that they had violated her substantive due process right by creating the danger that she faced when they identified her as a witness and took her witness statement while investigating the murder. <u>Id.</u> at 37.  We affirmed dismissal of this claim, noting that "[b]oth are necessary law enforcement tools, and cannot be the basis to impose constitutional liability on the state." <u>Id.</u>

recognize the Supreme Court's admonitions that it is "an immunity from suit rather than a mere defense to liability," and should thus be decided early in litigation. Plumhoff, 134 S. Ct. at 2019 (citation omitted). But we are reluctant to make law in the absence of more facts. We thus send the case back to the district court for some development of facts material to those issues.

We vacate the district court's ruling as to the individual defendants and remand the case with instructions that the parties be permitted to conduct discovery on relevant facts. The discovery should include facts on whether there was any departure from established police protocol or training on, inter alia, the manner in which the police should notify the accused of allegations filed against him or her; what exactly the State Police officers knew about the risk that Lord posed to Irish and when exactly they knew it; and what message they left for Lord. Whether or not the officers followed proper procedure and how much they knew about the attendant risks of leaving a casual voice message, in turn, may bear on the questions of whether Irish has a due process claim that can withstand a 12(b)(6) motion and whether the officers are entitled to qualified immunity.

## I.

We recite the facts as alleged in the Irishes' complaint but note where key information is left wanting.

Irish and Lord met through a mutual friend and carried on an on-again, off-again relationship. Lord was a registered sex offender when the two met and, in 2011, Irish obtained a Protection from Abuse ("PFA") order against Lord for herself and for her son. That two-year order expired in 2013. Although Irish had rekindled a friendship with Lord in March 2015, that relationship took a turn for the worse by the next month, when Lord began to "threaten[] and harass[]" Irish and send her "explicitly sexual communications." Irish notified the Bangor Police Department ("BPD") of Lord's behavior, and the BPD advised her to obtain another PFA order against Lord. On or about July 6, 2015, Irish began the process of obtaining that second order against Lord. In July 2015, Irish was living with her boyfriend, Hewitt, with whom she had had a second son the previous year.

On July 14, 2015, Irish met with Lord at a local food store in Bangor, from which Lord abducted Irish and drove her to Aroostook County. There, he repeatedly raped her, strangled her with a seatbelt, and threatened to kill her. He specifically threatened to kill Irish if she reported the crime. The next day, on July 15, 2015, Irish submitted to a rape kit evaluation at her local hospital and reported what had happened to the BPD. The BPD referred her to the Maine State Police because the abduction and sexual assaults had taken place in two different counties. The

State Police requested that Irish drop off a written statement the next day.  No copy of the statement was appended to the complaint.

On July 16, 2015, Lord contacted Irish and asked her to meet with him to "talk about what had happened."  Irish advised the State Police of this request.  The complaint does not explain how much information she provided to the State Police about her encounter with Lord.  During the same conversation with the State Police, Irish also asked that she be permitted to meet with Lord, in order to elicit a confession from him, while wearing a wire or being monitored by a State Police officer.  The State Police refused, telling Irish that "that's not the way we do it."  The officers instead told her that they would call Lord, inform him of Irish's accusations against him, and ask him to come to the local State Police barracks to "give his side of the story."  Irish asked the State Police to refrain from doing so, pleading that "she was afraid that that would incite Lord to terrible violence and that she would not thereupon be safe."  The complaint does not allege that Irish withdrew her allegations.

Shortly thereafter, on the same day, unidentified officers of the State Police contacted Irish and informed her that they had left Lord a voice message advising him of Irish's criminal complaint against him and asking him to come to the local barracks. The record is silent on what exactly the message said.

Approximately two hours later, Irish learned from her father that her family's barn in Benedicta, Maine was on fire. Immediately suspecting that Lord had set the fire, Irish reported it to the State Police and began traveling, with Hewitt, to her parents' Benedicta home.  While meeting with two State Police officers in Benedicta later that day, Irish received a phone call from her brother's friend.  That friend informed Irish that he was at a bar and had learned from Lord's close friend there that "Lord had received a voice mail from the State Police, had become immediately incensed and agitated and had indicated that 'someone was going to die tonight.'"

After receiving this call, Irish asked the two officers for a member of the State Police to be sent to protect her and her children overnight.  The officers refused, saying that they could not spare the manpower but that they would "keep an eye on the situation."  Irish's mother then asked if the officers could park an empty police car outside of the Benedicta home overnight "because she felt that that ruse, at least, would keep Lord away." But the officers said that they also could not spare a car.  Later that evening, "several State Police cars were observed approximately eleven miles away [from the Benedicta home] 'dumpster diving,' apparently looking for accelerant from the Benedicta fire."

In the early morning of July 17, 2015, Lord entered the Benedicta home while Irish, Hewitt, and Kimberly Irish were present. Lord shot and killed Hewitt, shot and grievously wounded Kimberly Irish, and abducted Irish. With Irish in his car, Lord engaged in a shootout with State Police and fatally shot another person in the process. Lord was later apprehended.

On December 10, 2015, the plaintiffs brought suit against the State of Maine, the State Police, and ten unidentified State Police officers in the U.S. District Court for the District of Maine. The complaint alleged in relevant part that the defendants had violated the plaintiffs' substantive due process rights by failing to protect them from Lord's violence after having taken affirmative steps to increase the threat that Lord posed to them.

The district court granted the defendants' motion to dismiss, noting that the failure to protect against private violence is not a cognizable violation of due process. Irish v. Maine, 1:15-cv-00503-JAW, 2016 WL 4742233, at *8 (D. Me. Sept. 12, 2016). While the district court recognized the possible "state-created danger" exception to this principle, it found that the Irishes' complaint insufficiently alleged a state-created danger under Rivera. Id. at *10-11. The court also noted that the alleged conduct of the officers did not "shock the conscience,"

id. at *11, and that the individual defendants were shielded by qualified immunity, id. at *12.[2]

## II.

The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. As a general matter, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney, 489 U.S. at 197. But some circuit courts have recognized the "state-created danger" exception to this rule based on language in DeShaney that "suggested, but never expressly recognized, the possibility that when the state creates the danger to an individual, an affirmative duty to protect might arise." Rivera, 402 F.3d at 34–35 (citing DeShaney, 489 U.S. at 201).[3] At least eight sister circuits have recognized the existence of the state-created danger theory. See Kennedy v. City of Ridgefield, 439 F.3d 1055, 1061 n.1 (9th Cir. 2006) (collecting cases). While this circuit has discussed the

_____

[2]   The district court also dismissed all claims against the State of Maine and the State Police on jurisdictional grounds. The Irishes do not appeal these rulings.

[3]   The Rivera opinion observed the lack of clarity on whether DeShaney's creation-of-danger language recognized a discrete exception or whether that language was "simply in service of the special relationship exception and provides a set of circumstances where the state's actions might create a 'special relationship' and thus a duty to protect." Rivera, 402 F.3d at 35 n.5.

- 9 -

possible existence of the state-created danger theory, we have never found it applicable to any specific set of facts.

In addition to alleging a sufficient state-created danger, the plaintiff must meet "a further and onerous requirement" to prove a substantive due process violation: "the state actions must shock the conscience of the court." Rivera, 402 F.3d at 35. To meet this standard, the state actions must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998). Although the circumstances of each case impact whether the state action at issue meets this standard, "where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice." Rivera, 402 F.3d at 36 (citing Lewis, 523 U.S. at 851–52). Finally, we "may elect first to address whether the governmental action at issue is sufficiently conscience shocking" before considering the state-created danger element. Id.

The Irishes argue that the officers' conduct in this case both exacerbated the danger that Lord posed to them and was sufficiently egregious to shock the conscience. Pointing to the voice message, the Irishes argue that by contacting Lord over Irish's objections and advising him of the allegations against him, the officers "specifically created the peril" to the Irishes with deliberate indifference for their safety.

Defendants respond by first arguing that "trying to interview a suspect who has been accused of a crime is standard police practice," and thus that <u>Rivera</u> must control.  <u>See id.</u> at 37.  But this argument fails to take into account the <u>manner</u> in which the officers tried to interview the suspect -- at the very outset of the investigation, before any other precautions had been taken, and despite being warned by the complainant about the suspect's violent tendencies.

Defendants further contend that even if the officers' actions violated Irish's constitutional rights, they must still be shielded by qualified immunity because "[a]ny officer who reads <u>DeShaney</u> and <u>Rivera</u> [wa]s going to come away understanding that it [wa]s not a clearly established violation of Ms. Irish's due process rights to leave a voicemail message with the alleged perpetrator."

In our view, the bare-bones nature of the complaint and the record at this early stage of litigation makes vacating the appropriate course.  To be sure, our concern is not that the State Police sought to interview Lord for "his side of the story."  Nor is our concern that they identified Irish as the complainant.  After all, even had they not identified her by name, her identity might have been clear to Lord, given the one-on-one nature of the crime of rape.  What we do question, however, is whether there are standard police protocols that were violated when the officers

decided not to be present when they alerted Lord to Irish's allegations but instead opted to leave Lord a voice message on his phone -- notwithstanding Irish's specific warning that such notification would "incite Lord to terrible violence." Assuming the voice message was left on Lord's cell phone, it is likely that he received immediate notification and was left free to immediately do violence. And given the timeline presented in Irish's complaint, the police had apparently not taken any prior steps to evaluate Irish's allegations or Lord's propensity for violence before leaving him the voice message. Or if they did, the actions are not documented in the record.

Neither party at oral argument could provide any detail on acceptable police procedures or training, if any, on how and when to notify the accused of the allegations that have been filed against him or her under similar circumstances. Our developing caselaw in this area helps explain why we pause.

In Stamps v. Town of Framingham, 813 F.3d 27 (1st Cir. 2016), we denied qualified immunity to a police officer who had accidentally shot and killed an elderly civilian after "pointing his loaded assault rifle at the head of a prone, non-resistant, innocent person who present[ed] no danger, with the safety off and a finger on the trigger." Id. at 39–40. Concluding that a reasonable officer would have known that such conduct constituted excessive force in violation of the Fourth Amendment, we emphasized

how the officer's decision to keep his finger on the trigger, to keep his weapon "off safe" at all times, and to point the weapon's muzzle at an innocent civilian's head, rather than in a safe direction, all violated police rules, training, and basic firearm safety procedures. Id. at 32–33.

Likewise, the violation of standard police protocols was pertinent to our analysis in Marrero-Rodríguez v. Municipality of San Juan, 677 F.3d 497 (1st Cir. 2012), a case in which we reversed in part a district court's 12(b)(6) dismissal of a complaint alleging substantive due process violations. Id. at 499. In that case, the estate of a deceased police sergeant, Carlos Lozada, brought suit after he was shot to death during a police training session that simulated the arrest of a suspect. Id. at 500–01. While Lozada played the role of a subdued suspect, lying prone on the ground with another officer holding him down by his back, a lieutenant walked into the simulation, declared that the training was not being done "properly," pulled out his weapon, put the barrel to Lozada's back, and pulled the trigger. Id. at 500. Finding that the plaintiff's factual allegations were sufficient to survive the motion to dismiss, we noted that the conduct of this lieutenant had violated several protocols, which stated that all officers must discharge their weapons in a sandbox before entering the training area, that officers must use only "dummy

guns" in the training facility, and that no firearms were to be used during this particular training session.  Id. at 500, 502.

The record here is devoid of any facts on whether the State Police officers' decision to leave a voice message for Lord -- despite Lord's foreseeable violent reaction; despite the fact that they were at the very outset of an investigation into allegations of violent assault, rape, and threats to kill; and without any effort to calm him down or prevent him from inflicting harm -- was in line with police protocol and training.[4]  More specifically, based on this record, we do not know the steps, if any, that officers should take when they have reason to believe that an alleged perpetrator is violent and is likely to retaliate against a victim who reports such serious crimes.  And as Stamps and Marrero-Rodríguez illustrate, violation of protocol and training is relevant both to the substantive due process and qualified immunity inquiries.

Beyond the dearth of facts on police procedure and training, the record also offers no facts on exactly what the officers knew about the veracity of the allegations that Irish had made, about Lord's propensity for violence, and about the risk

---

[4]   Cf. Kennedy, 439 F.3d at 1063 & n.3 (denying qualified immunity to an officer who had told the alleged perpetrator about complaints of child molestation against him, where the record evidence made clear that officers had received training that the best time to contact an offender is "[a]t the end of the investigation" with "all [the] facts in order").

that Lord would act on that propensity to harm Irish.  We do not know how much time the officers spent with Irish to go over her written statement that Lord had strangled, raped, and repeatedly threatened to kill her.  We do not know whether the officers contacted the local hospital for Irish's rape kit before alerting Lord about her accusations.  We do not know whether the State Police had prior experience with Lord.  We do not know whether the officers ran Lord's name through the system to check if he had a criminal record.  (In fact, the complaint alleges that Lord is a registered sex offender.)  We do not know whether they reached out to the BPD, which had referred Irish's case to the State Police.  (If they had done so, they might have learned that Irish had obtained a PFA order against Lord and was in the process of obtaining another one.)  We do not know whether the voice message was left on Lord's cell phone.  We do not know whether the officers made any attempt to find Lord after Irish reported that her parents' barn had been set on fire and that he had told his friend that "someone was going to die tonight" after receiving the officers' message.  We do not know if the officers felt they had probable cause to arrest Lord but nonetheless chose only to leave the voice message and, if so, the reasons for that decision.

All or some of the answers to these questions may be pertinent to the substantive due process and qualified immunity issues.  If discovery reveals that the officers' actions violated

accepted norms of police procedure or that they acted despite foreseeing the harm to Irish, it may strengthen the plaintiffs' argument that the officers exacerbated the danger that Lord posed. It may also directly speak to whether the officers acted in deliberate indifference to Irish's safety, so much so that their conduct shocks the conscience.

By contrast, if discovery reveals that no protocols were violated, then the plaintiffs may have a harder time surviving a 12(b)(6) motion.  While the fact that the officers did not take further discretionary steps to ensure Irish's safety may amount to negligence, mere negligence would be insufficient to maintain a claim of substantive due process violation.  See Cummings v. McIntire, 271 F.3d 341, 344 (1st Cir. 2001) ("[N]egligent conduct is 'categorically beneath the threshold of constitutional due process . . . .'" (quoting Lewis, 523 U.S. at 849)).  Similarly, if no or few protocols were violated, then the officers' chance of successfully asserting qualified immunity may increase, as a reasonable officer may not have known that acting in line with their own standard procedures and training would violate a private citizen's constitutional rights.  See Mlodzinski v. Lewis, 648 F.3d 24, 32 (1st Cir. 2011) (qualified immunity protects officers from liability "insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable

person would have known" (citation omitted)).  But we cannot reach any of these conclusions without a fuller development of the facts.

We  vacate  the  district  court's  ruling  as  to  the individual defendants and remand the case with instructions for discovery not  inconsistent  with  this  opinion.   No  costs  are awarded.