## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MAINE

| | |
|---|---|
| BRITTANY IRISH, Individually and as Personal Representative of the Estate of KYLE HEWITT, and KIMBERLY IRISH,<br><br>    Plaintiffs,<br><br>            v.<br><br>DETECTIVE JASON FOWLER, DETECTIVE MICAH PERKINS, and SERGEANT DARRIN CRANE,<br><br>    Defendants. | CIVIL ACTION NO.: 1:15-cv-00503-JAW |

## MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS JASON FOWLER, MICAH PERKINS AND DARRIN CRANE, WITH INCORPORATED MEMORANDUM OF LAW

On July 17, 2015, Anthony Lord ("Lord") shot and killed Kyle Hewitt ("Hewitt"), shot and wounded Kimberly Irish ("K. Irish") and (allegedly) abducted Brittany Irish ("B. Irish"). Plaintiffs allege that under principles of substantive due process, three members of the Maine State Police are responsible for the harm caused by Lord and are liable pursuant to 42 U.S.C. § 1983.  While normally state actors are not responsible for private harms, plaintiffs argue that defendants are liable because they allegedly promised to protect the plaintiffs from Lord and because they provoked Lord by supposedly leaving him a voice mail message advising him that B. Irish was accusing him of kidnapping and sexually assault.  This Court previously dismissed the lawsuit for failure to state a claim, but the First Circuit reversed, holding the further facts were necessary to determine whether plaintiffs stated a substantive due process claim and, if they

had, whether the defendants are entitled to qualified immunity.  *Irish v. Maine*, 849 F.3d 521 (1st Cir. 2017).

Now that discovery is complete, the undisputed facts demonstrate that defendants are entitled to summary judgment pursuant to Fed. R. Civ. P. 56.  Much of the First Circuit's decision is premised on the assumption (as is appropriate on a motion to dismiss) that the plaintiffs' allegations were true.  Discovery has revealed that many of their allegations are demonstrably false.  B. Irish never took out a protection from abuse order against Lord.  In the days leading up to the alleged kidnapping and sexual assault, she did not feel threatened by him or rebuff his efforts to have a romantic relationship with her.  To the contrary, she and Lord were involved in a consensual sexual relationship, and, on the very day of the alleged attack, she told Lord that she loved him and wanted to have a baby with him.

Neither in two interviews with the police nor in her written statement did B. Irish claim that Lord had threatened to hurt her if she went to the police or ask the police to refrain from contacting him.  In fact, during one interview, which was recorded, when one defendant told B. Irish that he was going to call Lord, the only concern she expressed was that Lord might not answer the phone.  B. Irish claims that the first time she voiced apprehension about the police contacting Lord was when she encountered one of the defendants in a parking lot.  Even crediting such a dubious claim, though, this occurred <u>after</u> another defendant had already left the message for Lord.  It is undisputed that the defendant who left the message did not say why he wanted to talk to Lord or suggest that B. Irish was making accusations against him.  Indeed, Lord thought the police were calling him about the death of his son.  There is no evidence that leaving a message seeking to interview a suspect violates training or protocols or is otherwise poor police practice.

2

Given these undisputed facts, plaintiffs cannot establish a substantive due process claim. Defendants never promised to protect plaintiffs, but, even if they had, the Supreme Court and the First Circuit have held that a promise of protection does not give rise to a constitutional duty to protect. The "state-created danger" claim fails because the only affirmative action the defendants took was to place a call to Lord asking to speak with him. Now that the relevant facts have been established regarding the circumstances of this call, it is clear that such a routine investigatory action cannot form the basis for a state-created danger claim. Nor did the defendants engage in conscience-shocking behavior, as is necessary to prevail on a substantive due process claim. Rather, the undisputed facts demonstrate that the defendants acted appropriately under the circumstances. Finally, even if the plaintiffs could establish a substantive due process violation, the defendants are entitled to qualified immunity. The First Circuit has never recognized the state-created danger theory, and there is no case that would have put the defendants on notice that they were committing a constitutional violation by contacting Lord by phone in an effort to interview him. In further support, defendants rely upon the following Memorandum of Law:

## **MEMORANDUM OF LAW**

### **Undisputed Facts**

#### ***Brittany Irish, Kyle Hewitt, and Anthony Lord***

Since March 2014, B. Irish lived with her boyfriend, Hewitt in an apartment in Bangor. Defendants' Statement of Undisputed Material Facts ("DSUMF"), ¶ 3. Hewitt moved out of the apartment in early June 2015, but he had moved back in as of July 10, 2015. *Id*., ¶ 4. For at least part of the time while B. Irish was living with Hewitt, B. Irish was romantically involved with

3

Lord. *Id.*, ¶ 6. She was briefly romantically involved with him in 2013, and she then became involved with him again starting in late April or May of 2015. *Id.*, ¶¶ 5-6.

B. Irish's allegations in the complaint that she was in only a "friendship relationship" with Lord in 2015 and that she rebuffed his efforts to make the relationship intimate are false. Second Amended Complaint (Docket Item 38), ¶¶ 15-16. For example, Lord spent the night at B. Irish's house on June 30, 2015 (while Hewitt was away) and, as of July 12, 2015, she wanted to spend the rest of her life with Lord. Stipulated Facts, ¶¶ 2-3. B. Irish testified that as of July 14, 2015 (the day when she claims that Lord kidnapped and sexually assaulted her), she was "probably" having sex daily with Lord. DSUMF, ¶ 10. [1] At 3:13 p.m. on June 14, B. Irish sent Lord a text message stating that she wanted to have a baby with him. Stipulated Facts, ¶ 5.

### The Evening of July 14 and Morning of July 15, 2015

At approximately 5:00 p.m. on July 14, 2015, B. Irish arrived at the house of her friend, Amber Adams ("Adams"). DSUMF, ¶ 11. At 7:04 p.m., B. Irish sent Lord a text message telling him that she was probably going to come see him that night. *Id.*, ¶ 12. At 8:15 p.m., B. Irish sent Lord a text message telling him that she loved him. Stipulated Facts, ¶ 6. At 8:43 p.m., B. Irish sent Hewitt a text message telling him that she was not going to visit Lord that night, but, as B. Irish has now admitted, she was lying to Hewitt inasmuch as she was planning on visiting Lord that night. DSUMF, ¶ 13. At a little after 10:00 p.m., B. Irish left Adams' house to drive to an IGA store in Orono to meet Lord. *Id.*, ¶ 14. B. Irish spoke on the phone with Lord the entire time while she was driving to meet him. *Id.*, ¶ 15.

---

[1] It is also not true, as is alleged in the complaint, that in 2011, B. Irish took out a protection from abuse order against Lord on behalf of both herself and her son. Second Amended Complaint (Docket Item 38), ¶ 10. B. Irish never applied for a protection from abuse order or protection from harassment order against Lord. *Id.*, ¶ 9. Rather, her parents applied for an order, and it was not because of anything Lord had done or that her parents had witnessed. *Id.*, ¶ 7. Rather, it was because B. Irish's father had learned that Lord was a registered sex offender, and he was concerned about Lord being around B. Irish, who was then underage and had a young son. *Id.*, ¶ 8.

4

When B. Irish met Lord at the IGA that night (July 14, 2015), she told him that she had a kidney infection, and Lord offered to drive her in his car to the hospital emergency room in Lincoln. Stipulated Facts, ¶ 7. B. Irish left her car in the IGA parking lot and got into Lord's car. *Id.*, ¶ 8. B. Irish subsequently reported that instead of taking her to the emergency room, Lord drove her to 1) a gravel road in or near Benedicta where he choked her with a seatbelt and sexually assaulted her; 2) a cabin where he bound her hands behind her back with window blind cords and sexually assaulted her; and 3) a second cabin where he sexually assaulted her. *Id.*, ¶ 9. The next morning (July 15, 2015), Lord dropped off B. Irish at her car in the IGA parking lot, and the two then drove in separate cars to a Verizon store on Stillwater Avenue in Bangor. *Id.*, ¶ 10. Lord and B. Irish entered the Verizon store at approximately 10:30 a.m. and left at approximately 10:47 a.m. *Id.*, ¶ 11. At 11:54 a.m., B. Irish sent Lord a text message telling him that she loved him. *Id.*, ¶ 12. She placed calls to Lord at 12:50 p.m., 12:52 p.m., 12:54 p.m., and 6:50 p.m. *Id.*, ¶ 16.

### The Police Interview B. Irish at the Hospital

On July 15, 2015, Adams drove B. Irish to St. Joseph's Hospital to have a rape kit done. *Id.*, ¶ 13. Maine State Police ("MSP") Detectives Micah Perkins ("Perkins") and Jason Fowler ("Fowler") met B. Irish at the hospital at 4:34 p.m. DSUMF, ¶ 16. Perkins asked B. Irish to complete a written statement, but she told Perkins that she was tired and did not want to write out a statement at that time. *Id.*, ¶ 17. B. Irish told Perkins and Fowler that she and Lord had been dating for two or three months but that the relationship had ended a few weeks before. *Id.*, ¶ 18. She said that the previous evening (July 14, 2015), she met with Lord in the parking lot of an IGA store in Orono to exchange some personal items. *Id.*, ¶ 19. She claimed that Lord then took her to a camp in Benedicta, where he tied up her wrists behind her back with window blind cord,

bound her feet with window blind cord, and tied B. Irish's feet to a bed, and then left for a while before returning and unbinding her. *Id.*, ¶ 20. Fowler could clearly see both of B. Irish's wrists, and he did not observe any marks on her wrists, as he would have suspected had her wrists been bound in the manner she described. *Id.*, ¶ 21. B. Irish told Perkins and Fowler that Lord dropped her off at her car at the IGA parking lot around between 11:00 and 11:15 a.m. on July 15, 2015, and that she then drove home to her apartment in Bangor. *Id.*, ¶ 22. B. Irish did not disclose to Perkins and Fowler that after Lord dropped her off at her car at the IGA parking lot, she and Lord drove in separate cars to a Verizon store on Stillwater Avenue in Bangor. *Id.*, ¶ 23.[2]

Perkins asked B. Irish to provide him with her clothes so that they could be examined for evidence, but she declined to do so, stating that the detectives would not find any evidence on the clothes. *Id.*, ¶ 24. Perkins and Fowler asked B. Irish to come to the police barracks the following day and bring with her a written statement and the clothes she was wearing at the time of the alleged assault. *Id.*, ¶ 27. At no point during the interview at the hospital on July 15 did B. Irish express any concern that Lord might hurt her or her children if he found out that she had reported him to the police, nor did B. Irish ask Perkins and Fowler to not contact Lord. *Id.*, ¶ 28.

### *Perkins and Fowler Investigate B. Irish's Allegations During the Night of July 15*

At 5:39 p.m. on July 15, Perkins and Fowler left the hospital and drove toward Benedicta in an effort to locate the two camps in which B. Irish claimed she had been sexually assaulted. *Id.*, ¶ 29. While en route, Perkins contacted two members of the MSP's Evidence Response Team, briefed them on the case, told them that he and Fowler were going to attempt to locate the

---

[2] Video surveillance taken from the store showing Lord and B. Irish entering, sitting together, and leaving was produced by the defendants in discovery, and B. Irish has now admitted that she made this excursion with Lord (just after he had allegedly kidnapped and sexually assaulted her). The fact that B. Irish drove in her own car to the store and entered the store at 10:30 a.m. necessarily means that B. Irish was not dropped off at her car between 11:00 and 11:15 a.m., as she told Perkins and Fowler.

camps, and requested that they go to the camps in the morning and process them for evidence. *Id.*, ¶ 30.

At 8:10 p.m., Perkins and Fowler located what they suspected was the gravel road where B. Irish had said the seatbelt strangulation and first sexual assault took place, and Perkins took photographs of tire tracks. *Id.*, ¶ 31. At 8:25 p.m., Perkins and Fowler and located what they suspected was the first of the two camps described by B. Irish, and Perkins took interior and exterior photographs, including photographs of two fingerprints on a window which Perkins later learned (after the events of July 16 and 17) belonged to Lord. *Id.*, ¶ 32. At 9:25 p.m., Perkins and Fowler went to the home of Warden Seth Powers in Benedicta, and Warden Powers provided them with information to help them find the second camp. *Id.*, ¶ 33. At 10:20 p.m., Perkins and Fowler located a camp road that they suspected was the one described by B. Irish leading to the second camp, but because it was dark they were not able to locate the camp. *Id.*, ¶ 34. Perkins arrived back home at 1:00 a.m. on July 16, 2015. *Id.*, ¶ 35.

### Irish Completes a Written Statement and Perkins and Fowler Interview B. Irish and Adams on July 16

On July 16, 2015, B. Irish placed telephone calls to Lord at 9:23 a.m., 9:52 a.m., and 10:58 a.m. Stipulated Facts, ¶ 17. At 1:00 p.m., B. Irish went to the office of the MSP's Major Crimes Unit ("MCU") in Bangor and was met there by Adams, who was then one of B. Irish's best friends. DSUMF, ¶¶ 36-37. B. Irish had not completed her written statement, as Perkins and Fowler had requested. *Id.*, ¶ 38. Perkins and Fowler gave B. Irish time to complete the statement at the MCU office, and, while she was doing that, Perkins and Fowler conducted a recorded interview of Adams. *Id.*, ¶¶ 39-40.

Adams told Perkins and Fowler that B. Irish is a "pathological liar," that she does not believe any of what B. Irish was saying about being sexually assaulted by Lord, and that she

thinks B. Irish was making up the story because she was afraid that her boyfriend, Hewitt, would leave her if he learned that she voluntarily had sex with Lord. *Id*., ¶ 41. Adams stated that B. Irish and Hewitt had been together for four years but that B. Irish had been cheating on him with Lord the entire time. *Id*., ¶ 42. Adams said B. Irish had sex with Lord two days before the alleged assault and that earlier that very day, B. Irish had told Lord both over the phone and via text messages that she loved him. *Id*., ¶¶ 43-44.

Adams showed Perkins and Fowler text messages she had exchanged with Hewitt on July 15, 2015 while Adams was at St. Joseph's Hospital with B. Irish. *Id*., ¶ 45. In one text, Hewitt states: "I want to believe her [Brittany] . . . But I don't." *Id*., ¶ 46. In another text message, Hewitt states: "I want to believe . . . it's just really hard, especially with no marks. . ." *Id*., ¶ 47. In another text message, after Adams tells Hewitt that a pregnancy test done at the hospital showed that B. Irish was probably not pregnant, Hewitt responds: "Lol. She lies." *Id*., ¶ 48. At 4:00 p.m., while Perkins was on his way to check on whether B. Irish had completed her written statement, Adams saw Perkins and told him that the statement B. Irish was writing was different than the story that B. Irish had told the detectives, Adams, and the hospital nurse. *Id*., ¶ 49.

Shortly after 4 p.m. on July 16, B. Irish completed her written statement, which totaled ten pages. *Id*., ¶ 50. B. Irish tried to include all of the details she thought were important that she could remember. *Id*., ¶ 51. Perkins reviewed the written statement before interviewing B. Irish. *Id*., ¶ 52. In her written statement, B. Irish made no reference to Lord having threatened to hurt her or her children if she went to the police. *Id*., ¶ 53.

Starting at 4:24 p.m., Perkins and Fowler conducted a recorded interview of B. Irish. *Id*., ¶ 54. Within the first three minutes of the interview, Perkins told B. Irish that he needed to obtain a statement from Lord and that his goal was to get the statement that evening. *Id*., ¶ 55.

8

B. Irish told Perkins that she could get Lord to meet her somewhere, as long as someone was with her. *Id.*, ¶ 56. Perkins told B. Irish:

> "Well, you know, ultimately, he's either going to meet with us or he's not. So the way I look at is, you know, I have no problem calling his cellphone and saying 'Hi, I am Detective Perkins. I'm investigating a case. It's really important that you come over here so that we can speak. And he can say 'no thank you' and if he does, he does. I mean, we'll carry on. Obviously, we can't make him make a statement he doesn't want to make."

*Id.*, ¶ 57. When Perkins told B. Irish that he was planning on calling Lord on his cellphone, B. Irish expressed the view that Lord might not answer the phone, but she did not at that time say anything about Lord having threatened to hurt her if he found out she had gone to the police. *Id.*, ¶ 58. B. Irish provided Perkins with Lord's cell phone number. *Id.*, ¶ 59.

Perkins and Fowler concluded their interview at 5:00 p.m., and B. Irish left the MCU office shortly after that. *Id.*, ¶ 60. B. Irish testified that when she left the police barracks, she understood that Perkins would be calling Lord on his cell phone. *Id.*, ¶ 61. At no point during the interview or at any other point while she was at the MCU office prior to her 5:00 p.m. departure did B. Irish express concern about Perkins and Fowler contacting Lord or request that they not contact him, nor did she say anything about Lord having threatened to hurt her or her children if she went to the police. *Id.*, ¶¶ 62-63.

### *Perkins Makes a Recorded Phone Call to Lord*

Perkins placed a recorded telephone call to Lord's cell phone at 6:17 p.m. on July 16, 2015. *Id.*, ¶ 64. When Lord did not answer the phone, Detective Perkins left the following voice mail message for Lord:

> Hello, Anthony. This is Detective Perkins. I'm giving you a call here from the Maine State Police. I'm looking to see if there's a time that we could speak with you. Phone number you can call us back – the dispatch – is 973-3700. 973-3700. I'll be right here. Just let them know Detective Perkins if you don't mind calling

back and I will try you back in a few moments.  Thank you.
Goodbye.

*Id.*, ¶ 65.  Lord never called Perkins back, and it is undisputed that Lord believed the call related to the death of his son.  *Id.*, ¶¶ 66-73.  First, Lord later told Perkins that he thought it was a Detective Pickering who had left the message.  *Id.*, ¶ 68.  Second, Lord did in fact call Pickering just 20 minutes after Perkins left the message.  *Id.*, ¶ 72.[3]

### *For the First Time, B. Irish Expresses Concern About the Police Contacting Lord*

At 6:30 p.m. on July 16, 2015, B. Irish returned to the MCU office to turn over the clothes she had been wearing at the time of the alleged sexual assault.  *Id.*, ¶ 74.  B. Irish met Fowler in the parking lot.  *Id.*, ¶ 75.  B. Irish testified that the <u>first</u> time that she told the police that she was afraid that Lord would hurt her if the police contacted him was during this second visit when she spoke with Fowler in the parking lot.  *Id.*, ¶ 76.  Thus, she expressed her concern only <u>after</u> Perkins had left a message for Lord.[4]

### *Perkins and Fowler Interview Hewitt and Shahan*

At approximately 6:45 p.m. on July 16, Perkins and Fowler conducted a recorded interview of Hewitt.  *Id.*, ¶ 77.  Hewitt stated that while he and B. Irish were together, B. Irish had lied to him about her relationship with Lord.  *Id.*, ¶ 78.  At 7:28 p.m., Perkins and Fowler conducted a recorded interview of Kimberly Shahan ("Shahan"), who, at the time, was one of B. Irish's best friends.  *Id.*, ¶¶ 79-80.  Shahan stated that it would not be unusual for B. Irish to take

---

[3] In May 2015, MSP Detective Thomas Pickering was one of the detectives investigating the death of Lord's son, Larry Earl Lord.  *Id.*, ¶ 70.  On May 6 or 7, 2015, Pickering gave Lord his business card with his cell phone number written on it.  *Id.*, ¶ 71.  At 6:37 p.m. on July 16, 2015, Lord called Pickering at that number.  *Id.*, ¶ 72.  Pickering called Lord back, but Lord did not answer.  *Id.*, ¶ 73.

[4] To be clear, defendants dispute that B. Irish ever expressed a concern about them calling Lord.  If she really had such a concern, the obvious time to express it would been when Perkins told her during the recorded interview that he planned on calling Lord that evening.  B. Irish admits (as she must inasmuch as the interview was recorded) that she did not express any concern at that time.  Rather, she claims she first expressed the concern in a one-on-one unrecorded conversation with Fowler in a parking lot.  While defendants dispute that she expressed this concern during this alleged encounter, they take it as true for purposes of this motion.

off for a night with Lord, and she expressed skepticism about the truth of B. Irish's sexual assault allegations, saying that "there were so many things that aren't adding up." *Id.*, ¶ 81.

### *Perkins and Fowler Learn of the Barn Fire and Go to Benedicta to Search for Lord*

At 8:05 p.m. on July 16, Perkins received a telephone call from an MSP detective advising him that a barn was on fire in Benedicta. *Id.*, ¶ 82. Perkins and Fowler then begin driving the 75 miles from Bangor to Benedicta. *Id.*, ¶ 83. At approximately 8:30 p.m., B. Irish's father called her to tell her that the barn at the house of B. Irish's mother, Kimberly Irish ("K. Irish"), in Benedicta was on fire, and B. Irish and Hewitt began to drive from Bangor to Benedicta. *Id.*, ¶¶ 84-85. At 9:24 p.m., Perkins spoke with B. Irish by phone, and she told Perkins that someone had heard that Lord had recently left his uncle's house saying, "I am going to kill a fucker." *Id.*, ¶ 86.

At approximately 9:30 p.m. on July 16, 2015, MSP Sergeant Darrin Crane ("Crane") called an Assistant District Attorney, briefed him on the information Perkins and Fowler had gathered while investigating B. Irish's allegations, and told him that Lord might be a suspect in the barn fire. *Id.*, ¶ 87. The ADA told Crane that there was not probable cause to arrest Lord with respect to the kidnapping and sexual assault and that more evidence would need to be gathered. *Id.*, ¶ 88.

At approximately 10:00 p.m. on July 16, Crane joined in the search for Lord. *Id.*, ¶ 89. Crane instructed two MSP troopers to go to the residence of Lord's mother in Houlton, but they reported that no one answered the door. *Id.*, ¶ 90. At 10:05 p.m., Perkins requested issuance of a state-wide teletype for a "stop and hold" of Lord, and Perkins provided information regarding the vehicle Lord was likely driving and instructions to contact Perkins if Lord was located. *Id.*, ¶ 91.

At 10:12 p.m., Crane told Perkins over the phone that he had briefed an ADA, and that the ADA had said that he would not authorize Lord's arrest for kidnapping and sexual assault because there was not probable cause. *Id.*, ¶ 92.

At 10:36 p.m. on July 16, Perkins and Fowler arrived at the scene of the barn fire. *Id.*, ¶ 93. Perkins immediately requested that a K9 unit be dispatched to the scene to look for a track. *Id.*, ¶ 94. At 11:49 p.m. and again at 11:58 p.m., Perkins spoke with Lord's probation officer and learned that Lord's last known residence was in a camper on his uncle's property in Crystal. *Id.*, ¶ 95. At approximately 12:30 a.m. on July 17, 2015, Crane, Perkins, Fowler and an MSP trooper went to Lord's uncle's house, but the uncle advised the officers that Lord had been gone for at least two weeks. *Id.*, ¶ 97. Around 1:00 a.m., Perkins called the Bangor Police Department to confirm that they had received the "stop and hold" teletype about Lord, and Perkins requested that they send a police officer to Acadia Hospital to see if Lord had gone there. *Id.*, ¶ 99. Until approximately 3:00 a.m., Perkins and Fowler continued to search the area for Lord. *Id.*, ¶ 102.

### B. Irish and K. Irish Request Protection

At around midnight on July 16, 2015, B. Irish requested of Perkins that officers be placed at her mother's house for security and that she planned on staying there for the night. *Id.*, ¶ 96. Shortly before 1:00 a.m. on July 17, Perkins told Crane about B. Irish's request for overnight security, and Crane informed Perkins that there was not sufficient manpower to do that. *Id.*, ¶ 97. At approximately 2:00 a.m., Perkins told B. Irish that he had spoken with his supervisor (Crane) about her request for overnight security and that he told Perkins that they did not have the manpower to do so. *Id.*, ¶ 100. Perkins made clear to B. Irish that there would not be any overnight security at her mother's house. *Id.*, ¶ 101.[5]

---

[5] For purposes of this motion, defendants take as true K. Irish's claims that she requested assistance from unidentified members of the MSP by asking them to place an officer at her house for the night and/or to leave a

At some point during the early morning of July 17, B. Irish's mother, K. Irish, called the "800 number" for the MSP and spoke with either the person who answered the phone or with someone else to whom she was transferred.  Stipulated Facts, ¶ 20.  K. Irish told the person that she was going to bring her family down to the police station and park in the parking lot.  *Id.*, ¶ 21.  The person told K. Irish not to do that and said "if you have any problems, just call us. . . . [W]e've got officers in the vicinity and . . . we'll take care of it but . . . don't leave the house, that would be a dangerous mistake."  *Id.*, ¶¶ 22-23.  The person with whom K. Irish spoke was not Crane, Perkins or Fowler.  DSUMF, ¶ 103.

Subsequently, in the early morning of July 17, 2015, Lord entered the house, shot and killed Hewitt, shot and wounded K. Irish, and abducted B. Irish.  Stipulated Facts, ¶ 24.  Lord was arrested that afternoon.  *Id.*, ¶ 25.  At no time while B. Irish was with Lord on July 16 and July 17 did he express anger over her having gone to the police.  DSUMF, ¶ 104.

## <u>Argument</u>

Plaintiffs bring a claim pursuant to 42 U.S.C. § 1983, alleging that the defendants violated the plaintiffs' substantive due process rights by failing to protect them from Lord.  As the plaintiffs readily acknowledge, "the State's failure to protect an individual against private violence does not ordinarily constitute a constitutional violation. . . ."  Second Amended Complaint (Docket Item 38), ¶ 43.  This principle was established in *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989).  There, a young boy was severely beaten by his father.  *Id.*, at 193.  The boy's mother sued various social workers and other officials, arguing that they were aware that the boy was being abused, that they did nothing to protect the boy, and that "their failure to act deprived him of his liberty in violation of the Due Process Clause. . . ."

---

police car at the house as a deterrent.  The unidentified officers told K. Irish that they did not have the manpower to do the former and could not do the latter.  Stipulated Facts, ¶¶ 18-19.

*Id.*, at 191.  The Court rejected this argument, finding that as a "general matter," "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *Id.*, at 197.

Plaintiffs nevertheless claim that for two reasons, the defendants are responsible for the harm caused by Lord.  First, they argue that the defendants owed them a "special duty" because they promised to protect the plaintiffs, the plaintiffs relied upon the promise, the defendants failed to fulfill the promise, and the plaintiffs were injured.  Second Amended Complaint, ¶ 45.  Second, they argue that the defendants created the harm posed by Lord and are therefore liable under the so-called "state-created danger" theory.  *Id.*, ¶ 43.  Both arguments fail.  And, in any event, the undisputed facts demonstrate that defendants did not engage in any "conscience-shocking" conduct, which is a necessary element of a substantive due process claim.

### *Defendants Never Promised to Protect Plaintiffs, But Even If They Did, Promises to Protect Do Not Give Rise to a Constitutional Duty to Protect.*

It is undisputed that no defendant ever made a promise to protect the plaintiffs.  To the contrary, the plaintiffs have stipulated that when K. Irish asked members of the MSP whether an officer could stay at the house, she was told that the MSP did not have the manpower to do that.  Stipulated Facts, ¶ 18.  The plaintiffs also stipulated that when K. Irish asked members of the MSP whether a police car could be left at the house to deter Lord, she was told the MSP could not do that.  *Id.*, ¶ 19.  B. Irish testified that she was also told that the MSP did not have the manpower to provide protection.  DSUMF, ¶ 100.  Perkins made clear to B. Irish that there would be no overnight security at the house.  *Id.*, ¶ 101.

Plaintiffs may argue that the MSP promised protection when K. Irish spoke on the phone with an unidentified person who told her that there were officers "in the vicinity" and that if there was trouble, they would "take care of it."  Stipulated Facts, ¶ 23.  Given the undisputed

14

facts that defendants expressly told plaintiffs that they could not provide overnight security or station a car at the house, it is impossible to see how such a vague statement constitutes a promise.[6]  And, in any event, whoever the person may have been who made this statement, it was not one of the defendants.  DSUMF, ¶ 103.  Nor is there evidence in the record suggesting that any defendant knew at the time that someone had said this to K. Irish.  In short, it is undisputed that no defendant ever promised to protect the plaintiffs or was aware of a promise.

More fundamentally, though, promises to protect do not give rise to a constitutional duty to protect.  In *DeShaney*, the Supreme Court rejected the mother's argument that a "special relationship" is created when the State is aware that a person is in danger and proclaims its intent to protect the person.  *Id*., at 197-201.  The Court stated: "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."  *Id*., at 200.  Relying on *DeShaney*, the First Circuit has rejected the argument that a duty to protect against private harm arises when state actors are aware of a private danger to a person, promise to protect the person, the person relies on the promise, and the state actors fail to keep the promise, resulting in the person's death.  *Rivera v. Rhode Island*, 402 F.3d 27, 37-38 (1st Cir. 2005) (no duty to protect where state actors allegedly promised to protect witness if she agreed to testify against murder suspect).  In sum, *DeShaney* and *Rivera* foreclose plaintiffs' argument that a promise to protect gives rise to a duty.

---

[6] In its earlier decision on defendants' motion to dismiss, this Court stated:  "The Court is doubtful whether, even assuming the facts alleged in the Complaint are true, the statement by the state police may be fairly construed as a promise of protection, especially given that the state police also allegedly stated that 'they could not even spare a car' to park outside of the house overnight as a 'ruse' to 'keep Lord away.'"  *Irish v. Maine*, 2016 WL 4742233, at *9 (D. Me. Sept. 12, 2016).

### Under the Undisputed Facts, the Defendants Are Not
### Liable Under a "State-Created Danger" Theory.

In holding that the State had no duty to protect from private harms, the *DeShaney* Court noted that "while the State may have been aware of the dangers . . . ., it played no part in their creation, nor did it do anything to render him any more vulnerable to them."  489 U.S. at 201. The Court thereby "suggested, but never expressly recognized, the possibility that liability might arise where the state creates or substantially contributes to the creation of a danger."  *Velez-Diaz v. Vega-Irizarry*, 421 F.3d 71, 80 (1st Cir. 2005).  "While [the First Circuit] has discussed the possible existence of the state-created danger theory, [it has] never found it applicable to any specific set of facts.  *Irish*, 849 F.3d at 526 (emphasis added).

Assuming for purposes of this motion that the First Circuit is prepared to recognize the state-created danger theory, it applies only if, among other things, state actors have taken affirmative acts to create or exacerbate the danger posed by third parties.  *See Ramos-Pinero v. Puerto Rico*, 453 F.3d 48, 55 n.9 (1st Cir. 2006) ("To the extent plaintiffs attempt to ground liability in the so-called 'state-created danger' theory, the absence of an affirmative act by the state in creating the danger is fatal to the claim.");  *Rivera*, 402 F.3d at 35.  Here, the only possible affirmative act is the voice mail message Perkins left for Lord on July 16, 2015, which plaintiffs claim triggered Lord to commit various acts of violence during the early morning of July 17.  As an initial matter, though, there is no evidence in the record upon which a trier of fact could reasonably conclude that the message was the trigger.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  B. Irish has admitted that Lord thought the message was about the death of his son.  DSUMF, ¶ 66.[7]  As discussed above, Lord has stated that he thought the message related to his son, and he called back not Perkins, who had left the message, but a

---

[7] B. Irish has moved to amend this admission, but even if the motion is granted, it will still be undisputed that Lord thought the message was about his son.

different detective involved in the investigation of his son's death.  There is nothing suggesting that Lord thought that Perkins was calling about B. Irish's kidnapping and sexual assault allegations, and B. Irish has admitted that Lord never expressed anger at her for having gone to the police.

Even if the message was the trigger, though, it is not the kind of affirmative action that can form the basis of a state-created danger claim.  In *Rivera*, a fifteen-year-old girl witnessed a murder and "was continually threatened with death if she agreed to testify as to the murder she witnessed."  402 F.3d at 31.  Prosecutors and police officials were aware of these threats, and they promised to protect the girl.  *Id.*, at 31-32.  As a result of these promises, the girl agreed to testify, and she was later shot to death to prevent her from testifying.  *Id.*, at 32.  The girl's mother subsequently brought a Section 1983 claim alleging a state-created danger theory, claiming that police officers and prosecutors created the danger by securing the girl as a witness, compelling her testimony, and providing her with "false assurances of protection upon which she relied" in agreeing to testify.  *Id.*, at 37.

The First Circuit affirmed the district court's dismissal of the action for failure to state a claim.  As discussed above, the Court rejected the mother's argument that the alleged promises to protect her daughter gave rise to a constitutional duty to protect her.  *Id.*, at 37-38.[8]  The court also rejected the mother's argument that defendants' actions in identifying her daughter as a witness and taking a statement from her enhanced the danger to her and gave rise to a state-created danger claim.  *Id.*, at 37.  The Court stated: "Both are necessary law enforcement tools, and cannot be the basis to impose constitutional liability on the state."  *Id.*; *see also Morgan v.*

---

[8] The court noted that "[t]he Supreme Court has said that only in very rare situations will the state's failure to protect someone amount to a constitutional violation, even if the state's conduct is grossly negligent," and "has cautioned that '[t]he doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever [they] are asked to break new ground in this field.'"  *Id.*, at 30-31 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

*Town of Lexington, MA*, 823 F.3d 737, 744 (1st Cir. 2016) ("These routine acts of school discipline, truancy enforcement, and administrator-parent conferences are not the vehicle for a substantive due process constitutional claim.") (citing *Rivera*, 402 F.3d at 37).  Similarly, the Court rejected the mother's argument that defendants increased the risk to her daughter by issuing her a subpoena to testify at trial:

> While requiring [the daughter's] testimony may in fact have increased her risk, issuance of a subpoena did not do so in the sense of the state created danger doctrine. Every witness involved in a criminal investigation and issued a subpoena to testify in a criminal proceeding faces some risk, and the issuance of a subpoena cannot become the vehicle for a constitutional claim against a state.

*Rivera,* 402 F.3d at 37.

Seeking to interview an alleged perpetrator of a sexual assault is just as much a "necessary law enforcement tool" as was taking a witness statement in *Rivera*.  Police officers can hardly be expected to not follow up on such serious accusations.  The court in *Rivera* acknowledged that while witnesses involved in criminal investigations face some risk, police do not violate principles of substantive due process when they nevertheless proceed with their investigations.  Here, then, Perkins did not violate those principles when he called Lord and left a message asking Lord to speak with him.

The basis for the First Circuit's conclusion that further facts are needed to determine whether *Rivera* controls is not clear.  It may be, though, that the court determined that whether a law enforcement tool can form the basis for a state-created danger claims depends to some extent on whether the tool was reasonably used.  While defendants do not agree with that proposition, the undisputed facts demonstrate that it was entirely reasonable for the defendants to leave a message for Lord.  The First Circuit questioned whether defendants violated "standard police protocols" or their training.  Irish, 849 F.3d at 526-27.  There is no evidence in the record

18

suggesting that leaving a message for a suspect violates training or protocols.  To the contrary, plaintiffs' own expert testified that it depends on the circumstances as to whether it is acceptable to call a suspect on the phone and ask him to come meet with the police.  DSUMF, ¶ 105.  The expert further testified that there is no standard of care, MSP policy or protocol, or standard promulgated by the International Association of Chiefs of Police addressing when officers should or should not contact a suspect by telephone.  *Id.*, ¶¶ 106-108.

The First Circuit questioned whether the defendants could have foreseen that leaving a message for Lord would result in harm to B. Irish.  *Irish*, 849 F.3d at 527-28.  The First Circuit assumed the truth of B. Irish's allegation that defendants disclosed in the message to Lord that B. Irish was accusing him of sexual assault.  *Id.*, at 526.  The undisputed fact is that defendants did not disclose this.  DSUMF, ¶ 65.  It is also now undisputed, contrary to what B. Irish alleged and the First Circuit assumed to be true, that defendants left the message for Lord after B. Irish had "plead" with them not to do so because it would incite Lord to "terrible violence."  *Irish*, 849 F.3d at 524, 526.  Even crediting B. Irish's parking lot story, she did not tell the defendants to refrain from calling Lord until <u>after</u> Perkins had already left Lord a message.  DSUMF, ¶¶ 64-65, 74-76.  And it is undisputed that B. Irish did not tell the defendants that Lord had threatened to cause harm if she went to the police when they interviewed her at the hospital, in her detailed written statement, or during her recorded interview.  *Id.*, ¶¶ 28, 53, 63.  Indeed, it is undisputed that when Perkins told B. Irish that he was going to call Lord, the only concern she expressed was that Lord might not answer the phone.  *Id.*, ¶ 58.  In fact, she gave Lord's cell phone number to Perkins.  *Id.*, ¶ 59.  In sum, under the undisputed facts, harm from leaving a message was not foreseeable.

19

There is extensive evidence regarding what the defendants knew about "the veracity of the allegations that Irish had made." *Irish*, 849 F.3d at 528.  When Perkins and Fowler first met with B. Irish, she would not complete a written statement or give them her clothes.  DSUMF, ¶¶ 17, 24.  Fowler did not observe any marks on B. Irish's wrists, as he would have expected had her wrists been bound in the manner she described.  *Id.*, ¶ 21.  One of B. Irish's best friends, Adams, told Perkins and Fowler that B. Irish was a "pathological liar" and was making up the story about Lord sexually assaulting her because she was afraid that her boyfriend, Hewitt, would leave her if he knew the truth.  *Id.*, ¶ 41.[9]  Adams showed Perkins and Fowler text messages from Hewitt in which he stated that he did not believe B. Irish's allegations.  *Id.*, ¶¶ 45-48.  When Perkins and Fowler interviewed Hewitt and Shahan (another of B. Irish's best friends), they both expressed skepticism about B. Irish's allegations.  *Id.*, ¶¶ 77-81.

The First Circuit noted that it is not known "whether the officers contacted the local hospital for Irish's rape kit before alerting Lord about her accusations."  *Irish*, 849 F.3d at 528.  Of course, as discussed above, it is undisputed that the officers did <u>not</u> alert Lord to B. Irish's accusations.  That said, rape kits are analyzed by the MSP Crime Laboratory and it takes some time to get the results.  DSUMF, ¶ 25.  Perkins did not have the results prior to contacting Lord, and the medical providers at the hospital did not advise him of any findings they made during their examination of B. Irish relevant to whether a sexual assault had occurred.  *Id.*, ¶¶ 25-26.

Discovery has demonstrated that defendants went to extensive efforts to locate Lord after they learned of the barn fire.  All three defendants – Perkins, Fowler and Crane – went to the scene to look for Lord.  *Id.*, ¶¶ 89, 93, 102.  Crane dispatched troopers to the home of Lord's mother.  *Id.*, ¶ 90.  Perkins issued a state-wide "stop and hold" for Lord.  *Id.*, ¶ 191.  Perkins

---

[9] Adams also told Perkins and Fowler that B. Irish had sex with Lord two days before, while B. Irish had told them that the relationship ended a few weeks previously.  *Id.*, ¶ 18, 43.

requested that a K9 unit look for tracks at the scene of the fire. *Id*., ¶ 94. Perkins called Lord's probation officer, learned his last known residence, and, along with Fowler, Crane and a trooper, went to the residence to look for Lord. *Id*., ¶¶ 95-96. Perkins ensured that the Bangor Police Department had received the "stop and hold," and he asked them to look for Lord at Acadia Hospital. *Id*., ¶ 99. Perkins and Fowler continued to search for Lord until 3:00 a.m. on July 17, 2015. *Id*., ¶ 102.

The First Circuit queried whether defendants had probable cause to arrest Lord. *Irish*, 849 F.3d at 528. It is undisputed that Crane called an Assistant District Attorney and briefed him on the case, and the ADA told Crane that there was not probable cause to arrest Lord and that more evidence was necessary. Crane relayed this to Perkins. DSUMF, ¶¶ 87-88, 92. While the First Circuit suggested that defendants could have learned that B. Irish took out a protection from abuse order against Lord, *Irish*, 849 F.3d at 528, it is undisputed that B. Irish never took out such an order. DSUMF, ¶ 9. Rather, it was her parents who had done so in 2011, and it was not because of any violence or threats of violence on the part of Lord, but because they did not want a sex offender around their underage daughter and her young son. *Id*., ¶¶ 7-8. There is no evidence that B. Irish was "in the process of obtaining" a protection from abuse order against Lord. Irish, 849 F.3d at 528. To the contrary, right up to the day of the alleged kidnapping and assault, Irish was in a romantic relationship with Lord, was "probably" having daily sex with him, and wanted to have a baby with him. DSUMF., ¶ 10; Stipulated Facts, ¶¶ 4-5.

In sum, given the undisputed facts, the defendants' decision to leave a voice mail message does not constitute affirmative action for purposes of a state-created danger claim or otherwise form the basis for a substantive due process claim.

21

### *Defendants Did Not Engage in Conscience-Shocking Behavior.*

Assuming for the sake of argument that the voice mail message could form the basis for a substantive due process claim, plaintiffs still must show that the defendants' conduct was "so egregious as to shock the conscience." *Pagan v. Calderon*, 448 F.3d 16, 32 (1st Cir. 2006); *see also Melendez-Garcia v. Sanchez*, 629 F.3d 25, 36 (1st Cir. 2010); *Lockhart-Bembery v. Sauro*, 498 F.3d 69, 77 (2007); *Rivera*, 402 F.3d at 36 (to prevail under a state-created danger theory, a plaintiff would need to establish not only that the State "play[ed] a role in the creation or enhancement of the danger," but also would have to meet the "further and onerous requirement" that the state's actions "shock the conscience of the court."). There is no evidence in the record from which a factfinder could reasonably find that defendants' conduct shocks the conscience.

"The burden to show state conduct that 'shocks the conscience' is extremely high, requiring 'stunning' evidence of 'arbitrariness and caprice' that extends beyond '[m]ere violations of state law, even violations resulting from bad faith' to 'something more egregious and more extreme.'" *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010) (quoting *DePoutot v. Raffaelly*, 424 F.3d 112, 119 (1st Cir. 2005)). "The state action must be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Rivera*, 402 F.3d at 36 (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). The First Circuit has stated that "[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'" *Id.* (citing *Lewis*, 523 U.S. at 851-52); *see also Irish*, 849 F.3d at 526.

Arguably, it might shock the conscience if a police officer contacted a suspect and advised him that a specific person had made criminal allegations against him after the accuser had told the officer to not contact the suspect because it might result in harm to the accuser or her

children.  But the Court does not need to decide this issue because those are not the facts here.

Again, it is undisputed that at the time Perkins called Lord, B. Irish had never told the defendants

that Lord might harm her if he learned she had gone to the police or asked them to not contact

Lord.  It is undisputed that Perkins did not tell Lord that B. Irish had accused him of kidnapping

and sexual assault.  There is no evidence that leaving a voice mail message for a suspect asking

to speak with him is contrary to training or policy.  More broadly, it is undisputed that Perkins

and Fowler thoroughly investigated B. Irish's claims.  They immediately attempted to locate the

places where the acts were alleged to have taken place in an effort to collect physical evidence.

DSUMF, ¶¶ 29-35.  They requested the assistance of an Evidence Recovery Team.  *Id.*, ¶ 30.

They conducted multiple recorded interviews, including two interviews of B. Irish (in addition to

obtaining a written statement from her). *Id.*, ¶¶ 16-28, 36-63, 77-81.

Any argument that it was conscience-shocking for defendants to decline to provide

protection to B. Irish when she requested it is without merit.  Again, as discussed above,

defendants had no duty to provide protection.  Moreover, while the defendants did not station

troopers at K. Irish's house, they instead focused their efforts on locating Lord.  This was a

reasonable decision.  *See Ramos-Pinero v. Puerto Rico*, 453 F.3d 48, 54 (1st Cir. 2006) ("Even

where the government is aware of specific dangers . . . it must perform a triage among competing

demands. . . .").  Quite simply, defendants are aware of no legal support for the proposition that

police engage in conscience-shocking conduct when they turn down a person's request for

protection in circumstances like these.

### The Defendants Are Entitled to Qualified Immunity.

Even if plaintiffs could establish a substantive due process claim, the defendants would

be entitled to qualified immunity.  "The doctrine of qualified immunity protects government

officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

"Officials are entitled to qualified immunity unless (1) 'the facts that a plaintiff has alleged or shown make out a violation of a constitutional right' and (2) 'the right at issue was 'clearly established' at the time of [their] alleged misconduct.'"  *Walden v. City of Providence*, 596 F.3d 38, 52 (1st Cir. 2010) (quoting *Pearson*, 555 U.S. at 231).  The second prong has two aspects.  "One aspect . . . focuses on the clarity of the law at the time of the alleged civil rights violation" such that "to overcome qualified immunity, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Maldonado v. Fontanes*  568 F.3d 263, 269 (1st Cir. 2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Id*.  Considering the contours of the right at issue and the particular facts of the case, "the salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Id*.

As argued above, the undisputed facts demonstrate that defendants did not violate the plaintiffs' substantive due process rights.  But, if there was a violation, the law was not clearly

established, and the defendants are thus entitled to qualified immunity.[10]  As discussed above, neither the Supreme Court nor the First Circuit has ever applied the state-created danger theory or held that promises of protection give rise to a constitutional duty.  To the contrary, the Supreme Court has held that state actors generally are not liable for harms caused by private parties, even when they have promised protection.  *DeShaney*, 489 U.S. at 196.  In *Rivera*, the First Circuit held that "necessary law enforcement tools" cannot form the basis for a state-created danger claim.  402 F.3d at 37.  Further, as discussed above, only conscience-shocking actions violate the Constitution, and defendants could not have understood that their actions rose to that level.

## <u>Conclusion</u>

For the reasons set forth above, the defendants respectfully request that summary judgment be granted in their favor.

DATED:  April 26, 2019                            Respectfully submitted,

AARON M. FREY
Attorney General

<u>/s/ Christopher C. Taub</u>
Christopher C. Taub, Asst. Atty. Gen.
Christopher.C.Taub@maine.gov
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145

---

[10] Alternatively, the Court could skip deciding whether there is a triable issue as to whether defendants violated plaintiffs' substantive due process rights and instead decide whether defendants should have understood that their conduct was unlawful.  *Pearson v. Callahan*, 555 U.S. at 236 (in conducting qualified immunity analysis, courts may first address the "clearly established" prong); *Maldonado,* 568 F.3d at 269-70.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this, the 26th day of April, 2019, I sent the above document via

electronic mail to the following:

Scott Lynch, Esq.
slynch@hlrvd.com

/s/ Christopher C. Taub
Christopher C. Taub, Asst. Atty. Gen.
Six State House Station
Augusta, Maine  04333-0006
Tel.  (207) 626-8800
Fax (207) 287-3145
Christopher.C.Taub@maine.gov
