## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MAINE

BRITTANY IRISH, *et al*.,       )
                              )
Plaintiffs                )
                              )    CIVIL ACTION NO. 1:15-CV-00503-JAW
v.                          )
                              )
DETECTIVE JASON FOWLER,      )
DETECTIVE MICAH PERKINS, and  )
SARGENT DARRIN CRANE,       )
                              )
Defendants             )

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT WITH INCORPORATED MEMORANDUM OF LAW

**I.     Introduction**

Defendants have not carried their burden in a case that is not meant for summary judgment. Plaintiffs submit admissible evidence of disputed material facts concerning over 50 promises, false statements, likely violations of Maine State Police ("MSP") policy and training, and knowing violations of MSP policy and training by Defendants.

In two independent ways, Defendants' conduct created or exacerbated the danger that Anthony Lord ("Lord") posed to Plaintiffs under a state-created danger theory. Defendants' conduct establishes all liability elements in this case and it precludes the defense of qualified immunity.

Plaintiffs also deny thirty of Defendants' Statement of Material Facts ("SMF"); qualify another fifteen, and submit evidence creating genuine disputes as to twenty-two of the twenty-six points of interest raised by the First Circuit within their Opposing Statement of Material Facts

(ōOSMFö). There is indeed an irreconcilable disagreement between the parties as to what led to these tragic events, one that may only be resolved by a factfinder.  Summary judgment is not appropriate here.

## II.    Plaintiffs' OSMF And Defendants' SMF Are Incorporated Herein.

Plaintiffs incorporate herein their 139 Additional Facts in their Additional Statement of Material Facts as a section of their OSMF.  Plaintiffs also incorporate Defendantsø Statement of Material Facts and Plaintiffsø Objections and Responses thereto.  Incorporation is necessary because Defendants made both significant material omissions and admissions in their SMF. Plaintiffs use this opportunity to oppose Defendantsø motion accurately and dispute key omissions in Defendantsø timeline.[1]

## III.    Summary Judgment Legal Standard.

ōSummary judgment is appropriate [only] when the evidence of record =show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.øö *Theriault v. Genesis Healthcare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(a). Material facts have the ōpotential to affect the outcome . . . under the applicable law.ö *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996).  ōA dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point [for] the non-moving party.ö *Id.*

---

[1]    Plaintiffsø timeline, which appears at OSMF 134-193, also addresses the twenty-six fact questions raised by the First Circuit in this case.  The partiesø respective Statements of Fact in this case show that approximately twenty-two of the twenty-six fact questions raised by the First Circuit are disputed, in addition to the other genuine disputes of material fact identified by Plaintiffs.

**Fact Argument**

**IV.    Defendants Created Or Exacerbated The Danger Posed By Lord In Two Independent Ways:  Defendants' Voicemail and Defendants' Conduct.**

**1.    The Facts Show Lord's Violence Was Due To Defendants' Voicemail Because Lord Knew Defendants' Voicemail Was About Irish.**

Defendants contend that Lord thought the 6:17 p.m. voicemail by Defendants on July 16, 2015 was about Lord's deceased son, and that Lord could not have thought the voicemail was about his multiple rapes and kidnapping of Irish.  *See* SMF 66-73.  At least four facts refute this; thus, creating genuine disputes of material fact. These facts show that Lord knew Defendants' voicemail was about Irish; that Defendants could foresee this; that, as soon as Lord received Defendants' voicemail, he made a threat that someone was going to die; and, finally, that Irish's request for protection was logical, given all of this, as proven by the fact that Lord did show up and hurt Irish's loved ones within hours, including kidnapping Irish again, too.  These four facts are:

> (1)    OSMF 251:  Lord has admitted that he knew Irish reported his July 14, 2015 and July 15, 2015 crimes to the Maine State Police;
>
> (2)    OSMF 157:  Detective Perkins testified that he agreed a suspect could deduce that, if the suspect committed a rape, and then got a call from the Maine State Police the next day, it is logical, given the one-on-one nature of rape, for the suspect to connect the dots that's why the State Police are calling;
>
> (3)    OSMF 168:  Detective Crane testified that at 9:30 p.m. on July 16, 2015 he learned from Detective Perkins the rumor that Lord had told people that he, Lord, had received a voicemail from the Maine State Police and that someone was going to die; and
>
> (4)    OSMF 175:  Detective Perkins testified that Irish's July 16, 2015 request for protection at midnight was logical enough that he

passed it up to Sergeant Crane, and that Irish's logical fear came to fruition when Lord did show up and hurt people.

### 2. Even If Lord Thought Defendants' Voicemail Was Not About Irish, Defendants Still Caused Or Exacerbated The Danger Lord Posed Due To Defendants' Conduct During Defendants' Forty-One Hour Investigation.

As shown below, even assuming *arguendo* that Defendants could establish that Lord thought Defendants' voicemail was not about Irish, Defendants independently caused or exacerbated the danger that Lord posed, specifically through Defendants' violations of MSP policy, MSP training, and MSP standards. It is important to note that Defendants' voicemail itself was a violation, as demonstrated below.

### 3. Plaintiffs' Opposing Material Facts Show Genuine Disputes Regarding Over 50 Violations by Defendants of MSP Policy, Training, and Standards.

For each violation, Plaintiffs' admissible evidence is set forth in Plaintiffs' Additional Statement of Material Facts (within the OSMF), cited at the end of each paragraph or as appropriate.

### a. MSP Policy M-4 and Related State Statute:

Defendants, by statute, policy, training, and reasonableness[2], knew of MSP policy M-4, its related state statute, and its requirements, but Defendants acted to disregard it, at each juncture, for forty-one hours. The evidence in Plaintiffs' OSMF establishes: (1) MSP M-4, a domestic violence policy/general order, exists; (2) M-4 applies to all MSP officers and is not discretionary; (3) Defendants decided M-4 did not apply to them; (4) Defendants decided they can apply M-4 in a different manner than required; (5) Defendants still believe they can graft other factors onto M-4; (6) the MSP

---

[2]     Defendants testified that MSP officers are required to apply a default rule of objective reasonableness if MSP policy or training does not cover a situation. See OSMF 194, 195, 196. This brief refers to this MSP requirement of "reasonableness" as "MSP OR".

Incident Review Team (IRT) that analyzed this investigation found Defendants had possible "deficiencies" as to M-4; (7) Defendants knew M-4 specifically applied to Plaintiffs' domestic violence case, but Defendants still ignored M-4 and refused to apply it; (8) and Defendants knew that even if M-4 did not exist, Defendants still had the same duties to protect DV victims under MSP training and MSP OR.  *See* OSMF 113-133.

Defendants' summary judgment pleadings omit all of these material facts.  *See* SMF 1-112.  Defendants M-4 violations were knowing violations by each Defendant of law, policy, training, and MS OR:  Twelve violations at each "juncture" of the investigation.  At each juncture, Defendants had to decide anew to commit M-4 violations again.[3]

b.   **Premature Suspect Contact (When To Contact):**  Defendants, by law[4], MSP training, and MSP OR, knew it was premature for Defendants to contact Lord, but Defendants contacted Lord anyway:  (1)  Defendants knew the best time to contact a suspect is when the investigation is at its end, with all facts in order; (2) Defendants knew this from MSP legal and procedure training, and from MSP OR; (3) yet at 6:17 p.m. on July 16, 2015,  when Defendants left their voicemail for Lord, multiple investigative facts were not in order, including crime scenes, physical evidence, and evidentiary leads Defendants had not investigated or were at the MSP lab (*e.g.,* two fingerprints and Irish's rape kit exam).  *See* SMF 32; *see also* OSMF 197-

---

[3]     Defendants' motion introduced junctures into this case, citing six junctures that Plaintiff Brittany Irish faced in interacting with Defendants.  *See* SMF 1-112.  For purposes of Plaintiffs' Opposition, Defendants had at least six investigative junctures as well --- decision points, or crossroads, when they had to decide all over again what to do.  Here, this would calculate to 72 separate intentional violations of M-4 in forty-one hours by Defendants for purposes of the legal analysis in this case.

[4]     Detective Perkins testified that MSP officers are trained in, and receive updates of, relevant case law.  *See* OSMF 229.  In 2006, *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 n.1 (9th Cir. 2006) had collected cases from at least eight sister circuits recognizing the state-created danger theory, and *Kennedy* had found evidence of state-created danger, and had denied qualified immunity to an officer, where that officer contacted a suspect early on, despite the fact that, like here, the record showed the officer had received training that the best time to contact a suspect is "[a]t the end of the investigation" with "all of [the] facts in order".  *Kennedy*, 439 F.3d at 1063 and n.3; *see also Irish v. State*, 849 F.3d 521, 527, n.4 (1st Cir. 2017) (citing *Kennedy* at 1063 and n.3).

203.  Defendants' violations were knowing violations by each Defendant of training, and MS

OR.  This occurred at one "juncture", the time of the 6:17 pm voicemail by Defendants.

       c.      **Promises and Related False Statements:**  Defendants, by law, training, and MSP

OR, knew not to make promises or false statements to Brittany Irish or Kimberly Irish, but

Defendants made several over the final six hours anyway, from roughly 9:00 p.m. on July 16 to

3:00 a.m. on July 17, 2015:  (1) Defendants told Irish by phone at 9:24 p.m. that Defendants

would be at the Irish home where the barn fire was, and where Irish was also heading.  Also

Defendants took two actions at 9:24 p.m., that Irish knew of, and could reasonably rely upon as

promises of safety by Defendants:  (2) Defendants were already in their car and driving to the

Irish home; and (3) Defendants, while driving to the Irish home, fulfilled a safety request made

by Irish, i.e., Defendants had a "safety check" performed on Irish's two children.  (4) Defendants

then took another action that Irish could reasonably rely on as a promise of safety when, at 10:36

p.m., Defendants did arrive at the Irish property.  *See* SMF 93.  Defendants' words and actions at

9:46 p.m. and 10:36 p.m., together, made it reasonable for Irish to rely on (5) Defendants' silence

between midnight, when Irish renewed a request for safety, and 2:00 a.m., the time when (6)

Defendants made the false statement to Irish regarding manpower and protection.  Meanwhile, at

1:00 a.m., (7) Defendants had separately conferred together and had (8) decided to convey the

false statement that there was no manpower available, which Defendants finally conveyed to

Irish an hour later, at 2:00 a.m.

       Separately, the evidence shows that (9) Defendants' false statement only spoke to

personal security at the Irish house; Defendants (10) told Irish they were still looking for Lord in

the area, allowing Irish to reasonably presume Defendants would still be in the vicinity.  *See*

OSMF 184; *see also* SMF 100, 101, 102.  However, within an hour, by 3:00 a.m., (11)

Defendants all left to go home, without telling Irish, even though Defendants' last words to Irish, back at 2:00 a.m., were that Defendants were still looking for Lord in the area (*see* OSMF 184, testimony of Detective Fowler). All were false.

In addition to the above, Defendants made: (11) at least one false statement to Kimberly Irish regarding no manpower; (12) a statement to Kimberly Irish to just call if the Irishes needed help; (13) a promise to Kimberly Irish that MSP had officers (plural) in the vicinity; and (14) a promise to Kimberly Irish that "we'll take care of it" if safety issues arose.

The record evidence supporting the above appears at SMF 85, 86, 93, 96, 100, 103; *see also* OSMF 163-165, 169, 175, 177, 179, 180, 182-188, 204-208. Defendants dispute or omit all of these facts. *See* SMF 1-112 (denying any promises made). These promises and false statements were a violation by each Defendant of law, MSP training, and the MSP OR default rule.[5]

> **d.     Manner of Contacting Suspect (How To Contact):** This was a particular focus of the First Circuit. Defendants' voicemail to Lord was a knowing violation, specifically: Defendants violated MSP training and the MSP OR rule regarding how to contact Lord. The evidence shows that: (1) MSP trains officers that four options for contacting suspects exist, based on an evaluation of several factors; (2) Defendants knew this; (3) Defendants ignored their training, and decided to make no evaluation of the options or factors; (4) instead, Defendants decided to call Lord solely for "efficiency"; (5) yet "efficiency" is not an MSP

---

[5]      Defendants' "no manpower" statements were false because at least ten MSP resources were in the immediate area: (1) Sergeant Crane; (2) Detective Perkins; (3) Detective Fowler; (4, 5) the two Troopers who checked the first Lord address (*see* SMF 90); (6) the Trooper who went with all three Defendants, as a unit of four; to check the second Lord address (*see* SMF 97); (7, 8) the separate Detective and Trooper at a gas station dumpster the next town over, collecting evidence (*see* OSMF 182, 183); and (9, 10) the K-9 Trooper and K-9 dog the Detectives called to the scene at 10:36 p.m. (*see* SMF 94). In addition, off-duty State Police and both on- and off-duty local police could be made available. *See* SMF 90, 94, 97; OSMF 182, 183. Defendants never mention these facts in their summary judgment pleadings.

training factor, and, separately, (6) "efficiency" does not satisfy the MSP OR rule, particularly when safety issues are present. *See* OSMF 209-216. Defendants omit these facts. *See* SMF 1-112. This was a violation by each defendant of MSP training and MSP OR for a total of six violations. For the reasons set forth in the fact analysis, pages 2-3, and the legal analysis, pages 14-22, Defendants' knowing and intentional violation in leaving a voicemail with Lord constitutes an independent path to state-created danger, separate from the path created by the totality of the other 50 violations Defendants decided to make. *See* legal analysis at pages 14-22, *infra*.

    e. **Go Physically Find The Suspect:** Defendants, by training and MSP OR, knew they had to go find Lord, but Defendants repeatedly decided not to do this required act: (1) Defendants did not know where Lord was; (2) It is MSP training, and an MSP OR requirement, to (3) go find such a suspect. (4) Eventually an officer may reach out by phone, but only if the phone is an officer's only avenue. *See* OSMF 223-226. This was a violation by each Defendant of MSP training and MSP OR for a total of six violations before adding any officer re-evaluations at each new juncture of the investigation.

    f. **Ascertain Suspect Risk and Propensity for Recidivism**: Defendants, by MSP policy, MSP training and MSP OR, knew they had to determine Lord's danger to Irish and others (even without the ODARA tool), but they repeatedly decided not to do this required act: (1) Defendants knew Lord had made death threats to Irish and others; (2) Defendants knew Lord had made a temporary abduction threat about Irish's children; (3) Defendants knew by 4:00 p.m. on July 16, 2015, from Exhibit 11 of the Brittany Irish depo. (Written Statement to MSP) that Lord had made a retaliation threat to Irish; (4) Defendants knew, orally from Irish, at 3:05 p.m.

on July 15,[6] and again orally before 5:00 p.m. on July 16, that Lord had made a retaliation threat to Irish; (5) Defendants knew that Irish repeated her fear of Lord's retaliation threat, and Lord's risk of retaliation, orally to defendants at 6:30 p.m. on July 16; (6) yet Defendants still decided not to assess Lord's risk, in violation of MSP training and MSP OR.  (7) Meanwhile, Defendants testified the best MSP law enforcement tool for ascertaining risk and recidivism, the ODARA risk assessment tool, should not have been used; but (8) Defendants contradicted themselves on this point, *see* Plaintiff's Response to SMF 112 (Fowler depo. p. 55, ln. 14-17).  (9) MSP's training documents on ODARA contradicted Defendants on this point as well, *see* Exhibit 29 MSP 1610-1695 (ODARA training pages).  (10) In any event, even assuming *arguendo* that the ODARA tool could not be used in this case, notwithstanding Detective Fowler's testimony and Exhibit 29, Defendants knew how to assess risk and recidivism from other MSP training, and Defendants knew that they still had to do it.  *See* OSMF 228-231.  This was a violation by each Defendant of MSP policy, MSP training and the MSP OR default rule for a total of nine violations, even without adding officer re-evaluations at the various junctures of the investigation.

> **g.    Believe The Victim in Domestic Violence And Rape Cases**: Defendants, by MSP training and MSP OR, knew they were required to believe Irish, as a rape and domestic violence ("DV") victim for investigation purposes, but Defendants repeatedly decided to violate this requirement:  (1) both MSP training and MSP OR require that rape and DV victims be believed; (2) Irish was providing Defendants with objectively credible and

---

[6]    Defendants claim Irish did not feel threatened by Lord in the days leading up to July 14, 2015. Irish felt so threatened that Irish went to the Bangor Police and the Bangor Police interceded on Irish's behalf on July 7, 2015 (*See* OSMF 134); *see also* Exhibit 35 (BPD Cease Harassment Order 7/7/15). Defendants did not know this because they never followed up with the Bangor Police, in violation of MSP training and the MSP OR rule. (*See* OSMF 135)

corroborated facts (including two consistent written statements and five consistent interviews across two agencies (Bangor PD, MSP), location evidence (the camps), pending forensic evidence that would be credible, since it would come from the MSP's own lab (a rape kit exam and 2 fingerprints), clothes, text messages, her phone, and more).  Despite this, (3) Defendants quickly and subjectively judged Irish as not credible. Some Defendants testify that they still don't believe Irish; that Irish is not the victim; and that she was not credible about her initial allegations against Lord, even though Lord has admitted to some of those allegations.

It is a reasonable inference from the above facts that, for unknown reasons, Defendants decided, early on, to focus on proving that Irish was not credible, rather than investigating Lord, or his danger potential, or dedicating resources to finding him.  As Defendants candidly testified, if they can prove the crime is a false report by the rape or DV victim, then the rape crime and the DV crime "go away."  *See* OSMF 217-221; *see also* Exhibit 30 MSP p. 2282-2283; Exhibit 30A MSP p. 2357.  This was a violation by each Defendant of MSP training and MSP OR for a total of six violations before multipliers for repeated decisions.[7]

> **h.**     **Help The Victim Obtain a Protection From Abuse (PFA) Order:** Defendants, by MSP policy, MSP training and MSP OR, are required to do this, but Defendants ignored this requirement too.  *See* SMF 1-112; *see also* OSMF 227 (testimony by MSP Training Academy Director Rogers stating that "at the very minimum," once a MSP officer contacts a suspect,"[we] have the obligation under DV policies to explain to the victim how to obtain a protection from abuse order.").  This was a violation by each Defendant of MSP policy, training, and the MSP OR for a total of nine violations.

---

[7]     Should credibility be an issue, there are key instances when Defendants undermined their own credibility by contradicting either themselves or their colleagues in sworn deposition testimony regarding material facts.  *See* OSMF 222 (collecting contradictory testimony among Defendants).

      **i.**      **Respond Reasonably to Investigation Information:** Defendants, by MSP training and MSP OR, knew they had to respond reasonably as the forty-one hour investigation developed. Yet, Defendants repeatedly decided to ignore this basic MSP requirement. *See* OSMF 194-196.

### (i).   Repeated Decisions Not To Run A Criminal Check.

      Even as Defendants increasingly knew it was vital to ascertain Lord's criminal background history, Defendants decided not to do this, over and over again.  Defendants finally decided to remedy their error in hour 36 of the forty-one hour investigation, when they suddenly ran a background check at about 12:00 midnight on July 16-17, 2015.  A reasonable inference from these facts, in the light most favorable to Plaintiffs, is that Defendants had a reason for deciding to wait as long as they could.  As discussed *supra*, without Lord's criminal background, defendants knew they could not employ the ODARA tool, nor complete any danger assessment of Lord as one requires the other as a prerequisite to calculating the risk of harm.  A reasonable inference is that Defendants had a reason for not wanting to assess Lord's danger to Irish for as long as Defendants could, presumably so that Defendants could have time to build their "false report" case against Irish, given Defendants' other actions and inactions during the nearly two day span.  *See* OSMF 151, 172, 201, 243, 246, 217-221.

### (ii).   Repeated Decisions Not To Learn Probation Status.

      Similarly, even as Defendants increasingly knew it was vital to ascertain Lord's probation status, Defendants decided not to do this, over and over again.  Defendants finally decided to remedy their error in hour 36 of the forty-one hour investigation --- within minutes of finally running a criminal background check, *supra*, at about 12:00 midnight on July 16-17, 2015.

When Defendants finally did learn Lord's probation history, and finally contacted Lord's probation officer, Defendants obtained an official address for Lord, about six hours after Defendants had placed their 6:17 p.m. voicemail to Lord. A reasonable inference is that, here again, for some reason, Defendants had a reason for waiting as long as they could to learn investigative facts about Lord. *See* OSMF 151, 173, 217-221, 228-231.

### (iii).    Repeated Decisions To Ignore Evidence Of Serious Threats.

Defendants knew from Irish's multiple oral statements and written statement between 3:05 p.m. on July 15 and 6:30 p.m. on July 16 that Lord had made serious threats to Irish (including death threats and a retaliation threat), and that Irish was scared of retaliation by Lord as a result. Defendants also knew that Irish had acted to move her children on July 15 due to her fear of retaliation by Lord. Further, the record evidence is that Defendants knew, from Irish, the facts of Lord's threats, including Lord's retaliation threat, as early as 3:05 p.m. on July 15, which disputes Defendants' contention at SMF 76.

Given the above, Defendants' position --- that Irish was somehow "too late" with her July 16, 6:30 p.m. reiteration of her prior Lord retaliation concerns, only thirteen minutes after Defendants' improper voicemail to Lord --- is, by its terms, an admission by Defendants: Defendants knew that their voicemail, which violated MSP training, had likely tipped off Lord, creating or exacerbating the danger Lord posed, and Defendants knew it was also likely that Defendants could not contain Lord at this point, now that Defendants had enraged him. Notably, Defendants did nothing after leaving their voicemail, even after Irish's latest warning to Defendants about retaliation by Lord, just thirteen minutes later. *See* SMF 16, 17, 27, 28, 38, 51, 52, 53, 58, 62, and 63; *see also* OSMF 140, 141, 150, 159, 160.

### (iv).   Decision To Interview Non-Eyewitnesses In Order To Investigate Irish, Not Lord.

The evidence shows Defendants decided to jointly interview non-eyewitnesses Adams, Hewitt, and Shahan for significant amounts of investigative time, at the cost of letting Lord continue to roam free, whereabouts unknown, despite the fact that Defendants had probable cause to arrest him as of 8:40 a.m. July 16, 205 due to the evidence of breaking and entering at camp one. (OSMF 146).

Defendants did not ask Adams, Hewitt, or Shahan any questions about Lord, or Lord's criminal history; or whether Lord was on probation; or Lord's home and work addresses. Defendants did not ask for any investigative leads about Lord, either. *See* SMF 1-112. Instead, Defendants sought and gained information about the credibility of a rape and DV victim, Irish, whom, by MSP requirement, Defendants were supposed to believe. (SMF 217-221). Defendants held the Hewitt and Shahan interviews during the critical minutes right after 6:30 p.m., when Defendants contend they had brand new retaliation threat information from Irish for the very first time. Defendants' own timeline shows that, having left their voicemail for Lord (a violation for several reasons, including, improperly, that it was the most "efficient", or easy, thing to do, OSMF 215, 216), defendants decided to consume valuable investigation time at a critical juncture by resuming their subjective investigation of Irish's credibility. Specifically, within twenty-five minutes of leaving their voicemail to Lord, and within ten minutes after Irish giving Defendants brand new retaliation threat information (if Defendants' version is credited), Defendants decided to spend over eighty minutes of time jointly interviewing Hewitt and Shahan, and not doing anything else in the investigation until the call about the barn fire interrupted them at 8:05 p.m. *See* SMF 40, 77, 79.

> **j.**      **Decisions Not To Actively Develop Probable Cause:** Defendants, by

MSP training and MSP OR, are required to actively develop probable cause in domestic violence

scenes and investigations, yet they did not do this for several crimes relating to Lord:   (1)

Defendants did not relay the confirmed evidence of breaking and entering at the first camp (as

described credibly by Irish) up the MSP chain of command, causing that arrest opportunity to be

squandered; (2) Defendants did not develop probable cause as to the õplethoraö of DV crimes

that can be charged in DV cases (OSMF 231); (3) yet Defendants are trained to be focused on

developing probable cause, to determine if there is enough to arrest or charge a suspect with a

particular DV crime, *see id.* (Rogers depo. p. 16, ln 21-25).

Separately, as discussed in Section IV(3)(b), at 6:17 p.m. on July 16, 2015,   when

Defendants left the voicemail for Lord, Defendants still had not devoted investigative efforts to

developing probable cause as to Irishøs allegations of kidnapping, strangulation, and three rapes,

because Defendants had not yet tried to develop multiple facts, leads, and crime scenes.  All of

this was relevant to the probable cause analyses that the Assistant District Attorney (õA.D.A.ö)

did and did not consider as to Lord, and the crimes the A.D.A. rejected for arrest as to Lord, late

on July 16.  These facts allow the reasonable inference that Defendants decided and acted to

forego available law enforcement tools for developing probable cause and arresting Lord.  *See*

OSMF 146, 160, 170, 200, 231; *see also* SMF 32, 36, 87, 88, 92.

## Legal Argument

## V.      Defendants Created Or Exacerbated The Danger Posed By Lord In Two Independent Ways:  Defendants' Voicemail and Defendants' Other Conduct.

### A.      State-Created Danger Elements.

Under the Fourteenth Amendmentøs Due Process Clause, U.S. Const. Amend. XIV, § 1,

õat least eight sister circuits have recognized the existence of the state-created danger theory . . . .

While [the First Circuit] has discussed the possible existence of the state-created danger theory, we have never found it applicable to any specific set of facts." *Irish v. Maine*, 849 F.3d 521, 526 (1st Cir. 2017).   While it is an open question in this Circuit, other circuits have used four elements, some with multiple prongs, to analyze state-created danger.  *See, e.g., Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006).  They are analyzed here in the next five pages in light of both (1) Defendants' voicemail to Lord (itself a violation of MSP training) and (2) the totality of Defendant's other violations, over 50 of them, many of them knowingly and repeatedly made.

1.     The harm ultimately caused was foreseeable and fairly direct.

Admissible evidence establishes both prongs here.  In addition to OSMF 251, 157, 168, and 175, Irish had communicated to Defendants in writing and orally, at least four times prior to and immediately after Defendants' 6:17 p.m. voicemail to Lord, that Lord had made nine threats --- multiple death threats against Irish, torture and death threats against Hewitt, temporary abduction of Irish's two children, and a clear retaliation threat to Irish.  *See, e.g.,* Exhibit 11 of Brittany Irish depo. (Written statement to MSP).  As Irish had documented and predicted, just two or three hours after Defendants' voicemail, violation of MSP training and reasonableness, a third-party heard Lord make a new death threat, now just a few miles from the Irish home:  A death threat directly linked to the Maine State Police voicemail made by Defendants at 6:17 p.m. *See* OSMF 168.  Lord was already on the radar for fairly direct harm:  Lord was Defendants' immediate suspect in the arson of the Irish's two-story barn, at their home, at 8:05 p.m.  The ultimate harms that Lord caused, starting at 4:40 a.m. and then 5:00 a.m., at the Irish home, were just as predictable.  As such, "foreseeability" and "fairly direct" are both satisfied by Defendants' voicemail violation alone, if this Circuit adopts these prongs.   *See* OSMF 251, 157, 168, and 175.

2.     A state actor acted with a degree of culpability that shocks the conscience.

These two prongs are met as well, particularly as shown by Defendantsø over 50 conduct violations, many of them made knowingly with deliberate indifference, *see* analysis *infra* at pages 20-21.  Defendants, working together in a slow-moving investigation (no split-second decisions; ample time to think and reconsider), demonstrated culpability:  Over 50 violations of law, policy, training, many of them knowingly, between 12:30 p.m. on July 15, 2015 until 5:00 a.m. on July 17, 2015.  Both (a) the sheer volume and repetition of the violations, combined with (b) the uniformly deliberately indifferent manner in which Defendants made them (slowly, purposefully, knowingly, and in collaboration with each other, over forty-one hours) constitutes more than just culpability; it does shock the conscience.  *See infra* page 20-21.

Further, as discussed, it is a reasonable inference that instead of investigating Lord, and ascertaining and containing his danger, and instead of protecting Irish as required by the mandatory M-4 policy, Defendants were trying to delay action on Lord in order to build a õfalse reportö case *against* Irish, in order to make the rape and domestic violence allegations go away.  The deposition testimony was this:  õHey, . . . [t]his girl is reporting that she was raped by a man . . . .ö OSMF 132 (MSP Deputy Chief Cote) . . . . (õIf . . . we can prove that everything [Irish] told us was a lie, then the crime of DV never occurred, the crime of false report has.ö  OSMF 217 (Sergeant Crane).  All of the above shocks the conscience when added to the intentional indifference by Defendants that continued even as the evidence of danger to Irish became more obvious, and the danger itself grew, in the final hours after Defendantøs voicemail to Lord.

Separately, it shocks the conscience that Defendants themselves knew of, and foresaw, the danger they had created, as it escalated, but still did nothing in the final hours, except to make false statements about manpower, and mislead the Irishes, one of whom was a domestic

violence and sexual assault victim.  *See* pages 21-22 *infra; see also* OSMF 151, 157, 168, and 175.

     3.     A relationship between the state and plaintiff, so plaintiff was a foreseeable victim of the defendant's acts, not a member of the public in general.

Here, the required relationship existed under state statute and MSP policy:  Defendants had an ongoing mandatory duty under the MSP M-4 policy, to protect Irish.  Instead, Defendants placed a voicemail to Lord, in violation of training, despite Defendants knowing Lord's threats to Irish and Irish's fears of retaliation by Lord.  In addition to violating their legal requirement to Irish pursuant to state statute and the M-4 policy, Defendants affirmatively put Irish in a far worse place.  Defendants did this in many ways, due to over 50 violations, during Defendants' investigation in which Irish was supposed to be recognized by the MSP as a special type of a complainant:  A domestic violence and sexual assault victim.  When Defendants created and exacerbated the danger posed by Lord, not just through Defendants' voicemail but through all of their violations during their investigation, Defendants made Irish a foreseeable victim of Lord through the totality of Defendants' violations, decisions, and acts.  Separately, the special relationship is also confirmed by Defendants' admission that Irish was in fact worthy of special protection.  *See* OSMF 175.

     4.     A state actor affirmatively used authority in a way that created a danger to the citizen or that rendered the citizen more in danger than had the state not acted.

Both disjunctive prongs are satisfied on the record here.  Defendants misused their investigation tools, in stark contrast to *Rivera*, compromising Defendants' investigation and making it foreseeable that Irish would be in danger. Lord was improperly tipped off through the voicemail that was an admitted violation, *see* OSMF 251, 157, 168, and 175.  By favoring Lord and disfavoring Irish through their dozens of investigative violations, Defendants created a

foreseeable, direct, and dire risk to Irish, as shown starting no later than 8:05 p.m. on July 16, 2015, when the Irish barn arson became known.  Due to Defendants both provoking Lord (with the 6:17 p.m. voicemail) and enabling him (with forty-one hours of Defendants effectively using no law enforcement tools against Lord, letting Lord run free), Defendants created a danger, and put Irish in more danger, than had Defendants not been assigned to the Irish/Lord investigation at all.

The most obvious facts of the increasing danger created by Defendants and Lord are: Defendants 6:17 p.m. voice mail, escalating to Lord's 8:00 p.m. barn arson, escalating to Lord's new threat that someone was going to die that night. This was directly linked to Lord having receiving Defendants voicemail from the Maine State police. *See* OSMF 168. Then, further escalating to Defendants final series of acts and words from 2:00 a.m. to 3:00 a.m. on July 17, 2015, when Lord's whereabouts was still unknown:  Defendants abandoned the Irishes on the basis of Defendants false statement about "no manpower" was available for in-home protection, when ten MSP resources were available. *See* OSMF 179 and 182.  Defendants had promised they would still be near; looking for Lord, yet that pledge was broken too.  By 3:00 a.m. Defendants had gone home, without telling the Irish's, as Lord was starting to steal guns just six miles away for his final deadly assault on the Irish home.  Each of these acts by Defendants created or exacerbated the danger posed by Lord, in steps that slowly unfolded and left Irish in more danger than if Defendants had never acted at all.  In this case, Defendants entire investigative approach, with all of its violations of MSP policies, training, and rule of reasonableness, caused or exacerbated the harm that Lord posed.

Thus, the likely basic elements of a state-created danger claim, if adopted in this manner by the First Circuit, have been satisfied, independently and together, by both Defendants

voicemail as a standalone violation, as well as Defendantsø other fifty cumulative conduct violations, many of them committed knowingly.

Defendants admit causation in writing; specifically, Defendants admit they created and exacerbated a state-created danger here, as they must in light of OSMF 251, 157, 168, and 175: öIn conclusion, it weighs heavy knowing that . . . our investigation[] . . ., as it was ongoing, *led to* the tragic events that took the lives of two people and hurt so many others.ö *See* OSMF 131 (Sergeant Crane Depo., reading his written comments to the Incident Review Team) (emphasis added). Defendants donøt address this causality admission whatsoever in their pleadings.

A second analysis, focused more heavily on the cumulative totality of Defendantsø violations, rather than just Defendantsø voicemail, confirms the legal conclusion as to state-created danger. *See Sanford,* 456 F.3d at 304, discussed *supra*.  It is as follows:

Instead of Defendants properly using the probable cause that Defendants had gained on Lord as of 8:40 a.m. on July 16 (OSMF 144), combined with Defendants timely contacting Lordøs probation officer, timely running a criminal background check, and timely assessing risk with the ODARA tool, in order to get a probation hold on Lord, or probable cause to arrest Lord on breaking and entering, related to one of the camps or on a DV crime, Defendants instead affirmatively acted to delay all of this, over and over, at each possible juncture, for thirty-six hours of a forty-one hour investigation.  In the process, Defendants committed their over fifty violations of law, policy and training, many of them knowingly and flagrantly, establishing culpability and shocking the conscience, *see infra* pages 20-21.  Further shocking the conscience, in particular, Defendants not only left Lord unaccounted for; Defendants also provoked Lord with Defendantsø improper voicemail violation (SMF 64, 65, OSMF 221, 222), while misfocusing their entire investigation not on Lord but on Irishøs credibility instead.  At the same

time, Defendants ignored Irish's information of Lord's death threats and retaliation threats; Defendants ignored their mandatory duties to Irish under M-4 policy (which created the required unique, non-general relationship)[8]; and Defendants made promises, acts, and related false statements that helped bring Irish to, and kept her at, the danger zone --- the site where the ultimate harms of July 17 foreseeably occurred just a few hours later.  All of this once again establishes not just foreseeability, but also a fairly direct nexus, as well as Defendants' deliberate indifference, given the abundant time Defendants had to consider, consult, and decide upon their courses of action.[9]

## B.   Shocking The Conscience/Deliberate Indifference.

"In addition to alleging a sufficient state-created danger, the plaintiff must meet 'a further and onerous requirement' to prove a substantive due process violation:   'the state actions must shock the conscience [.]'"  *Irish*, 849 F.3d at 526 (quoting *Rivera*, 402 F.3d at 35).  The previous

---

[8]      A third analysis establishes state-created danger in a still different way.  In this scenario, the M-4 duty from Defendants to Irish continued and/or renewed with the barn arson, because the barn arson created a new DV scene between Lord and Irish, and a new DV incident, to which Defendants were the first responding MSP officers for Irish.  This fact cements both M-4's applicability and the required special relationship between Irish and Defendants.  All harms posed by Lord were, here again, foreseeable and fairly direct in this scenario, given the same series of promises and false statements, specifically the "no manpower" false statement when there were ten MSP personnel resources available in the area, *see* SMF 90, 94, 97, 98; *see also* OSMF 179, 182.  Abandonment of Irish by Defendants occurred between 2:00 a.m. and 3:00 a.m., as in the other scenarios, without any warning to her by Defendants, but now in clear violation of M-4, given that Defendants were the first responders for the MSP to the DV incident and DV scene that Lord created when he burned the Irish barn as a threat to Irish due to his knowledge that she had gone to the MSP.  This scenario highlights how Defendants' abandonment of Irish in the wake of Lord's arson constitutes another potential path for state-created danger, apart from Defendants' voicemail and/or Defendants' fifty conduct violations.

[9]      Defendants continue to misapprehend *Rivera*, 402 F.3d at 37, claiming, in their brief, that necessary law enforcement tools cannot impose constitutional liability on the state.  As the First Circuit has explained, the issue is the _manner_ and the _timing_ in which those tools are used (or not used).  *See Irish*, 849 F.3d at 527.  Defendants' liability in this case arises from *how* and *when* they did (and did not) use their law enforcement tools, policies, training, and standards.  Defendants also continue to misapprehend *Ramos-Pinero v. Puerto Rico*, 453 F.3d 48, 55 n.9 (1st Cir. 2006), a footnote that requires an affirmative *action* for state-created danger.  The First Circuit has stated at least three times in this case that officer *decisions* constitute qualifying actions, not just physical actions.  *See, e.g., Irish*, 849 F.3d at 527; *see also Stamps v. Town of Framingham.*, 813 F.3d 27, 32-33 (1st Cir. 2016) (denying qualified immunity to officer who made three decisions).

discussion analyzed the "shock the conscience" requirement at length, *see* pages 15-16 *supra*; further relevant here is that "[w]here actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice." *Irish*, 849 F.3d at 526, quoting *Rivera*, 402 F.3d 36 (internal quotation omitted).  Here, Plaintiffs offer over fifty violations of law, policy, training, and the reasonableness default rule of the Maine State Police. These are over fifty violations by three Defendants, all highly trained and experienced (one Sargent, two Detectives), who had available to them forty-one hours of investigation time that did not involve any split-second or minute-to-minute junctures.  The sheer volume and repetition of violations that still occurred, and Defendants' manifest unwillingness to revisit or mitigate any of Defendants' decisions, and the amount of hours that Defendants had available to them, but misused, satisfies the deliberate indifference standard in light of the senseless danger which Defendants increasingly exposed Plaintiffs to as things escalated on July 16 into July 17, 2015. This is particularly the case when the inferences set forth in Section IV are applied to the analysis, as they must be at summary judgment.  *See Irish*, 849 F.3d at 526.

**C.     Qualified Immunity.**

"[V]iolation of protocol and training is relevant both to the substantive due process and qualified immunity inquiries.  With respect to qualified immunity, officer decisions and acts that violate protocol and/or training may be sufficient to deny qualified immunity to officers.  *See Irish*, 849 F.3d at 527 (citing *Stamps v. Town of Framingham.*, 813 F.3d 27, 32-40 (three officer "decision[s]" with severe consequences); *Marrero-Rodriquez v. Munic. of San Juan*, 677 F.3d 497, 499-502 ("several" violations of protocol and training having severe consequences); *see also id.* n.4 (citing *Kennedy v. City of Ridgefield*, 439 F.3d at 1063 and n.3) (denying qualified immunity to an officer who had told the suspect about complaints against him, where the record

showed that officers had received training that the best time to contact an offender is "[a]t the end of the investigation" with "all [the] facts in order").  The record evidence shows this here. *See* OSMF 197, 198, 199, 200, 201, and 202.  The quantity, repetition, and uniform manner of Defendants' violations, given the ample time, often measured in hours, that Defendants had available to reflect and confer, raise the issue that qualified immunity does not protect the "plainly incompetent or those who knowingly violate the law."  *MacDonald v. Town of Eastham.*, 745 F.3d 8, 11 (1st Cir. 2014) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Here, Plaintiffs have adduced admissible evidence of decisions, acts, and non-acts resulting in over fifty conduct violations, many of them knowing and repeated, over forty-one hours. Defendants are not entitled, on this evidence, to qualified immunity.

**D.    Promises And Related False Statements.**

Defendants did not cite any authority on the legal issues raised by the evidence showing promises (both in word and action) and related false statements that Defendants made to Brittany Irish between 9:00 p.m. and 3:00 a.m. on July 16-17 (and the promises made to Kimberly Irish set forth in the Stipulated Facts).  Defendants have thus waived this issue.

The material facts in evidence that underlie Defendants' promises and false statements appear in Section IV. The legal discussion of those facts is straightforward; it is simply this: Defendants' false statements are violations of policy, training, and the MSP's default rule of reasonableness for two separate reasons.   First, false statements to a victim violate, at a minimum, MSP's reasonableness rule.  Second, Irish was not just any victim; she was a domestic violence and rape victim, who was supposed to be specially protected by Defendants under M-4. Defendants did more than just make knowingly false statements about manpower and vehicles. Defendants also made false statements that went to the heart of their legal and policy duties to a

special type of victim, about a mandatory domestic violence policy pursuant to statute, MSP

policy M-4.  Defendantsø false statements led to foreseeable and fairly direct harm suffered by

Irish, caused and exacerbated by Defendants.  This is yet further proof of a state-created danger,

deliberate indifference, a series of conduct shocking of the conscience, and a conclusion that

qualified immunity does not apply to Defendants in this case.


## CONCLUSION

    For the reasons noted herein, summary judgment should be denied.


DATED:  June 11, 2019.

                /s/ Scott J. Lynch
                Scott J. Lynch, Esq.
                Lynch & Van Dyke, P. A.
                261 Ash Street - P.O. Box 116
                Lewiston, Maine 04243-0116
                (207) 786-6641
                slynch@HLRVD.com

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE


**<u>CERTIFICATE OF SERVICE</u>**


I hereby certify that on June 11, 2019, I electronically filed the within


**PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
WITH INCORPORATED MEMORANDUM OF LAW**

using the ECF system which will send notification of such filing to the following counsel and same shall be provided to Plaintiffs by means of U. S. Postal Service.


CHRISTOPHER TAUB, ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
6 STATE HOUSE STATION
AUGUSTA, ME  04333-0006


<u>/s/ Scott J. Lynch</u>

Lynch & Van Dyke, P. A.
261 Ash Street - P.O. Box 116
Lewiston, Maine 04243-0116
(207) 786-6641
slynch@HLRVD.com