# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MAINE

| | | |
|---|---|---|
| BRITTANY IRISH, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | CIVIL ACTION NO. 1:15-CV-00503-JAW |
| v. | ) | |
| | ) | |
| DETECTIVE JASON FOWLER, | ) | |
| DETETCTIVE MICAH PERKINS, and | ) | |
| SERGEANT DARRIN CRANE | ) | |
| | ) | |
| Defendants | ) | |

## PLAINTIFFS' OPPOSING STATEMENT OF MATERIAL FACTS WITH ADDITIONAL STATEMENT OF MATERIAL FACTS

Pursuant to Maine Local Rule 56(c), Plaintiffs submit this opposing Statement of Material Facts with Additional Statement of Material Facts ("OSMF").  Due to Defendants' omissions, this document is incorporated into Plaintiffs' Brief.[1]

### I.  Opposition and Responses to Defendants' Statement

1.  Qualified.  In SMF 1, Defendants admit a lover's triangle and an Irish/Lord relationship qualifying for Maine State Police ("MSP") domestic violence "DV" protection under 19-A M.R.S. § 4012(6) and MSP M-4, the MSP's related DV general order and policy for all officers. *See* Exhibit B (19-A M.R.S. § 4012(6) (Maine Revised Statute Title 19-A; Domestic Relations)); Exhibit A (MSP M-4 Policy 2578-2607).

2.  Objection.  Inadmissible; irrelevant.  *See* Fed. R. Evid. 402.

---

[1]  Defendants omitted material facts.  For the record to be accurate, Plaintiffs have (a) identified the SMF omissions; (b) provided the accurate facts, including Defendants' admissions in their SMFs; and (c) provided an accurate timeline.  Plaintiffs have also (d) addressed the First Circuit's specific fact questions (*see* Plaintiffs' Brief) and (e) organized its OSMF by subject, where possible, for clarity.  Given Defendants' omissions, Plaintiffs must provide this level of detail in order to accurately oppose the pending motion.

3.     Objection.  Inadmissible; irrelevant.  *See* Fed. R. Evid. 402.

4.     Objection.  Inadmissible; irrelevant.  *See* Fed. R. Evid. 402.

5.     Admitted.

6.     Admitted.

7.     Denied.  A court of law granted the order.  A court would not do so absent evidence Lord had done something to satisfy the legal standard for such orders.  Lord had a criminal history including rape, domestic violence ("DV"), related probation violations, and status as a registered felony sex offender. (Plaintiffs easily learned that Lord was a sex offender when Irish's "dad had Googled [Lord] and found the [sex] registry.") (Irish depo. 29, ln. 18 to p. 30, ln. 1)

8.     Admitted.

9.     Qualified.  Irish went to Bangor Police Department ("BPD") on July 7, 2015; BPD went to Lord; Lord was ordered to stop harassing Irish.  *See* Exhibit 35 (BPD) Cease Harassment Order 7/7/15).

10.    Qualified.  *See* Response to SMF 1; that Response and its Exhibits are incorporated herein.

11.    Objection; Inadmissible; irrelevant.  *See* Fed. R. Evid. 402.

12.    Objection.  Inadmissible; irrelevant.  *See* Fed. R. Evid. 402.

13.    Objection.  Inadmissible; irrelevant.  *See* Fed. R. Evid. 402.

14.    Objection.  Inadmissible; irrelevant.  *See* Fed. R. Evid. 402.

15.    Objection.  Inadmissible; irrelevant.  *See* Fed. R. Evid. 402.

16.    Denied.  SMF 16 is denied for six reasons.  *See* OSMF 140, 141, 142.  <u>First</u>, this SMF 16 omits a crucial material interaction between Irish and Defendants by providing incorrect timing.  Defendants first spoke with Irish at or about 3:05 p.m. on July 16, not 90 minutes later at 4:34

2

p.m. (that was their second meeting of the day).  *See* Irish depo. 139, ln. 8 to p. 140, ln. 25

(placing first Irish talk with Defendants at 3:05 p.m., not 4:34, which was their second meeting

that day); *accord* Fowler depo. p. 19, ln. 12 to p. 20 ln. 1 (same).  <u>Second</u>, Defendants' timeline

omission (which was sworn to in Defendants' affidavits), *see* SMF 16, allowed them to omit

material substantive evidence:  At or about 3:05 p.m. (or, at latest, at 4:34 p.m., even if

Defendants' timeline version is credited), Irish unmistakably told Defendants (i) Lord had made

death threats and other threats to Brittany Irish; (ii) Irish feared for herself and her two children;

(iii) Irish had acted to protect her children by hiding them from Lord, so seriously did she take

Lord's threats; and (iv) based on all of these threats and fears, Defendants were reasonable to

infer, but did not infer, that Lord would make good on his retaliation and other threats if Lord

learned that Irish had reported her allegations to the police.  This is the substantive evidence

omitted by Defendants in SMF 16:

| | |
|---|---|
| Q. [AAG]: | And did [the Detectives] say Defendants wanted to take a statement from you? |
| A. [Irish]: | Yes. |
| Q. | And did you tell them [the Detectives] that you were too tired to do that? |
| A. | I told them [the Detectives] that I wanted to go home and give my children hugs and kisses because they were going to their grandmother's house so I asked if I could do it [the statement] the next day. |
| í | |
| Q. | Was this like a preplanned visit, or was this because of what had happened? |
| A. | Because of what had happened. |
| Q. | All right.  And so why did you want the kids to go up to [their grandmothers house?] |
| A. | Because Anthony wasn't aware, she lived, and I wanted them away from where he knew. |

> Q.        So you were afraid that he might do something to
>           your kids at this point?
> A.        Yes.

(Irish depo. p. 141, ln. 5 to p. 142, ln. 12).  <u>Third</u>, the timing evidence placing the above at the first interaction between Irish and Defendants, at 3:05 p.m. on July 16 (or, at latest, even if Defendants' version is credited, 4:34 p.m.) is testified to by both Defendants and Irish, *see* Irish depo. 139, ln. 8 to p. 140, ln. 25; Fowler depo. 19, ln. 12 to p. 20, ln. 1.  <u>Fourth</u>, both the timing (3:05 p.m. on July 15) and the substance (Irish told Defendants of Lord's retaliation threat if she went to the police) is corroborated by the testimony of Kimberly Irish as well.  *See* Kimberly Irish depo. 84, ln. 14 to p. 85 ln. 11 (testifying that Kimberly Irish and Brittany Irish spoke the morning of July 15; that Brittany Irish told Kimberly Irish that Lord had threatened Brittany Irish if she went to the police; that Kimberly Irish told Brittany Irish to tell the police; and that Brittany Irish did tell Defendants these facts on July 15 when Brittany Irish first met the Detectives, at 3:05 p.m.).  <u>Fifth</u>, SMF 16 is denied because it incorrectly alters the material timeline in this case regarding what Defendants knew when.  Prior to 4:34 p.m. on July 15, this is what Defendants knew: (i) 12:32 p.m.: Defendants assigned to case (Perkins Aff. par. 3); (ii) 2:00 p.m.: Defendants receive from BPD, but do not read, Irish's first two-page typed BPD statement identifying a Lord death threat to Irish (Lord would cut Irish ear to ear) and a threat to himself (suicide), *see* Exhibit  34 (D. Crane 7/15/15 email to J. Fowler) (attaching two-page BPD typed statement of Irish); (iii) 3:05 p.m.:  Defendants learn of the retaliation threat if Irish goes to the police; of Irish's concern for her children; and of Irish's concrete acts to protect her children, discussed *supra*. (Fowler depo. 19, ln. 12-23)  The undisputed facts also show that, prior to 4:34 p.m. on July 15: (iv) Sergeant Crane knew at 12:30 p.m. that Lord was a registered sex offender, but not whether felony or misdemeanor, and Defendants did not find out (Perkins depo. 71, ln.

20, p. 74, ln. 7); (v) Sergeant Crane had once arrested Lord for an unrelated burglary or theft (Crane depo. 10, ln. 3-7); (vi) Sergeant Crane personally knew Lord because Sergeant Crane and Lord grew up in the same area (Crane depo. 9, ln. 16-25, p. 10, ln. 1); (vii) the BPD detective who typed Irish's first statement did not identify or remark about any credibility issues as to Irish or her allegations, *see* Exhibit 34 (D. Crane 7/15/15 e-mail to J. Fowler);  and (viii) Detectives Perkins and Fowler never followed up with BPD as to the statement, nor with the BPD Officer Tyler Rusby, who interviewed Irish.  *See* OSMF 135, 140, 141, 142.  <u>Sixth</u>, SMF 16 is denied because Defendants seek inferences and facts viewed in the light most favorable to Defendants. Defendants are movants; only Plaintiffs, as non-movants, are entitled to reasonable inferences and to have facts viewed in the most favorable light to Plaintiffs.

17.     Denied.  SMF 17 is denied for four reasons.  <u>First</u>, SMF 17 has material omissions in both substance and timing as to what Irish told Defendants when.  As Plaintiff's Response to SMF 16 shows, Irish identified fear of retaliation as to her and her children, including retaliation if she went to the police, as of 3:05 p.m. on July 15.  *See* Response to SMF 16; that Response and its Exhibits are incorporated here in their entirety.  <u>Second</u>, SMF 17 omits that Defendants already possessed a written statement from Irish, from the BPD, and that Defendants had elected not to read it. (Irish depo. 141, ln. 5 to p. 142, ln. 12).  <u>Third</u>, SMF 17 continues to incorrectly alter the material timeline in this case regarding what Defendants knew when.  *See* Response to SMF 16; that Response and its Exhibits are incorporated here in their entirety.  <u>Fourth</u>, SMF 17 is denied because Defendants seek inferences and facts viewed in the light most favorable to Defendants.  Defendants are movants; only Plaintiffs, as non-movants, are entitled to reasonable inferences and to have the facts viewed in the most favorable light.

18.     Admitted.

19.     Admitted.

20.     Denied.  SMF 20 is denied because Defendants have omitted that Irish told, and wrote, much more to Defendants by 4:34 p.m. on July 15.  *See* Responses to SMF 16 and 17; those responses and their Exhibits are incorporated here.

21.     Denied.  ̃[Irish] may or may not have had marks.  What Detective Fowler should have known is that DV characteristically involves strangulation and strangulation does ̃[n]ot always ̃ result in visible marks.  (Van Blaricom (Expert) depo. 140, ln. 22 to p. 141, ln. 5).  SMF 21 is further denied because Defendants seek inferences and facts viewed in the light most favorable to Defendants.  Defendants are movants; only Plaintiffs, as non-movants, are entitled to reasonable inferences and to have the facts viewed in the most favorable light.

22.     Admitted.

23.     Denied.  In SMF 23, Defendants omit that Irish addressed this:  Irish had not mentioned the store because ̃[Lord] didn ̸t commit any crimes at Verizon so I didn ̸t think it made much sense [to put it in her statement.] ̈  (Irish depo. p. 130, ln. 20 to p. 131, ln. 4).  SMF 23 is further denied because Defendants seek inferences and facts viewed in the light most favorable to Defendants.  Defendants are movants; only Plaintiffs, as non-movants, are entitled to reasonable inferences and to have the facts viewed in the most favorable light.

24.     Denied.  Brittany Irish initially declined to provide her clothes because she is of limited financial means and could not afford replacement clothes.  OSMF 147, 155.  Later, despite this, she still voluntarily gave Defendants her clothes from July 14 and 15.  *See* OSMF 155, SMF 74.  SMF 24 is further denied because Defendants seek inferences and facts viewed in the light most favorable to Defendants.  Defendants are movants; only Plaintiffs, as non-movants, are entitled to reasonable inferences and to have the facts viewed in the most favorable light.

25.     Qualified.   In SMF 25, Defendants admit for the first of several ways that their investigation was not at its end; nor were all or even most of Defendants' investigative facts in place before Defendants left Lord their voicemail at 6:17 p.m. on July 16.  Here, the rape kit results in SMF 25 were not yet in place, yet Defendants contacted Lord anyway.

26.     Qualified.  In SMF 26, Defendants separately admit their investigation was not at its end; nor were all or even most of Defendants' investigative facts in place before Defendants left Lord their voicemail at 6:17 p.m. on July 16.  Here, the medical providers' findings in SMF 26 were not yet in place, yet Defendants contacted Lord anyway.  Plaintiff's Response to OSMF 25 is incorporated in its entirety.  SMF 26 is further denied because Defendants seek inferences and facts viewed in the light most favorable to Defendants.  Defendants are movants; only non-movants are entitled to inferences and to have facts viewed in the most favorable light.

27.     Denied.  *See* Responses to SMF 16, 17, and 24; those Responses and their Exhibits are incorporated herein.

28.     Denied.  SMF 28 is denied for three reasons.  <u>First</u>, as Plaintiffs' Responses to SMF 16 and 17 shows, Defendants already had the information described in SMF 28 starting at 2:00 p.m. and again at 3:05 p.m. on July 16.  Plaintiffs' Responses to SMF 16 and 17 are incorporated here with their Exhibits in their entirety.  <u>Second</u>, SMF 28 is denied because Defendants, who are trained detectives, decided with deliberation and reflection not to ask Irish any questions about the topics identified in Defendants' SMF 28, despite knowing that Irish had suffered multiple traumatic events, including, indisputably, the traumatic event of undergoing a rape kit examination. (Fowler depo. 24, ln. 25 to p. 26, ln. 4)  <u>Third,</u> SMF 28 is denied because Defendants seek inferences and facts viewed in the light most favorable to Defendants.

Defendants are movants; only Plaintiffs, as non-movants, are entitled to reasonable inferences and to have the facts viewed in the most favorable light.

29.     Qualified.  In SMF 29, Defendants admit two material facts.  First, Defendants admit that Defendants decided with deliberation and reflection to first look for evidence first, rather than first making Irish safe.  *See* Responses to SMF 16, 17; *see also* OSMF 247 (testimony of Detective Perkins that the first step in a DV or rape call is to attend to the victim; four steps later, after taking care of the victim, it's gather [sic] information) (Perkins depo. 153, ln. 2-15).  Second, Defendants separately admit that Defendants spent over 2.5 hours driving (*compare* SMF 29 to SMF 31) to find evidence, and during this time, Defendants did not (i) first attempt to keep the victim safe; (ii) go find Lord; (iii) run Lord's criminal history; (iv) learn Lord's probation status (and an official address, to locate him); or (v) begin to assess Lord's risk to her children, to Hewitt, or to the public; or (vi) begin to assess Lord's propensity for recidivism as to Irish, his sexual assault and domestic violence victim:  These six initial investigative steps of the MSP, all omitted by Defendants, are material; Defendants were obligated to fulfill all of them under Maine State Police policy, Maine State Police training, and the Maine State Police reasonableness rule.  *See* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247.

30.     Qualified.  In SMF 30, Defendants admit two material facts.  First, Defendants admit Defendants had the ability to multi-task while driving for 2.5 hours; they could have furthered the investigation by commencing the six initial investigative steps, *see* Response to SMF 29 and OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247, but Defendants, with reflection and deliberation, decided not to commence any of them during this 2.5 hour juncture.  *See id*.; *see also* SMF 30.  Defendants did

decide to call MSPøs Evidence Response Team (õERTö), tasking them to go to the camps for evidence gathering, but Defendants decided not to do anything else with this investigative time. Second, Defendants admit that Defendants were now free to investigate Lord in other ways, and that Defendants were free to go find him, because the MSP ERT was handling the evidence gathering.  Instead, Defendants decided with deliberation and reflection to spend approximately eight early investigation hours (about 5 p.m. on July 15 to 1 a.m. on July 16) gathering evidence, rather than keeping Irish safe and then doing the six initial investigative steps as part of finding and securing Lord.  *See* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247.

31.     Qualified.   In SMF 31, Defendants admit Irish provided Defendants with credible information related to her allegations of sexual assault, strangulation, and kidnapping by Lord.

32.     Qualified.   In SMF 32, Defendants admit Irish provided Defendants with additional credible information.   Defendants further admit they gained partial evidence such that Defendantsø investigation would not be complete, and not all facts would be in order, at the time Defendantsø left Lord their voicemail at 6:17 p.m. on July 16.  SMF 32 states this on its face. *See* OSMF 197, 198, 199, 200.

33.     Qualified.   In SMF 33, Defendants admit Defendants continued to make deliberate decisions with reflection at this new decision-making juncture, including but not limited to new decisions to not undertake any of the six requirements regarding Lord and regarding Irish as his sexual assault and domestic violence victim.   *See* Plaintiffsø Responses to SMF 16, 17, 28, 29, and 30, incorporated here with their Exhibits in their entirety; *see also* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247.

34.     Qualified.  In SMF 34, Defendants admit that Defendants, at this next decision-making juncture, continued to make deliberate and reasoned decisions by deciding: (i) not to spend any of this available time doing any of the other six initial investigative tasks, *see* Plaintiffsø Response to SMF 29; *see also* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247; (ii) never sending any MSP resource or Evidence Response Team (õERTö) to this second crime scene, *see* OSMF 142; and (iii) never again returning to this crime scene themselves, *see id.*; such that (iv) this second crime scene was never developed at all, meaning that (v) Defendants, here again, did not have all investigative facts in order before their voicemail to Lord.  *See* OSMF 142, (Fowler depo. 23, ln. 15 to p. 24, ln. 9); *see also* OSMF 197, 198, 199, 200.

35.     Qualified.  In SMF 35, Defendants admit to their subjective belief that they can graft additional factors onto M-4; here, Defendants speak of long work hours serving as an exception to M-4, which is impermissible.  *See* Exhibit 18 (M. Perkins 11/5/15 email to D. Crane) (written statement by Detective Perkins to the Maine State Police Incident Review Team (õIRTö) that Defendants should not be õbeholdenö to M-4 when Defendants have worked long hours).  *See also* OSMF 129 (õDetective Fowler and I worked an 18-hour day and then a 21-hour day.  To what end is an officer beholden to subsection E [of M-4, which says an officer shall stay with a victim to protect them]?ö) (Perkins depo. 68, ln. 11 to p. 69, ln. 21).

36.     Denied.  SMF 36 is denied for three reasons.  First, in SMF 36 Defendants omit a critical material fact from the timeline:  8:40 a.m. is the first material development of July 16, not 1:00 p.m., as Defendants claim.  At 8:40 a.m. on July 16, (i) Defendants learned from the first camp owner that breaking and entering occurred at the first camp on July 14, *see* OSMF 146; (ii) Defendants now had probable cause (õPCö) to arrest Lord; but (iii) Defendants did not tell this to

anyone else, ever, *see id.*; and (iv) Defendants decided at this new juncture to continue to make decisions after reflection and deliberation.  Among them:  Defendants decided to continue to not do any of the initial investigative tasks as to Lord, *see* Response to SMF 29; *see also* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247; and Defendants decided not to tell the Assistant District Attorney late that night on July 16 about the PC to arrest Lord for breaking and entering and the first camp, even when the A.D.A. was trying to decide if the D.A.'s Office could authorize an arrest of Lord on any charge that evening.  *See* OSMF 170.

37.     Objection.  Inadmissible; irrelevant.  *See* Fed. R. Evid. 402.

38.     Denied.  SMF 38 is denied for three reasons.  <u>First</u>, SMF 38 is denied for all of the reasons set forth in Plaintiffs' Reponses to SMF 16, 17, 28, 29, and 30.  Those Responses and their Exhibits are incorporated herein in their entirety.  <u>Second</u>, SMF 38 is denied because it is misleading.  Irish was working on her MSP statement (her second statement, after the 2-page BPD statement that Defendants had possessed for over twenty-six hours by this point, but did not read); Irish's MSP statement was 10-pages single spaced in small, legible handwriting; and Irish's combined statements, both oral and written, placed Defendants on notice of least nine (9) threats against four (4) people, including two children, and including threats of retaliation, including if Irish went to the police.  *See* Exhibit  11 of B. Irish Depo (Written Statement to MSP); *see also* SMF 49, 62; OSMF 149.  <u>Third</u>, SMF is denied because Defendants have not claimed that any of Irish's threat allegations or other allegations were inconsistent as among any of her two written statements (MSP, BPD) and five interviews (MSP (4), BPD (1)).

39.     Qualified.  This was Irish's second written statement; the first was the BPD statement. *See* Exhibit 34.

40.     Qualified.  In SMF 40, Defendants admit that, at this next juncture in Defendantsø investigation, Defendants made, with time for reflective deliberation, decisions to act and to not act yet again.  Here, instead of dividing up, and instead of working to start or complete any of the initial investigative requirements, *see* Response to SMF 29 and OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247, Defendants decided to jointly interview a non-eyewitness.  *See* OSMF 147.

41.     Objection.  Inadmissible; irrelevant; double hearsay.  *See* Fed. R. Evid. 402; Fed. R. Evid. 805.  If admissible, SMF 41 is admitted.  Here, Defendants assert the same admissions made by Defendants in SMF 40.  PlaintiffsøResponse to SMF 40 and its Exhibits is incorporated herein.

42.     Qualified.  *See* SMF 40 and PlaintiffsøResponses thereto, incorporated herein.

43.     Qualified.  *See* SMF 40 and PlaintiffsøResponses thereto, incorporated herein.

44.     Qualified.  *See* SMF 40 and PlaintiffsøResponses thereto, incorporated herein.

45.     Admitted.

46.     Objection.  *See* SMF 41 and PlaintiffsøResponses thereto, incorporated herein.

47.     Objection.  *See* SMF 41 and PlaintiffsøResponses thereto, incorporated herein.

48.     Objection.  *See* SMF 41 and PlaintiffsøResponses thereto, incorporated herein.

49.     Objection.  Inadmissible; irrelevant; double hearsay.  *See* Fed. R. Evid. 402; Fed. R. Evid. 805.  If admissible, SMF 49 is denied because Defendants omit testimony from Irish confirming that Adams could not have possibly heard the information Defendants claim in their SMF.  (Irish depo. 139, ln. 8 to p. 140 ln 25) (testimony by Irish that Adams was not present and Irish was alone with Defendants in a private room).

50.     Qualified.  In SMF 50, Defendants make four omissions and admissions.  First, Defendants omit the substantive content of Irishøs written MSP statement, in which Irish, under

12

penalty of perjury, stated that Lord had made (i) nine (9) separate threats (ii) against four (4) people, three of the threats being against (iii) Irish and her two children; with (iv) eight of those threats being predicate threats by Lord to support Lord's ultimate (iv) retaliatory threat.   In pertinent part from Irish's 10-page MSP statement, the nine threats appeared as follows:

1.      "[Lord] said . . . he would cut me [Irish] from ear to ear" [1. first death threat to Irish];

2.      "[Lord] said . . . I have someone picking up [Hewitt] and the boys [her children] the boys [sic] will be [released]. . . and [Hewitt] will be brought out here and tortured . . . and . . . [Lord] would take [Hewitt's] life and then [Irish's]" [2. second death threat to Irish; 3. first death threat to Hewitt; 4. torture threat to Hewitt; 5. and 6. abduction threats as to each of Irish's children] ;

3.      "[Lord] said he [would] tie me up[,] weigh me down and throw me in the lake . . . I could see the lake and I started to cry" [7. third death threat to Irish, 8. tying up threat to Irish] ;

4.      "[Lord] then told me . . . *not to try anything*." [9. retaliation threat to Irish.] (emphasis added).

(*See* Exhibit 11 of Brittany Irish deposition, written statement to Maine State Police); *see also* OSMF 150, 151, 219, 220.

51.      Qualified.   Brittany Irish did include all important details; it is Defendants who then omitted them:   Irish identified nine threats, including a retaliation threat.   *See* Exhibit 11 of Brittany Irish Deposition (Written Statement to MSP).   *See also* OSMF 150, 151, 219, 220; *see also* Plaintiffs' Responses to SMF 16, 17, 35, 38, 50, 52; those Responses and their Exhibits are incorporated herein in their entirety.

52.      Denied.   SMF 52 is denied for four reasons.   <u>First</u>, Defendants' own testimony contradicts SMF 52:   Defendants testified they cannot remember how long Defendants reviewed Irish's ten-page single-spaced written statement, if at all, which she gave to Defendants "shortly after" 4:00 p.m. on July 16.   *See* OSMF 148, 149, 150.   <u>Second</u>, SMF 52, on its face, states only

Defendant Perkins could have read the statement, and that no other Defendant read it. *Id.*  Third, even if any Defendant did read Irish's statement, it could not have been for more than 15 or 20 minutes (statement finished "shortly" after 4:00 p.m.; interview began at 4:24 p.m., *see* SMF 50, 54).  Fourth, assuming Defendants did read Irish's statement, Defendants then, with deliberation and reflection, decided to ignore the nine (9) threats, including the retaliation threat, set forth therein, *see* OSMF 150, and Defendants did not act to keep Irish safe under M-4, and Defendants did not undertake any of the six basic tasks required in MSP investigations.  *See* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247.  Instead, in SMF 52 Defendants admit that, at this new juncture, they made new decisions to act and not to act.  *See, e.g.,* SMF 36, 44, 77, 79 (Admissions by Defendants that they decided to jointly interview non-witnesses Adams, Hewitt, and Shahan *each* for a longer time than Defendants could have reviewed Brittany Irish's ten-page statement with its nine threats, including a retaliation threat).

53.     Denied.  SMF 53 is denied on multiple grounds, all stemming from material omissions by Defendants, and all of which have been denied and responded to at length *supra*.  *See* Plaintiffs' response to SMF 16, 17, 28, 30, 51, 52.  Those Responses and their Exhibits are incorporated herein in their entirety.

54.     Admitted.

55.     Qualified.  SMF 55 constitutes multiple admissions by Defendants.  First, Defendants admit they had time to decide, in advance, at this new juncture, that (i) their intent was to prematurely obtain a statement from Lord that evening, even with (ii) all of the evidence outstanding; and (iii) no matter what Irish might say in this, her first post-statement interview.  Second, Defendants admit they had time to decide, in advance, and had already jointly pre-

determined to (iv) place Irish's victim safety, pursuant to M-4, not first (as required, *see, e.g.,* OSMF 126, 128, 226), but rather secondary to Defendants' joint decision to prematurely obtain a statement from Lord before all of the evidence was in[2], *see* OSMF 197, 198, 199, 200.  Third, on the face of SMF 55, Defendants admit Defendants had already made up their minds as to both their timing and their manner of contacting Lord; it would not matter what Irish said.  *See* SMF 55 (stating that "[w]ithin the first three minutes of the interview," Defendants "told" Irish that Defendants "needed" to obtain a statement from Lord "that evening.").  Fourth, Defendants admit another material fact regarding manner of contact:  Defendants had decided they would consider only one of the four options Defendants were trained and required by the MSP to collectively evaluate before contacting a suspect, *see* OSMF 209, 210, 211, 212, 213, 214, 215, 216; and, further, that Defendants had not considered the appropriate MSP factors for those four options, *see id.*, but rather had grafted into MSP training their own factor, "efficiency," which is not a MSP factor that may be considered.  *See id.*

56.    Admitted.

57.    Qualified.  In SMF 57 Defendants admit two material facts.  First, Defendants admit Defendants did not apply the appropriate MSP factors:  Whether Detective Perkins "ha[s] no problem" with leaving a voicemail with a suspect on the undisputed facts of this case is not consistent with MSP training; there are both MSP training factors and a MSP objective reasonableness standard Defendants must consider, but Defendants did not consider them and

---

[2]    Prior to Defendants' leaving Lord their voice mail at 6:17 p.m. on July 16, the investigative facts and crime scenes that Defendants had not developed or did not know include, but are not limited to: (1) not knowing Lord's criminal history; (2) whether he was on (or in violation of) probation; (3) whether he had any felonies for rape or DV; Defendants also did not know (4) the results of the rape kit examination from the hospital, or (5) whose fingerprints Defendants had found at the first camp, or (6) whether there was evidence at the second camp Defendants had not gone back to, or (7) what evidence was on Irish's clothes that she had provided; or (8) what propensity for (9) risk and/or (10) recidivism Lord posed as to (11) Irish, (12) her children, or (13) other people (such as Hewitt or Lord himself).  This list is not exhaustive.

made up a new one.  *See* OSMF 209, 210, 211, 212, 213, 214, 215, 216.  <u>Second</u>, Defendants admit they did not assess the risk of placing a voice mail with Lord at all; Defendants decided, with deliberate indifference, after having had time to reflect, reason, confer, and jointly decide, that Defendants "have no problem calling [Lord's] cellphone [because Lord] can say –'no thank you'– and if he does, he does, I mean, we'll carry on." SMF 57 (citing Perkins Aff. par. 49 and Exhibit C thereto).  This is undisputed evidence of Defendants consciously disregarding the risk posed by Lord with deliberate indifference after having deliberated on the question, together as two Detectives, prior to making this statement to Irish.

58.     Denied.  SMF 58 is denied on multiple grounds, all stemming from material omissions by Defendants, and all of which have been denied and responded to at length *supra*.  *See* Plaintiffs' response to SMF 16, 17, 28, 30, 51, 52, 53.  Those Responses and their Exhibits are incorporated herein in their entirety.

59.     Denied.  SMF 59 is denied for two reasons.  <u>First</u>, Irish complied voluntarily with a request from two Maine State Police Detectives. (Perkins Aff. par. 56) (Brittany Irish depo. 201, ln. 17 to p. 202, ln. 9)  <u>Second</u>, SMF 59 is denied because Defendants seek inferences and facts viewed in the light most favorable to Defendants.  Defendants are movants; only Plaintiffs, as non-movants, are entitled to reasonable inferences and to have the facts viewed in the most favorable light.

60.     Denied.  Defendants interviewed Irish for only about 30 minutes or less, (Fowler Aff., pars. 17-18) and Defendants do not allege or cite evidence showing they asked a single question regarding the topics Defendant identified in SMF 16, 17, 28, 30, 51, 52, 53, 62, 63.

61.     Denied.  In SMF 61, Defendants omit and misstate Irish's testimony.  Irish testified that she understood that Defendants would be calling Lord "[l]ater that night, yes, as [Detective

Perkins] had said.ö  (Irish depo p. 198, ln. 25) (also testifying that Detective Perkins had said he would call Lord öthat evening.ö).  Defendants do not allege or cite any evidence showing Defendants told Irish they would be calling Lord at or around the dinner hour, early evening, the hour of 6:00 p.m.; nor do Defendants offer any evidence as to what Defendants did with the 75 minutes of time between SMF 60 and SMF 64.

62.    Denied.  SMF 62 is denied on multiple grounds, all stemming from material omissions by Defendants, and all of which have been denied and responded to at length *supra*.  *See* Plaintiffsø response to SMF 16, 17, 28, 30, 51, 52, 53, 62, and 63.  Those Responses and their Exhibits are incorporated herein in their entirety.

63.    Denied.  SMF 62 is denied on multiple grounds, all stemming from material omissions by Defendants, and all of which have been denied and responded to at length *supra*.  *See* Plaintiffsø response to SMF 16, 17, 28, 30, 51, 52, 53, 62, and 63.  Those Responses and their Exhibits are incorporated herein in their entirety.

64.    Qualified.  In SMF 64, Defendants make multiple admissions:  (i) Defendants, after time to deliberate, decided to (ii) ignore the relevant options and factors required by the MSP before contacting a suspect, *see* OSMF 209, 210, 211, 212, 213, 214, 215, 216; (iii) Defendants prematurely contacted a suspect, before all of the evidence of the investigation was in, *see* OSMF 197, 198, 199, 200; (iv) Defendants did not first act to keep Brittany Irish safe at this or any other time (at this particular juncture, 6:17 p.m., they had sent her home for her clothes, an address that Lord knew, such that Lord would be receiving the voice mail while Irish was alone at her home at Defendantsø request), *see* OSMF 126, 128, 226; and (v.)  Defendants had decided to continue to act, and not act, in violation of MSP and training as to the six basic investigative

tasks they had regarding Lord.  *See* SMF 87, 88; *see also* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247.

65.    Qualified.  In SMF 65, Defendants make several admissions.  <u>First</u>, they admit they deliberated upon, and with reflection decided to leave a voicemail identifying Detective Perkins in the plural, not the singular:  ̃This is Detective Perkins . . . from the Maine State Police . . . [is] there[] a time that *we* could speak with you.̈ (Perkins Aff. par. 57) (emphasis added).  <u>Second</u>, Defendants admit they used the dispatch number, not an officer̈s cell number, and that they did not use any information referring to any of the facts set forth in SMF 69-73.  <u>Third</u>, Defendants also admit they deliberated and made the separate decision, also with time to reason, to leave a voicemail with these elements, rather than hang up, and leave no voicemail, if Lord did not pick up the call. (Perkins Aff. par. 58  These facts are material: They are set forth in Defendants̈ SMF 64, 65, 67, 69, 70, 71, 72, and 73.  <u>Fourth</u>, these facts, admitted to by Defendants in their own SMFs, show that Lord (i) received a call from Defendants; (ii) Lord cross-checked the unrelated Detective Pickering̈s cell phone in the same minute, to confirm the unrelated Detective Pickering had not placed the call; and then (iii) Lord disappeared to commence his additional criminal acts.  *See also* OSMF 251, 252.  In SMF 65, Defendants̈ own voicemail, both in the fact that Defendants left it, and in the manner (words) that Defendants used when leaving it, enabled Lord to deduce in less than one minute that Irish had gone to the police despite his retaliation threats to her.  It is undisputed that Lord was able to deduce this with one (1) phone call in just one (1) minute, the exact same minute, 6:37 p.m., due to the fact of, and words of, Defendants̈ voicemail.  The tip-off was that clear; these are Defendants̈ own facts.  *See* SMF 65 (Defendants place voicemail to Lord at 6:37 p.m.); SMF 72 (Lord calls unrelated Detective Pickering̈s cell phone at exact same minute, 6:37 p.m., to confirm it is not Pickering calling, but

rather that Irish has gone to the police despite his retaliation threats).  *Accord* OSMF 251, 252 (discussing the evidentiary facts to which Lord agreed when he pleaded guilty).  <u>Fifth</u>, Defendants admit that at no time were Defendants in contact with Detective Pickering about this circumstance; Defendants had decided not to address this contingency before placing their voicemail.

66.    Denied.  *See* this Court's 6/4/19 Order on Motion to Amend Plaintiff's Response To Request For Admission.  See also Response to SMF 65.  *See also* OSMF 251, 252.

67.    Qualified.  SMF 67 is an also admission by Defendants that Lord was tipped-off by the voicemail.  *See also* Plaintiffs' response to SMF 65, which is incorporated in its entirety herein.

68.    Denied.  *See* this Court's 6/4/19 Order on Motion to Amend Plaintiff's Response To Request For Admission.  *See also* OSMF 251, 252.

69.    Admitted.

70.    Admitted.

71.    Admitted.

72.    Qualified. SMF 72 is an admission by Defendants that Lord immediately eliminated his son's homicide investigation as the reason for Defendants' 6:37 p.m. voicemail, and that Lord immediately deduced that Irish had gone to the police despite his retaliation threats.  This took Lord one call and one minute to figure out.  *See* Plaintiffs' responses to SMF 65 and 67.  Those responses are incorporated in their entirety herein.

73.    Qualified.  SMF 73 is an admission by Defendants that Lord immediately eliminated his son's homicide investigation as the reason for Defendants' 6:37 p.m. voicemail, and that Lord immediately deduced that Irish had gone to the police despite his retaliation threats.  This took

Lord one call and one minute to verify.  *See* Plaintiffs' responses to SMF 65, 67 and 72.  Those

responses are incorporated in their entirety herein.  *See also* OSMF 251, 252.

74.     Denied.  SMF 74 has a significant material omission and is not accurate.  *See* Plaintiffs'

Responses to SMF 16, 17, 20, 27, 28, 38, 51, 52, 53, 55, 58, and 62, incorporated herein.  At this

time, 6:30 p.m., just thirteen (13) minutes after Defendants' 6:17 p.m. voicemail to Lord, Irish

repeated her concern about Defendants contacting Lord given his retaliation threats if Irish went

to the police.  Irish, who had been articulating this concern since 3:05 p.m. on July 15, a day

earlier, now repeated this to Detective Fowler.  (Irish depo. p. 272, ln. 1-15).  Defendants admit

this occurred at 6:30 p.m., 13 minutes after the voicemail.  *See* SMF 74, 75, and 76 ("At 6:30

p.m. on July 16 . . . Irish told [Defendants] that she was afraid that Lord would hurt her if the

police left a voicemail message for him." SMF 74-76.  As shown in Plaintiffs' responses to SMF

16 and 17, it is undisputed that, before the 6:17 p.m. voicemail, Irish had already articulated fears

of retaliation and harm if she went to the police; as such, just thirteen minutes after 6:17 p.m.,

she was now in SMF 74 repeating her fears of retaliation, including that Lord would hurt her if

the police left a voicemail.  *See also* OSMF 140, 141.

75.     Denied.   *See* Plaintiffs' Response to SMF 74, incorporated here in its entirety.

76.     Denied.  *See* Plaintiffs' Response to SMF 74, incorporated here in its entirety.  *See also*

Plaintiffs' Responses to SMF 16, 17, 20, 27, 28, 38, 51, 52, 53, 55, 58, and 62, incorporated in

their entirety herein.

77.     Qualified.  SMF 77 is an admission by Defendants that, even upon purportedly hearing

new information from Irish regarding retaliation threats for allegedly the first time ever at 6:30

p.m., Defendants, with deliberation and reflection, decided not to make the victim safe, and did

not commence any of the six basic investigation steps as to Lord, but instead decided to jointly

interview a non-eyewitness from whom only information regarding Irish's credibility was sought. *See* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247.

78.    Objection.  Inadmissible; irrelevant; *See* Fed. R. Evid. 402.

79.    Qualified.  SMF 79 is an admission by Defendants that, even upon purportedly hearing new information from Brittany Irish regarding retaliation threats for allegedly the first time ever at 6:30 p.m., Defendants, with deliberation and reflection, decided not to make the victim safe, and did not commence any of the six basic investigation steps as to Lord, but instead decided to jointly interview a non-eyewitness from whom only information regarding Irish's credibility was sought.  *See* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247.

80.    Objection.  Inadmissible; irrelevant; *See* Fed.R.Evid. 402.

81.    Objection.  Inadmissible; irrelevant; *See* Fed.R.Evid. 402.

82.    Denied.  SMF 82 contains omissions and multiple admissions.  It was not just "a" barn fire, but also the following.  First, Defendants immediately suspected Lord as the arsonist; *see infra*; *see also* OSMF 162.  Second, SMF 82 is an admission by Defendants that Lord's acts the night of July 16, beginning with this act of arson, were foreseeable and fairly directly related to Defendants' 6:17 p.m. voicemail:  Defendants admit another MSP detective (not on the case) deduced to call Defendants about this fire, making the connection, *see* SMF 82, and at 8:05 p.m., just 2.5 hours after Defendants had placed their voicemail to Lord, Detective Perkins testified that he suspected Lord immediately, simply upon hearing the words barn, fire, and Benedicta. *See* OSMF 162 (testimony by both Detective Perkins and Detective Fowler that they suspected Lord for the barn arson upon first hearing of "a" barn fire in Benedicta).  Third, given Lord's

previous threats, known to Defendants, and Defendantsø voicemail, the barn fire was not mere arson:  It was a threat, a physical threat to Irish and her family (constituting (i) terrorizing and punishing Irish for going to the police, (ii) proof that Lord would make good on his threats, and (iii) a new threat that physical bodily harm would be next, not just a barn, if Irishøs police cooperation continued).  Fourth, it was also, under M-4, a new DV incident at a new DV scene involving Irish.  *See* OSMF 126.  Fifth, Defendants would be the first MSP responders to this new DV scene involving Brittany Irish, *see* SMF 93; *see also* OSMF 126; *see also* Plaintiffsø objections and responses to SMF 16, 17, 20, 27, 28, 38, 51, 52, 53, 55, 58, and 62, incorporated herein; *See* also Exhibit 11.

83.    Qualified.  In SMF 83, Defendants make multiple admissions. First, Defendants admit that, while driving seventy-five miles together in response to a new, foreseeable, escalating danger zone, Defendants still decided at this new juncture, with deliberation, not to commence any of the six basic MSP investigative tasks as to Lord.  *See* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247.  Second, Defendants also continued to decide that M-4 did not apply to them; Defendants deliberately decided not to keep the victim, Brittany Irish, safe, with respect to any location, or with respect to Lord.  *See* OSMF 119, 120, 121, 122, 123, 124, 125, 126, 244, 245. Third, Defendants made promises and undertook acts that Irish could reasonably rely upon to conclude she would be made safe, acts and words by Defendants that foreseeably brought Brittany Irish into a known danger zone regarding Lord.  *See, e.g.,* 9:24 p.m. call with Brittany Irish, *see* OSMF 163, 164, 166, 171, 175, 183, 184.  Fourth, Defendants did not help Irish get to a safe place away from the new DV scene at the Benedicta home; and Defendants did not even call Irish to warn her that, due to the arson, Lord might be near her parentøs house, such that the house might not be safe.

<u>Fifth</u>, Defendants did not use the idle time of the seventy-five mile drive to review, adjust, modify, revisit, or revise any of their investigation plan, or their protection duties under M-4, or any of their decisions in the prior thirty-two hours since starting their investigation.  All of these decisions to act and not act by Defendants are undisputed admissions in relation to SMF 83 that were omitted by Defendants.  *See* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247.

84.    Admitted.

85.    Admitted.

86.    Qualified.   SMF 86 contains omissions and admissions.   <u>First</u>, Defendants now had knowledge of yet another threat by Lord, and another explicit death threat.  Yet, Defendants did not take any steps while driving to initiate any required M-4 protection measures for Brittany Irish, the victim, nor undertook any of the six basic investigation steps as to Lord.  *See* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247.   <u>Second</u>, Defendants did not use this phone call with Irish to warn her about the danger of staying at the Irish home.  Instead, by words and actions, Defendants indicated they would be there, too, and did not tell Irish of the foreseeable danger and the fairly direct connection between the voicemail, the barn fire, and the latest verbal threat that was developing. *See* OSMF 163, 164, 166, 171, 175, 183, 184.

87.      Denied.   SMF 87 contains an omission.   Defendants did not tell the Assistant District Attorney about the breaking and entering probable cause learned by Defendants at 8:40 a.m. on July 16, 2015.  *See* SMF 88, 92 (A.D.A. considered only kidnapping and rape for arrest); *see also* OSMF 170.   In addition, Defendants did not tell the A.D.A. that they had not commenced any of the basic investigative steps as to Lord.  *See* SMF 88.

88.    Qualified.   SMF 88 is a further admission by Defendants that their voicemail was premature due to too little evidence having been gathered at the time of the voicemail.

89.    Denied.  Defendantsø own testimony states that there was no search to join until 10:05 p.m. at the earliest, and perhaps not until 11:00 p.m. (*see* SMF 91 and OSMF 169 regarding conflicting testimony on this point).  Separately, Defendants Perkins and Fowler did not arrive in Benedicta until 10:36 p.m., *see* SMF 93, and the undisputed evidence is that all three Defendants stayed together, with a fourth officer, a Trooper, (presumably for their own safety), when they made their first search for Lord at his residence at 12:30 a.m.  *See* SMF 97.

90.    Qualified.  SMF 90 is also an admission by Defendants that at least two MSP Troopers were available that night (but not used) to help Defendants keep the victim safe in compliance with M-4.   SMF 90 is also an admission by Defendants that Defendants knew Lord posed an extreme danger, even to trained professionals with weapons, in that Defendants sent two Troopers together (but did not provide any for the DV victim, leaving her alone).

91.    Denied.  First, Defendantsø testimony is unclear; SMF 91 may have occurred at 10:05 p.m., or it may have occurred at 11:00 p.m.  *Compare* OSMF 169 and SMF 89, 90, and 91 (Defendants place the time, be it 10:05 p.m. or 11:00 p.m., as referring to three events:  The beginning of the search for Lord, the initial stop and hold, and the subsequent use caution warning for officers to all be õnot long afterö each other. Second, with either time, Defendants had opportunity to reflect and decide on the risk Lord posed to officers:  Defendants revisited and revised their initial õstop and holdö statewide request because, õnot long afterö, Defendants decided and acted to add a õuse cautionö warning to advise their fellow law enforcement officers. In addition to being the only evidence in the entire record of Defendants reconsidering or amending a decision or action, this omitted fact in SMF 91 is material because it shows

Defendants could foresee the danger created and exacerbated with respect to Lord.  Put another way, Defendants objectively concluded that law enforcement needed special warnings --- even though these officers were trained professionals who carried weapons.  *See* OSMF 169 (four citations to Detective Perkins' testimony on these topics).  Yet, Defendants did not revisit any of their decisions with respect to keeping Brittany Irish safe, nor their decisions not to investigate Lord.  *See* SMF 91, OSMF 126, 169, *see also* OSMF 119, 120, 130, 194, 195, 196, 201, 203, 217, 218, 223, 224, 226, 227, 228, 229, 230, 231, 232, 243, 246, and 247.

92.    Qualified.  SMF 92 is a further admission by Defendants that Defendants ignored other avenues for arresting Lord:  By only briefing the A.D.A. on sexual assault and kidnapping, Defendants ignored (a) the probable cause Defendants had regarding the breaking and entering at camp one (PC that Defendants had possessed since 8:40 a.m. on July 16, 2015, *see* OSMF 146, 170, and (b) probable cause for the "whole plethora" of DV crimes that can be charged.  *See* OSMF 231 (testimony of Maine Criminal Justice Academy (Director Rogers) stating "[the officer should be] in . . . the development stage of probable cause to see whether or not  . . . to charge somebody with a particular crime of domestic violence.  I say a particular crime because there's a whole plethora of those [DV crimes for which PC can be developed]."

93.    Qualified.  SMF 93 is an admission of an unexplained time gap, combined with time to reflect and deliberate, for Defendants:  2.5 hours to travel seventy-five miles in a police car. SMF 93 is also an admission that Defendants continued to worry about Brittany Irish's safety (by arriving at the scene of the arson and the Irish home, where Irish was). SMF 93 is also an admission that Defendants did not use any of that time to advance the investigation as to Lord, nor to secure safety for Irish pursuant to M-4.  *See* SMF 82, 83, 93 (showing it took the Defendants 2.5 hours to reach the Irish residence (8:05 p.m. to 10:36 p.m.).  Defendants made

promises to Brittany Irish, through Defendants' oral statements to Brittany Irish, beginning at 9:24 p.m., and through Defendants' actions that Defendants conveyed to Brittany Irish. *See* SMF 96 (discussing the promises Defendants started making at 9:24 p.m. on July 16, 2015). *See also* OSMF 163, 164, 166, 171, 175, 183, 184. There is conflicting evidence by Detective Perkins' testimony on whether these promises reassured Irish that needs to be resolved:

Q:      She was reassured by the fact that you were going to be up there as well[?]

    AAG TAUB:      Objection.

A.      I'm not sure.

Q.      I'm just asking, was she reassured?

    AAG TAUB:      Objection.

A:      I don't know.

Q.      Did she say to you, I'm reassured that you're going to be there?

A:      I don't recall.

Q:      When you say I don't recall, does that mean, it didn't happen or are you saying you just don't remember one way or the other?

A:      I don't remember one way or the other.

(Perkins depo. 111, ln. 1-14); *see also* OSMF 163 (summarizing this testimony).

94.      Qualified. SMF 94 is also an admission by Defendants that Defendants were the first responding MSP officers to a new DV situation and DV scene, due to the barn fire arson likely started by DV suspect Lord as a threat to DV victim Irish, that was part of their DV investigation where victim Irish already was present (rendering M-4 indisputably applicable to them even if Defendants' incorrect personal interpretations of M-4 were somehow credited as correct). *See* OSMF 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133. It is undisputed that the barn that burned was very close to the Irish home. *See* OSMF 171. It is undisputed the K-9 unit was immediately called by Defendants, *see* SMF 94,

because the arson suspect, Lord, was likely in the immediate area. *See* OSMF 162, 163, 164, 165. SMF 94 is also an admission by Defendants that now a third and fourth MSP resource was now available to provide M-4 protection to the victim as required by policy: After "look[ing] for a track" both the Trooper-handler and the K-9 trained dog could have been placed on the premises around the Irish home to keep Irish and her family safe. *See id.*

95.     Qualified. SMF 95 is an admission by Defendants that Defendants decided to never try or attempt to learn Lord's criminal history, nor his probation status, until almost midnight on July 16, 2015, which was thirty-five hours after the Defendants' had the initial facts of this case, and about thirty-three hours (since 2:00 p.m.) on July 15, 2015) after the Defendants had the BPD written statement (which included a death threat against Irish) and other information. *See* SMF 16, 17, 18, 51, 62; *see also* OSMF 172, 173.

96.     Qualified. SMF 96 is an omission and an admission by Defendants that Irish's midnight call was not a first or new call, but rather perseverance and persistence by a rape and DV victim to get help and safety, given her reasonable reliance on statements and actions by Defendants, and given her continued articulation of credible threats and her fear of retaliation that were now manifesting in real time. Brittany Irish had articulated her concerns to Defendants starting at 3:05 p.m. on July 15, 2015. *See* OSMF 140, 141; *see also* OSMF 16, 17, 28, 30, 51, 52, 53, 62, and 63; (those Responses and their Exhibits are incorporated herein in their entirety). SMF 96 is also an admission by Defendants that their 9:24 p.m. promises to Irish (one verbal, one through action) that Defendants would be at her parents' home too, (OSMF 164) *see id.* As such, SMF 96, Brittany Irish's midnight call, constitutes Irish calling Detective Perkins as a follow-up to her reliance on Detective Perkins' 9:24 p.m. words (we the Detectives are coming and will be there) and Detective Perkins' and Detective Fowler's separate actions which started at 8:05 p.m. and

were continuing (*i.e.,* Detectives Perkins and Fowler were already driving there, consistent with his words).  This all had placed Brittany Irish at a new DV scene, and Defendants had not advised her to leave that scene.  Yet, the detectives, except for a short time around 10:36 p.m., were never in the area of the Irish home at all.  (*See* SMF 163, Perkins depo. 110, ln. 12 to p. 111, ln. 14.)  *See* SMF 83, 86, 93, 96, *see also* OSMF 163, 164, 171, 175, 177, 178, 179, 180, 181, 182, 183, 184, 185;  *see also* OSMF 186, 187 (testimony of Detective Fowler stating Defendants "basically just drove around different areas . . . hoping to see a truck or someone, anything like that.  So that's what we did . . . . I don't recall [if] . . . we drove around or whatever we did to be honest.") (Fowler depo 57, ln. 24-25, p. 58, ln. 1-20)

97.     Qualified.  SMF 97 is an admission by Defendants that Defendants viewed Lord to now be, after their 6:17 p.m. voicemail, such a danger that four (4) MSP officers had to go together to his home address, while no officers were placed at or near the Irish home.  SMF 97 is also an admission that a fifth additional MSP resource, another Maine State Trooper, was available to comply with M-4 and provide victim safety protection.

98.     Denied.  Defendants' testimony is that Sergeant Crane at 1:00 a.m. on July 17 initially refused Irish's latest check-in, made an hour earlier, without a stated reason, and then Sergeant Crane cited lack of manpower as an afterthought.  *See* OSMF 177, 178 ("No, we're not . . . No, we are not going to provide --- we don't have the manpower to provide overnight security."). (Perkins depo. 50, ln. 1-12) SMF 98 is an admission that Defendants decided together at 1:00 a.m. to tell a victim two false statements:  (1) there was no MSP manpower; and (2) MSP cannot abide by M-4 and provide the required protection); both were false statements that Defendants

would not convey until an hour later, at 2:00 a.m., *see* OSMF 182, 183, when it is undisputed there were at least ten (10) MSP resources in the immediate area.[3]

99.    Admitted.

100.    Qualified.  SMF 100 is also an admission by Defendants that in response to an ongoing midnight follow-up request by a DV victim for protection and safety (which is mandated by MSP M-4 policy), and which was confirmed by, and foreseeable from, Defendants' 9:24 p.m. promises, *see* OSMF 163, 164.  First, Defendants took a full two hours to respond to Brittany Irish.  It is undisputed this was a two-hour delay without need and the decision to delay was made with time to reflect and deliberate.  *See* SMF 96, 97, 98, 99, 100, 101.  Second, it is an admission that during this two-hour time block, given all other statements and actions by Defendants that night, *see* OSMF 163, 164, it was reasonable for Irish to conclude the two hours of silence after her latest protection check-in meant she was continuing to receive the protection arising from the 9:24 p.m. promises.  *See id.*  Third, it is an admission that, after Defendants met alone at 1:00 a.m. to decide to use lack of manpower as the reason for denying Brittany Irish's midnight follow-up check-in for the required M-4 policy protection, *see* OSMF 177, 178, it was not until another hour later, at 2:00 a.m., that Defendants, having used that hour to reflect and deliberate, decided to still go forward and affirmatively tell Irish a statement that was both a false statement and one in violation of M-4 policy, *see* OSMF 183, 184.  That SMF 100 is a false statement by Defendants is undisputed because there were at least ten (10) MSP resources in the immediate area.  See Response to SMF 98; *see also* OSMF 179.

---

[3] (1) Sergeant Crane, (2) Detective Perkins, (3) Detective Fowler, (4, 5) the two Troopers who checked-in on the first Lord address (*see* SMF 90), (6) the Trooper who went with all three defendants to check-in on the second Lord address, for a team of four (*see* SMF 97), (7) the Detective at the gas station dumpster collecting evidence and (8) the Trooper also at the same dumpster collecting evidence (*see* OSMF 179, 182), and finally (9, 10) the K-9 Trooper and the K-9 dog (*see* SMF 94).  This list of 10 available MSP resources in the area does not count available off-duty Maine State Police, and it does not count on-duty and off-duty local police.  *See* SMF 90, 94, 97; OSMF 179, 182 (identifying all resources available.)

101.    Denied.  *See* OSMF 184 (testimony of Detective Fowler stating that he heard Detective Perkins tell Brittany Irish that Defendants were still looking for Lord and that there would not be a security detail posted at her parent's residence, because we didn't have the manpower to do it.) (Fowler depo. 51, ln. 1-12.).  A factfinder could infer that while MSP would not be posted right at the residence, that they would be nearby looking for Lord.

102.    Denied.  The undisputed facts are that, instead of searching the area for Lord, Defendants met in other towns to decide to tell Brittany Irish of "lack of manpower"; met in other towns to talk with other MSP resources who were in a dumpster instead of protecting the DV victim; and then Defendants next testified Defendants don't remember what exactly they were doing.  *See* OSMF 163, 164, 171, 175, 177, 178, 179, 180, 181, 182, 183, 184, 185.  *See also* OSMF 186, 187 (testimony of Detective Fowler stating Defendants "basically just drove around different areas . . . hoping to see a truck or someone, anything like that.  So that's what we did . . . . I don't recall [if] . . . we drove around or whatever we did to be honest.") (Fowler depo 57, ln. 24-25, p. 58, ln. 1-20)

103.    Admitted.

104.    Qualified.  *See State v. Lord*, 2019 ME 82, __, A.3d __.

105.    Qualified.  SMF 105 contains the qualifiers "depending on the circumstances" and "may"; as such, conversely, depending on the circumstances, it also may not be acceptable to call a suspect on the phone.

106.    Qualified.  Defendants and MSP leadership have themselves testified that if there is no articulated MSP standard of care, then all MSP decisions and actions must follow MSP training and the default objective reasonableness standard.  *See* OSMF 194, 195, 196, 214.

107.    Qualified.   MSP Training addresses the options and factors to consider.  *See* OSMF 209, 210, 211, 212, 213, 214, 215, 216.

108.    Qualified.   Defendants themselves have testified that if there is no articulated MSP standard of care, then all MSP decisions and actions must follow MSP training and objective reasonableness.  *See* OSMF 194, 195, 196, 214.

109.    Denied.  SMF 109 is not an accurate representation; the deponent twice testified he was not aware of any such policies, which is different than testifying that there is no such policy. SMF is thus both inaccurate and an omission.  (Van Blaricom (Expert) depo. 93, ln. 10-17)

110.    Denied.  Defendants themselves have testified that if there is no articulated MSP standard of care, then all MSP decisions and actions must follow MSP training and objective reasonableness.  *See* OSMF 194, 195, 196, 214.

111.    Admitted.

112.    Denied.   The MSP Academy Director of Training (Rogers) and Detective Fowler contradict Detective Perkins.   *See* OSMF 228, 231 (the purpose of risk assessment exists independent of the Ontario Domestic Assault Risk Assessment (ōODARAö) *see* Exhibit 29 and MSP officers are trained to assess propensity for recidivism and future harm of a victim using four factors);  (Maine Criminal Justice Academy depo. (Director Rogers) 15, ln. 16-25, p. 16, ln. 1-24)

(that there is nothing in ODARA that says it cannot be used to assess how much victim protection may be needed in order to comply with M-4).

**PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

A.      *Facts Relevant to MSP DV Policy / General Order M-4.*

*All Officers Are Required To Abide By M-4, But Some Interpret That Defendants Do Not.*

113.    MSP "DV Policy M-4" deals with "DV investigations." (MSP 30(b)(6) (Cote) depo. 16,

ln. 22-25 (Deputy Chief); M-4 is an MSP general order; a policy for DV and response to it,

including investigations. (MSP Lt. Grzyb depo. 6, ln. 25 to p. 7, ln. 4); "[T]he DV policy M-4 . .

. . [is] a way to guide . . . spoon-feed . . . proper steps." ((30(b)(6) MSP depo. 16, ln. 1-8)

114.    General Order M-4 is applicable to road troopers, detectives, all members of the Maine

State Police.  (Lt. Grzyb depo. 47, ln. 24 to p. 48, ln. 2)

115.    M-4 is "[a]bsolutely" applicable to all MSP members whether Defendants are in a major

crimes unit [MCU] or not.  (Grzyb depo. 47, ln. 24 to p. 48, ln. 4)

116.    M-4 is not discretionary, yet "the major crimes unit [MCU] really does not abide by [M-

4][.]" MSP 30(b)(6) (Cote depo. 16, ln. 12-17).  "[A]s far as having to abide word-for-word or

having M-4 kind of dictate that investigation, that's not really how M-4 is applied [by the

MCU]." MSP 30(b)(6) (Cote depo. 16, ln. 19-21; Cote depo. 15, ln. 25 to p. 16, ln. 25)

117.    Some officers treat "DV policy M-4 . . . as a . . . guideline to a more traditional domestic

call, something that is active and ongoing or has just happened, and it really is a guide to a

uniform officer who doesn't deal with larger, more complex investigations." (Cote depo. 16, ln.

1-6)  "[T] those of us with [MCU] experience . . . our interpretation is that M-4 would not apply

in this case." (Cote depo. 20, ln. 2-6)

118.    Detective Fowler of the MCU received all mandatory training for the M-4 policy.

(Fowler depo.  16, ln. 7-9)  Detective Fowler testified Exhibits A and B of his deposition are the

M-4 policy and the related state statute he was trained on.  (Fowler depo. 16, ln. 10-17)

119.    Detective Fowler testified he agrees "one of the foremost goals you have is to protect the victim." (Fowler depo. 35, ln. 21-23)  It's important the victim be made safe, before there's first contact with the offender.  (Fowler depo. 11, ln. 25 to p. 12, ln. 2)

120.    Detective Fowler testified if he is at the scene of where a DV incident occurred, "then I have to follow the steps in our M-4 protocol.  I have to . . . . we got to make sure that the victim feels safe or encourage the victim to go somewhere where she is going to feel safe or should be safe." (Fowler depo. 39, ln. 21 to p. 40, ln. 5)  Detective Fowler testified he is going to stay with a DV victim if it's necessary." (Fowler depo. 40, ln. 7-8)

121.    Detective Perkins and Sergeant Crane of the MCU never agreed that M-4 applies to them. SMF 1-112; OSMF 113-252.

*Facts showing Irish's case was both sexual assault <u>and</u> domestic violence.*

122.    In his report on Irish's allegations, Detective Perkins put the subject as rape and also a DV crime.  (Perkins depo. 70, ln. 3-12)

123.    Findings made by the MSP IRT [Incident Review Team] showed the Irish case was both a rape claim and also a DV situation because there were such things as the seat belt strangulation. (Grzyb depo. 48, ln. 11-17)  Because Irish was a sexual partner of Lord, her case fell within the household and family member definition of DV assault because "it talks about partners and former partners." (Grzyb depo. 48, ln. 23 to p. 49, ln. 4)

124.    Grzyb testified as such, the requirements of order M-4 were important to be considered in the strategy of investigating the crimes in this case.  (Grzyb depo. 49, ln. 5-8)

125.    MSP's training academy scenarios expand all members' understanding of DV. "[DV] is a very wide and broad topic." MSP 30(b)(6) (Cote depo. 43, ln. 20 to p. 44, ln. 3)  Detective Perkins defines "DV" to mean "violence that occurs between intimate partners, household family

members"; Defendants can be intimate partners and not live in the same household; Defendants can also include former sexual partners."  (Perkins depo. 19, ln. 18 to p. 20, ln. 4)

126.    MSP Leadership testified barn burning is not just a violent act; it can be an act of DV. (Grzyb depo. 56, ln. 14-19) (testifying for MSP IRT that "Someone might argue the fire could have been" a DV incident and scene."); (Van Blaricom (Expert) depo. 138, ln. 6-10) ("The barn burning is a violent act and [the Detectives] suspected [Lord] did that, that's why Defendants drove up there, and then the priority becomes protection of the victim, that's always the priority, and [the Detectives] simply ignored that.")

*M-4 is Mandatory, But Some Defendants Apply It Differently.*

127.    Detective Perkins testified his view is "State Police policies are a guideline that should be followed when you can follow them", even when an MSP Order is titled "Operations General Order".  (Perkins depo. 18, ln. 8-11)  Detective Perkins disagrees with the language in M-4 that states "Given that this is a statutorily mandated policy, officers must abide by this policy as it applies to all standards of the Maine Criminal Justice Academy[.]".  (Perkins depo. 20, ln. 5-18) This despite Detective Perkins testifying the M-4 order and the related statute employ the word "shall", which Detective Perkins understands to mean "mandatory"; and the word "immediately", which Detective Perkins understands to mean "without delay".  (Perkin depo. 15, ln. 4-20; Perkins depo. 23, ln. 3-17; Exhibits A and B)  Detective Perkins understands the language of both M-4 and its related Maine State statute.  (Perkins depo. 14, ln. 10 to p. 23, ln. 24)

128.    Detective Perkins testified, if he had applied M-4, he would apply his own interpretation of it.  "I'm going to stay with them [victims] as long as it's reasonably practical to conduct my investigation, as it serves the purpose of furthering my criminal investigation.  But, yes, I could

stay with that person for a period of time.ö  (Perkins depo. 28, 12-16)  Detective Perkins believes

protecting the safety of the victim is important, but situational.  (Perkins depo.  27, ln. 14-22)

*Grafting Factors Like Work Hours Into M-4 So That Defendants Are Not Beholden To It.*

129.    Detective Perkins testified he wrote to the MSP IRT [Incident Review Team], through an

email sent to Sergeant Crane [*See* Exhibit 18], as follows:  öDet. Fowler and I worked an 18-hour

day [on July 15, 2015] and then a 21-hour day [on July 16, 2015], to what end is an officer(s)

beholden to Subsection E, paragraph 2?ö [of M-4, which says an officer shall stay with a victim

to protect them].  (Perkins depo. 68, ln. 11 to p. 69, ln. 21); *See also* Exhibit 18.

*Defendants Did Not Stay With Victims In The Manner Required by M-4.*

130.    The expert witness testified Detective Perkins and Detective Fowler and Sergeant Crane

violated the MSP M-4 DV policy because Defendants did not take reasonable means to protect

the victim because, under Exhibit A, Section E of M-4, MSP-002594, öIn any circumstances in

which an officer has reason to believe that a family or household member has been or is being

abused, the officer shall immediately use all reasonable means to prevent further abuse,ö and

because Brittany Irish öcertainly got no assistance where she was and Defendants had every

reason to believe [Lord] was in the vicinity . . . . If you canøt immediately arrest [Lord] and you

know heøs in the vicinity, the obvious next step is to provide protection for the victim.ö (Van

Blaricom (Expert) depo. 104, ln. 7 to p. 109, ln. 21).

*Defendants' Admission That Their Investigation "Led To" The Events.*

131.    Sergeant Crane, in subsequent written comments to the empaneled MSP IRT [Incident

Review Team], wrote: ö÷In conclusion, it weighs heavy knowing that one of our investigations in

Section 6, as it was ongoing, led to the tragic events that took the lives of two people and hurt so many others.ö (Crane depo. 30, ln. 24 to p. 31, ln. 19)   Detective Fowler never made any objection to Sergeant Crane about these written comments by Sergeant Crane to the MSP IRT. (Fowler depo. 56, ln. 7-15)

132.    In contrast, the MSP 30(b)(6) designee testified, õHey, . . . [t]his girl is reporting that she was raped by a man . . . [w]eõre going to put our feelers out to try to locate him, but we are not going to bring to bear [our full] resources . . . [].ö  (MSP 30(b)(6) depo. 33 ln. 17-21)  õ[T]he investigation was showing that [Irish] was lying and, therefore, this was a false report and not DV [sic] complaint.  (MSP 30(b)(6) depo. 31, ln. 14 to p. 32, ln. 3)

*The MSP Incident Review Team Noted Possible Deficiencies Applying M-4.*

133.    Grzyb confirmed that MSP Incident Review Team [IRT] recommendations noted possible deficiencies in the application of General Order M-4, Section 4.  (Grzyb depo. 45, ln. 11-14); (Grzyb depo. 63, ln. 10-15); *see also* Exhibit 14 (Report at 3342).   One of the deficiencies regarding M-4 was the requirement that if an officer has reason to believe that a family or household member has been or is being abused, the officer shall immediately use all reasonable means to prevent further abuse and that the officer shall assist such victim  (Grzyb depo. 45, ln. 16 to p. 46, ln. 4)  The IRT recommended that MSP personnel in MSP Major Crime Units should receive training to emphasize the requirement of general order M-4 so that it is considered in the strategy of investigating crimes.  (Grzyb depo. 44, ln. 21 to p. 45, ln. 10)  The IRT wanted to make sure the Major Crimes Unit got a refresher on M-4 when Defendants had cases that are both rape and DV cases.  (Grzyb depo. 65, ln. 5-15)  This is because the

36

requirements of general order M-4 were important to be considered in the strategy of investigating the crimes in this case. (Lt. Grzyb depo. 49, ln. 5-8).

**B.    Facts Showing Timeline, Chronology, and First Circuit Questions.**

<u>July 7, 2015</u>

134.    On July 7, 2015, one week before the events began in this case, the BPD gave a harassment notice to Lord, instructing Lord to leave Irish alone. (Fowler depo. 67 ln. 3-8)  *See* Exhibit 35 (BPD Cease Harassment Order 7/7/15).

<u>July 15, 2015</u>

135.    At no time on July 15 or 16, did Detective Fowler know about the above July 7 Lord/Irish harassment notice to Lord by the BPD, because he never contacted BPD.  He just received, without following up, the BPD July 15 allegations by Irish, typed and sent by BPD to MSP at 2:00 p.m. on July 15. (Fowler depo. 67, ln. 10-22); *see also* Exhibit 35.

136.    At 12:00 p.m. on July 15, Sergeant Crane was the first MSP officer involved when he received a call from BPD. (Crane depo. 12, ln. 20 to p. 13, ln. 19) Sergeant Crane learned from a BPD officer that Irish had come to the BPD and made a complaint of rape against Lord. (Crane depo. 13, ln. 2-7)  The BPD officer told Sergeant Crane that Irish alleged Lord abducted her the day before [July 14]; had kept her against her will for several hours [overnight into July 15] and; had raped her several times. (Crane depo. 13, ln. 11-15)  Sergeant Crane did not testify that the BPD officer who interviewed Irish and typed her statement [which contained a threat by Lord, *see* SMF 9, 135, 138, Exhibit 34, thought Irish lacked credibility. *Id.*  Sergeant Crane assigned Detectives Perkins and Fowler at 12:00 p.m. on July 15. (Crane depo. 14, ln. 9-19)

137.    At 1:20 p.m. on July 15, Detective Perkins was briefed by Sergeant Crane that the suspect was Lord; that Irish had broken up with him; and allegations involved violence, choking with a

seat belt, and multiple rapes at multiple locations.  (Perkins depo. 72, ln. 21; p. 73, ln. 25)  Still at 1:20 p.m. on July 15, Detective Perkins also learned from Sergeant Crane that Lord was on the Sex Offender Registry; however, at that time, Detective Perkins did not run a criminal background check to determine what Lord's full criminal record was.  (Perkins depo. 74, ln. 5-16)  At 1:25 p.m. on July 15, Detective Perkins in turn briefed Detective Fowler that Irish had alleged she was choked with a seat belt; that she had been sexually assaulted; and that she had been held captive the night before, July 14 into July 15.  (Fowler depo. 18, ln. 7-24)  Detective Fowler is unsure when he learned from Sergeant Crane that Lord was a registered sex offender. (Fowler depo. 27, ln. 3-14)

138.    At 2:00 p.m. on July 15, Sergeant Crane received by email, from the BPD, Irish's two-p. statement as typed by the BPD officer; it had "the details of what [the BPD officer] had talked to B. about."  (Crane depo. 13, ln. 20-24)  Detective Perkins testified he knew Irish filed her original complaint and made her original statement with BPD, and that he and Detective Fowler had obtained "reports" from BPD, but Detective Perkins does not recall when he obtained those reports.  (Perkins depo. p. 72, ln. 1-13)  At 2:05 p.m. on July 15, MSP internal emails, *see* Exhibit 35, Detective Crane 7/15/15 email to Jason Fowler, show that Sergeant Crane forwarded to the detectives, by email, Brittany Irish's original two-page statement to the BPD, as typed by the BPD.  The statement by Brittany Irish that Defendants now had included a written allegation by Irish that Lord had made a death threat against her; specifically, that he would "cut her from ear to ear."  *See* Exhibit 34.

139.    From about 2:05 p.m. to 3:05 p.m. on July 15, Detectives Perkins and Fowler drove together to meet Brittany Irish at the hospital where she was having a voluntarily rape kit exam. During this time, Detective Perkins testified he and Detective  Fowler did not make any efforts to

ascertain Lord's criminal history, and Defendants did not find out whether he had any bail or probation conditions; yet Detective Perkins testified this mattered:  A "probation hold" can be better than an arrest warrant from a D.A, (Perkins depo. 76, ln. 13-24), because a probation hold is achieved simply by calling a suspect's probation officer and explaining the allegations; this is done by phone; but if you don't know someone is on probation, you can't ask for a hold. (Perkins depo. 77, ln. 3-13)

*3:05 p.m. July 15.  Brittany Irish Tells Defendants of Retaliation Fears, Including If Irish Goes To Police.*

140.    At 3:05 p.m. on July 15, Detectives Perkins and Fowler arrived at the hospital where Brittany Irish was having her rape kit exam; Defendants initially met with Irish for the first time; and Defendants met with the rape advocate.  (Fowler depo. 19, ln. 12-23)  Upon her first meeting with Detectives Perkins and Fowler at 3:05 p.m., Irish indicated that, despite being tired, she wanted to talk with them; she did in fact talk to them in that initial meeting; and the initial information that Irish provided in talking to the them at 3:05 p.m. led to the MSP finding corroborating evidence in two camp locations, in Sherman and Benedicta, Maine.  (Fowler depo. 21, ln. 7 to p. 22, ln. 2)  Brittany Irish also told the Detectives that she feared retaliation and feared for her children.  (Irish depo. 141, ln. 5 to p. 142, ln. 12) (testifying to fear, retaliation, children, and timing nexus to Defendants' first request for a statement at 3:05 p.m. on July 15).

141.    Defendants first spoke with Irish at or about 3:05 p.m. on July 16, *i.e.,* not 90 minutes later, at 4:34 p.m., as Defendants allege (4:34 was Defendants' second meeting that day with Brittany Irish, not the first meeting).  *See* Irish depo. 139, ln. 8 to p. 140, ln. 25 (placing first Brittany Irish talk with Defendants at 3:05 p.m., not 4:34, which was their second meeting that day); *accord* Fowler depo. 19 ln. 12 to p. 20 ln. 1 (same).  At or about 3:05 p.m. (or, at latest, at 4:34 p.m., even if Defendants' timeline version is credited), Irish told Defendants (i) Lord had

made death threats and other threats to her; (ii) Irish feared for herself and her two children; (iii) Irish had acted to protect her children by hiding them from Lord, because she took Lord's threats that seriously; and (iv) based on all of this, Defendants were reasonable to infer, but did not infer, that Lord would make good on his retaliation threat if Lord learned that Irish had reported her allegations to the police.  This is additional substantive evidence omitted by Defendants in SMF 16:

| | | |
|---|---|---|
| Q. [AAG]: | | And did [the Detectives] say Defendants wanted to take a statement from you? |
| A. [Irish]: | | Yes. |
| Q. | | And did you tell them [the Detectives] that you were too tired to do that? |
| A. | | I told them [the Detectives] that I wanted to go home and give my children hugs and kisses because they were going to their grandmother's house so I asked if I could do it [the statement] the next day. |
| … | | |
| Q. | | Was this like a preplanned visit, or was this because of what had happened? |
| A. | | Because of what had happened. |
| Q. | | All right.  And so why did you want the kids to go up to [their grandmothers house?] |
| A. | | Because Anthony wasn't aware, she lived, and I wanted them away from where he knew. |
| Q. | | So you were afraid that he might do something to your kids at this point? |
| A. | | Yes. |

(Brittany Irish depo. 141, ln. 5 to p. 142, ln. 12).  The timing evidence placing the above at the first interaction between Irish and Defendants, at 3:05 p.m. on July 16 (or, at latest, even if Defendants' version is credited, 4:34 p.m.) is testified to by both Defendants and Irish, *see* Irish depo. 139, ln. 8 to p. 140, ln. 25; Fowler depo. 19, ln. 12 to p. 20, ln. 1.  Both the timing and the

substance (Brittany Irish told Defendants of Lord¢s retaliation threat if she went to the police) is corroborated by the testimony of Kimberly Irish.  *See* Kimberly Irish depo 84, ln. 14 to p. 85, ln. 11 (testifying that Kimberly Irish and Brittany Irish spoke the morning of July 15; that Brittany Irish told Kimberly Irish that Lord had threatened Brittany Irish if she went to the police; that Kimberly Irish told Brittany Irish to tell the police; and that Brittany Irish did tell Defendants these facts on July 15 when Brittany Irish first met the Detectives, at 3:05 p.m.).  As such, prior to 4:34 p.m. on July 15, this is what Defendants indisputably knew: (i) 12:30 p.m.:  Defendants assigned to case (Perkins Aff. par. 3); (ii) 2:00 p.m.: Defendants receive from BPD, but do not read, Irish¢s first two-page typed BPD statement identifying a Lord death threat to Irish (Lord would cut Irish ear to ear) and a threat to himself (suicide), *see* Exhibit 34 (D. Crane 7/15/15 email to J. Fowler attaching two-page BPD typed statement of Irish); (iii) 3:05 p.m.:  Defendants learn of the retaliation threat if Irish goes to the police; of Irish¢s concern for her children; and of Irish¢s concrete acts to protect her children, discussed *supra*. (Fowler depo. 19, ln. 12-23) The undisputed facts also show that, prior to 4:34 p.m. on July 15: (iv) Sergeant Crane knew at 12:30 p.m. that Lord was a registered sex offender, but not whether felony or misdemeanor, (Perkins depo. 71, Ln. 20, p. 74, ln. 7) and Defendants did not find out; (v) Sergeant Crane had once arrested Lord for an unrelated burglary or theft (Crane depo. 10, ln. 3-7); (vi) Sergeant Crane personally knew Lord because Sergeant Crane and Lord grew up in the same area (Crane depo. 9, ln. 16-25, p. 10, ln. 1); (vii) the BPD Officer who typed Brittany Irish¢s first statement did not identify or remark about any credibility issues as to Irish or her allegations (*see* Exhibit 34); and (viii) Detectives Perkins and Fowler never followed up with BPD as to the statement, nor with the BPD officer who interviewed Irish.  *See* OSMF 135, 136, 137.

142.    Continuing at 3:05 p.m. on July 15, both Detective Perkins and Detective Fowler were present when Brittany Irish orally told them her allegations (which were also in the BPD report that the Detectives had):  After she asked Lord to drive her back, he choked her with a seat belt, took her multiple places, sexually assaulted her multiple times, and at times tied her up; based on her descriptions, Detectives Perkins and Fowler later found the first location, a camp.  (Fowler depo. 22, ln. 21 to p. 23, ln. 14)  *See also* SMF 31, 32.  At 3:05 p.m. on July 15, Brittany Irish also described for both Detectives the second camp location where she was sexually assaulted, but Detectives Perkins and Fowler never went to it, due to darkness; Defendants never went back to it; and Detective Fowler does not know if an ERT [evidence team] ever went there, either.  (Fowler depo. 23, ln. 15 to p. 24, ln. 9)  Irish also told the Detectives that she feared retaliation and feared for her children.  Brittany Irish depo. 141, ln. 5 to p.142, ln. 12 (testifying to fear, retaliation, children, and timing nexus to Defendantsø first request for a statement at 3:05 p.m. on July 15).  *See also* SMF 62, 63.

143.    At this first meeting with Brittany Irish, Detective Fowler testified while he did not observe any marks on her wrists, he agreed it could depend on how she was restrained, as to if it would leave marks.  (Fowler depo. 24, ln. 18-22)  Detective Fowler also testified you donøt hold it against trauma victims if Defendants want to rest before giving a written statement; Irish had shown courage to go to the hospital to report a rape; the examination is invasive; and the detailed questions asked by the hospital and the detectives are invasive.  (Fowler depo. 24, ln. 25 to p. 26, ln. 4)

144.    At about 5:00 p.m. on July 15, the detectives ended their initial interviews of Brittany Irish and started driving together for 2.5 to 3 hours to try to find the camps Irish described; neither before nor during the 2.5 to 3 hours between interviewing Brittany Irish and finding the

first camp she had described, Detectives Perkins and Fowler [1] did not attempt to determine Lord's criminal history (Perkins dep. 86, ln. 15-18) [2] did not attempt to determine whether he was on probation [which would yield both a registered home address and work address] (Perkins depo. 86., ln. 19-21); [3] did not attempt to assess Lord's risk for propensity for violence (Perkins depo. 86, ln. 12-25); [4] did not attempt to assess Lord's recidivism risk for harming Irish (Perkins depo. 86, ln. 12-23); and [5] did not help or advise Irish regarding how to seek a Protection From Abuse Order against Lord. (Perkins depo. 86, ln. 12-23) Defendants also [6] did not attempt to learn what Defendants could from his known status on the Sex Offender Registry, and Defendants did not discuss (Perkins depo. 86, ln. 12-23) [7] a plan to go and find Lord, since his whereabouts were unknown.  (Perkins depo. 86, ln. 12-23); (Perkins Aff. par. 65-72; Fowler Aff. par. 2-25)

145.    At 8:10 p.m. on July 15, Detectives Perkins and Fowler find a camp in Benedicta, Maine as described by Irish; Defendants also find tire tracks and a visible fingerprint on the outside front window.  (Fowler depo. 26, ln. 5-18)  The gravel road, camp, and evidence of truck tire tracks with a larger lug pattern that was consistent with Irish's description.  (Perkins depo. p. 87, ln. 2-14)  After finding the matching location, camp, and evidence of consistent tire tracks, the detectives did not attempt to determine Lord's criminal history or whether he was on probation. (Perkins depo. 87, ln. 15 to p. 88, ln. 1)  At no point in time on July 15, 2015, did Detective Perkins or Detective Fowler attempt to determine Lord's criminal background or whether he was on probation.  (Perkins depo. 90, ln. 2-9;  Fowler depo. 26, ln. 25 to p. 27, ln. 2)

    July 16, 2015

146.    At 8:40 a.m. on July 16, 2015, Detective Perkins learned facts from the camp owner such that Lord may have committed breaking and entering at the camp.  (Perkins depo. 90, ln. 10 to p.

91, ln. 12)  Detective Perkins did not attempt to determine Lordøs criminal record after learning

this.   (Perkins depo. 91, ln. 13-15)   Neither Detective Perkins nor Detective Fowler ever

communicated this to anyone.  *See* SMF 1-112. (Crane Aff. par. 6)

147.    At 1:41 p.m. on July 16, about five hours later, the detectives decided to jointly interview

non-eyewitness Amber Adams, who said Irish did not want to give up her clothes because Irish

was of limited financial means and could not afford replacement clothes.  (Fowler depo. 28 ln. 3-

19; Perkins depo. 101 ln. 19-23)  The record shows no other investigative activity.

148.    At 4:24 p.m. on July 16, Detective Fowler testified he and Detective Perkins reviewed

Irishøs written MSP statement, which she finished at 4:00 p.m., but he does not recall how much

time Defendants spent on it, and he does not know if he read all of Irishøs written MSP

statement.  (Fowler depo. 29, ln. 1-15); *see also* Exhibit 23 [Irish MSP Statement].  Detective

Fowler testified he did see the portion where Irish wrote Lord threatened to cut her from ear to

ear.  (Fowler depo. 30, ln. 2-4)  Detective Fowler testified he did see the portion where, after

Lord threatened to cut Irish from ear to ear, Lord had also threatened to hurt or torture Kyle

Hewitt.  (Fowler depo. 30, ln. 5-9)

149.    Detective Perkins testified he saw in Brittany Irishøs statement to the MSP that she

alleged Lord would cut her from ear to hear if she tried to go anywhere, and that Lord had

someone picking up the boys [Irishøs children] and the boys will be dropped off at your momøs

and [Hewitt] will be brought out here and tortured . . . and if [Irish] was lying, he would take

[Hewittøs] life and then mine [Irishøs].ö  (Perkins depo. 92, ln. 19 to p. 93, ln. 15); *see also*

Brittany Irish depo., Exhibit 11 (Written statement to MSP).

*4:00 p.m. to 4:24 p.m.  Detectives Receive Written Statement Documenting Retaliatory Threat.*

150.    Defendants never acknowledged the retaliatory threat by Lord, nor the full list of nine (9) separate threats against four (4) people, including two children, all by Lord, recorded in writing in Irish's ten (10) page single-spaced July 16 MSP Statement, which she finished and handed to Defendants sometime between 4:00 p.m. and 4:24 p.m. on July 16.  *See* SMF 51, 52, 53, 58, 62, 63; *see also* SMF 1-112; (Perkins Aff. par. 19; Fowler Aff. par. 15-18)

151.    4:24 p.m. to 6:17 p.m. on July 16.  After reviewing Irish's MSP statement, Detectives Perkins and Fowler did not determine if Lord had a criminal record, and Defendants did not determine if he was on probation. (Perkins depo. 81, ln. 21 to p. 82, ln. 15)  Detective Perkins testified he agreed that after Detective Perkins and Detective Fowler read Brittany Irish's statement that Lord threatened to torture and kill an uninvolved party, and mentioned two children, had threatened to cut Irish from ear to ear, and had threatened to kill her after killing the uninvolved party,  neither Detective attempted to obtain Lord's criminal record.  (Perkins depo. 94, ln. 4-14)

152.    Separately, after reading Irish's written MSP statement containing the threats made by Lord, including the retaliatory threat, Detective Perkins did not ascertain what risk Lord might pose to Irish for recidivism; he did not ascertain whether Lord was on probation; and he did not ascertain whether Lord was a felon.  (Perkins depo. 95, ln. 23 to p. 96)

153.    Detective Fowler confirmed:  Prior to leaving the voicemail with Lord on his cell at 6:17 p.m. on July 16, Detective Fowler did not run a background check to determine whether Lord had a prior felony, and he did not run a background check to determine what at level of sex offender he had been convicted.  (Fowler depo. 35, ln. 8-18)

154.    Defendants have not produced any evidence, admissible or otherwise, showing that Defendants considered any of the MSPøs required options and factors besides leaving a voicemail with Lord on the basis of õefficien[cy]ö, which is not an appropriate factor, prior to 6:17 p.m. on July 16, when Defendants left a voicemail with Lord.  *See* SMF 1-112. (MSP (30(b)(6) depo. (Cote) 35, ln. 2-8 (Deputy Chief)

155.    5:00 p.m. on July 16.  The Defendants tell Brittany Irish that Defendants will have a phone conversation with Lord; she leaves the MSP for ninety minutes and is alone at her residence, which is known to Lord, to get her clothes.  The detectives told Irish that Defendants would be having a call with Lord later that evening, but did not say they were leaving a voicemail during the dinner hour.  SMF 61, 64.


*6:17 p.m. Voicemail to Lord.*

156.    6:17 p.m. on July 16.  Detective Fowler testified 6:17 p.m. is when the voicemail was made by the detectives to Lord.  Fowler depo. 33 ln. 6-25.  Detective Perkins testified his agreement that at 6:17 p.m. on July 16, Detective Perkins left a voicemail for Lord; before making the voicemail, Detective Perkins did not determine if Lord was on probation, did not determine if he was a felon, did not determine he had been convicted for DV, and did not determine if he had been on probation for sexual assault;  Detective Perkins testified these are not important factors to know when contacting a suspect, and Detective Perkins [12] õ[does not] see howö these factors are important for protecting the victim.  (Perkins depo. 99, ln. 3-18)  Detective Fowler testified background criminal information is important to know õ[a]t some point.ö  (Fowler depo. 35, ln. 19-20)

46

157.     Detective Perkins testified he agreed that a suspect might think that if they committed a rape and then get a call from a MSP Detective the next day, it is logical, given the one-on-one nature of rape, for the suspect to put together the dots, "that that's [sic] why the State Police are calling." (Perkins depo. 98, ln. 22 to p. 99, ln. 2)

158.     Detective Fowler was present when Detective Perkins left the voicemail for Lord. (Fowler depo. p. 10, ln. 25 to p. 11, ln. 1)  When the detectives made the voicemail to Lord at 6:17 p.m. on July 16, Detective Fowler thinks Defendants may have already left Irish [alone] and Defendants were driving, but he is not sure.  (Fowler depo. 33, ln. 18 to p. 34, ln. 16)  Sergeant Crane testified he was never advised by Detective Perkins and Detective Fowler that Defendants had left a voice message for Lord on Lord's cell phone until "about 9:30 p.m." that night, July 16.  (Crane depo. 22, ln. 1 to p. 23 ln. 7)


*6:30 p.m.  Irish Again Conveys Fear of Lord Retaliation To Defendants.*

159.     Brittany Irish, who had already articulated  retaliatory and police retaliatory threats by Lord in her written MSP statement of July 16, and in her prior 3:05 p.m. talk with Defendants the day before, on July 15, reiterated Irish's retaliation fears again at 6:30 p.m. when she came back to the MSP and was told a casual voicemail had already been left with Lord, just thirteen (13) minutes earlier by Defendants.  *See* SMF 74, 76. (Brittany Irish depo. 203, ln. 12 to p. 204, ln. 5)

160.     Sergeant Crane testified Detective Perkins and Detective Fowler did not tell him that Irish had informed the detectives that Lord had threatened to kill her or her children or similar if she reported the abduction and multiple rapes.  (Crane depo. 21, ln. 10-16)  The detectives did not do anything at 6:30 p.m. or thereafter in response to Brittany Irish's 6:30 p.m. restatement of fear of retaliation, which she made as soon as she learned of the detective's 6:17 p.m. voicemail.

The detectives did discuss it with each other and they did not [1] help make Irish safe (Perkins depo. 97, ln. 13 to p. 101, ln. 10) (Brittany Irish depo. 209, ln. 22), or [2] stay with her (Brittany Irish depo. 209, ln. 22), or [3] consult M-4 (Perkins Aff. par. 61-65) (Fowler Aff. par. 21-23) , or [4] run Lord's criminal history (*see* Exhibit 36  SBI Anthony Lord Criminal History Record) (Perkins depo. 100, ln. 5-7), or [5] assess his risk for recidivism to Irish (via the ODARA tool or otherwise) (Perkins depo. 116, ln. 9-22), or [6] find out if he was on probation (to get a home or work address); (Perkins depo. 99, ln. 3-5) or [7] split up and go find Lord (Perkins Aff. par. 29) (Fowler Aff. par. 23); or [8] convey the probable cause about the camp breaking and entering to Sergeant Crane, to get a "stop and hold" issued statewide (Perkins depo. 48, ln. 15-20); or [9] do a safety check on Irish's two children. (Perkins depo. 120, ln. 22 to p. 121, ln. 8) Defendants did decide to commence eighty minutes of non-eyewitness interviews, jointly, in which they sought information about Brittany Irish's credibility.  *See* SMF 77, 78, 79, 80, 81.

161.    At 6:45 p.m., the detectives' joint interview of Kyle Hewitt began.  (Perkins depo. 102 ln. 1-2)  During the interview, the detectives jointly reviewed texts from Irish to Hewitt that said, "not safe"; "call police?"; "not safe"; and, "don't text back."  (Perkins depo. 102 ln. 3-13)  At 7:28 p.m., after finishing the Hewitt interview, the detectives began a joint interview of a non-substantive witness, Kimberly Shahan.  (Fowler depo. 36, ln. 12-14)  Detectives Perkins and Fowler never testified at deposition or in their affidavits that Defendants made any decisions or took any actions in response to the 6:30 p.m. restatement by Irish of her ongoing retaliation fears. *See* SMF 74, 75, 77, 79; *see also* SMF 1-112.

*8:05 p.m.  Barn Fire As Possible New Physical Retaliation And Retaliation Threat by Lord.*

162.    At 8:05 p.m. on July 16, 2015, the detectives learned õa barnö was on fire in Benedicta; Detective Fowler testified he saw this, at 8:05 p.m., as õpossible suspiciousö as to Lord.  (Fowler depo. 38, ln. 11-14)  Detective Perkins testified he was õconcernedö as of 8:05 p.m., even on the limited information, that Lord was involved and might have lit the fire; Detective Perkins was concerned enough that he and Detective Fowler started driving all the way up to Benedicta from Bangor.  (Perkins depo. 109, ln. 9 to p. 110, ln. 8)  Fowler confirmed that at about 8:05 p.m., the detectives started driving together to Benedicta, about õan hour away.ö  (Fowler depo. 37, ln. 10 to p. 38, ln. 6)   At 9:10 p.m. on July 16, while the detectives were still driving together to Benedicta, Detective Perkins calls Sergeant Crane about the Irish barn fire, because Detective Perkins thought the fire was a significant development in the case.  (Perkins depo. 112, ln. 14-17)  While the detectives were still driving to Benedicta, the Fire Chief called Detective Perkins to say the fire was suspicious, and Detective Perkins thought as he drove to the scene that the human element might be Lord.  (Perkins depo. 113, ln. 7-25)

*9:24 p.m. New Retaliation Threat by Lord; Irish Calls Defendants; Promises Made.*

163.    Several facts then occurred during a 9:24 p.m. call that Brittany Irish placed to Defendants while Defendants were driving to Benedicta.  First, Irish placed the call.   (Fowler depo. 38, ln. 7-13) Second, Irish informed them it was her parentsø barn that was on fire at the Irish family home.  (Fowler depo. p. 38, ln. 7-13)  Third, Detective Perkins testified Brittany Irishøs call was exactly what Detective Perkins was worried about.  (Perkins depo. 110, ln. 12-25)  Fourth, despite this, it is undisputed that Defendants took no action and made no decisions during their remaining hour of their drive to the suspicious barn fire at the Irish home in Benedicta.  *See* SMF 1-112.

164.     Detective Perkins testified, during this same 9:24 p.m. call, that Brittany Irish told the Detectives she was going to stay at her parentsø home, and Detective Perkins testified he never told Brittany Irish not to go to her parentsø home; and Detective Perkins testified he told Brittany Irish on that call that he would be at her parentsø home as well.  *See* SMF 85, 93, 96, 100, 103, 187; *see also* OSMF 163, 164, 165, 204, 205, 206, 207.  *See also* Perkins depo. 110 ln. 12-25. <u>Fifth</u>, Detective Perkins confirmed his testimony that he told Brittany Irish that he was going to be there at her parentsø home, but he is not sure and does not recall if Brittany Irish was reassured by this; Detective Perkins does not remember one way or another.  (Perkins depo. 110, ln. 23 to p. 111, ln. 14)

165.     During this same 9:24 p.m. call, Irish told Detective Perkins she was worried about her children, named Joshua Irish and Benjamin Hewitt.  (Perkins depo. 114, ln. 18 to p. 115, ln. 2) Defendants subsequently acted on this in a manner that Irish could reasonably interpret as reassurance by Defendants and protection by Defendants, when Defendants called in to have a safety check performed on both children by, at latest, 11:00 p.m. that night.  *See* OSMF 169.

166.     <u>Sixth</u>, during this same 9:24 p.m. call from Brittany Irish to Detective Perkins, she also told Detective Perkins there was a rumor going around that night that Lord had left his uncleøs house and had said: õIøm going to kill a fucker.ö  (Perkins depo. 115, ln. 3-6)  There is no evidence that Defendants took any action in response to this.  *See generally* (Perkins Aff.; Fowler Aff.; Crane Aff.)  Sergeant Crane testified what he first described as a õrumorö regarding Lord killing someone was a õthreat,ö specifically a õthreat of violence.ö  (Crane depo. 35, ln. 5; p. 35, ln. 22-23; p. 36, ln. 14)  Sergeant Crane testified he õput more resources into finding [Lord] after the fire and the threat.ö  (Crane depo. 36, ln. 13-14)  There is no evidence of this in the record.  *See* SMF 1-252.  Detective Perkins testified this threat was concerning based on what

he knew about the barn fire and the other threats made against Kyle Hewitt in terms of [Hewitt] was going to be tortured and injured and that Brittany Irish was going to be attacked.  (Perkins depo. 115, ln. 7-12)  Despite this, Detective Perkins testified he did not convey to Sergeant Crane at 9:30 p.m., during a call from Perkins to Crane, any of the information that Brittany Irish conveyed to Perkins during this 9:24 p.m. call to Detective Perkins.  (Perkins depo. 115, ln. 13-15)  Rather, Detective Perkins testified he told Sergeant Crane about the threat that Lord was going to kill a fucker during a later call that night, at 10:12 p.m. on July 16.  (Perkins depo. 119, ln. 7-14)  *But see* OSMF 168 (testimony of Sergeant Crane contradicting Detective Perkins and stating Detective Perkins advised Sergeant Crane at 9:30 p.m. that Lord was telling people he had received a voicemail from the Maine State Police and that someone was going to die.)

167.    At 9:30 p.m. on July 16, Sergeant Crane learned of the barn fire that was set at the Irish home when Detective Perkins called him.  (Crane depo. 23, ln. 9-24)  During this call, Sergeant Crane also learned from Detective Perkins for the first time that the detectives had left Lord a voicemail on Lord's cell phone just over three hours earlier, at 6:17 p.m.  *See* OSMF166.

168.    At 9:30 p.m. on July 16, Sergeant Crane testified during this same 9:30 p.m. phone call he also learned from Detective Perkins that Lord had told people that Lord had received a voicemail call from the Maine State Police, and that someone was going to die.  (Crane depo. 24, ln. 7-18)  Sergeant Crane then left his residence and joined the investigation.  (Crane depo. 24, ln. 19-23)  Sergeant Crane testified it was the fire's significance at the Irish home that caused him to join the investigation because "We were still looking for Anthony at that point[.]" (Crane depo. p. 25, ln. 21, to p. 26, ln. 4)  Sergeant Crane "did not ever go to Benedicta", (Crane depo. p24, ln. 25 to p. 25, ln. 3), and he emphasized the 9:30 p.m. time was "actually really the start of my role in this investigation." (Crane depo. 25, ln. 16-17)  Sergeant Crane testified he had "no

roleö regarding any requests by Brittany Irish or Kimberly Irish regarding protection or anything of that nature.  (Crane depo. 25, ln. 4-8)  Contradicting this are all of the following facts: SMF 98, 100, Perkins Aff. par. 77, Crane Aff. par. 10 (showing Sergeant Crane made the decision to make the false statement that there was no manpower available), OSMF 222 (testimony of Perkins contradicting Crane).

_10:00 p.m. or 11:00 p.m. (Contradictory Times In Record):_
_Use Caution Warning For Police Officers, and First Safety Check of Irish Children._

169.    At either about 10 p.m. or 11 p.m.  on July 16, Detective Perkins testified õsafety checks [of Irishøs two children] and attempt to locate Anthony Lord began:  At 10:05 p.m. [Detective Perkins] requested a stop and hold teletype to be issued for Anthony Lord along with his vehicle information[.]ö  (Perkins depo. 48, ln. 15-20)  After the attempt to locate Lord õbeg[a]nö at 10:05 p.m. on July 16 when Perkins requested the stop and hold teletype, Detective Perkins also then added a õuse cautionö warning for all police officers.  (Perkins depo. 48, ln. 16-25)  Detective Perkins asked MSP to update the teletype to õcautionö or õuse cautionö; this means pull Lord over, hold him, and use caution when you do it for officer safety; Detective Perkins added this to the state-wide teletype because Detective Perkins now thought Lord was enough of a risk that trained police professionals with weapons now needed to be warned ahead of time about Lord so that Defendants would not be harmed by Lord. (Perkins depo. 120, ln. 12-21)  After the õuse cautionö order was placed for officers, Detective Perkins called the Caribou Police Department and asked for safety checks to be made on Brittany Irishøs children, Joshua Irish and Benjamin Hewitt.  (Perkins depo. 120, ln. 22 to p. 121, ln. 8)

Case 1:15-cv-00503-JAW   Document 88   Filed 06/11/19   Page 53 of 82   PageID #: 1083


*10:10 p.m. and 10:12 p.m.:  Information To and From ADA.*

170.    At 10:10 p.m. on July 16,  Detective Perkins was told by Sergeant Crane by phone that the A.D.A. was not authorizing an arrest of Lord at that time for the crimes of kidnapping or rape.  (Perkins depo. 49, ln. 1-3)  During this call, Detective Perkins did not inform Sergeant Crane of any of Lord's criminal record, because the Detectives had still not run or requested Lord's criminal background yet.  (Perkins depo. 49, ln. 4-9); (Perkins depo. 115, ln. 19-25) Detective Perkins testified he did not believe that Lord's criminal history was important, or that Lord's ODARA score for propensity for violence/recidivism against Irish was important. (Perkins depo. 116, ln. 9-22)  Detectives Perkins and Fowler decided not to pass all information up to the A.D.A, through Sergeant Crane, such as Lord's ODARA score for recidivism against victims, which turned out to be an 8 out of 10, which is "high risk" for propensity to harm and for recidivism against victims  (Perkins depo. 116, ln. 23 to p. 119, ln. 1.) There is also no evidence in the record that the Defendants told the A.D.A. of the 8:40 a.m. probable cause of Lord likely breaking and entering at the camp of one of the rape scenes, and Defendants have cited none.  *See* SMF 1-112.


*10:36 p.m.  Detectives Arrive at Irish Home/Barn Fire.*

171.    At 10:36 p.m. on July 16, the detectives arrive at Brittany Irish's parents' residence in Benedicta where the barn had been set on fire.  There is no record evidence why the detectives' drive that was supposed to take about "an hour" took 2.5 hours.  *c.f.* SMF 84 to 93.  At no point in time while Detectives Perkins and Fowler were driving from Bangor to Benedicta, did the detectives call to determine Lord's risk of recidivism by doing a criminal background check. (Perkins depo. 114, ln. 1-17)  When Defendants were told the fire had a suspicious human

element, Detective Perkins õviewed the fire as a potential escalation [by Lord].ö  (Perkins depo. 52, ln. 19 to p. 6)  Detective Perkins believed Lord was most likely responsible for the fire. (Perkins depo. 120, ln. 1-7)  The barn had been two stories, 25 x 35 feet; was a total loss due to the fire; and was close to the Irish home; it was not far away.  (Fowler depo. 44, ln. 21-24) (Fowler depo. 43, ln. 15 to p. 18)  Detective Fowler testified the facts from the Fire Marshall õabsolutelyö put him on further alert about Lord being escalating, given the fireøs location at Irishøs parentsø home after the rape of Irish.  (Fowler depo. 45, ln. 25 to p. 46, ln. 8)

*11:38 p.m. July 16, 2015.  First Criminal Background History of Lord Is Run by Defendants.*

172.    At 11:38 p.m. on July 16, 2015, Detective Perkins placed a phone call to MSP RCC [Regional Command Center] in Houlton and asked for a Triple I SBI, which was a full criminal history check on Lord. (*See* Exhibit 36) This was the first time that Detective Perkins learned that Lord was on probation for DV and was a convicted felon.  This is also the first time that Detective Perkins learned that Lord was on probation and that Lord had a probation officer, and who Lordøs probation officer was.  (Perkins depo. 121, ln. 9-23)  There is no record evidence explaining why Defendants finally ran a criminal background check on Lord at this late date. *See* SMF 1-112.

*11:49 p.m. July 16, 2015.  First Contact Attempt With Lord's Probation Officer By Defendants.*

173.    At 11:49 p.m. on July 16, 2015, Detective Perkins spoke by phone with Lordøs Probation Officer for the first time.  (Fowler depo. 46, ln. 9-11) (Perkins depo. 121, ln. 23 to p. 122, ln. 8) Between 11:49 p.m. and 11:59 p.m. on July 16, Lordøs Probation Officer tried and failed to make contact with Lord; the Probation Officer then gave Detective Perkins information on how to

locate Lord during the second call at 11:59 p.m. on July 16. (Perkins depo. 122, ln. 9-15) Detective Fowler confirmed this timeline, testifying that he and Detective Perkins "became aware" [Lord] was on probation "at some point" but Defendants did not know on July 15, or on July 16, until almost midnight on July 16, two days after starting the investigation. (Fowler depo. 46, ln. 12-18) That Lord was on probation and had a Probation Officer is something the detectives could have learned by doing a criminal background check (an SBI or a Triple I) by phone, but Defendants did not do one until July 16 at midnight. (Fowler depo. 46, ln. 19 to p. 47, ln. 6) There is no record evidence explaining why Defendants finally decided to ascertain Lord's probation status at this particular time. *See* SMF 1-112.

*About 11:49 p.m. July 16, 2015.  Decision to Arrest Lord for Domestic Assault.*

174.    Simultaneously, at about 11:49 p.m. on July 16, a decision was made to arrest Lord for domestic assault, and Detective Perkins advised Lord's probation officer, but Detective Fowler does not know what led to this. (Fowler depo. 47, ln. 7-25) The record is silent on who decided and why it was decided.

*Midnight of July 16  into July 17, 2015: Brittany Irish follows up on 9:24 p.m. call with Detective Perkins.*

175.    At around 12 midnight on July 16 going into July 17, Brittany Irish called Detective Perkins for the second time [the first time was 9:24 p.m.] and asks that an MSP officer provide security at her parents' residence, where she was staying, which was adjacent to the barn that burned. (Perkins depo. 49 ln. 10-25) Detective Perkins testified Brittany Irish's request was logical and that he passed the security request up to Sergeant Crane; and that the logical fear that Brittany Irish had did come to fruition when Lord did show up and hurt people. (Perkins depo.

133, ln. 4-22)   Brittany Irish did not receive a response from Defendants about the security request until 2:00 a.m.  SMF 100.


*12:30 am July 17, 2015.  Four Officers Go To  Lord's Address Together; None At Irish House.*

176.    At 12:30 a.m. on July 17, the detectives [accompanied by Sergeant Crane and an MSP Trooper, for a total of four MSP officers, *see* SMF 94, 98] arrive at Lord's registered address in the sex offender registry. This is information that the detectives could have known two days before, at the start of the case.  (Fowler depo. 48, ln. 4-11)  Lord is not there.  (Fowler depo. 48, ln. 4-11)


*About 1:00 a.m. July 17, 2015.  All Three Defendants Meet In Crystal; No One At Irish Home.*

177.    At about 1:00 a.m. on July 17, 2015, the detectives met in person with Sergeant Crane in Crystal (not at the Irish residence in Benedicta) to discuss Brittany Irish's midnight continuing request for security at her parents' home for the rest of the night.  (Fowler depo. 49, ln. 10-13; Perkins depo. 125, ln. 23 to p. 126, ln. 21)

178.    Detective Perkins testified that Sergeant Crane told Detective Perkins at defendants' meeting that õNo, we're not . . . No, we are not going to provide --- we don't have the manpower to provide overnight security.ö  (Perkins depo. 50, ln. 1-12)

179.    It is undisputed that, at this time, in the area, there were at least ten (10) MSP resources, including a K-9 dog, but not counting off-duty MSP officers, and not counting both on-duty and off-duty local police.  *See* SMF 90, 94, 97, 98; *see also* OSMF 182, 183.

180.    When Sergeant Crane informed Detective Perkins that he did not have the manpower to provide overnight security, Detective Perkins did not advocate for overnight security for Brittany

Irish.  (Perkins depo. 126, ln. 4-23)   Detective Perkins testified if security were provided, the Irish residence in Benedicta was the right scene to do it:  "It would make no sense to send troopers to one of the two camps . . . . If Brittany Irish was going to be supplied protection, the most reasonable place was where she was at the time.  That would be common-sensical." (Perkins depo. 127, ln. 15-24)

181.   Detective Perkins testified he does not recall whether he told Sergeant Crane that Irish was returning to her parent's home; Detective Perkins believes that Sergeant Crane was aware that Irish was there at some point in the night, but he does not recall if he told Sergeant Crane that Irish was returning to her mother's home.  (Perkins depo. 125, ln. 1-10)

*About 2:00 a.m. on July 17, 2015. Four MSP Officers at Trash Dumpster in Crystal; None At Irish Home; Irish Not Told of Earlier 1:00 a.m. "No Manpower" Decision.*

182.   At about 2:00 a.m. on July 17, Detective Fowler testified after defendants spoke in person in Crystal with Sergeant Crane at 1:00 a.m. about Brittany Irish's request for protection, the detectives did not call or visit Irish to advise her of the decision.  *See* SMF 96, 99, 100. Instead, Detective Perkins and Detective Fowler jointly drove to and met with two additional MSP members, Detective Jonah O'Rourke and Detective Trooper Corey Hafford, who were at a Sherman, Maine, gas station [the Sherman Irving]. The detective and the trooper were doing a search in the gas station's trash dumpster for evidence of the original rape.  (Fowler depo. 50, ln. 14-21; Perkins depo. 127, ln. 25 to p. 128, ln. 17)   Detective Perkins testified he disagrees that protecting a victim is more important than finding a piece of evidence because what "is most productive in a paramilitary organization [is that you] do what you're told in your assignment and not freelance." (Perkins depo. 129, ln. 8-14)   Detective Perkins testified it is not shocking to him that both a detective and a Maine State Trooper were both in a dumpster looking for

evidence when at the same time ten miles away Irish was concerned about Lord hurting her again.  (Perkins depo. 130, ln. 3-12)  Defendants had still not advised Irish of their decision not to provide protection due to lack of manpower when Irish called Perkins again.  *See* SMF 100.

*About 2:00 a.m. July 17, 2015.  Irish  Again Follows Up On The 9:24 Call, Asking For Safety.*

183.    At about 2:00 a.m. on July 17, 2015, having not heard from defendants since 9:24 p.m. and then not again at midnight, Brittany Irish called to request safety and protection safety at about 2:00 a.m.  (Perkins depo. 50 ln. 17-21)  Detective Fowler confirmed the timing: While Detectives Perkins, Fowler, O'Rourke and Trooper Hafford, were at the dumpster in Sherman, Maine, regarding an evidence search, Brittany Irish called from Benedicta, Maine, at her family residence where the barn had burned down, to request protection.  (Fowler depo. 50, ln. 22 to p. 51, ln. 25)

184.    Detective Fowler heard Detective Perkins tell Brittany Irish that defendants were still looking for Lord and that there would not be a security detail posted at her parents residence, because we didn't have the manpower to do it.  (Fowler depo. 51, ln. 1-12)

185.    Detective Perkins agrees that the MSP IRT [Incident Review Team] report states that Brittany Irish asked for protection twice in the early morning hours of July 17.  (Perkins depo. 50, ln. 25 to p. 51, ln. 10)

*2:00 a.m. to 3:00 a.m. on July 17, 2015.*

186.    At about 2:00 a.m. on July 17, 2015, after leaving Detective O'Rourke and Trooper Hafford at the gas station dumpster to continue to look for evidence, Detective Fowler testified Detective Perkins and Detective Fowler "basically drove around just different areas . . . . We

drove back down to Sherman [Maine] . . . hoping to see a truck or someone, anything like that. So that's what we did." (Fowler depo. 57, ln. 21 to p. 58, ln. 6)

187.    Detective Fowler testified Defendants knew Lord could have been at the Irish residence in Benedicta earlier, because Defendants suspected that he started the fire, and Defendants were already in the neighboring towns, but Defendants did not just camp out for little while at the Irish Benedicta address because "I don't recall as we sat there for a bit or drove around or whatever we did to be honest." (Fowler depo. 58, ln. 7-20)


*3:00 a.m. to 5:00 a.m. on July 17, 2015.  MSP Goes Home But Does Not Tell Brittany Irish; MSP Makes More Promises Like Those Made To Brittany Irish Earlier; Irish Family Alone. Lord Enters 5:00 a.m.*

188.    At 3:00 a.m. on July 17, Detectives Perkins and Fowler left the Sherman/Crystal area; Detective Fowler arrived at his home at 5:05 a.m.   (Fowler depo. 58, ln. 21-24)   Detective Perkins arrived at his home at 4:40 a.m.  (Perkins depo. 54, ln. 4)  Sergeant Crane had already left the Sherman/Crystal area, 30 minutes earlier, at 2:30 a.m., to go home. (Crane depo.  43, ln. 4-11) Defendants did not tell the Irishes that Defendants and MSP were leaving.   The MSP Detective and Trooper who were at the Sherman, Maine, dumpster looking for evidence also left around 3:00 a.m. on July 17 to go home. (Crane depo. 46, ln. 1-5)

189.    Kimberly Irish makes one or more calls prompting members of the MSP, to make promises consistent with Defendants' 9:24 p.m. promises.  *See* Parties' Joint Stipulated Facts 18, 19, 20, 21, 22, and 24.  They are incorporated herein by reference for the sake of brevity.

190.    Between 4:00 a.m. and 4:40 a.m. on July 17, an individual named Kary Mayo reported to MSP that he had been assaulted by Lord at his residence in nearby Silver Ridge, Maine. He was beaten by Lord with a hammer.  Lord stole Mayo's two guns and his truck.  (Perkins depo. 51, ln. 11-20)  This was six miles and about twelve minutes away from the Irish home in Benedicta.

(Perkins depo. 51, ln. 21 to p. 52, ln. 15)  Sergeant Crane testified the Mayo assault and thefts were about 4:00 a.m. on July 17, prior to when the shootings began at the Irish residence at Benedicta.  (Crane depo. 43, ln. 12 to p. 44, ln. 2)  Trooper Carmen Lilley, the MSP Trooper who responded to the Mayo home, was also the first Trooper to respond to the Irish home in Benedicta at 5:00 a.m.; Trooper Lilley only responded because he was on call.  (Crane depo. 44, ln. 3 to p. 45, ln. 17)  Sergeant Crane does not know if any other MSP resource was stationed between Benedicta and Houlton, other than Trooper Lilley, around 5:00 a.m. on July 17.  (Crane depo. 45, ln. 22-25)  Sergeant Crane does not know if any Maine State Police resource was within twenty miles of the Irish home in Benedicta, Maine, at 5:00 a.m. on the morning of July 17 when Lord entered the Irish home.  (Crane depo. 39, ln. 2-3)  Sergeant Crane does not know what MSP resources were in the vicinity of the Irish home after Detective Perkins and Detective Fowler left the area at 3:00 a.m. to go each go home.  (Crane depo. 40, ln. 10-19; Perkins depo. 131, ln. 11 to p. 132, ln. 4)

191.    Sergeant Crane testified it would not be proper for Detectives Perkins and Fowler to say Defendants would be in the vicinity, if Defendants were not in the vicinity.  (Crane depo. p. 40, ln. 1-5)  Sergeant Crane did not cite a policy or standard.  *Id.*

*Overview of MSP Resources:  10:00 p.m. July 16 to 5:00 a.m. July 17 [7 hours].*

192.    During the forty-one hour investigation, Sergeant Crane testified he was never in Benedicta, Maine; he ödrove through Benedicta but not specifically Benedicta.ö  (Crane depo. 16, ln. 15-19)  Sergeant Crane testified he does not know the positions of MSP officers or resources between the hours of 10:00 p.m. on the night of July 16 and 5:00 a.m. on the morning of the July 17, and Sergeant Crane does not know who from the MSP stayed in the vicinity of Benedicta, Maine, where the barn was set fire.  (Crane depo. 37, ln. 2 to p. 38, ln. 8)  Sergeant

Crane testified, between the hours of 10:00 p.m. on the night of July 16 and 5:00 a.m. on the morning of July 17, "we are focusing on the collection of evidence [for the arson] from the Sherman [Maine] trash." (Crane depo. 37, ln. 14 to p. 38, ln. 16) Sergeant Crane knows that MSP resources were looking in a dumpster at an Irving gas station in another town, Sherman, Maine; Sergeant Crane does not know how many MSP vehicles were there, but he knows that there were at least two MSP officers there. (Crane depo. 40, ln. 20 to p. 41, ln. 3)

193.    Sergeant Crane testified he also wrote to the MSP IRT [Incident Review Team], "we were in the general area to include the Irish home within approximately one hour of this event starting at the Mayo residence. We did not abandon the Irish family and simply give up or not care about the situation." (Crane depo. 41, ln. 6-11) *But see* OSMF 131 (testimony by Sergeant Crane regarding his written conclusion to the IRT that "In conclusion, it weighs heavy knowing that one of our investigations in Section 6, as it was ongoing, *led to* the tragic events that took the lives of two people and hurt so many others." (Crane depo. 30, ln. 24 to p. 31, ln. 19) (emphasis added).

### *End of Timeline / Chronology Facts*

### *C.     Facts Relevant to MSP Training and The MSP Reasonableness Standard.*

194.    In addition to DV policy/general order M-4, the Maine Criminal Justice Academy trains all officers that all decisions and actions are governed by reasonableness. (Maine Criminal Justice Academy depo. (Director Rogers) 25, ln. 13-17)

195.    When there is no specific MSP protocol, MSP officers are to apply reasonableness. (MSP 30(b)(6) depo. (Cote) 21, ln. 2-21); (MSP 30(b)(6) depo. (Cote) 28, ln. 9-10)

196.    The MSP training factors that go into an assessment of officer reasonableness regarding rapes and DV situations where a victim has indicated she has been threatened, or fears for her life, or has asked the officer not to contact the suspect, include:  [1] the severity of the underlying rape; [2] whether the suspect had made threats against the life of the victim [3] and/or children; [4] whether the suspect had a felony or [5] violent past record.   (Maine Criminal Justice Academy depo. (Rogers, Director) 25, ln. 18 to p. 19)

*Defendants Contacted Lord Before The End Of Investigation, Without All The Facts.*

197.    Detective Perkins stated that rape kits are analyzed by the MSP Crime Lab, and can often take some time to get the results back.  SMF 25; (Perkins Aff. par. 18)

198.    Detective Perkins testified he õabsolutelyö agrees the best time to contact a suspect is at the end of the investigation, with all of the facts in order.  (Perkins depo. 100, p. ln. 8-12)

199.    Detective Fowler agrees with Detective Perkins that the best time to contact an offender is at the end of the investigation with all the facts in order, and did not disagree when this was described as a õprotocol[]ö.  (Fowler depo. 11, ln. 12-24)

200.    The investigation and evidence gathering in this case was not at its end:  At the time Defendants contacted Lord, Defendants [1] had not completed their evidence gathering at camp 1; [2] Defendants had not found and had not started their evidence gathering at camp 2; [3] Defendants had not started their evidence gathering on Lordøs car; and [4] Defendants had not received back information from the hospital and the lab regarding [5]  Irish and [6] her clothes. All of these were crime scene related.  Separately, Defendants had not [7] received fingerprint analysis on two separate fingerprints, both of which would turn out to be Lordøs, and would confirm the [8] suspected breaking and entering crime at camp one.  This was the status of the

physical and forensic evidence as of the voicemail by Defendants at 6:17 p.m. on July 16. (Perkins Aff. par. 18 and 25) *See* SMF 24, 25, 26, 29, 30, 31, 32, 33, 34, 50, 87, 88, 92; *see also* OSMF 146 (never followed up with BPD), OSMF 151 (had not run criminal background check); OSMF 152 (had not ascertained probation status), OSMF 145 (lab results on fingerprints and tire tracks),  OSMF 140 (lab results from rape kit exam),  OSMF 144 (five crime scenes:  camp one, camp two, car, Lord, Irish); OSMF 146 (developing breaking and entering PC on Lord at camp one); and OSMF 220 (Irish's clothes).

201.    Gathering Lord's past criminal history was not at its end.  Before Defendants contacted Lord, Defendants had not started their investigation as to his criminal history; Defendants did not have their facts in order regarding Lord was convicted of criminal trespass in 1999, convicted of assault in 2002, had a probation violation in 2003, charge of Felony Class A [the highest ranked felony in the State of Maine] gross sexual assault in 2002, which lead to a Felony Class C conviction in 2002, a second probation violation in 2009, a DV assault charge Class D in 2015, for which he served forty-five days in jail and was on probation for a third time.  (Perkins depo. 104, ln. 10 to p. 107, ln. 16)

202.    Facts from Sex Offender Registry:  Detective Perkins testified "I knew right from the beginning [of the investigation that] he [Lord] was on the [sex] registry" but Perkins did not determine any facts about Lord through that information before contacting Lord. (Perkins depo. 107, ln. 25 to p. 108, ln. 22)

203.    Assessing Lord's future violent risk and risk of recidivism against Irish was not at its end. Before Defendants contacted Lord, Defendants had not used any MSP tool to ascertain Lord's propensity for future violence or recidivism, including but not limited to the ODARA tool. (Perkins depo. 61, ln. 7-24); (Perkins depo. 147, ln. 7 to p. 151, ln. 12)   One predicate for

assessing risk of future violence and recidivism is to obtain all the facts of past criminal history, which were not obtained yet. *Id.* It is undisputed that multiple categories of information in all parts of the early investigation were not yet in order before Defendants contacted Lord. *See* SMF 24, 25, 26, 29, 30, 31, 32, 33, 34, 50, 87, 88, 92; *see also* OSMF 146 (never followed up with BPD), OSMF 151 (had not run criminal background check); OSMF 152 (had not ascertained probation status), OSMF 145 (lab results on fingerprints and tire tracks), OSMF 140 (lab results from rape kit exam), OSMF 144 (undeveloped leads from three crime scenes: camp one, camp two, vehicle); OSMF 146 (developing breaking and entering PC on Lord at camp one); and OSMF 220 (Irish's clothes).

*Defendants Made Promises, Reliance Statements, and False Statements.*

204.   With respect to protection and safety, the undisputed facts in the record show that Defendants decided and made at least twelve (12) promises, and took actions upon which the Plaintiffs reasonably relied. *See* SMF 85, 86, 93, 96, 100, 103; OSMF 163, 164, 165, 169, 175, 177, 179, 180, 182, 183, 184, 186, 187, 188, 204, 205, 206, 207, 208: (1) 9:24 p.m. words by detectives to Irish that Defendants were going to be there, where Irish was, at the Irish home, site of barn fire (Perkins Aff. par. 66) (Perkins depo. 110, ln. 23-25); (2) the 9:24 p.m. reliable acts of Detective Perkins (Perkins Aff. par. 66); (3) both Detectives were in route driving there already and (Fowler Aff. par. 23, 25); (4) 10:00 p.m. or 11:00 p.m. requesting safety check for both of Irish's children in response to Irish's request (Perkins Aff. par. 73); (5) two hour reliance on Defendants' silence (midnight to 2:00 a.m., reasonably indicating that their 9:24 p.m. promises would continue) (Perkins Aff. par. 74-79); (6) false decision about promises at 1:00 a.m. to say no manpower to Irish at some point (Perkins Aff. par. 77); (7) false statement about promises at

2:00 a.m. telling Brittany Irish no manpower (Perkins Aff. par. 79); (8) Defendants leaving entire area at 3:00 a.m. for rest of night without telling anyone in Irish family, after last words to Irish at 2:00 a.m. were that  Defendants were still looking for Lord in area (*see* OSMF 184, testimony of Detective Fowler regarding Detective Perkins' last words to Brittany Irish) (Perkins Aff. par. 81) (Fowler Aff. par. 27); at (9) least one false statement to Kimberly Irish regarding no manpower (Kimberly Irish depo. 56, ln. 10-13); (10) a reliance statement to Kimberly Irish to "just call us" (Kimberly Irish depo. 56, ln. 21); (11) an affirmative promise to Kimberly Irish that MSP had officers, plural not singular, in the vicinity (Kimberly Irish depo. 56, ln. 22); (12) the false affirmative promise to Kimberly Irish that we'll take care of it (Kimberly Irish depo. 56, ln. 23); and (13) the initial statement to Brittany Irish by Detective Perkins using the inclusive plural pronoun that "we'll carry on" at 4:24 p.m. on July 16 (SMF 57) when referencing Lord. (Perkins Aff. par. 49)  *See* SMF 85, 86, 93, 96, 100, 103; OSMF 163, 164, 165, 169, 175, 177, 179, 180, 182, 183, 184, 186, 187, 188, 204, 205, 206, 207, 208.

*Additional facts regarding promises, reliance statements, and reliance acts are as follows:*

205.    "We would have discussions with victims about:  Hey, you understand we can't stay here with you.  We would not tell somebody that we would stay and then not stay.  We wouldn't give people any false hope that:  Hey, if you call, we are five minutes away.  We would be very candid with these people to say that our priority right now is the capture of this person."  (MSP 30(b)(6) (Cote) depo. 53, ln. 21 to p. 54, ln. 8 (Deputy Chief))

206.    It is appropriate for MSP officers to say, we'll keep an eye on the place, we'll be in the vicinity, only if Defendants were going to be able to do that.  (MSP 30(b)(6) (Cote) depo. 54, ln. 18-22 (Deputy Chief))

207.    If youøre not going to remain in the area, it would not be appropriate to make promises that could not be fulfilled.  (MSP 30(b)(6) (Cote) depo. 54, ln. 18-22 (Deputy Chief))

208.    The MSP 30(b)(6) designee believes three MSP Officers were available from its Troop F in Houlton on the night of the July 16 through the morning of July.  (MSP 30(b)(6) (Cote) depo. 4,8, ln. 22 to p. 49, ln. 21 (Deputy Chief))  The MSP 30(b)(6) designee testified other MSP Officers were available and could have been called to work from off-duty status.  (MSP 30(b)(6) (Cote) depo. 49, ln. 22 to p. 50, ln. 51 ln. 3 (Deputy Chief)) The MSP 30(b)(6) Designee testified once Lord completed his shootings and second abduction of Brittany Irish on the morning of July 17, MSP then called several MSP off-duty officers to work öbecause at that point, you have --- the scene is fluid and rapidly unfolding.ö  (MSP 30(b)(6) (Cote) depo 51, ln. 4-8 (Deputy Chief)) The MSP 30(b)(6) designee testified MSP did not perceive Lord as a risk necessary for calling up officers from off-duty until after the Lordøs shootings and second abduction of Brittany Irish occurred.  (MSP 30(b)(6) (Cote) 51, ln. 15-18) (Deputy Chief))  The 30(b)6) designee testified öif the need was determined that, hey, we need a uniform trooper dedicated to this investigation, I believe that we could have called one.ö  (MSP 30(b)(6) (Cote) depo. 52, ln. 21 to p. 53, ln. 2 (Deputy Chief))

*Defendants Left A Voicemail In Disregard of Factors and Other Options.*

209.    Detectives Perkins and Detective Fowler left a voicemail for Lord when Defendants could have done other things; Defendants could have developed a physical presence around him; or Defendants could have done a pre-textual phone call. (MSP 30(b)(6) depo. (Cote) 41, ln. 10-21 Deputy Chief))  The 30(b)(6) MSP designee confirmed this:  The option exists of making a pretext phone call in which the MSP has a victim make contact with the suspect. (MSP 30(b)(6) depo. (Cote)  35, ln. 2 to p. 36, ln. 13 (Deputy Chief))

210.    "[A] much more traditional method that [the MSP] use[s]" [rather than leaving a voicemail] is to "pretend to be the victim and ask to meet with the suspect. We may script some things about getting admissions related to the allegations against him[.]" (MSP 30(b)(6) depo. (Cote) 36, ln. 6-13 (Deputy Chief))

211.    MSP Deputy Chief Cote, the MSP 30(b)(6) designee, testified the MSP do not know why none of these other contact procedures were attempted by Detective Perkins or Detective Fowler in this case. (MSP 30(b)(6) depo. (Cote) 37, ln. 4-6 (Deputy Chief))

212.    Sergeant Crane agrees with MSP Deputy Chief Cote, the MSP 30(b)(6) designee, that there are four options MSP officers can use to make contact with suspects: [1] find the person first, before the suspect is notified of any allegation against them; [2] have the victim make phone calls to the suspect, in an effort to elicit a confession, and thereupon arrest the suspect, if successful; [3] use the victim's phone and pretend to be the victim, to lure the suspect out; and [4] leave a voicemail message on a suspect's cell phone, as was done in this case. (Crane depo. 26, ln. 16 to p. 27, ln. 10) Sergeant Crane testified if there is a real risk of violence in the event of such a phone call or voicemail, "[y]ou would definitely take that into consideration as you're making your plan to find him." (Crane depo. 27, ln. 15-24)

213.    Sergeant Crane does not know if Detective Perkins and Detective Fowler took the risk of violence into account when Defendants made the decision to leave a voicemail with Lord. (Crane depo. 28, ln. 25 to p. 29, ln. 4); and Sergeant Crane testified he does not know why any of the other alternatives were not used here. (Crane depo. 27, ln. 11-22)

214.    The Maine Criminal Justice Academy trains troopers to be reasonable. (Maine Criminal Justice Academy(Rogers) depo. 20, ln. 15 (Director)) If a victim of a rape fears for her safety or has said that the suspect told her that he will kill her or her children, the Director of the Maine

Criminal Justice Academy is õnot sure I would tell the suspect right offö; instead, he õwould go try to find the suspect, get him to a neutral placeö because õ[y]ouσre going to have to go find this person.ö  (Maine Criminal Justice Academy(Rogers) depo. 20, ln. 19-25 (Director); (Maine Criminal Justice Academy(Rogers) depo. 19, ln. 2 (Director))

215.    Sergeant Crane testified the reason why Detective Perkins and Detective Fowler left a voicemail on Lordσs cell phone was õyou would look at an efficient way to try to contact the person you want to speak with.ö  (Crane depo. 27, ln. 1-14)

216.    It is undisputed that õefficien[cy]ö is not a valid MSP factor or part of MSP training that may be considered when contacting suspects, particularly if risk of violence is at issue.  *See* SMF 1-112; OSMF 113-252.


*Defendants Used Time To Investigate Irish, Not Lord, But Should Have Believed Victim.*

217.    MSP officers are õalways going to give the victim the benefit of the doubt.ö  (MSP 30(b)(6) depo. (Cote) 21, ln. 14-15 (Director))  Yet, Sergeant Crane testified focusing on Brittany Irishσs credibility, instead of on Lord, could be helpful to Defendants, in several ways: õIf í  we can prove that somebody makes a false report, then thatσs the crime, itσs not a DV.  If . . . we could prove that everything [Irish] told us was a lie, then the crime of DV never occurred, the crime of false report has.ö  (Crane depo. 33, ln. 13-20)

218.    Detective Perkins testified he does not remember the MSP DV training, in either the MSP Academy or in MSP continuing education, that states the credibility of a witness is never a factor in assessing whether or not a DV event occurred, but he states õit was certainly possible.ö (Perkins depo. 63, ln. 1-7)  Detective Perkins testified Exhibit 30, (training presented by the Maine Coalition Against Sexual Assault), was training that he attended; he testified he agrees the

exhibit states to be careful of prematurely judging the validity of a rape report because it may have detrimental consequences; specifically, officers are trained to be careful of their own skepticism about what a victim tells them because you may not be able to gather all the information you need.  Yet, Detective Perkins testified he was skeptical of Brittany Irish in this case as the investigation was unfurling.  (Perkins depo. 151, ln. 13 to p. 153 ln. 1)

219.    Detective Fowler does not recall that Brittany Irish told a different story in her written statement compared to her oral interview with Detectives Perkins and Fowler.  (Fowler depo. 31, ln. 5-9)  Detective Fowler did not note anywhere in his police report that he thought Irish was showing indicators that she was being deceptive or less than honest during her oral interview with the detectives after her written report.  (Fowler depo. 31, ln. 24 to p. 32, ln. 3)

220.    Brittany Irish provided four (4) consistent written statements and interviews to Defendants:  [1] BPD written statement, [2] MSP written statement, [3] interview with BPD, and [4] interviews with Detectives Perkins and Detective Fowler; and Brittany Irish also provided accurate physical locations of at least one camp, which yielded signs of breaking in at that camp, along with specific tire tracks.  There was pending forensic evidence with the rape kit exam and the procurement of clothes.  *See* SMF 1-112.  Despite this, Sergeant Crane "know[s] that there were concerns of Brittany Irish being completely forthcoming", (Crane depo. 19, ln. 19 to p. 20, ln. 11), because one of Brittany Irish's friends, Amber Adams, "had told us that she felt Brittany was not being truthful" --- but Sergeant Crane "[does not] know" if anyone made any inquiry into whether Adams had, herself, a motivation to fabricate.  (Crane depo. 20, ln. 10-16)  Sergeant Crane also testified from "July 15 through the morning of July 17 there were concerns that Irish had been "dishonest as to her allegations" (Crane depo. 20, ln. 19-24), including very early in the investigation, although Defendants had not yet gathered most of the facts, because Detective

Perkins told Sergeant Crane that he harbored "concerns with [Irish's] credibility." (Perkins depo. 63, ln. 8-12)

221.    Detective Perkins agrees the MSP IRT [Incident Review Team] concluded in writing that starting "on July 14 . . . Lord went on a four-day crime spree [of] murder, kidnapping, rape, aggravated assault, arson, burglary, theft, and various other crimes" but Detective Perkins still challenges Irish's credibility regarding this, stating "I . . . disagree that this crime scene started necessarily on July 14, 2015. I would say that is debatable . . . the events [of] July 14 and July 15 are in question." (Perkins depo. 38, ln. 8 to p. 39, ln. 12); *see* Exhibit 14 (IRT report). Corroborating Irish, and rebutting Detective Perkins, Lord later admitted to the MSP after July 17 that he had tied up Irish on July 14 into July 15, just as Irish had described to Defendants. (Perkins depo. 46, ln. 2-7)  Detective Perkins continues to challenge Irish's credibility. "Brittany's lies affected the outcome of the case[.]" (Perkins depo. 156, ln. 13-14)  Detective Perkins indicated to the IRT and at deposition that he still believes Brittany Irish was not the victim here. (Perkins depo. 162, ln. 12-14)

*Defendants' Self-Contradictions Place Their Own Credibility In Doubt.*

222.    Detective Perkins first testified "I am not aware that I have any mechanism of addressing deficiencies or my disagreements with the IRT report. I did not have a say in the IRT report." (Perkins depo. 59, ln. 4-6)  He later contradicted himself, testifying that Detectives Perkins and Detective Fowler were reminded in a written email by Sergeant Crane to send their input to the IRT team, and Detective Fowler sent his input to Sergeant Crane. (Perkins depo. 7-23)  Other contradictions are as follows:  Detective Fowler was "taught in Major Crimes" to write down "exact times":  "The most important friend you've got is your watch. As you get things, write it

70

down, know it.  Write it down, know it.ö  (Fowler depo. 20, ln. 13-20) However, Defendants did not write down certain exact times during their forty-one hour investigation, including multiple multi-hour blocks of time largely unaccounted for.  *See* SMF 1-112.  Detective Perkins does not recall whether he told Sergeant Crane that Brittany Irish had written in her statement that Lord would cut her from ear to ear because õI do not recall what I did or did not say specifically about every allegation Brittany made.ö  (Perkins depo. 119, ln. 2-6) (Irish made 5 allegations:  three rapes, one strangulation, one kidnapping, in addition to documenting and orally reporting Lordøs threats). Detective Fowler does not know what day or time he or Detective Perkins ran Lordøs name through the system to check if Lord had a criminal record.  (Fowler depo. 8, ln. 3-14) Sergeant Crane and Detective Perkins contradicted each other as to whether Detective Perkins advised Sergeant Crane at 9:30 p.m. on July 16 that Lord was telling people that he had received a voicemail from the MSP and that someone was going to die that very night.  *See* OSMF 168 (Crane depo. 24, ln. 7-18)  Sergeant Crane testified he had õno roleö regarding any requests by Brittany Irish or Kimberly Irish regarding protection or anything of that nature, *see* (Crane depo. 25 ln. 4-8), but contradicting Sergeant Craneøs sworn testimony are all of the following facts: SMF 98, 100; Perkins Aff. par. 77, Crane Aff.  par. 10 (both showing Sergeant Crane made the conscience decision to tell Brittany Irish the false statement that there was õno manpowerö available), OSMF 178 (testimony of Detective Perkins contradicting Sergeant Crane and providing a direct quote attributable to Crane). (Perkins depo. 129, ln. 23-25 to p. 130, ln. 6, p. 131, ln. 1-5)

*Defendants Did Not Go To Find Lord Despite Training.*

223.   If a DV suspect has not been located, õyouøve got to go find him or her.ö  (Maine Criminal Justice Academy depo. (Director Rogers) 18, ln. 21 to p. 19, ln. 2)

71

224.    "[I]t's not a specific protocol, but it is . . . training and experience, that . . . . [y]ou're

going to try and find out where Defendants live, where Defendants work . . . . [i]f you can't do

that, eventually you are going to reach out by phone, if that's your only avenue." (MSP 30(b)(6)

depo. (Cote) 22, ln. 11-18 (Deputy Chief))

225.    MSP officers are not going to contact a perpetrator if Defendants think there may be

some collateral damage to having to explain why the suspect needs to talk to an MSP Detective

"and things like that.  We are always careful about that type of situation." ( MSP 30(b)(6) depo.

(Cote) 22, ln. 18-23 (Deputy Chief))   The known violent nature of a suspect is a factor in

whether to leave a phone call versus physically finding the suspect.  (MSP 30(b)(6) depo. (Cote)

25, ln. 3 to p. 26, ln. 1 (Deputy Chief)) The nature of the threats by a suspect against the victim

of doing harm to her or her children is a factor in whether to leave a phone call versus physically

finding the suspect.  (MSP 30(b)(6) depo. (Cote) 26, ln. 2-5 (Deputy Chief))

226.    "The standard of care is that the first priority is the victim's safety and you would do

nothing that would put her safety at risk, and contacting the suspect and leaving a phone message

is the last thing I would consider doing . . . . You'd have to take into account the consideration of

the safety of the victim, that's the only standard I'm aware of . . . . And if you're trying to

safeguard the victim, you don't tip off the suspect when she's already said he'd threaten her."

(Van Blaricom (Expert) depo. 68, ln. 6 to p. 69, ln. 2)


        *Defendants did not explain to Irish how to obtain a PFA Order.*

227.    "[A]t the very minimum" once MSP contacts a suspect, "[we] have the obligation under

DV policies to explain to the victim how to obtain a protection from abuse order."  (MSP

Training Acad. depo. (Rogers) 24, ln. 15-21 (Director))  Defendants did not do this.  *See* SMF 1-112.

 

*Defendants Did Not Assess Risk and Recidivism.*

228.     Detective Fowler testified repeatedly that, while he thought the purpose of the ODARA perpetrator risk assessment is for post-arrest use such as for bail, the reality is that it should be done at the scene, early in an investigation.  (Fowler depo. p. 54, ln. 6-10; Fowler depo. p. 54, ln. 17-24; Fowler depo. 54, ln. 25 to p. 55, ln. 4)  He then testified there is nothing in ODARA that says it cannot be used to assess how much victim protection may be needed in order to comply with M-4.   (Fowler depo. 55, ln. 9-17)   Detective Perkins testified the related Predominant Aggressor Risk Assessment is an MSP protocol; he completed MSP mandated training for it in 2008.  (Perkins depo. 32, ln. 10-23)  Defendants had tools to assess risk, but decided not to assess risk or recidivism.

229.     In 2009 Detective Perkins completed MSP training for how to be on the scene for rape calls, for responding to rape calls, and for understanding rape calls.  (Perkins depo. 34, ln. 4-13)  He completed MSP training for domestic abuse twice in 2001, twice again in 2003, again in 2004.  (Perkins depo. 34, ln. 18 to p. 35, ln. 2)  He started receiving MSP training in M-4, responding to incidents involving DV, in January 2008, and training in M-4 has been part of his continuing training since; M-4 is a predominant subject matter that Detective Perkins has studied as part of his training in the MSP.  (Perkins depo. 35, ln. 3-19)  Detective Perkins also receives training in First Circuit Court of Appeals law updates.  (Perkins depo. 35, ln. 20 to p. 36, ln. 2) Detective Perkinsø training summary has a section titled Maine DV Training Program, where it

summarizes the different categories of classes that Detective Perkins has taken throughout his training.  (Perkins depo. 36, ln. 7-17)

230.    On December 1, 2015, about nine months before Irish¢s allegations against Lord, Detective Perkins received training in the MSP¢s ODARA risk assessment tool.  (Perkins depo. 36, ln. 18-22; Perkins depo. 38, ln. 2-5)

231.    Separate from ODARA, in a pre-arrest DV situation, MSP officers are trained to assess a suspect¢s propensity for harming a victim in several ways:  [1] the officer should get prior history to see whether or not there may have been any prior incidences; [2] Defendants look at the scene; and, [3] while this occurs, the officer should be at the development stage of probable cause to see whether or not there is enough to arrest or charge somebody with a particular crime.  (Maine Criminal Justice Academy depo. (Rogers) 15, ln. 16 to p. 16, ln. 24 (Director))  There are a whole plethora of domestic violence (DV) crimes that can be charged.  (Maine Criminal Justice Academy(Rogers) depo. 16, ln. 21 to 25 (Director))

*Defendants Did Not Make An Immediate Arrest Or Consider The Factors For It.*

232.    Detective Perkins testified he attended state mandated training on rape using The Maine Criminal Justice Academy¢s Curriculum [of the MSP Training Academy], Unit Title õSexual Offensesö, which states, *see* Exhibit 30-A (Maine CASA õOn the Scene of Sexual Assaultsö), that for a determination as to whether an immediate arrest should be made, the factors are [1] the type of assault, [2] the protection of the victim, [3] whether more evidence is needed to be taken, [4] potential flight risk, and [5] possible destruction of evidence. (Maine Criminal Justice Academy depo. (Rogers) depo. 19, ln. 3-12 (Director)); *see also* (Perkins depo. 154, ln. 16 to p. 155, ln. 20)  However, Detective Perkins testified his decision about whether to make any arrest

depended upon whether or not he believed Brittany Irish, which is not an appropriate factor that may be considered under MSP training.  (Perkins depo. 163, ln. 12-15)  Specifically, Detective Perkins stated he had the training shown in Exhibit 30-A, which is state mandated rape training by Maine Coalition Against Sexual Assault which states that it is never a correct factor to assess the credibility of a victim when deciding whether to arrest a suspect.  (Perkins depo. 154, ln. 4 to p. 156, ln. 1); *see also* Exhibit 30-A.

*Other Affirmative Acts By Defendants That Created or Exacerbate Harm.*

233.   Sergeant Crane, supervisor of Detectives Fowler and Perkins, knew Lord prior to this case:  He grew up with Lord in the same area.  (Crane depo. 9, ln. 12-20)  Sergeant Crane personally charged Lord with an unrelated burglary or theft sometime before 2006.  (Crane depo. 10, ln. 3-21)   Detective Fowler testified Sergeant Crane knew Lord was a registered sex offender; that Sergeant Crane told Detective Perkins this; that Perkins then told Detective Fowler; but Fowler does not recall whether this was on July 15, 16, or 17. (Fowler depo. 7, ln. 13 to p. 8, ln. 2; Fowler depo. 8, ln. 15-17)

234.   Detective Fowler does not recall contacting the BPD about Irish's initial complaint to the BPD, and does not recall Detective Perkins contacting BPD about her initial complain either. (Fowler depo. 8, ln. 18 to p. 9 ln. 1)  Detective Fowler believes he recalls getting a report emailed from the BPD, but he does not recall if he called the BPD to flesh out the details. (Fowler depo. 9, ln. 5-15)

235.   Detective Fowler did not attempt to learn whether Brittany Irish had obtained a Protection From Abuse order against Lord at some point in the past; yet this is information that Detective Fowler can obtain; he has done it before.  (Fowler depo. 9, ln. 23 to p. 10 ln. 11)

236.     Brittany Irish did exactly what a DV victim should do according to M-4; she went to stay with family after learning of the fire, but Irish and her mother were both reporting that they didn't feel safe there. (Perkins depo. 66, ln. 2 to p. 67, ln. 13)  Detective Perkins was not aware that Brittany Irish's mother was an elderly person with multiple sclerosis, who required a walker, because Detective Perkins has never seen her or spoken with her.  (Perkins depo. 60, ln. 7-14) During the forty-one hour investigation, Sergeant Crane never met Irish.  (Crane depo. 16, ln. 12-14)

237.     "I admit the more officers you have theoretically you would have a [tactical] advantage in defending a person."  (Perkins depo. 154, ln. 2-3)  Detective Fowler disagrees with the IRT, which thought that it might be a possible problem, that other resources for protection had not been examined.  (Fowler depo. 52, ln. 4-7)

238.     The Expert Witness' Report, (*see* Exhibit 4) dated October 11, 2018, represents the opinions that Expert Witness D.P. Van Blaricom intends to offer in this case; those opinions are that Defendants did not exercise a reasonable standard of care in their investigation of Brittany Irish's allegations; and that Defendants assumed a special duty as to protection that Defendants did not fulfill, because Defendants had reason to believe Lord had burned the Irish barn and was still in the area, but Defendants simply left the Irishes unprotected, despite promises; and the reasons for these opinions are based on record evidence.  (Van Blaricom (Expert) depo. 77, ln. 24 to p. 78, ln. 9; Van Blaricom depo. 132, ln. 23 to p. 133, ln. 10)

239.     The IRT is a group of individuals, generally comprised of three lieutenants, a local police chief and a civilian. (Grzyb  depo. 30, ln. 10-12)

240.     Brittany Irish voluntarily allowed the detectives to photograph all of the texts on her cell phone (Perkins depo. 96, ln. 9-11)  From Brittany Irish's tests, Detective Perkins learned that

there was basically a love triangle; Brittany Irish was involved with two different men in roughly overlapping periods of time, which was not a new or shocking circumstance in Detective Perkins' experience, because he had seen such things before.  (Perkins depo. 96, ln. 13 to p. 97, ln. 12) Brittany Irish also voluntarily showed the detectives, and voluntarily told the detectives about, all of her text messages, including but not limited to texts she sent saying "not safe" and "don't text back". (Perkins depo. 47, ln. 1-8)

241.     Defendants had the name of the individual, and the location of the bar, for the individual who personally heard Lord make the death threat after the voicemail on July 16, 2015, but there is no evidence that Defendants ever attempted to contact or find this individual, or go to the bar, to learn Lord's next whereabouts, nor to send or task a MSP Trooper or local police officer to do the same.  (Perkins depo. 47, ln. 19-23; Perkins depo. 48, ln. 2-6)

242.     Brittany Irish's information enabled Defendants to ascertain that Lord had broken into a camp in Benedicta and gone through a window, a crime for which he should have been arrested on July 16, 2015; Irish accurately described this to the detectives on July 15, 2015.  (Perkins depo. 45, ln. 10-17)

243.      Detective Perkins testified that "It is certainly proper practice to run someone's criminal history." (Perkins depo. 84, ln. 11-12)  Detective Perkins did not appreciate an early background check is critical. (Perkins depo. 84, ln. 11-12)

244.     Defendants interpret the undefined word "scene" in M-4 differently and subjectively. Detective Fowler testified if he had applied M-4 in this case, Detective Fowler would use the common sense definition of "scene".  (Fowler depo.  41, ln. 11-17)  Detective Fowler defines "scene" as the place where the incident occurred, [but] "I have a problem with someone moving three, four times different places over and us following them around.  I don't think that's what

the – just me, personally, I don't think that's what the heart of the policy is getting to.  Do I follow that person around for four places for four days, for seven days moving around?" (Fowler depo. 41, ln. 18 to p. 42, ln. 14)  Detective Fowler does not know whether M-4 applies once the victim has left the initial scene of an initial act of DV, even if the alleged suspect has followed her and knows her location.  (Fowler depo. 42, ln. 20 to p. 43 ln. 14)  In contrast, Detective Perkins testified if he had applied M-4, Detective Perkins agreed the term "scene" is not defined and a DV scene can be dynamic, like in a car, or move from one town to another.  (Perkins depo. 23, ln. 25 to p. 24, ln. 14)  Detective Perkins testified M-4 does not say that the MSP must protect DV victims only if Defendants are at the literal first scene where the first abuse occurred.  (Perkins depo. 27, ln. 23 to p. 28, ln. 5)  Detective Perkins defines "scene" to mean that something happened in more than one place, there could be more than one scene.  (Perkins depo. 25, ln. 22 to p. 26, ln. 2)

245.    Defendants believed another reason that M-4 did not apply was because this case was a "long", "deliberate", "high-level" investigation over "several days" and "very different" from a rapidly developing situation.  The MSP 30(b)(6) designee testified Irish had alleged that she was kidnapped and raped multiple times in a series of separate incidences, in several locations, on July 14 and 15, 2015; that Irish reported these to BPD on July 15; that BPD referred the allegations to MSP on July 15 because of jurisdictional issues on July 15; and the MSP started investigating on July 15.  (MSP 30(b)(6) (Cote) depo. 18, ln. 9-21 (Deputy Chief))  "[T]his was a long, high-level investigation that's been going on for several days and is much different than a – you're arriving at a scene within 20 minutes of a phone call to the police to report a DV assault. It's very different."  (MSP 30(b)(6) depo. (Cote) p. 19, ln. 11-20 (Deputy Chief))

246.    It is fundamental to do a criminal background check on any suspect; it is the first thing you do, because you would learn if the suspect is on probation; it is important to know as much as you can about the suspect.  (Van Blaricom (Expert) depo.124, ln. 3 to p. 126, ln. 19)

247.    Detective Perkins agreed the first step in a DV or sexual assault call is to attend to the victim; four steps later, after taking care of the victim, it's to gather information.  (Perkins depo. 153, ln. 2-15)

248.    Kimberly Irish knew R.J. Hartt, the man who reported the threat by Lord at a bar after the 6:17 p.m. voicemail; Hartt heard Lord; the bar was only a few miles from the Irish home; Hartt was at the Irish home for a few minutes, soon after, to report the threat to Kimberly Irish. (Kimberly Irish depo. 85, ln. 12 to p. 86, ln. 23)  Defendants' Summary Judgment pleadings do not show that Defendants followed up on this lead.  *See* SMF 1-112.

249.    Kimberly Irish did not dare take her eyes of the area the whole night and she never saw a cruiser go by.  (Kimberly Irish depo. 92, ln. 1-15)  After July 17, once Lord was in custody, the MSP K-9 Officer and the K-9 dog were placed at the Irish house 24 hours a day, for two days, to protect the crime scene, and Lord's other girlfriend (Jamie Clark) was given safe house protection, even though Lord was already in custody.  (Kimberly Irish depo. p. 93, ln. 6 to p. 94, ln. 3)

250.    The MSP IRT [Incident Review Team] in this case noted Defendants' possible deficiencies in the Defendants' failure to apply M-4.  *See* OSMF 133.  Lt. Grzyb, who was on the MSP Incident Review Team (IRT) that looked at this investigation, did not know that the IRT's draft report was then distributed to all three Defendants for their comment.  (Grzyb depo. 43, ln. 19-23.)

*Additional Facts Regarding Lord*

251.    On May 30, 2019, the Maine State Supreme Judicial Court issued an opinion in the case of *State v. Lord*, 2019 ME 82, ___ A.3d ___; that opinion summarizes the evidentiary facts to which Lord agreed when he pleaded guilty during the relevant time period in this case; specifically, at paragraphs 3-10, the Law Court wrote that, at his guilty plea, Lord did "not dispute the evidentiary support for any of the following facts including (i) "[t]wo months prior to the events in issue, his six-month-old son had died" and (ii) "prior to the events in issue, [Irish] had reported criminal conduct by Lord toward her." *Id.* ¶ 4.  Lord thus admitted at his guilty plea that he knew Irish reported his July 14 and 15 crimes to the MSP. *See Order On Motion to Amend Plaintiff's Response to Request for Admission (ECF 68).  Accord* OSMF 168 (also showing Lord knew the MSP voice mail was because Brittany Irish had reported Lord's July 14 and 15 crimes).

252.    The Maine Supreme Judicial Court also wrote that, at his guilty plea, Lord did "not dispute the evidentiary support for" (iii)  "[s]ometime before 8:30 p.m. on July 16 . . . Lord set fire to [the Irish family barn]" and that Irish's mother "suffers from multiple sclerosis" such that "[a]s the fire was raging, [Irish and Hewitt] arrived" . . . and Brittany Irish stayed with her mother "after the fire department left." *Id.* par. 5.  The Maine Supreme Judicial Court also wrote of "Lord's criminal history going back to 1999, including an assault and unlawful sexual contact in 2005 and, most recently, a domestic violence assault in 2015, for which he was on probation at the time." *Id.* par. 21.  For all of this, "Lord confessed to the police truthfully." *Id.* par. 18. *Order On Motion to Amend Plaintiff's Response to Request for Admission (ECF 68).*

DATED:  June 11, 2019.

/s/ Scott J. Lynch
Scott J. Lynch, Esq.
Lynch & Van Dyke, P. A.
261 Ash Street - P.O. Box 116
Lewiston, Maine 04243-0116
(207) 786-6641
slynch@HLRVD.com

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2019, I electronically filed the within

**PLAINTIFFS' OPPOSING STATEMENT OF MATERIAL FACTS WITH
ADDITIONAL STATEMENT OF MATERIAL FACTS**

using the ECF system which will send notification of such filing to the following counsel and same shall be provided to Plaintiffs by means of U. S. Postal Service.

CHRISTOPHER TAUB, ASSISTANT ATTORNEY GENERAL
OFFICE OF THE ATTORNEY GENERAL
6 STATE HOUSE STATION
AUGUSTA, ME  04333-0006

/s/ Scott J. Lynch

Lynch & Van Dyke, P. A.
261 Ash Street - P.O. Box 116
Lewiston, Maine 04243-0116
(207) 786-6641
slynch@HLRVD.com