| | | |
|---|---|---|
| BRITTANY IRISH et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:15-cv-00503-JAW |
| | ) | |
| JASON FOWLER et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

This tragic case returns to the Court on a motion for summary judgment by the Defendants, Maine State Troopers Darrin Crane, Jason Fowler, and Micah Perkins. The Plaintiffs—Brittany Irish, the estate of Kyle Hewitt, and Kimberly Irish—brought an action against the Defendants, alleging that despite knowing of her old boyfriend's threats of violence against Brittany Irish, the troopers left a voicemail message for him, implicitly informing him that she had gone to law enforcement to report that he had sexually assaulted her, and then law enforcement failed to protect her and the other plaintiffs from the ensuing and predictable harm. The Court concludes that the record does not demonstrate a genuine issue of material fact as to whether Maine State Sergeant Crane was acting in a deliberately indifferent manner and that he is entitled to summary judgment in his favor.

Taking the facts and inferences in the light most hospitable to the Plaintiffs, the Plaintiffs have shown sufficient disputed facts to raise a jury issue as to whether Maine State Detectives Fowler and Perkins violated the Plaintiffs' substantive due process rights. However, because the Court finds that the law on state-created

danger was not clearly established when the events in this case took place, the Court concludes that the Defendants are entitled to qualified immunity and grants their motion for summary judgment.

## I.    PROCEDURAL HISTORY

On December 10, 2015, Brittany Irish, individually and as personal representative of the estate of Kyle Hewitt, deceased, and Kimberly Irish (Plaintiffs) filed a three-count complaint in this Court, bringing a civil rights action against the state of Maine, the Maine State Police, and ten certain known and unknown state of Maine police officers (Defendants). *Compl.* at 1 (ECF No. 1). After this Court granted the Defendants' motion to dismiss, the Plaintiffs appealed to the Court of Appeals for the First Circuit and on March 1, 2017, the First Circuit vacated this Court's order with respect to the individual defendants and remanded the case for further discovery. *Irish v. Maine*, 849 F.3d 521, 529 (1st Cir. 2017). On March 23, 2017, the Court received the mandate of the First Circuit, which returned jurisdiction to the Court. *Mandate* (ECF No. 17). On September 13, 2017, the Plaintiffs filed a first amended complaint, naming Jason Fowler, Micah Perkins, John Darcy, and Andrew Levesque as Defendants. *First Am. Compl.* (ECF No. 32). On October 26, 2017, the Plaintiffs filed a second amended complaint naming Jason Fowler, Micah Perkins, and Darrin Crane (Individual Officers) as Defendants. *Second Am. Compl.* (ECF No. 38). On November 30, 2017, the Individual Officers answered the Second Amended Complaint. *Answer* (ECF No. 42).

After the parties engaged in discovery, the discovery period closed on October 29, 2018. *Order Granting Mot. to Amend Scheduling Order* (ECF No. 54). On December 14, 2018, the Defendants filed a motion to exclude one of the Plaintiffs' experts. *Defs.' Mot. to Exclude D.P. Van Blaricom* (ECF No. 59). The Plaintiffs responded on January 11, 2019. *Pls.' Obj. to Defs.' Mot. to Exclude D.P. Van Blaricom* (ECF No. 62). The Defendants replied on January 25, 2019. *Defs.' Reply in Support of Mot. to Exclude D.P. Van Blaricom* (ECF No. 67). On March 13, 2019, the Court ruled on the motion to exclude Mr. Van Blaricom. *Order on Mot. to Exclude D.P. Van Blaricom* (ECF No. 68).

On March 20, 2019, the parties filed a joint motion for approval of a Local Rule 56(h) schedule, which the Court granted on the same day. *Jt. Mot. for Summ. J. Schedule* (ECF No. 69); *Order Granting Mot. for Approval of Local Rule 56(h) Schedule* (ECF No. 70). On April 17, 2019, the parties jointly filed a stipulation of facts (JSF). *Joint Stipulated Facts* (ECF No. 72) (*JSF*). On April 26, 2019, the Individual Officers filed a statement of material facts (DSMF). *Defs.' Statement of Undisputed Material Facts* (ECF No. 79) (DSMF). On the same day, the Individual Officers filed a motion for summary judgment. *Mot. for Summ. J. of Defs. Jason Fowler, Micah Perkins and Darrin Crane* (ECF No. 80) (*Defs.' Mot.*). On June 11, 2019, the Plaintiffs filed a response to the Individual Officers' Motion for Summary Judgment as well as a response to their statement of material facts, which included a statement of additional material facts. *Pls.' Opp'n to Defs.' Mot. for Summ. J.* (ECF No. 87); *Pls.' Opposing Statement of Material Facts with Additional Statement of*

*Material Facts* (ECF No. 88). On July 8, 2019, the Plaintiffs filed an amended response to the Individual Officers' motion for summary judgment as well as an amended response to their statement of material facts (PRDSMF), which included an amended statement of additional material facts (PSAMF). *Pls.' Opp'n to Defs.' Mot. for Summ. J.* (ECF No. 95) (*Pls.' Opp'n*); *Pls.' Opposing Statement of Material Facts with Additional Statement of Material Facts* (ECF No. 96) (for paragraphs 1-112, PRDSMF; for paragraphs 113-336, PSAMF). On July 31, 2019, the Individual Officers filed a reply to the Plaintiffs' response to their statement of material facts and the Plaintiffs' statement of additional material facts (DRPSAMF) as well as a reply to the Plaintiffs' opposition to their motion for summary judgment. *Defs.' Reply Statement of Facts* (ECF No. 99) (DRPSAMF); *Defs.' Reply in Supp. of Mot. for Summ. J.* (ECF No. 100) (*Defs.' Reply*). The Court ordered oral argument, which it held on January 22, 2020. *Min. Entry* (ECF No. 103).

## II.  FACTUAL BACKGROUND[1]

### A.  The Relationship Between Brittany Irish and Anthony Lord

Brittany Irish met Anthony Lord in June of 2011, when she was sixteen years old. DSMF, Attach. 1 at 18:17-19:01 (*Dep. of Brittany Irish*). In July of 2011, Brittany Irish's parents took out a protection from abuse or protection from harassment order against Mr. Lord.[2] DSMF ¶ 7; PRDSMF ¶ 7. Brittany Irish believed that they had

---

[1]    The Court states the facts "in the light most hospitable to [Plaintiffs], consistent with record support . . .." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 37 (1st Cir. 2018) (citing *Ahern v. Shinseki*, 629 F.3d 49, 51 (1st Cir. 2010); *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).

[2]    The Plaintiffs qualify this statement by pointing out that "[a] court of law granted the order" which it would not have done "absent evidence Lord had done something to satisfy the legal standard for such orders." PRDSMF ¶ 7. Although the qualified response is correct, satisfying the legal

4

done so because her father discovered that Mr. Lord was a registered sex offender and because she was underage and had just had a child. DSMF ¶ 8; PRDSMF ¶ 8. Mr. Lord had a significant criminal history, including convictions for criminal trespass in 1999 and assault in 2002, a "charge of Felony Class A . . . gross sexual assault in 2002, which lead to a Felony Class C conviction in 2002," probation violations in 2003 and 2009, and a domestic violence "assault charge Class D in 2015, for which he served forty-five days in jail and was on probation for a third time." PSAMF ¶ 280; DRPSAMF ¶ 280.

In October of 2011, Brittany Irish became romantically involved with Kyle Hewitt.[3] DSMF ¶ 1; PRDSMF ¶ 1. Mr. Hewitt and Brittany Irish began living together in May of 2012. DSMF ¶ 2; PRDSMF ¶ 2. For a brief period in 2013, Brittany Irish was romantically involved with Mr. Lord. DSMF ¶ 5; PRDSMF ¶ 5. In December 2013, Brittany Irish gave birth to her and Mr. Hewitt's son. *JSF* ¶ 1. In March of 2014, Brittany Irish and Mr. Hewitt moved to an apartment in Bangor, Maine. DSMF ¶ 3; PRDSMF ¶ 3. Brittany Irish and Mr. Lord once again became romantically involved beginning in April or May of 2015.[4] DSMF ¶ 6; PRDSMF ¶ 6.

---

standard for the issuance of the order is implicit. The Court therefore declines to qualify the paragraph.

[3] The Plaintiffs qualify this statement by stating that "Defendants admit a lover's triangle and a[ Brittany] Irish/Lord relationship qualifying for Maine State Police . . . domestic violence . . . protection . . .." PRDSMF ¶ 1. The Court views this qualification as argument, rather than a dispute regarding the factual content of the statement. The Court declines to qualify the Individual Officers' statement.

[4] The Plaintiffs once again qualify this statement by stating that "Defendants admit "a lover's triangle and a[ Brittany] Irish/Lord relationship qualifying for Maine State Police . . . domestic violence . . . protection . . .." PRDSMF ¶ 6. The Court again views this qualification as argument, rather than a dispute regarding the factual content of the statement. The Court declines to qualify the Individual Officers' statement.

In early June of 2015, Mr. Hewitt moved out of the apartment he and Brittany Irish shared, but he had moved back in as of July 10, 2015. DSMF ¶ 4; PRDSMF ¶ 4.

On June 30, 2015, Mr. Lord spent the night at Brittany Irish's residence. *JSF* ¶ 2. Brittany Irish has never taken out a formal order for protection against Mr. Lord, DSMF ¶ 9; however, on July 7, 2015, Brittany Irish called the Bangor Police Department (BPD) "to report being harassed and threatened by her ex-boyfriend Anthony Lord."[5] *BPD Harassment Report*; *see also* DSMF ¶ 9; PRDSMF ¶ 9; PSAMF ¶ 194; DRPSAMF ¶ 194. On that same day, BPD officer Michael Brennan called Mr. Lord and advised him that Brittany Irish had contacted the police about Mr. Lord's harassing and threatening her and that Mr. Lord "was to stop attempting to contact her."[6] PSAMF ¶¶ 137, 194; DRPSAMF ¶¶ 137, 194. As of July 12, 2015, Brittany Irish wanted to spend her life with Mr. Lord. *JSF* ¶ 3. As of July 14, 2015, Brittany Irish was engaged in a romantic relationship with Mr. Lord involving regular

---

[5]    Paragraph 9 of the DSMF states, "B[rittany] Irish has never applied for a protection from abuse order or for a protection from harassment order against Lord." DSMF ¶ 9. The Plaintiffs qualify this statement by pointing out that Brittany Irish had previously gone to BPD to report Mr. Lord for harassment, PRDSMF ¶ 9, and while the Court regards this as argument outside of the scope of the fact asserted by the Individual Officers, the Court alters this statement to reflect the record and because this information is included in PSAMF ¶ 194.

The final sentence of paragraph 194 of the PSAMF reads, "This *harassment* complaint made by Brittany Irish, a little over one week earlier to the voicemail being left for Lord, is demonstrative that Lord knew that Brittany Irish had contacted the police at least once before to report abuse by Lord." PSAMF ¶ 194. The Individual Officers move to strike this sentence, arguing that "it is not supported by the cited-to portions of the record," "is argument," and that furthermore, Brittany Irish "reported being harassed and threatened by Lord," but "did not report recent abuse." DRPSAMF ¶ 194. The Court agrees that the Plaintiffs' statement is not supported by the record evidence, as the BPD Harassment Report does not demonstrate that Brittany Irish reported abuse by Mr. Lord. *See* PSAMF, Attach. 12 at 2 (*BPD Harassment Report*). Therefore, the Court strikes the third sentence of paragraph 194 of the PSAMF.

[6]    The Individual Officers seek to qualify paragraph 137 of the PSAMF, stating that "[a] BPD officer called Mr. Lord and told him that B[rittany] Irish wanted no further contact with him and that he was to stop attempting to contact her." DRPSAMF ¶ 137. The Court is unclear how this is different from the Plaintiffs' statement and declines to qualify the original statement.

intimate relations,[7] and on that day, she sent him a text message stating that she wanted to have a baby with him. *JSF* ¶ 4-5; DSMF ¶ 10; PRDSMF ¶ 10.

## B.    The Evening of July 14, 2015

On July 14, 2015, Brittany Irish arrived at her friend Amber Adams' house at approximately 5:00 p.m.[8]  DSMF ¶ 11; PRDSMF ¶ 11.  At 7:04 p.m., Brittany Irish sent Mr. Lord a text message telling him that she was probably going to come see him that night.[9]  DSMF ¶ 12; PRDSMF ¶ 12.  At 8:15 p.m., Brittany Irish sent Mr. Lord a text message telling him that she loved him.  *JSF* ¶ 6.  At 8:43 p.m., Brittany Irish sent Mr. Hewitt a text message telling him that she was not going to visit Mr. Lord that night; however, at the time she sent this text message, Brittany Irish was planning to see Mr. Lord.[10]  DSMF ¶ 13; PRDSMF ¶ 13.

---

[7]        The Plaintiffs attempt to qualify this statement by referring back to their responses to paragraphs 1 and 6 of the DMSF.  PRDSMF ¶ 10.  The Court again views this qualification as argument, rather than a dispute regarding the factual content of the statement.  The Court declines to qualify the Individual Officers' statement.

[8]        The Plaintiffs object to the inclusion of this fact as irrelevant.  PRDSMF ¶ 11.  The Individual Officers counter that it is relevant "because it relates to the events immediately preceding B[rittany] Irish's encounter with Lord outside of an IGA store, as alleged in paragraph 19 of the Second Amended Complaint."  DRPSAMF ¶ 11.  The Court agrees with the Individual Officers and overrules the Plaintiffs' objection.

[9]        The Plaintiffs object to the inclusion of this fact as irrelevant.  PRDSMF ¶ 12.  The Individual Officers counter that it is relevant on two grounds, the first of which is that "it relates to the events immediately preceding B[rittany] Irish's encounter with Lord outside of an IGA store, as alleged in paragraph 19 of the Second Amended Complaint."  DRPSAMF ¶ 12.  The Court overrules the Plaintiffs' objection on this ground, and so does not reach the second ground.

[10]        The Plaintiffs object to the inclusion of this fact as irrelevant.  PRDSMF ¶ 13.  The Individual Officers counter that it is relevant "because it relates to the events immediately preceding B[rittany] Irish's encounter with Lord outside of an IGA store, as alleged in paragraph 19 of the Second Amended Complaint" and "because it corroborates Hewitt's statement to Perkins and Fowler that B[rittany] Irish lied to him about her relationship with Lord."  DRPSAMF ¶ 13.  The Court agrees with the Individual Officers that the statement is relevant and thus admissible.  The Court overrules the Plaintiffs' objection.

At approximately 10:00 p.m., Brittany Irish left Ms. Adams' house and drove to an IGA store in Orono, Maine, to meet Mr. Lord.[11]  DSMF ¶ 14; PRDSMF ¶ 14. Brittany Irish spoke to Mr. Lord on the phone throughout this drive.[12]  DSMF ¶ 15; PRDSMF ¶ 15.  Upon meeting Mr. Lord, Brittany Irish told him that she had a kidney infection, and he offered to drive her in his car to a hospital emergency room located in Lincoln, Maine.  *JSF* ¶ 7.  Brittany Irish left her car in the parking lot at the IGA and got into Mr. Lord's car.  *JSF* ¶ 8.

Brittany Irish later reported to Maine State Police (MSP) Detectives Micah Perkins and Jason Fowler that Mr. Lord did not take her to the emergency room, but rather drove her to a gravel road in or near Benedicta, Maine, where he choked her with a seatbelt and sexually assaulted her.[13]  *JSF* ¶ 9.  He then drove her to a cabin where he bound her hands behind her back with window blind cords and sexually assaulted her, and then drove her to a second cabin where he again sexually assaulted her.  *JSF* ¶ 9.  After Mr. Lord dropped Brittany Irish off at her car in the IGA store parking lot in the morning on July 15, Mr. Lord and Brittany Irish drove in separate cars to a Verizon store on Stillwater Avenue in Bangor.  *JSF* ¶ 10.  The two entered

---

[11]     The Plaintiffs object to the inclusion of this fact as irrelevant.  PRDSMF ¶ 14.  The Individual Officers counter that it is relevant "because it relates to the events immediately preceding B[rittany] Irish's encounter with Lord outside of an IGA store, as alleged in paragraph 19 of the Second Amended Complaint."  DRPSAMF ¶ 14.   The Court agrees with the Individual Officers and overrules the Plaintiffs' objection.

[12]     The Plaintiffs object to the inclusion of this fact as irrelevant.  PRDSMF ¶ 15.  The Individual Officers counter that it is relevant on two grounds, the first of which is that "it relates to the events immediately preceding B[rittany] Irish's encounter with Lord outside of an IGA store, as alleged in paragraph 19 of the Second Amended Complaint."  DRPSAMF ¶ 15.  The Court overrules the Plaintiffs' objection on this ground, and so does not reach the second ground.

[13]     For the purposes of resolving this motion for summary judgment, the Court draws all reasonable inferences in favor of the Plaintiffs, the non-movants, and so in this order the Court assumes the truth of Brittany Irish's allegations against Mr. Lord.

the store at approximately 10:30 a.m. and left at approximately 10:47 a.m.  *JSF* ¶ 11.

At 11:54 a.m., Brittany Irish sent Mr. Lord a text message stating that she loved him.

*JSF* ¶ 12.

## C. Brittany Irish's First Meeting with Micah Perkins and Jason Fowler

At 12:50 p.m., 12:52 p.m., 12:54 p.m., and 6:50 p.m. on July 15, 2015, Brittany

Irish placed telephone calls to Mr. Lord.  *JSF* ¶ 16.  That same day, Ms. Adams drove

Brittany Irish to St. Joseph's Hospital to complete a rape kit.  *JSF* ¶ 13.  At 12:00

p.m. on July 15, Sergeant Darrin Crane of the MSP received a call from an officer

with the BPD, relaying that Brittany Irish had made a complaint of gross sexual

assault against Mr. Lord to the BPD.[14]  PSAMF ¶¶ 139-40; DRPSAMF ¶¶ 139-40.

The BPD officer told Sergeant Crane that Brittany Irish alleged Mr. Lord abducted

her on July 14, kept her against her will, and raped her several times.  PSAMF ¶ 141;

DRPSAMF ¶ 141.  Sergeant Crane knew Mr. Lord personally, having grown up with

him and having arrested him for an unrelated burglary or theft.  PSAMF ¶¶ 161-62;

DRPSAMF ¶¶ 161-62.

Sergeant Crane assigned Detectives Perkins and Fowler to the case after this

phone call.  PSAMF ¶ 142; DRPSAMF ¶ 142.  Sergeant Crane briefed Detective

Perkins at 1:20 p.m. on July 15, telling him that Mr. Lord was the suspect, that

Brittany Irish had broken up with him, and that her allegations included violence,

---

[14]     The Court altered the Plaintiffs' statement in response to the Individual Officers' qualification.
*See* DRPSAMF ¶ 140.  The record does not reflect that the BPD officer told Sergeant Crane that
Brittany Irish had called the BPD but does provide support for Brittany Irish having made a complaint
of gross sexual assault against Mr. Lord to the BPD.  *See Defs.' Reply in Supp. of Mot. to Exclude D.P.
Van Blaricom*, Attach. 1 at 13:02-07 (ECF No. 67) (*Dep. of Crane*).

choking with a seatbelt, and multiple rapes at multiple locations. PSAMF ¶ 143; DRPSAMF ¶ 143. Detective Perkins also learned from Sergeant Crane that Mr. Lord was on the Sex Offender Registry but did not run a criminal background check at that time to determine Mr. Lord's full criminal record.[15] PSAMF ¶¶ 144; DRPSAMF ¶¶ 144. Detective Perkins briefed Detective Fowler about what Sergeant Crane had told him about the events of the night before at 1:25 p.m. PSAMF ¶ 145; DRPSAMF ¶ 145.

At just before 2:00 p.m. on July 15, Sergeant Crane received an email from the BPD containing an officer's report of what the BPD officer had spoken to Brittany Irish about.[16] PSAMF ¶ 146; DRPSAMF ¶ 146. The report contained a statement by Brittany Irish, as recorded by the BPD officer, that Mr. Lord would "cut her ear to ear" if she "did not stop lying to him."[17] PSAMF ¶ 148; DRPSAMF ¶ 148. At 2:05

---

[15]   Paragraph 160 of the PSAMF states that "Sergeant Crane knew at 12:30 p.m. that Lord was a registered sex offender, but not whether this conviction was a felony or misdemeanor and the detectives were not notified." PSAMF ¶ 160. The Individual Officers argue that the cited portion of Detective Perkins' deposition does not provide support for this assertion. DRPSAMF ¶ 160. The Court strikes this paragraph. The cited portion of Detective Perkins' deposition, *Pls.' Obj. to Defs.' Mot. to Exclude D.P. Van Blaricom*, Attach. 3 at 71:20-74:07 (ECF No. 62) (*Dep. of Perkins*), makes clear that Sergeant Crane only told Detective Perkins that Mr. Lord was on the sex offender registry at 1:20 p.m., and provides no support for Sergeant Crane having known earlier, at 12:30 p.m. Additionally, it makes clear that Sergeant Crane notified Detective Perkins that Mr. Lord was a registered sex offender. *Id.*

[16]   The Plaintiffs refer to the BPD officer's report as Brittany Irish's "statement as typed by the BPD officer . . .." PSAMF ¶ 146. The Individual Officers quibble with this characterization. DRPSAMF ¶ 146. The Court does not understand the Individual Officers to disagree that Brittany Irish made statements to the BPD which were recorded by a BPD officer and sent to Sergeant Crane as a report, but rather with reference to that report as a "statement." The Court agrees with the Individual Officers that the cited portion of the record does not refer to this report as a "statement," but believes the distinction of no moment. The report constitutes a collection of statements made by Brittany Irish to a BPD officer, even if it is not a formal "statement" as that term is understood in the law enforcement community. *See* PSAMF, Attach. 11 at 1-2 (using variants of the phrase "Brittany stated" at least twelve times).

[17]   The Court altered the Plaintiffs' statement to reflect the Individual Officers' qualification that Mr. Lord's threat was conditioned on Brittany Irish's honesty with him and that the BPD officer rather than Brittany Irish recorded the statement. DRPSAMF ¶ 148.

p.m., Sergeant Crane forwarded the report to Detective Fowler.[18]  PSAMF ¶ 147; DRPSAMF ¶ 147.  Because Detective Fowler did not follow up with BPD regarding Mr. Lord, he did not know about the July 7, 2015, notice given by BPD to Mr. Lord stating that Brittany Irish had complained of harassment by Mr. Lord and wanted no more contact with him.  PSAMF ¶ 138; DRPSAMF ¶ 138.

From approximately 2:05 p.m. to 3:05 p.m. on July 15, Detectives Perkins and Fowler drove together to meet Brittany Irish at St. Joseph's Hospital, where she was completing a rape kit exam.  PSAMF ¶ 149; DRPSAMF ¶ 149.  During this time, neither Detective Perkins nor Detective Fowler made any effort to ascertain Mr. Lord's criminal history or whether he had any bail or probation conditions.  PSAMF ¶ 150; DRPSAMF ¶ 150.  As Detective Perkins testified, it is simpler to get a probation hold on a suspect than an arrest warrant, as a probation hold is achieved by calling a suspect's probation officer and explaining the allegations; however, if one does not know that a suspect is on probation, one cannot ask for such a hold.[19] PSAMF ¶ 150; DRPSAMF ¶ 150.

---

[18]     The Individual Officers qualify this fact by asserting that Brittany Irish's report to BPD was not a "statement."  DRPSAMF ¶ 147.  The Court rejects this qualification for the reasons expressed in footnote 16, supra.

[19]     The Court altered the Plaintiffs' statement to reflect the Individual Officers' qualification that Detective Perkins referred to probation holds as simpler than warrants, rather than better. DRPSAMF ¶ 150.  The Court also notes Detective Perkins' testimony that, even had he known Mr. Lord was on probation, he would not have sought a probation hold during his drive to the hospital, DRPSAMF ¶ 150, but does not include that statement in its recitation of facts.  The PSAMF does not allege that Detective Perkins would have sought a probation hold had he known of Mr. Lord's probation status.  Therefore, the Individual Officers' inclusion of this testimony by Detective Perkins about what he would have done under different facts violates District of Maine Local Rule 56(d), which "limit[s] a party's reply to only the opposing party's additional facts and requests to strike."  *Michaud v. Calais Reg'l Hosp.*, No. 15-cv-00359-NT, 2017 WL 902133, at *1 n.1 (D. Me. Mar. 7, 2017).

At 3:05 p.m. on July 15, Detectives Perkins and Fowler arrived at St. Joseph's hospital and met with the sexual assault advocate and Brittany Irish.[20] PSAMF ¶¶ 151, 155, 157; DRPSAMF ¶¶ 151, 155, 157. The meeting was brief, and it is not clear from the record or from the parties what was discussed.[21] *Dep. of Brittany Irish* at 139:08-140:06.

## D. Brittany Irish's Second Meeting with Micah Perkins and Jason Fowler

At 4:34 p.m. on July 15, 2015, Detectives Perkins and Fowler met with Brittany Irish for a second time at St. Joseph's Hospital.[22] *JSF* ¶ 14; DSMF ¶ 16; PRDSMF ¶ 16. Brittany Irish indicated at this meeting that, though she was tired, she wanted to talk to Detectives Perkins and Fowler. PSAMF¶ 152; DRPSAMF ¶ 152. Brittany Irish told the two that she and Mr. Lord had been dating for two or three months but that their relationship had ended recently. DSMF ¶ 18; PRDSMF ¶ 18. She described having met with Mr. Lord the previous evening in the parking lot of an IGA store in

---

[20] The Individual Officers qualify paragraph 157 of the PSAMF by stating that the 3:05 p.m. meeting between Brittany Irish and Detectives Perkins and Fowler on July 15, 2015, did not occur the way the Plaintiffs allege it did in other facts. DRPSAMF ¶ 157. The Court regards this qualification as argument outside the facts asserted by the Plaintiffs and disregards it. Furthermore, the Court is required to view disputed facts in the light most favorable to the non-movants.

[21] The Plaintiffs maintain Brittany Irish reported a threat of retaliation by Mr. Lord during this first meeting with Detectives Perkins and Fowler, PSAMF ¶¶ 154, 156; however, a portion of Brittany Irish's deposition just before the cited portion suggests that the events the Plaintiffs describe as a reporting of a retaliation threat took place during a later meeting with Detectives Perkins and Fowler. *See Dep. of Brittany Irish* at 140:07-141:04. The Court included the threat of retaliation in its description of the second meeting among the detectives and Ms. Irish. The exact timing as to when between these two meetings Brittany Irish told the detectives of the Lord threats is not material for purposes of ruling on the instant motion.

[22] Stripped of argument, the Plaintiffs' denial of this statement by the Individual Officers boils down to a denial that the meeting described in this statement was the first meeting between Detectives Perkins and Fowler and Brittany Irish. PRDSMF ¶ 16. The Court already described the previous meeting that took place between Detectives Perkins and Fowler and Brittany Irish and alters the Individual Officers' statement to clarify that it refers to a second, rather than initial, meeting.

Orono to exchange some personal items.[23] DSMF ¶ 19; PRDSMF ¶ 19. She told them that after she asked Mr. Lord to drive her back,[24] Mr. Lord choked her with a seatbelt. PSAMF ¶ 163; DRPSAMF ¶ 163. She told them that after that, Mr. Lord took her to a camp in Benedicta, Maine, where he tied her wrists behind her back with window blind cord, bound her feet, and tied her feet to a bed, before leaving for a while, returning, and unbinding her. DSMF ¶ 20; PRDSMF ¶ 20. She also told them that Mr. Lord kidnapped her, took her multiple places, and sexually assaulted her multiple times. *JSF* ¶ 15; PSAMF ¶ 163; DRPSAMF ¶ 163. The information Brittany Irish gave Detectives Perkins and Fowler during this conversation led to evidence being found in two different locations.[25] PSAMF ¶¶ 153, 164, 174-75; DRPSAMF ¶¶ 153, 164, 174-75.

---

[23] The Plaintiffs qualify this statement by pointing out that the statement "omit[s] that [Brittany] Irish told much more to Defendants by 4:34 p.m. on July 15." PRDSMF ¶ 19. This is not a proper qualification under District of Maine Local Rule 56(c). The Plaintiffs are free to submit additional statements of material fact, if they wish to do so. As the Plaintiffs do not deny or qualify the facts contained in the statement and as the Court finds the statement supported by the record citation, the Court deems the statement admitted. *See Forrest v. Brinker Int'l Payroll Co., LP*, No. 06-cv-00073-P-C, 2007 WL 120307, at *4 n.2 (D. Me. Jan. 11, 2007) (noting that when a party's response to a statement of fact is not acceptable under Local Rule 56, the statement is deemed admitted if supported by the citation provided), *adopted by* 2007 WL 1083431 (D. Me. Apr. 11, 2007), *aff'd*, 511 F.3d 225 (1st Cir. 2007).

[24] It is unclear from the record where the Plaintiffs assert Brittany Irish requested to be driven back from, but the Court assumes they are referring to the gravel road where Brittany Irish says Mr. Lord drove her prior to sexually assaulting her the first time. *See* DSMF ¶ 31; PRDSMF ¶ 31.

[25] The Individual Officers qualify the Plaintiffs' statement that Brittany Irish provided "corroborating evidence," PSAMF ¶ 153, by pointing out that this goes beyond the record citation, in which Detective Fowler only testifies that Brittany Irish provided information that led to evidence being found in two locations. *See* DRPSAMF ¶ 153; *Pls.' Obj. to Defs.' Mot. to Exclude D.P. Van Blaricom*, Attach. 2 at 21:07-22:02 (ECF No. 62) (*Dep. of Fowler*). The Court altered this statement to more accurately reflect the record.

The Individual Officers qualify paragraph 164 of the PSAMF by stating that the locations Detective Perkins and Fowler found were locations where Brittany Irish claimed to have been raped, not locations where she was necessarily raped. Because the Court takes all reasonable inferences in favor of the non-movants, the Court rejects this qualification.

Brittany Irish told Detectives Perkins and Fowler that Mr. Lord dropped her off at her car at the IGA parking lot between approximately 11:00 and 11:15 a.m. on July 15, and that she then drove home to her apartment in Bangor. DSMF ¶ 22; PRDSMF ¶ 22. Because she did not consider it relevant, she did not disclose to them that after Mr. Lord dropped her off at her car in the IGA parking lot, she and Mr. Lord drove separately to a store on Stillwater Avenue in Bangor, where they spent some time together.[26] DSMF ¶ 23; PRDSMF ¶ 23. During this conversation, Detective Fowler was able to see both of Brittany Irish's wrists and did not observe any marks on them, although he later testified that whether marks would appear could depend on how she was bound.[27] DSMF ¶ 21; PRDSMF ¶ 21; PSAMF ¶ 166; DRPSAMF ¶ 166.

Detective Perkins asked Brittany Irish to provide him with her clothing so that it could be examined for evidence, but she declined, stating that the detectives would not find any evidence on the clothing.[28] DSMF ¶ 24; PRDSMF ¶ 24. Detective Perkins also asked Brittany Irish to complete a written statement, but she told him

---

[26] The Court altered this statement to reflect the Plaintiffs' qualification that Brittany Irish did not mention the store because she did not believe it was relevant. PRDSMF ¶ 23.

[27] The Plaintiffs qualify paragraph 21 of the DSMF by pointing to expert testimony that Detective Fowler should have known domestic violence strangulation does not always leave visible marks. PRDSMF ¶ 21. Because the Individual Officers admit paragraph 166 of the PSAMF, which shows that Detective Fowler testified that he knew restraints do not always leave marks, the Court views this qualification as resolved. PSAMF ¶ 166; DRPSAMF ¶ 166.

[28] The Plaintiffs deny paragraph 24 of the DSMF on the basis that the actual reason Brittany Irish declined to provide her clothes was because she was of limited financial means, PRDSMF ¶ 24; however, the Court finds that there is a basis in the record for the Individual Officers' statement and that the Plaintiffs' denial does not refute the statement. The Court therefore regards the Plaintiffs' response to paragraph 24 of the DSMF as a qualification and deems it resolved by the Court's inclusion of paragraph 180 of the PSAMF, which states that Amber Adams told Detectives Perkins and Fowler on July 16, 2015, about Brittany Irish's true reason for not giving the Individual Officers her clothes. PSAMF ¶ 180.

that she was too tired and "wanted to go home and give [her] children hugs and kisses . . .."[29] DSMF ¶ 17; PRDSMF ¶ 17; PSAMF ¶ 156; DRPSAMF ¶ 156. Detective Fowler later testified that one does not hold it against trauma victims if they want to rest before giving a written statement, that Brittany Irish had shown courage by going to the hospital to report a rape, and that the examination and the detectives' questioning of a victim are invasive. PSAMF ¶ 167; DRPSAMF ¶ 167. Brittany Irish told Detectives Perkins and Fowler that she was scared of Mr. Lord and that he would be angry and do "terrible violence" to her and her children if he found out she went to the police.[30] PSAMF ¶¶ 153, 159; DRPSAMF ¶¶ 153, 159.

---

[29]    The Plaintiffs deny paragraph 17 of the DSMF for several reasons which boil down to an objection as to when this interaction occurred. PRDSMF ¶ 17. The Court addressed this issue in footnote 22, supra, and applies the same logic here. The Court does alter this statement to include an additional reason provided by the Plaintiffs for why Brittany Irish did not want to give her statement during this meeting. PSAMF ¶ 156.
        The Individual Officers request that a large portion of paragraph 156 of the PSAMF be stricken. DRPSAMF ¶ 156. The Plaintiffs' statement says that Brittany Irish "told [the Individual Officers] that she had acted to hide her children from Lord because she was fearful that he might 'do something.'" PSAMF ¶ 156. The Individual Officers point out that the cited portion of the record does not reflect that she told this to Detectives Perkins and Fowler. DRPSAMF ¶ 156. The Court agrees and strikes everything from this statement except what Brittany Irish said to Detectives Perkins and Fowler about wanting to give her children hugs and kisses. The cited portion of the record reflects that Brittany Irish was fearful that Mr. Lord might do something to harm her children but not that she said this to Detectives Perkins and Fowler. *Dep. of Brittany Irish* at 141:05-142:12. For the same reason, the Court strikes paragraphs 154 and 158 of the PSAMF.
[30]    The last sentence of paragraph 153 of the PSAMF states that, in talking to Detectives Perkins and Fowler, "Irish described that she was scared of Lord and that [he]would be angry and do 'terrible violence' if he found out she went to the police," citing Brittany Irish's affidavit. PSAMF ¶ 153. (Paragraph 153 actually says that "she was scared of Lord and that she would be angry and do "terrible violence" if he found out she went to the police." The Court has changed the pronoun to "he" because based on its context and the content of the affidavit, the "she" must be a typographical error.) The Individual Officers request that this sentence be stricken, stating that in her deposition, Brittany Irish testified she was "'not sure exactly' when she first told the police that Lord said he would hurt her or her children if she went to the police" and that she "cannot now attempt to create a material dispute of fact by offering an affidavit contradictory to that of her deposition, at least in the absence of any explanation for the change." DRPSAMF ¶ 153 (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994); *West v. AT&T Mobility, LLC*, No. 13-cv-00092-DBH, 2014 WL 2804115, at *1 (D. Me. June 19, 2014); *McGowen v. Four Directions Dev. Corp.*, 12-cv-00109-JAW, 2014 WL 916366, at *9 n.36 (D. Me. Mar. 10, 2014)).
        It is true that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly

The MSP crime laboratory analyzes rape kits and these analyses can often take some time to return results; Detective Perkins did not receive any results from Brittany Irish's rape kit on July 15 or 16.[31] DSMF ¶ 25; PRDSMF ¶ 25; PSAMF ¶ 275; DRPSAMF ¶ 275. Additionally, the medical providers at the hospital did not tell Detective Perkins any findings they made relevant to whether Brittany Irish was

contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni*, 44 F.3d at 4-5. However, the Court does not regard the discrepancy here as contradictory. In her deposition testimony, Brittany Irish could not remember when she had communicated this threat information to Detectives Perkins and Fowler. *Dep. of Brittany Irish* at 202:15-203:03. As she was writing her later affidavit, she remembered. PSAMF, Attach. 22 ¶¶ 6-8 (*Aff. of Brittany Irish*). On a motion for summary judgment, taking all reasonable inferences in favor of the non-movant, the affidavit controls. *See Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 26 (1st Cir. 2002) (noting that "[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment"). The Court declines to strike the last sentence of paragraph 153 of the PSAMF.

In DSMF paragraph 28, the Defendants assert that during the interview at the hospital on July 15, 2015, Brittany Irish did not express any concern that Mr. Lord might hurt her or her children if he found out that she had reported him to the police nor did she ask them not to contact Mr. Lord. DSMF ¶ 28. In their response, the Plaintiffs denied this paragraph. PRDSMF ¶ 28. The Court strikes paragraph 28 of the DSMF, which the Court finds is not supported by the applicable record citation. *See* DSMF ¶ 28. The portion of Brittany Irish's deposition testimony referenced by the Individual Officers deals only with the first time Brittany Irish expressed fear of retaliation if Detectives Perkins or Fowler left a voicemail for Mr. Lord. *Dep. of Brittany Irish* at 197:20-198:02. This does not exclude the possibility that she communicated a more general retaliation threat to Detectives Perkins and Fowler earlier. Additionally, the portions of the affidavits of Detectives Perkins and Fowler offered by the Individual Officers as support would require the Court to weigh the credibility of those affidavits against the affidavit of Brittany Irish, which is not the Court's role on a motion for summary judgment. *See Town of Westport v. Monsanto Co.*, 877 F.3d 58, 66 (1st Cir. 2017) (stating that "a judge must not engage in making credibility determinations or weighing the evidence at the summary judgment stage" (quoting *Pina v. Children's Place*, 740 F.3d 785, 802 (1st Cir. 2014))). The Court is required to view disputed facts in the light most favorable to the non-movants.

Additionally, the Individual Officers request that the Court strike paragraph 159 of the PSAMF as merely a summary of earlier statements of fact presented as argument. DRPSAMF ¶ 159. The Court disagrees and declines to strike it. Furthermore, the answers the Individual Officers attempt to incorporate into their response to paragraph 159, DRPSAMF ¶ 159, do not address the fact for which the Court cited paragraph 159—namely, that Brittany Irish told Detectives Perkins and Fowler she was fearful Mr. Lord would harm her children if he knew she had gone to the police. PSAMF ¶ 159.

[31]     The Plaintiffs qualify this statement by reciting various ways that the Individual Officers' "investigation was not at its end . . .." PRDSMF ¶ 25. The qualification is non-responsive because DSMF paragraph 25 does not state or imply that the investigation was over. If the Plaintiffs wished to present this fact, the proper place to do so would have been in their statement of additional facts. The Court declines the Plaintiffs' qualification.

sexually assaulted during their examination of her.[32]  DSMF ¶ 26; PRDSMF ¶ 26.

Detectives Perkins and Fowler asked Brittany Irish to come to the police barracks

the following day and bring a written statement and the clothes she was wearing at

the time of the alleged assault.[33]  DSMF ¶ 27; PRDSMF ¶ 27.  At approximately 5:00

p.m. on July 15, 2015, Detectives Perkins and Fowler ended their initial interviews

of Brittany Irish.  PSAMF ¶ 168; DRPSAMF ¶ 168.

### E.    Micah Perkins and Jason Fowler's Investigation of the Benedicta Camps

At 5:39 p.m. on July 15, 2015, Detectives Perkins and Fowler left the hospital

and drove towards Benedicta, attempting to locate the two camps in which Brittany

Irish claimed she had been sexually assaulted.[34]  DSMF ¶ 29; PRDSMF ¶ 29.  This

drive took between two and a half and three hours.  PSAMF ¶ 169; DRPSAMF ¶ 169.

During this time, neither Detective Perkins nor Detective Fowler attempted to learn

about Mr. Lord's criminal history or whether he was on probation.[35]  PSAMF ¶¶ 169-

---

[32]    The Plaintiffs' qualification to this statement is identical in substance to their qualification of paragraph 25 of the DSMF.  *Compare* PRDSMF ¶ 25, *with* PRDSMF ¶ 26.  For the reasons discussed in footnote 31, supra, the Court rejects the Plaintiffs' qualification.

[33]    The Plaintiffs attempt to qualify this statement by referring to their denials of paragraphs 16 and 24 of the DSMF.  PRDSMF ¶ 27.  The Court reviewed the two denials referenced by the Plaintiffs and determines they do not alter the statement.  Paragraph 16 of the PRDSMF is a long recitation of arguments unrelated to the statement at issue here, and the Court is not clear what portion of the record the Plaintiffs are attempting to cite by referring to this paragraph, as required by District of Maine Local Rule 56(c).  PRDSMF ¶ 16.  Paragraph 24 merely states that Brittany Irish did not want to give Detectives Perkins and Fowler her clothes because she had limited financial resources, which does not contradict the statement in paragraph 27 of the DSMF.  PRDSMF ¶ 24.

[34]    The Plaintiffs' qualification of this statement constitutes argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 29, and the Court disregards it as violative of District of Maine Local Rule 56(c).  *See Michaud*, 2017 WL 902133, at *1 n.1 (noting that "qualifications" that exceed the scope of the original statement are appropriately presented as additional facts rather than qualifications).

[35]    In paragraphs 169-73, the Plaintiffs list a variety of investigative steps that Detectives Perkins and Fowler did not take during this drive.  PSAMF ¶¶ 169-73.  As the Individual Officers make clear, this list is not supported by the cited portion of the record, which only shows that Detective Perkins

73; DRPSAMF ¶¶ 169-73.  However, while en route, Detective Perkins contacted two members of the MSP's evidence response team, briefed them on the case, told them that he and Detective Fowler were attempting to locate the camps, and requested that they go to the camps in the morning and process them for evidence.[36]  DSMF ¶ 30; PRDSMF ¶ 30.

At approximately 8:10 p.m., Detectives Perkins and Fowler found what appeared to be the gravel road where Brittany Irish said she was strangled with a seatbelt and sexually assaulted for the first time, and Detective Perkins took photographs of tire tracks.[37]  DSMF ¶ 31; PSAMF ¶ 31.  Also at approximately 8:10 p.m., Detectives Perkins and Fowler found a camp in Benedicta matching the first camp Brittany Irish described and found tire tracks and two fingerprints on the outside front window.[38]  DSMF ¶ 32; PRDSMF ¶ 32; PSAMF ¶ 174; DRPSAMF ¶ 174.  A fingerprint analysis would later show that these fingerprints belonged to Lord.[39]  PSAMF ¶¶ 279, 326; DRPSAMF ¶¶ 279, 326.  Detective Perkins took interior and

_____

and Fowler did not attempt to learn Mr. Lord's criminal history or probation status.  DRPSAMF ¶¶ 169-73; *Dep. of Perkins* at 86:12-23.  The Court altered these statements to reflect the record.

[36]    The Plaintiffs attempt to qualify paragraph 30 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 30, and as in footnote 34, supra, the Court rejects it.

[37]    The Plaintiffs' attempt to qualify paragraph 31 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 31, and as in footnote 34, supra, the Court rejects it.

[38]    The Individual Officers say that Detectives Perkins and Fowler found this camp at 8:25 p.m. DSMF ¶ 32.  In this order on a motion for summary judgment, the Court adopts the time put forward by the non-movant, which is supported by deposition testimony.  PSAMF ¶ 174.  Moreover, the Individual Officers say that Detectives Perkins and Fowler found two fingerprints, DSMF ¶ 32, while the Plaintiffs say that Detectives Perkins and Fowler found "a visible fingerprint" on the window. PSAMF ¶ 174.  The Court adopts the Individual Officers' statement because it is not inconsistent with there being "a visible fingerprint" on the window and the Plaintiffs did not object to its truth.

The Plaintiffs' attempt to qualify paragraph 32 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 32, and as in footnote 34, supra, the Court rejects it.

[39]    The Individual Officers qualify paragraph 279 of the PSAMF on grounds irrelevant to this fact. *See* DRPSAMF ¶ 279.  The Court rejects the Individual Defendants' qualification.

exterior photographs of the camp. DSMF ¶32; PRDSMF ¶ 32. After finding these locations which matched Brittany Irish's description, Detectives Perkins and Fowler did not attempt to determine Mr. Lord's criminal history or whether he was on probation. PSAMF ¶ 176; DRPSAMF ¶ 176. Based on Brittany Irish's description of Mr. Lord's actions, even without the results of the fingerprint analysis, on July 16, 2015, Detectives Perkins and Fowler could have arrested Mr. Lord for breaking and entering this camp on July 14, 2015.[40] PSAMF ¶ 326; DRPSAMF ¶ 326.

At 9:25 p.m. on July 15, 2015, Detectives Perkins and Fowler visited the home of Warden Seth Powers in Benedicta and Warden Powers provided them with information regarding their search for the second camp.[41] DSMF ¶ 33; PSAMF ¶ 33. At 10:20 p.m., Detectives Perkins and Fowler located a camp road they suspected led

---

[40]     The Plaintiffs' paragraph 326 reads:
        Brittany Irish's information enabled Defendants to ascertain that Lord had broken into a camp in Benedicta and gone through a window, a crime for which he should have been arrested on July 16, 2015; Irish accurately described this to the detectives on July 15, 2015.
PSAMF ¶ 326. The Individual Defendants object to this statement on the ground that they did not learn the results of the fingerprint analysis until after July 17, 2015, and there is no basis for the statement that the Detectives should have arrested Mr. Lord on July 16, 2015, for breaking and entering. DRPSAMF ¶ 326. The Plaintiffs' paragraph and the Individual Defendants' response are problematic. First, the Plaintiffs' paragraph is argumentative. The Court strikes that portion of the paragraph that states what the Detectives should have done. Whether police protocol would have necessitated an arrest of Mr. Lord based on Brittany Irish's statement is not a matter of record.
        A closer question is whether Brittany Irish's statement would have given Detectives Perkins and Fowler probable cause to arrest Mr. Lord for breaking and entering. It is true, as the Individual Defendants point out, that they did not have the fingerprint analysis by July 16, 2015, but they did have Brittany Irish's statement, which could have been enough to arrest Mr. Lord. The Court therefore overrules the Individual Defendants' objection to this portion of the paragraph because, viewing the record in the light most favorable to the non-movant, Brittany Irish's statement could have caused the detectives to arrest Mr. Lord. It is not a matter of record whether in the real world of policing an arrest would have been made in these circumstances, based only on the statement of the victim, without waiting for the fingerprint analysis and without contacting the owner to determine whether he or she had given Mr. Lord permission to enter the cabin. However, given the state of the record and bearing in mind its obligation to view factual disputes in the light most favorable to the non-movant, the Court includes an altered version of Plaintiffs' paragraph 326 to reflect its concerns.
[41]     The Plaintiffs' attempt to qualify paragraph 33 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 33, and as in footnote 34, supra, the Court rejects it.

to the second camp described by Brittany Irish, but because it was dark they were not able to locate the camp; they never returned to this location.[42]  DSMF ¶ 34; PRDSMF ¶ 34; PSAMF ¶ 165; DRPSAMF ¶ 165.  Detective Perkins arrived back home at 1:00 a.m. on July 16.[43]  DSMF ¶ 35; PRDSMF ¶ 35.  Detectives Perkins and Fowler did not attempt to determine Mr. Lord's criminal history or probation status at any time on July 15.  PSAMF ¶ 177; DRPSAMF ¶ 177.  At 8:40 a.m. on July 16, Detective Perkins learned facts from the owner of the first camp, which he and Detective Fowler were able to identify, that there was evidence that Mr. Lord had committed a breaking and entering.[44]  PSAMF ¶ 178; DRPSAMF ¶ 178.  Upon learning this information, Detective Perkins did not attempt to determine Mr. Lord's criminal record.  PSAMF ¶ 179; DRPSAMF ¶ 179.

### F.     Brittany Irish's Visit to the Maine State Police Major Crimes Unit

On July 16, 2015, Brittany Irish placed telephone calls to Mr. Lord at 9:23 a.m., 9:52 a.m., and 10:58 a.m.  *JSF* ¶ 17.  At 1:00 p.m., Brittany Irish went to the offices of MSP's Major Crimes Unit in Bangor, where she met Amber Adams, one of her best

---

[42]     The Plaintiffs' attempt to qualify paragraph 34 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 34, and as in footnote 34, supra, the Court rejects it. The Court does not address the Individual Officers' qualification of paragraph 165 of the PSAMF, DRPSAMF ¶ 165, because paragraph 34 of the DSMF contains the same information and the Court includes the information above.

[43]     The Plaintiffs' attempt to qualify paragraph 35 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 35, and as in footnote 34, supra, the Court rejects it.

[44]     The Individual Officers qualify paragraph 178 of the PSAMF by arguing that, based on what the owner of the camp said, Detective Perkins now had evidence of a breaking and entering but not necessarily that this was done by Mr. Lord.  DRPSAMF ¶ 178.  The Court rejects the Individual Defendants' qualified response.  Even though Detectives Perkins and Fowler did not learn that the fingerprint came from Mr. Lord until after July 17, 2015, the Plaintiffs cite Detective Perkins' deposition in which he admitted that once he had spoken to the camp owner, he had evidence that Mr. Lord, not just someone, had broken into and entered the owner's cabin without her permission.

friends at the time.[45]  DSMF ¶¶ 36-37; PRDSMF ¶¶ 36-37.  When she arrived, she

had not completed her written statement, as Detectives Perkins and Fowler had

requested the day before.[46]  DSMF ¶ 38; PRDSMF ¶ 38.  Detectives Perkins and

Fowler gave Brittany Irish time to complete the statement; during this time, they

conducted a recorded interview of Ms. Adams.[47]  DSMF ¶¶ 39-40; PRDSMF ¶¶ 39-

40; PSAMF ¶ 180; DRPSAMF ¶ 180.

Ms. Adams told Detectives Perkins and Fowler that she did not believe that

Brittany Irish, whom she regarded as a "pathological" liar, had been sexually

assaulted by Lord, and that she thought Brittany Irish was making up the story out

of fear that Mr. Hewitt would leave her if he learned that she had voluntarily had sex

with Mr. Lord.[48]  DSMF ¶ 41; PRDSMF ¶ 41; DRPSAMF ¶ 41.  Ms. Adams told

---

[45]     The Plaintiffs' attempt to qualify paragraph 36 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 36, and as in footnote 34, supra, the Court rejects it.

[46]     The Plaintiffs object to paragraph 37 of the DSMF as inadmissible because irrelevant. PRDSMF ¶ 37.  The Individual Officers respond that the fact that Ms. Adams was one of Brittany Irish's best friends provides relevant context for Ms. Adams' later conversation with Detectives Perkins and Fowler.  DRPSAMF ¶ 37.  The Court agrees with the Individual Officers and overrules the objection.

[46]     The Plaintiffs' attempt to qualify paragraph 38 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 38, and as in footnote 34, supra, the Court rejects it.

[47]     The Plaintiffs' attempt to qualify paragraphs 39 and 40 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶¶ 39-40, and as in footnote 34, supra, the Court rejects it.

[48]     Paragraph 41 of the DSMF states:

Adams told Perkins and Fowler that B[rittany] Irish is a "pathological liar," that she does not believe any of what B[rittany] Irish was saying about being sexually assaulted by Lord, and that she thinks B[rittany] Irish was making up the story because she was afraid that her boyfriend, Hewitt, would leave her if he learned that she voluntarily had sex with Lord.

DSMF ¶ 41.  The Plaintiffs object to this statement as irrelevant and double hearsay.  PRDSMF ¶ 41. The Individual Officers respond that this statement is being offered for the effect on the listener—i.e. that Detectives Perkins and Fowler were told information by one of Brittany Irish's best friends that cast doubts on her credibility.  DRPSAMF ¶ 41.

The Court agrees with the Individual Officers that this statement is admissible, but not for its truth, and overrules the Plaintiffs' objection.  Whether Detective Perkins and Fowler had a legitimate basis to conclude that Brittany Irish was not being honest with them is relevant to the reasonableness of their continued investigation.  *See Morgan v. Mass. Gen. Hosp.*, 901 F.2d 186, 191 (1st Cir. 1990)

Detectives Perkins and Fowler various recent details regarding the intimate life of Brittany Irish and Mr. Lord, including that earlier on July 16, Brittany Irish had told Mr. Lord she loved him via text message and over the phone.[49] DSMF ¶¶ 42-44; PRDSMF ¶¶ 42-44. Ms. Adams showed Detectives Perkins and Fowler text messages that she had exchanged with Mr. Hewitt the previous day while Brittany Irish was completing her rape kit and examination in which Mr. Hewitt expressed doubts about Brittany Irish's story of assault and her credibility more generally.[50] DSMF ¶¶ 45-48; PRDSMF ¶¶ 45-48. She also told Detectives Perkins and Fowler that the reason Brittany Irish did not want to give up her clothing was that she was of limited financial means. PSAMF ¶ 180; DRPSAMF ¶ 180.

At 4:00 p.m., Ms. Adams intercepted Detective Perkins while he went to check whether Brittany Irish had finished her written statement and told him that Brittany Irish's statement was different from the narrative she had given to the detectives, Ms. Adams, and the hospital nurse the previous day.[51] DSMF ¶ 49; PRDSMF ¶ 49.

(stating that an affidavit from a supervisor regarding statements he received during the investigation of his employee was admissible to demonstrate investigative steps taken and information received during the investigation).

[49] The Plaintiffs object to paragraphs 42 through 44 of the DSMF as irrelevant and double hearsay. PRDSMF ¶¶ 42-44. The Court overrules this objection for the reasons in footnote 48, supra.

[50] The Plaintiffs object to paragraphs 46 through 48 of the DSMF as irrelevant and double hearsay. PRDSMF ¶¶ 46-48. The Court overrules this objection for the reasons in footnote 48, supra. Information from Brittany Irish's boyfriend is at least as relevant as information from her best friend for its effect on Detectives Perkin and Fowler and their determination of her credibility.

[51] The Plaintiffs object to paragraph 49 of the DSMF as irrelevant and double hearsay. PRDSMF ¶ 49. The Court overrules this objection for the reasons in footnote 48, supra.

The Plaintiffs also deny this statement on the grounds that Brittany Irish testified that Ms. Adams was not present when she wrote her statement, and thus could not have known whether the statement was different. PRDSMF ¶ 49. The Court agrees with the Individual Officers that this statement is not used to show Brittany Irish's statement was different, but to show that Ms. Adams said this to Detective Perkins. DRPSAMF ¶ 49. The Court included the statement.

Brittany Irish completed her ten-page written statement shortly thereafter.[52] DSMF ¶ 50; PRDSMF ¶ 50. Prior to 4:24 p.m., Detectives Perkins and Fowler reviewed Brittany Irish's statement.[53] DSMF ¶ 52; PRDSMF ¶ 52; PSAMF ¶ 181; DRPSAMF ¶ 181.

In her written statement, Brittany Irish attempted to include all the details she considered important that she could remember.[54] DSMF ¶ 51; PRDSMF ¶ 51. She did not refer in the written statement to threats by Mr. Lord to hurt her or her children in the specific event that she went to the police.[55] DSMF ¶ 53; PRDSMF ¶ 53. Detective Fowler acknowledged reading the portion of Brittany Irish's statement wherein she wrote that Mr. Lord threatened to "cut her from ear to ear," as well as the portion where she wrote that Mr. Lord had threatened to hurt or torture Kyle Hewitt. PSAMF ¶¶ 182, 184; DRPSAMF ¶¶ 182, 184. Brittany Irish's statement also referred to Mr. Lord mentioning Brittany Irish's children in the context of a threat to Mr. Hewitt. PSAMF ¶ 184; DRPSAMF ¶ 184. After reading

---

[52]  The Plaintiffs' attempt to qualify paragraph 50 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 50, and as in footnote 34, supra, the Court rejects it.

[53]  There is some dispute regarding when Detectives Perkins and Fowler reviewed Brittany Irish's statement, *compare* PSAMF ¶ 181, *with* DRPSAMF ¶ 181; however, the record makes clear that Detectives Perkins and Fowler must have completed their review of the statement prior to interviewing Brittany Irish, which they began to do at 4:24 p.m. DSMF ¶ 54; PRDSMF ¶ 54. The Court alters paragraph 181 of the PSAMF to reflect that Detectives Perkins and Fowler's review ended prior to 4:24 p.m.

The Plaintiffs' denial of paragraph 52 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 52, and as in footnote 34, supra, the Court rejects it.

[54]  The Plaintiffs' attempt to qualify paragraph 51 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 51, and as in footnote 34, supra, the Court rejects it.

[55]  The Plaintiffs' denial of paragraph 53 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 53, and as in footnote 34, supra, the Court rejects it; however, the Court altered this statement to clarify that it refers only to threats made about Brittany Irish communicating with the police, and not threats more generally, as the record establishes that Brittany Irish's statement did contain threats of violence from Mr. Lord. *See* PSAMF ¶¶ 182-84; DRPSAMF ¶¶ 182-84.

Brittany Irish's statement, Detectives Perkins and Fowler did not attempt to obtain information relating to Mr. Lord's criminal record or probation status, and Detective Perkins did not attempt to ascertain whether Mr. Lord was a felon or what risk he posed to Brittany Irish for recidivism.[56] PSAMF ¶¶ 184-85; DRPSAMF ¶¶ 184-85.

Detectives Perkins and Fowler began a recorded interview of Brittany Irish at 4:24 p.m. on July 16, 2015. DSMF ¶ 54; PRDSMF ¶ 54. During the first three minutes of the interview, Detective Perkins told Brittany Irish that he needed to obtain a statement from Mr. Lord and that his goal was to get such a statement that evening.[57] DSMF ¶ 55; PRDSMF ¶ 55. Brittany Irish told Detective Perkins that she could get Mr. Lord to meet her somewhere if someone was with her, but Detective Perkins rejected this offer.[58] DSMF ¶¶ 56-57; PRDSMF ¶¶ 56-57. When informed by Detective Perkins that he was planning on calling Mr. Lord's cellphone, Brittany Irish only expressed the concern that Mr. Lord might not answer and did not state that he had threatened her specifically if she went to the police.[59] *DMSF* ¶ 58; PRDSMF ¶ 58. Brittany Irish provided Detective Perkins with Mr. Lord's cellphone number at his request.[60] DSMF ¶ 59; PRDSMF ¶ 59. The interview concluded at

---

[56] The Individual Officers qualify paragraph 185 of the PSAMF by pointing out that the "retaliatory threat" referenced by the Plaintiffs referred to a threat Mr. Lord made about what would happen if Brittany Irish lied to him. DRPSAMF ¶ 185. The Court believes this is clear from the context already provided by the Court in footnote 17, supra.

[57] The Plaintiffs' attempt to qualify paragraph 55 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 55, and as in footnote 34, supra, the Court rejects it.

[58] The Plaintiffs' attempt to qualify paragraph 57 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 57, and as in footnote 34, supra, the Court rejects it.

[59] The Plaintiffs' denial of paragraph 58 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 58, and as in footnote 34, supra, the Court rejects it.

[60] The Court alters paragraph 59 of the DSMF to reflect the Plaintiffs' qualification that Brittany Irish provided Mr. Lord's cellphone number at Detective Perkins' request. *See Dep. of Brittany Irish* at 201:17-25; PRDSMF ¶ 59.

5:00 p.m., Detective Perkins and Fowler informed Brittany Irish that they would call Mr. Lord later that evening, and she left the MSP office shortly after that.[61] DSMF ¶ 60; PRDSMF ¶ 60; PSAMF ¶ 188; DRPSAMF ¶ 188. When she left the MSP officers, she understood that Detective Perkins would be calling Mr. Lord on his cellphone later that evening.[62] DSMF ¶ 61; PRDSMF ¶ 61. While she was at the MSP office, Brittany Irish did not express concern about Detective Perkins and Fowler contacting Mr. Lord or request that they not do so.[63] DSMF ¶ 62; PRDSMF ¶ 62. During this time, Brittany Irish also did not say anything to Detectives Perkins and Fowler about Mr. Lord having threatened to hurt her or her children if she went to the police.[64] DSMF ¶ 63; PRDSMF ¶ 63.

### G.    Micah Perkins' Voicemail Message to Anthony Lord

Prior to Detective Perkins' call to Mr. Lord on July 16, 2015, Detective Fowler did not run a background check to determine Mr. Lord's prior criminal history or probation status, though he later testified that at some point it becomes important to

---

[61]    The Plaintiffs' denial of paragraph 60 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 60, and as in footnote 34, supra, the Court rejects it.
    The Court grants the Individual Officers' request to strike the statement that Brittany Irish was "left alone at her residence," DRPSAMF ¶ 188, as unsupported by the record; the interview was conducted at the MSP offices, and Brittany Irish left those offices. *See Dep. Of Brittany Irish* at 198:5-16. Therefore, she could not have been left alone at her residence because she was not at her residence at the conclusion of the interview.

[62]    The Court alters paragraph 61 of the DSMF to reflect the Plaintiffs' denial, which points out that Brittany Irish only knew that Detective Perkins would be calling Mr. Lord later that evening. PRDSMF ¶ 61.

[63]    The Plaintiffs' denial of paragraph 62 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 62, and as in footnote 34, supra, the Court rejects it. Additionally, the Plaintiffs' denial based on what the Plaintiffs assert is a prior statement by Brittany Irish to Detectives Perkins and Fowler, PRDSMF ¶ 62, does not contradict paragraph 62 of the DSMF.

[64]    The Plaintiffs' attempt to qualify paragraph 63 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 63, and as in footnote 34, supra, the Court rejects it. The Plaintiffs' claim that Brittany Irish communicated this information to the detectives the day prior and at a different location, PRDSMF ¶ 63, does not contradict the Individual Officers' statement, which has record support.

conduct a background check on a potential suspect.[65]   PSAMF ¶¶ 186, 190, 192;

DRPSAMF ¶¶ 186, 190, 192.  Detective Perkins, on the other hand, later testified

that he did not see this as important information for the purposes of protecting a

victim.  PSAMF ¶ 191; DRPSAMF ¶ 191.

At 6:17 p.m. on July 16, 2015, Detective Perkins placed a recorded telephone

call to Mr. Lord's cellphone.[66]  DSMF ¶ 64; PRDSMF ¶ 64; PSAMF ¶ 189; DRPSAMF

¶ 189.  Mr. Lord did not answer his phone, so Detective Perkins left the following

voicemail message:

> Hello, Anthony.  This is Detective Perkins.  I'm giving you a call here
> from the Maine State Police.  I'm looking to see if there's a time that we
> could speak with you.  Phone number you can call us back—the
> dispatch—is 973-3700.  973-3700.  I'll be right here.  Just let them know
> Detective Perkins if you don't mind calling back and I will try you back
> in a few moments.  Thank you.  Goodbye.[67]

DSMF ¶ 65; PRDSMF ¶ 65.  Mr. Lord never returned Detective Perkins' phone call;

however, when Detective Perkins interviewed Mr. Lord after his arrest, on July 17,

2015, Mr. Lord stated that he believed the voicemail message was related to the death

of his son.[68]  DSMF ¶¶ 67-68; PRDSMF ¶¶ 67-68.  Detective Perkins later testified

---

[65]     The Court alters paragraph 186 of the PSAMF to reflect that it was Detective Perkins who
called Mr. Lord, not Detective Fowler.  DRPSAMF ¶ 186.
        The Court alters paragraph 192 of the PSAMF to reflect that Detective Fowler said background
criminal information is important to know at some point in an investigation but did not make the more
general statement asserted by the Plaintiffs.  DRPSAMF ¶ 192.
[66]     The Plaintiffs' attempt to qualify paragraph 64 of the DSMF is argument outside the scope of
the facts asserted in the statement, PRDSMF ¶ 64, and as in footnote 34, supra, the Court rejects it.
[67]     The Plaintiffs' attempt to qualify paragraph 65 of the DSMF is argument outside the scope of
the facts asserted in the statement, PRDSMF ¶ 65, and as in footnote 34, supra, the Court rejects it.
[68]     The Individual Officers agree with the Plaintiffs that paragraph 66 of the DMSF should be
stricken, and the Court accedes to this request.
        The Plaintiffs' attempt to qualify paragraph 67 of the DSMF is argument outside the scope of
the facts asserted in the statement, PRDSMF ¶ 67, and as in footnote 34, supra, the Court rejects it.
        The Plaintiffs object to paragraph 68 of the DSMF as hearsay, requesting that it be stricken
"since the [Individual Officers] have not produced an affidavit nor any testimony of Anthony Lord."

that he agreed that if a suspect committed a rape and then received a call from the MSP the next day, it would be logical for them to connect the dots between those two events. PSAMF ¶ 193; DSMF ¶ 193.

Thomas Pickering, a detective with the MSP, was one of the detectives investigating the death of Larry Earl Lord, who died at the age of six months on May 7, 2015. DSMF ¶¶ 69-70; PRDSMF ¶¶ 69-70. On either May 6 or 7, Detective Pickering met Mr. Lord, who was Larry Lord's father, at Eastern Maine Medical Center and gave him his business card, on which Detective Pickering wrote his cellphone number.[69] DSMF ¶ 71; PRDSMF ¶ 71.

At 6:37 p.m., approximately twenty minutes after receiving a voicemail message from Detective Perkins, Mr. Lord called Detective Pickering at the cellphone number Detective Pickering gave him, but Detective Pickering did not answer.[70] DSMF ¶ 72; PRDSMF ¶ 72. Detective Pickering returned Mr. Lord's call at 6:44 p.m.,

---

PRDSMF ¶ 68. If the Court finds this statement admissible, the Plaintiffs deny it. PRDSMF ¶ 68. The Individual Officers respond that "[a]lthough B[rittany] Irish was permitted to amend her response to Request for Admission No. 27, she admits in her amended response that Lord told detectives in an interview that Lord stated that he thought the message from Perkins related to the death of his son," and therefore there is "no basis for objecting to or denying this fact." DRPSAMF ¶ 68.

    The Individual Officers are correct that the Plaintiffs stipulated to this fact. *See Order on Mot. to Amend Pls.' Resp. to Request for Admission* at 3, 15 (ECF No. 86). Given that the Plaintiffs in fact specifically moved to alter their admission to this fact and their motion was granted, *id.* at 1, the Court sees no reason to disturb this stipulation. The Court does alter the statement to more accurately reflect the text of the Plaintiffs' admission by omitting reference to Detective Pickering. *See id.* at 3.

    The Court also notes that the Plaintiffs specifically do not admit that Mr. Lord believed his statement to Detective Perkins was true. *Id.* As Plaintiffs are the non-movants on this motion for summary judgment, the Court draws the inference that Mr. Lord was lying to Detective Perkins when he made this statement and that whether he knew immediately that the call was related to his kidnapping and rape of Brittany Irish, he did at least know before he began his spree of violence.

[69]    The Court draws from the fact that Mr. Lord had Detective Pickering's cellphone number the inference that Mr. Lord knew Detective Pickering's cellphone number was different from the number of the call that he received from Detective Perkins.

[70]    The Plaintiffs' attempt to qualify paragraph 72 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 72, and as in footnote 34, supra, the Court rejects it.

but Mr. Lord did not answer.[71] DSMF ¶ 73; PRDSMF ¶ 73. Sergeant Crane later testified that he was not advised of the voicemail until approximately 9:30 p.m. that night. PSAMF ¶ 195; DRPSAMF ¶ 195.

At the time Detective Perkins contacted Mr. Lord, Detectives Perkins and Fowler had not completed gathering evidence at the first Benedicta camp, considered the 4:30 p.m. discovery of a smashed door at the second camp, received the results of the fingerprint analysis from the first camp which would show that both fingerprints belonged to Mr. Lord, or received information from the hospital and lab regarding analysis of Brittany Irish and her clothes.[72] PSAMF ¶¶ 278-79; DRPSAMF ¶¶ 278-79. Detectives Perkins and Fowler also had not conducted an Ontario Domestic Assault Risk Assessment (ODARA) of Mr. Lord.[73] PSAMF ¶ 281; DRPSAMF ¶ 281. Detectives Perkins and Fowler had other options available to them at the time

---

[71] The Plaintiffs' attempt to qualify paragraph 73 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 73, and as in footnote 34, supra, the Court rejects it.

[72] Paragraph 187 of the PSAMF reads: "The sole basis of leaving the voicemail with Lord was not safety of the victim but 'efficien[cy],' but efficiency is not an appropriate factor to consider when and how to contact a suspect." PSAMF ¶ 187 (alteration in original). The Individual Officers request that this statement be stricken because it is not supported by the provided record citation. DRPSAMF ¶ 187. The Court reviewed the cited portions of the record and strikes this paragraph for the reasons given by the Individual Officers.

The Plaintiffs state that the fingerprint analysis "would confirm the suspected breaking and entering crime at the first camp." PSAMF ¶ 279. The Individual Officers request that this statement be stricken because it is "not supported by the cited-to portion of the record." DRPSAMF ¶ 279. The Court reviewed the cited portion of the record and strikes this paragraph for the reason given by the Individual Officers.

[73] The Individual Officers attempt to qualify paragraph 281 of the PSAMF by stating that the cited portions of the record do not support the Plaintiffs' implication that there is "any other MSP tool to ascertain Lord's propensity for future violence or recidivism." DRPSAMF ¶ 281. The Court reviewed the cited portions of the record and agrees with the Individual Officers. The Court altered the statement to reflect this lack of record support.

The Individual Officers' attempt to further qualify paragraph 281 of the PSAMF by pointing to Detective Perkins' testimony regarding when an ODARA analysis is done, DRPSAMF ¶ 281, is argument outside the scope of the facts asserted in the statement, PSAMF ¶ 281, and as in footnote 34, supra, the Court rejects it.

Detective Perkins left a voicemail message for Mr. Lord, such as developing a physical presence around him or conducting a pretextual phone call.[74]  PSAMF ¶ 287; DRPSAMF ¶ 287.  A pretext phone call is a call in which the MSP has a victim make contact with a suspect.[75]  PSAMF ¶ 288; DRPSAMF ¶ 288.  Another option available to Detectives Perkins and Fowler was pretending to be the victim and asking to meet with the suspect.[76]  PSAMF ¶ 289; DRPSAMF ¶ 289.

John Paul Cote, the MSP's 30(b)(6) designee and Deputy Chief of the MSP, later testified that the MSP does not know why none of these other contact procedures was attempted by Perkins or Fowler.  PSAMF ¶ 290; DRPSAMF ¶ 290.  Sergeant

---

[74]    The Individual Officers attempt to qualify paragraph 287 of the PSAMF by stating that the cited portion of the record only shows that "Perkins and Fowler 'possibly' could have done other things and it was a 'possibility' that they could have developed a physical presence around Lord."  DRPSAMF ¶ 287.  The Court rejects this qualification.  First, one line before the cited portion of Deputy Chief John P. Cote's deposition noticed pursuant to Federal Rule of Civil Procedure 30(b)(6) on behalf of the MSP, Cote states that Perkins and Fowler "had many options available to them," PSAMF, Attach. 16 at 41:09 (*Dep. of Cote*), which closely tracks the text of the Plaintiffs' statement.  *See* PSAMF ¶ 287.  Second, the Court does not see an inconsistency between Deputy Chief Cote's statement that developing a physical presence around Lord "was a possibility," *Dep. of Cote* at 41:13-15, and the Plaintiffs' statement that developing a physical presence around Mr. Lord was an option.  *See* PSAMF ¶ 287.

[75]    The Court alters paragraph 288 of the PSAMF to reflect the qualification offered by the Individual Officers.  DRPSAMF ¶ 288 (qualifying the portion of the statement referring to Deputy Chief Cote confirming himself).

[76]    The Individual Officers attempt to qualify paragraph 289 of the PSAMF by stating that "Cote did not testify that pretending to be the victim is a more traditional method than leaving a voice mail.  Rather, he apparently testified that it was more traditional than asking a victim to make a pretextual phone call."  DRPSAMF ¶ 289.  The Court reviewed the cited portion of Deputy Chief Cote's deposition, as well as the surrounding context, and disagrees with the proffered interpretations of both the Plaintiffs and the Individual Officers.  Deputy Chief Cote's statement, that pretending to be a victim "would be a much more traditional method that we use," *Dep. of Cote* at 36:06-13, refers back to his earlier conversation with the Plaintiffs' counsel in which he states that the MSP likely would not allow a victim "to meet with the perpetrator provided that there was police nearby . . .."  *Id.* at 34:18-24.  Deputy Chief Cote goes on to say "[w]e have other ways that we would do that with like pretext phone call," and then, after a discussion of pretext phone calls, lays out the second option of pretending to be a victim.  *Id.* at 34:25-36:13.  Based on this context, the Court concludes that the comparative in Deputy Chief Cote's statement that pretending to be a victim is a "more traditional method" refers neither to leaving a voicemail nor to a pretext phone call, but rather to allowing a victim to meet with the perpetrator in the presence of police.  The Court alters paragraph 289 of the PSAMF to more accurately reflect the record.

Crane agreed with Deputy Chief Cote in his later testimony that there are three other options MSP officers can use to make contact with suspects: (1) find the person first, before the suspect is notified of any allegation against them; (2) have the victim make a pretext phone call to the suspect in an effort to elicit a confession; and (3) use the victim's phone and pretend to be the victim. PSAMF ¶ 291; DRPSAMF ¶ 291. Sergeant Crane also stated that if there is a real risk of violence in the event of making a phone call to a suspect, one would take that into consideration when planning how to find the suspect, and he did not know why any of these alternatives were not used in Mr. Lord's case. PSAMF ¶¶ 292-93; DRPSAMF ¶¶ 292-93. Detectives Perkins and Fowler both testified that the best time to contact a suspect is at the end of an investigation with all the facts in order. PSAMF ¶¶ 276-77; DRPSAMF ¶¶ 276-77.

### H. Brittany Irish's Return to MSP

At 6:30 p.m. on July 16, 2015, Brittany Irish returned to the MSP to give Detectives Perkins and Fowler the clothes she had been wearing at the time she was sexually assaulted.[77] DSMF ¶ 74; PRDSMF ¶ 74. Brittany Irish met Detective Fowler in the MSP parking lot and reiterated that she was afraid Mr. Lord would hurt her if he knew she had gone to the police.[78] DSMF ¶ 75; PRDSMF ¶ 75; PSAMF

---

[77] Paragraph 74 of the DSMF refers to Mr. Lord's assault of Brittany Irish as "alleged." DSMF ¶ 74. As discussed in footnote 13, supra, the Court takes Brittany Irish's allegations of sexual assault as true for the purpose of resolving this motion for summary judgment and alters paragraph 74 accordingly.
  The Plaintiffs' attempt to qualify paragraph 74 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 74, and as in footnote 34, supra, the Court rejects it.
[78] The Individual Officers request that the Court strike a portion of paragraph 196 of the PSAMF which states that Brittany Irish "was told a casual voicemail had already been left with Lord," PSAMF

¶ 196; DRPSAMF ¶ 196. Sergeant Crane later testified that Detectives Perkins and Fowler did not tell him that Brittany Irish had informed them that Mr. Lord had threatened her and her children with violence if she reported her abduction and rapes. PSAMF ¶ 197; DRPSAMF ¶ 197. Detectives Perkins and Fowler did not take further action to protect Brittany Irish based on the threat of retaliation from Mr. Lord.[79] PSAMF ¶¶ 198-99; DRPSAMF ¶ 198-99.

While Brittany Irish waited in her car, *Dep. of Brittany Irish* at 270:07-22, Detectives Perkins and Fowler conducted a recorded interview of Mr. Hewitt in the MSP offices beginning at approximately 6:45 p.m.[80] DSMF ¶ 77; PRDSMF ¶ 77; PSAMF ¶ 200; DRPSAMF ¶ 200. During this interview, Detectives Perkins and Fowler reviewed texts from Brittany Irish to Mr. Hewitt that said "not safe"; "call police?"; "not safe"; and "don't text back." PSAMF ¶ 201; DRPSAMF ¶ 201. Mr.

---

¶ 196, due to a lack of record support. DRPSAMF ¶ 196. The Court agrees and strikes this portion of paragraph 196.

    The Individual Officers also request that the Court strike a portion of paragraph 196 of the PSAMF which states that "Brittany Irish was 'reiterating' her fear of retaliation . . .." DRPSAMF ¶ 196. The Court addressed this issue at footnote 30, *supra*, and applies the same logic here. Because the Court infers, for purposes of resolving this summary judgment motion, that Brittany Irish did indeed report her fears of retaliation to Detectives Perkins and Fowler prior to the meeting described in paragraph 196 of the PSAMF, the Court denies the Individual Officers' request to strike. For this reason, the Court also strikes paragraph 76 of the DSMF.

[79] The Individual Officers request that the Court strike paragraphs 198 and 199 of the PSAMF as not supported by the cited portions of the record. DRPSAMF ¶¶ 198-99. The Court reviewed those portions of the record and agrees they do not provide support for paragraphs 198 and 199 of the PSAMF. However, the Court also reviewed the statements of fact submitted by both parties and finds that the record as a whole supports an inference that the Individual Officers did not take any action based on what Brittany Irish told them about Mr. Lord's threats to her, and nowhere in the DSMF or DRPSAMF do the Individual Officers offer any statement which rebuts this inference. The Court alters paragraphs 198 and 199 of the PSAMF to more accurately reflect the record.

[80] The Individual Officers request that the Court strike a portion of paragraph 200 of the PSAMF which states that Detectives Perkins and Fowler conducted interviews "in which they sought information about Brittany Irish's credibility," PSAMF ¶ 200, due to a lack of record support. DRPSAMF ¶ 200. The Court agrees and strikes this portion of paragraph 200.

    The Plaintiffs' attempt to qualify paragraph 77 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 77, and as in footnote 34, *supra*, the Court rejects it.

Hewitt told them that while he and Brittany Irish were together, Brittany Irish had lied to him about her relationship with Mr. Lord.[81]  DSMF ¶ 78; PRDSMF ¶ 78; DRPSAMF ¶ 78.

At 7:28 p.m., after concluding their interview of Mr. Hewitt, Detectives Perkins and Fowler began an interview of Kimberly Shahan, who was at the time one of Brittany Irish's best friends.[82]  DSMF ¶¶ 79-80; PRDSMF ¶¶ 79-80; PSAMF ¶ 202; DRPSAMF ¶ 202.  Ms. Shahan told Detectives Perkins and Fowler that it would not be unusual for Brittany Irish to take off for a night with Mr. Lord and expressed skepticism about whether Brittany Irish was being truthful about her sexual assault allegations, saying that "there were so many things that aren't adding up."[83]  DSMF ¶ 81; PRDSMF ¶ 81.

---

[81]     The Plaintiffs object to paragraph 78 of the DSMF as inadmissible because it is irrelevant and hearsay and request that the Court strike it.  PRDSMF ¶ 78.  The Individual Officers argue that this statement is being offered for its effect on Detectives Perkins and Fowler, and that it is relevant because it reflects on the reasonableness of the investigative steps they took.  DRPSAMF ¶ 78.  As in footnote 48, supra, the Court agrees with the Individual Officers and overrules the objection.  The Court also views this as a party-opponent statement, admissible under Federal Rule of Evidence 801(d)(2)(A).

[82]     The Individual Officers request that the Court strike the reference to Kimberly Shahan as a "non-substantive witness" in paragraph 202 of the PSAMF, PSAMF ¶ 202, as not supported by the cited portion of the record.  DRPSAMF ¶ 202.  The Court reviewed the cited portion of the record and strikes this portion of paragraph 202 of the PSAMF.

     The Plaintiffs' attempt to qualify paragraph 79 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 79, and as in footnote 34, supra, the Court rejects it.

     The Plaintiffs object to paragraph 80 of the DSMF as inadmissible because it is irrelevant and request that the Court strike it.  PRDSMF ¶ 80.  The Individual Officers argue that this statement provides relevant context for the information Perkins and Fowler gleaned from their interview of Ms. Shahan.  DRPSAMF ¶ 80.  As in footnote 48, supra, the Court agrees with the Individual Officers and overrules the objection.

[83]     The Plaintiffs object to paragraph 81 of the DSMF as inadmissible hearsay and request that the Court strike it.  PRDSMF ¶ 81.  The Individual Officers argue that this statement is being offered for its effect on Detectives Perkins and Fowler.  DRPSAMF ¶ 81.  As in footnote 48, supra, the Court agrees with the Individual Officers and overrules the objection.

## I.     The Benedicta Barn Fire

At 8:05 p.m. on July 16, 2015, Detective Perkins received a telephone call from an MSP detective advising him that a barn was on fire in Benedicta, which Detective Fowler later testified that he saw as "possible suspicious."[84]  DSMF ¶ 82; PRDSMF ¶ 82; PSAMF ¶ 203; DRPSAMF ¶ 203.  Detective Perkins was "concerned" enough as of this time that Mr. Lord was involved and might have lit the fire that he and Detective Fowler began driving to Benedicta from Bangor.[85]  DSMF ¶ 83; PRDSMF ¶ 83; PSAMF ¶ 204; DRPSAMF ¶ 204.  At approximately 8:30 p.m., Brittany Irish's father called to tell her that the barn at her mother Kimberly Irish's house in Benedicta was on fire, and shortly after that call Brittany Irish began driving with Mr. Hewitt from Bangor to her mother's house in Benedicta.  DSMF ¶¶ 84-85; PRDSMF ¶¶ 84-85.

At 9:10 p.m., while still driving with Detective Fowler to Benedicta, Detective Perkins called Sergeant Crane to tell him about the barn fire, which Detective Perkins thought was a significant development in Brittany Irish's case.  PSAMF ¶ 205; DRPSAMF ¶ 205.  While en route, Detective Perkins also received a call from

---

[84]     The Plaintiffs' attempt to deny paragraph 82 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 82, and as in footnote 34, supra, the Court rejects it.
    The Individual Officers attempt to qualify paragraph 203 of the PSAMF by pointing out that Detective Fowler testified only that the fire was "possible suspicious," but did not explicitly tie this suspicion to Mr. Lord.  DRPSAMF ¶ 203.  The Court reviewed the cited portion of the record and agrees with the Individual Officers.  The Court alters paragraph 203 of the PSAMF to more accurately reflect the record; however, the Court finds it implausible based on the totality of the record and Detective Fowler's deposition testimony, *Dep. of Fowler* at 37:05-38:20, that Detective Fowler did not make a connection between the fire and Mr. Lord at the time he heard of it, whether or not the connection was a firm one, and the Court infers that he did.
[85]     The Plaintiffs' attempt to qualify paragraph 83 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 83, and as in footnote 34, supra, the Court rejects it.

the Benedicta fire chief, who said that the fire was suspicious; at this point, Detective Perkins thought that the human element of the fire might be Mr. Lord. PSAMF ¶ 206; DRPSAMF ¶ 206.

At 9:24 p.m., Brittany Irish called Detectives Perkins and Fowler to inform them that: (1) it was her parents' barn that was on fire and (2) that someone had heard Mr. Lord leave his uncle's house that evening saying "I am going to kill a fucker."[86] DSMF ¶ 86; PRDSMF ¶ 86; PSAMF ¶¶ 207, 212; DRPSAMF ¶¶ 207, 212. She also told Detectives Perkins and Fowler that she was going to stay at her parents' home and that she was worried about her children's safety; Detective Perkins told her that he would be at her parents' home as well.[87] PSAMF ¶¶ 207, 209-10; DRPSAMF ¶¶ 207, 209-10. Brittany Irish's call was exactly what Detective Perkins was worried about, and in fact, Detectives Perkins and Fowler later acted on some of Brittany Irish's concerns by requesting a safety check be performed on her children at 11:09 p.m. on July 16, 2019. PSAMF ¶¶ 208, 211; DRPSAMF ¶¶ 208, 211.

Kimberly Irish knew R.J. Hartt, the man who reported Mr. Lord's threat that he was "going to kill a fucker," and Mr. Hartt visited her at her home after the barn was found burning to tell her what Mr. Lord had said.[88] PSAMF ¶ 333; DRPSAMF

---

[86] The Plaintiffs' attempt to qualify paragraph 86 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 86, and as in footnote 34, supra, the Court rejects it.

[87] The Individual Officers attempt to qualify paragraph 209 of the DSMF by stating that Detective Perkins testified that he was "going to be going [to Brittany Irish's parents' home] as well." DRPSAMF ¶ 209 (some alterations in original). The Court does not understand the distinction the Individual Officers are making, as both wordings make clear that Detective Perkins would be at Brittany Irish's parents' home at some future point while leaving open when he would be leaving. Therefore, the Court rejects the qualification.

[88] The Individual Officers attempt to qualify paragraph 333 of the PSAMF by pointing out that Mr. Hartt did not go to the Irish house until after the barn was found burning. DRPSAMF ¶ 333. The Court reviewed the cited portion of the record and, though it does not see a contradiction between the

¶ 333. Sergeant Crane later described the rumor that Mr. Lord said he was "going to kill a fucker" as a "threat of violence." PSAMF ¶ 213; DRPSAMF ¶ 213. Detective Perkins also later agreed that this threat was concerning based on what he knew of the barn fire and the other threats he knew Mr. Lord had made about torturing and injuring Mr. Hewitt and attacking Brittany Irish. PSAMF ¶ 214; DSMF ¶ 214.

During a call between Detective Perkins and Sergeant Crane at approximately 9:30 p.m., Detective Perkins did not tell Sergeant Crane any of the information he had just been given by Brittany Irish, and he did not tell Sergeant Crane about Mr. Lord's most recent threat that he was "going to kill a fucker" until 10:12 p.m.[89] PSAMF ¶¶ 215-16; DRPSAMF ¶¶ 215-16. During his 9:30 p.m. call with Sergeant Crane, Detective Perkins told Sergeant Crane for the first time that he and Detective Fowler had left Mr. Lord a voicemail three hours earlier. PSAMF ¶ 218; DRPSAMF ¶ 218. Also at approximately 9:30 p.m., Sergeant Crane called an assistant district attorney and briefed him on some of the information Detectives Perkins and Fowler had gathered while investigating Brittany Irish's allegations—though he may have

---

Plaintiffs' statement and the Individual Officers' clarification, the Court alters paragraph 333 of the PSAMF to be more specific.

Paragraph 325 of the PSAMF states that the Individual Officers had the name of the person who heard Lord's threat and the location of the bar he heard it in but did not attempt to contact or find the person or the bar. PSAMF ¶ 325. The Individual Officers request that the Court strike paragraph 325 of the PSAMF as not supported by the cited portion of the record. DRPSAMF ¶ 325. The Court reviewed the cited portion of the record, agrees with the Individual Officers, and strikes paragraph 325 of the PSAMF.

[89] In paragraph 217 of the PSAMF, the Plaintiffs say that Sergeant Crane contradicted Detective Perkins by testifying that Detective Perkins did advise Sergeant Crane of Mr. Lord's threat at 9:30 p.m. PSAMF ¶ 217. The Individual Officers request that the Court strike this statement, as the record does not support it. DRPSAMF ¶ 217. Sergeant Crane's testimony was that he could not remember whether Perkins communicated this threat to him during the 9:30 p.m. phone call or after the call, *Dep. of Crane* at 24:07-18, which does not contradict Detective Perkins' testimony. The Court strikes paragraph 217 of the PSAMF in favor of the other timeline offered by the Plaintiffs at paragraphs 215 and 216 of the PSAMF.

excluded some relevant details—as well as the fact that Mr. Lord might be a suspect in the barn fire.[90]  DSMF ¶ 87; PRDSMF ¶ 87.  As an example of excluded details, there is no evidence in the record that Sergeant Crane told the assistant district attorney about either of the two camps which had been found based on Brittany Irish's description of the places where she had been raped and which showed evidence of breaking and entering.[91]  PSAMF ¶ 230; DRPSAMF ¶ 230.

[90]      The Plaintiffs deny paragraph 87 of the DSMF, listing several pieces of information that the Plaintiffs say Sergeant Crane did not give the assistant district attorney.  PRDSMF ¶ 87.  This denial is argument outside the scope of the facts asserted in the statement, DSMF ¶ 87, and as in footnote 34, supra, the Court rejects it.  However, the Court alters paragraph 87 of the DSMF to make clear that it is unknown exactly what information Sergeant Crane gave to the assistant district attorney, and that he may have left out some pertinent details.

The Plaintiffs also object to paragraph 88 of the DSMF, PRDSMF ¶ 88, which states that "[t]he Assistant District Attorney told Crane that there was not probable cause to arrest Lord with respect to the kidnapping and sexual assault and that more evidence would need to be gathered."  DSMF ¶ 88.  The Plaintiffs argue that this statement is "rank hearsay and not admissible" and "[e]ven the identity of the declarant is unknown."  PRDSMF ¶ 88.  The Individual Officers counter that this statement is not hearsay because "it is being offered to prove that the A.D.A. told [Crane] that there was no probable cause," rather than that "there was not, in fact, probable cause . . . ."  DRPSAMF ¶ 88.  The Individual Officers quote the First Circuit's opinion in *Irish v. Maine*, in which the First Circuit stated, "[w]e do not know if the officers felt they had probable cause to arrest Lord but nonetheless chose only to leave the voice message and, if so, the reasons for that decision," 849 F.3d 521, 528 (1st Cir. 2017), arguing that "the A.D.A.'s statement goes directly to the issue of whether [the Individual Officers] felt there was probable cause to arrest Lord."  DRPSAMF ¶ 88.

The Court sustains the Plaintiffs' objection.  The Individual Officers' purported rationale for introducing this statement rings hollow in light of the fact that the assistant district attorney did not tell Sergeant Crane that there was no probable cause to arrest Mr. Lord for the kidnapping and assault until approximately 9:30 p.m., at least three hours after Detective Perkins left the voicemail message for Mr. Lord.  Therefore, the A.D.A.'s statement cannot have any bearing on the issue identified by the First Circuit in the portion of its opinion quoted by the Individual Officers.  Additionally, at 10:05 p.m., Detective Perkins requested that the Houlton Regional Communications Center issue a "stop and hold" of Mr. Lord, DSMF ¶ 91, indicating that, at around this time, the Individual Officers did believe it was proper to detain Mr. Lord in some manner and controverting the Individual Officers' suggestion that the A.D.A.'s statement provides insight into their contemporaneous views of the unfolding investigation.  Given this sequence of events, it seems far more likely that the Individual Officers are attempting to introduce this statement for its truth—that there was not sufficient probable cause to arrest Mr. Lord.  This is improper, and the Court strikes paragraph 88 of the DSMF.

[91]      The Individual Officers attempt to qualify paragraph 230 of the PSAMF by pointing out that Detective Perkins did not testify that there was probable cause related to Mr. Lord breaking and entering at the camp described by Brittany Irish as contained in the Plaintiffs' statement, but rather that there was evidence of a breaking and entering.  DRPSAMF ¶ 230.  The Court reviewed the cited portion of the record, agrees with the Individual Officers, and alters paragraph 230 of the PSAMF to more accurately reflect the record.

After his call with Detective Perkins, at approximately 10:00 p.m., Sergeant Crane left his residence and began his role in the investigation, though he did not ever go to Benedicta.[92]  DSMF ¶ 89; PRDSMF ¶ 89; PSAMF ¶¶ 220-21; DRPSAMF ¶¶ 220-21.  Sergeant Crane instructed two MSP troopers to go to Mr. Lord's mother's residence in Houlton, Maine, but they reported that no one answered the door.[93] DSMF ¶ 90; PRDSMF ¶ 90.  At 10:05 p.m., Detective Perkins contacted the Houlton Regional Communications Center, provided information regarding the vehicle Mr. Lord was likely driving, requested that they issue a state-wide teletype for a "stop and hold" of Mr. Lord, and instructed them to contact Detective Perkins if Mr. Lord was located.[94]  DSMF ¶ 91; PRDSMF ¶ 91; PSAMF ¶ 222; DRPSAMF ¶ 222.  Not long after, Detective Perkins added a "use caution" warning to this teletype.[95]  *Dep. of Perkins* at 48:16-25; PSAMF ¶ 223; DRPSAMF ¶ 223.  This "use caution" warning

[92]     The Plaintiffs deny paragraph 89 of the DSMF, stating that Sergeant Crane could not have joined the search for Lord at 10:00 p.m. because "there was no search to join until 12:30 a.m." on July 17, 2015.  PRDSMF ¶ 89.  The Court reviewed the portions of the record cited by the Plaintiffs for their denial and finds that they do not offer support to the Plaintiffs' position.  The fact that the Individual Officers did not go to Lord's uncle's home until 12:30 a.m., PRDSMF ¶ 89, does not mean that there was no search prior to that time.  Additionally, the Plaintiffs state at paragraph 223 of the PSAMF that "the attempt to locate Lord 'beg[a]n' at 10:05 p.m. on July 16," PSAMF ¶ 223, which undercuts the Plaintiffs' denial.

[93]     The Plaintiffs' attempt to qualify paragraph 90 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 90, and as in footnote 34, supra, the Court rejects it.

[94]     The Plaintiffs attempt to qualify paragraph 91 of the DSMF by stating that Perkins may have done this at 11:00 p.m., but the Plaintiffs do not provide any record citation for this assertion.  PRDSMF ¶ 91.  Therefore, the Court rejects this aspect of the Plaintiffs' qualification.  The remainder of the Plaintiffs' qualification is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 91, and as in footnote 34, supra, the Court rejects it.

    The Individual Officers request that the Court strike the second sentence of paragraph 222 of the PSAMF as lacking in record support.  DRPSAMF ¶ 222.  The Court reviewed the cited portion of the record, agrees with the Individual Officers, and strikes this sentence.  The same logic applies to the second sentence of paragraph 223 of the PSAMF, which the Individual Officers also request that the Court strike.  DRPSAMF ¶ 223.  The Court strikes this sentence as well.

[95]     The Court sua sponte clarifies the first sentence of paragraph 223 of the PSAMF to more accurately reflect the record.

meant that officers should use caution when pulling Mr. Lord over and holding him for the sake of officer safety; Detective Perkins believed it was necessary because he now believed Mr. Lord posed a sufficient risk that armed police professionals would need this warning in order to avoid harm. PSAMF ¶ 224; DRPSAMF ¶ 224.

After issuing this "use caution" order, Detective Perkins called the Caribou, Maine, Police Department and asked them to conduct safety checks on Brittany Irish's children. PSAMF ¶ 225; DRPSAMF ¶ 225. At 10:10 p.m. or thereabouts on July 16, Sergeant Crane told Detective Perkins by phone that the assistant district attorney was not authorizing an arrest of Mr. Lord at that time for the crimes of kidnapping or rape.[96] DSMF ¶ 92; PRDSMF ¶ 92; PSAMF ¶ 226; DSMF ¶ 226. During this call, Detective Perkins did not inform Sergeant Crane of Mr. Lord's criminal record, as he and Detective Fowler still had neither requested nor sought Mr. Lord's criminal background. PSAMF ¶ 227; DRPSAMF ¶ 227. Detective Perkins did not believe that Mr. Lord's criminal history was important and had not computed an ODARA score for Mr. Lord because of his belief that ODARA scores could not be computed prior to an arrest.[97] PSAMF ¶ 228; DRPSAMF ¶ 228. Detectives Perkins and Fowler also did not pass on to Sergeant Crane the retaliatory threat of violence

---

[96] The Plaintiffs' attempt to qualify paragraph 92 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 92, and as in footnote 34, supra, the Court rejects it. The Plaintiffs did not object to paragraph 92 of the DSMF on hearsay grounds, and the Court considers this objection waived.

[97] The Individual Officers qualify the second sentence of paragraph 228 of the PSAMF by pointing out that Detective Perkins did not testify that an ODARA score was unimportant, but rather that he did not compute a score for Mr. Lord because Mr. Lord had not yet been arrested. DRPSAMF ¶ 228. The Court reviewed the cited portions of the record, agrees with the Individual Officers, and alters the second sentence of paragraph 228 of the PSAMF to more accurately reflect the record.

made by Mr. Lord, of which they were informed on two occasions by Brittany Irish.[98]

PSAMF ¶ 229; DRPSAMF ¶ 229.

Detectives Perkins and Fowler arrived at the scene of the barn fire at 10:36 p.m. and Detective Perkins immediately requested that a K9 unit be dispatched to the scene to look for a track.[99]  DSMF ¶¶ 93-94; PRDSMF ¶¶ 93-94; PSAMF ¶ 231; DRPSAMF ¶ 231.  When Detectives Perkins and Fowler were told the fire had a suspicious human element, Detective Perkins "viewed the fire as a potential escalation" by Mr. Lord and believed Mr. Lord was most likely responsible for the fire.  PSAMF ¶ 232; *see also* PSAMF ¶ 233; DRPSAMF ¶¶ 232-33.  The barn, which had been two stories and was close to Brittany Irish's parents' house, was a total loss due to the fire, and Detective Fowler later testified that the fire's location at Brittany Irish's parents' home and occurrence after Brittany Irish's allegations of rape "absolutely" "heightened" his suspicion of Mr. Lord.[100]  *Dep. of Fowler* at 45:25-46:08; PSAMF ¶¶ 234-35; DRPSAMF ¶¶ 234-35.

---

[98]    The Individual Officers request that the Court strike a portion of paragraph 229 of the PSAMF which states that Detectives Perkins and Fowler did not pass on Mr. Lord's ODARA score to Sergeant Crane because it is not supported by the cited portion of the record.  DRPSAMF ¶ 229.  The Court reviewed the cited portion of the record and agrees with the Individual Officers that there was no ODARA score at the time, and so Detectives Perkins and Fowler could not have chosen not to pass it along to Sergeant Crane.  The Court strikes this portion of paragraph 229 of the PSAMF.
    The Individual Officers also request that the Court strike a portion of paragraph 229 of the PSAMF which states that Detectives Perkins and Fowler did not pass Mr. Lord's retaliation threat to Crane because Detectives Perkins and Fowler testified that Brittany Irish never told them of this threat.  DRPSAMF ¶ 229.  The Court addressed this issue in footnotes 30 and 78, supra, and applies the same logic here.  The Court rejects the Individual Officers' request to strike this portion of paragraph 229 of the PSAMF.
[99]    The Plaintiffs' attempt to qualify paragraphs 93 and 94 of the DSMF is argument outside the scope of the facts asserted in the statement, PSAMF ¶¶ 93-94, and as in footnote 34, supra, the Court rejects it.
[100]   The Individual Officers attempt to qualify paragraph 235 of the PSAMF by pointing out that Detective Fowler did not specifically testify that he was put on alert, but rather that his suspicion about Mr. Lord was heightened.  DRPSAMF ¶ 235.  The Court reviewed the cited portion of the record, and while it does not see a significant amount of daylight between being "put on alert" and having a

At 11:38 p.m. on July 16, Detective Perkins called the MSP's Regional Command Center in Houlton and asked for a Triple I SBI of Mr. Lord, which is a full criminal history check; from this he learned for the first time that Mr. Lord was on probation for domestic violence and was a convicted felon, as well as the name of Mr. Lord's probation officer. PSAMF ¶¶ 236-37, 240; DRPSAMF ¶¶ 236-37, 240. At 11:49 p.m., Detective Perkins spoke by phone with Mr. Lord's probation officer.[101] DSMF ¶ 95; PRDSMF ¶ 95; PSAMF ¶ 238; DRPSAMF ¶ 238. On this phone call, Detective Perkins informed Mr. Lord's probation officer that a decision had been made to arrest Mr. Lord for domestic assault. PSAMF ¶ 241; DRPSAMF ¶ 241. Between 11:49 p.m. and around 11:59 p.m., Mr. Lord's probation officer attempted to make contact with Mr. Lord, but when he could not, he spoke again with Detective Perkins and told Detective Perkins that Mr. Lord's last known residency was a camper on his uncle's property in Crystal, Maine. DSMF ¶ 95; PRDSMF ¶ 95; PSAMF ¶ 239; DRPSAMF ¶ 239.

## J. Brittany and Kimberly Irish's Requests for Protection

At approximately midnight on July 17, 2015, Brittany Irish called Detective Perkins and asked that an MSP officer provide security at her parents' residence, where she was staying.[102] DSMF ¶ 96; PRDSMF ¶ 96; PSAMF ¶ 242; DRPSAMF ¶

"heightened" level of suspicion, it alters paragraph 235 of the PSAMF to hew more closely to Detective Fowler's deposition testimony.

[101] The Plaintiffs' attempt to qualify paragraph 95 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 95, and as in footnote 34, supra, the Court rejects it.
[102] The Plaintiffs' attempt to qualify paragraph 96 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 96, and as in footnote 34, supra, the Court rejects it.

The Court writes further to note that the Plaintiffs seem to argue that Detective Perkins had previously promised Britany Irish protection at 9:24 p.m. when he told her that he would be going to her parents' house. PRDSMF ¶ 96. The Court does not believe that this is a reasonable inference.

242. Detective Perkins inferred that Brittany Irish was afraid Mr. Lord was going to come back to the premises, found that inference logical, and passed her request on to Crane.[103]  PSAMF ¶ 243; DRPSAMF ¶ 243.  Brittany Irish did not receive a response until 2:00 a.m. on July 17 when she called Detective Perkins once again.  PSAMF ¶ 244; DRPSAMF ¶ 244.

One or more times during the evening of July 16 and early morning of July 17, Kimberly Irish asked members of the MSP whether an officer could stay at her house or a police car could be left outside; in response, she was told that the MSP did not have the manpower to provide an officer and was unable to leave a car.[104]  *JSF* ¶¶

The record indicates only that Detective Perkins told Brittany Irish that he would be at her parents' home at some unspecified future point for some unspecified period of time. *Dep. of Perkins* at 110:12-111:14.  The record also shows that Detective Perkins followed through on this statement, arriving at Brittany Irish's parents' home at 10:36 p.m.  DSMF ¶ 93; PRDSMF ¶ 93; PSAMF ¶ 231; DRPSAMF ¶ 231.  Even though the Court is required to view the facts in the light most favorable to the Plaintiffs, the Plaintiffs' attempt to reframe Detective Perkins' general statement that he would be at Brittany Irish's parents' home as a promise of protection is not a proper inference for the Court to draw on this record.  *See Ziegler v. Rater*, 939 F.3d 385, 397 (1st Cir. 2019) (stating that courts "are not required to 'draw unreasonable inferences . . .' in adjudicating summary judgment motions" (quoting *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018))).

[103]    The Individual Officers attempt to qualify paragraph 243 of the PSAMF by pointing out that Detective Perkins did not testify that Brittany Irish's request was logical, but rather that he inferred that she was fearful of Mr. Lord returning, which he believed was logical.  DRPSAMF ¶ 243.  The Court has reviewed the cited portion of the record, agrees with the Individual Officers, and alters paragraph 243 of the PSAMF to more accurately reflect the record.

[104]    The Individual Officers request that the Court strike paragraph 265 of the PSAMF on three grounds.  DRPSAMF ¶ 265.  Paragraph 265 of the PSAMF says, "Kimberly Irish makes one or more calls prompting members of the MSP, to make promises consistent with Defendants' 9:24 p.m. promises."  PSAMF ¶ 265.

The first ground for the request to strike is that Kimberly Irish described only a single call with a single person in her testimony.  DRPSAMF ¶ 265.  The Court rejects this ground, however, as the Individual Officers stipulated to the language that Kimberly Irish made "one or more" calls.  *JSF* ¶ 18.

Second, the Individual Officers argue that Kimberly Irish did not testify that any promises were made to her, but rather that an unidentified person told her "the police would be in the vicinity, they would keep somebody in the vicinity."  DRPSAMF ¶ 265.  The Court rejects this ground as well.  A promise is defined as "a declaration that one will do or refrain from doing something specified." *Promise*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003).  Here, Kimberly Irish testified that an MSP officer told her "if you have any problems, just call us" and "we've got officers in the vicinity and . . . we'll take care of it . . . ."  PSAMF, Attach. 20 at 56:16-24 (*Dep. of Kimberly Irish*).  The

18-19; PSAMF ¶ 265; DRPSAMF ¶ 265.  At some point during the early morning of July 17, Kimberly Irish called the "800 number" for the MSP and told either the person who picked up the phone or the person she was transferred to (who was not Sergeant Crane, Detective Fowler, or Detective Perkins) that she was going to bring her family down to the police station and park in the parking lot.  *JSF* ¶¶ 20-21; DSMF ¶ 103; PRDSMF ¶ 103.  The person with whom Kimberly Irish was speaking said that she could not do this as "that would be a very dangerous thing to do" and "leav[ing] the house . . . would be a dangerous mistake," and promised that if she had any problems, she should call the MSP who had "officers in the vicinity" and would "take care of it . . .."  *JSF* ¶¶ 22-23.  While Kimberly Irish did not dare to take her eyes off the area the entire night, she never saw a police cruiser go by.  PSAMF ¶ 334; DRPSAMF ¶ 334.

Deputy Chief Cote, the MSP's 30(b)(6) designee, later testified that "[i]t is appropriate for MSP officers to say, we'll keep an eye on the place, we'll be in the vicinity, only if [they] were going to be able to do that," and that if one is not going to remain in the area, it would not be appropriate to make promises that could not be fulfilled.  PSAMF ¶¶ 282-83; DRPSAMF ¶¶ 282-83.  Deputy Chief Cote also testified to his belief that three MSP officers were available from Troop F in Houlton on the

Court views this as a promise by an MSP officer that, should Kimberly Irish call, the MSP would use officers in the vicinity to take care of whatever problem she was having.

Third, the Individual Officers argue that there was no 9:24 p.m. promise on July 16, 2015. DRPSAMF ¶ 265.  The Court has already addressed this issue in footnote 102, supra, and strikes the portion of paragraph 265 of the PSAMF that refers to a 9:24 p.m. promise.  With the exception of this portion, however, the Individual Officers' request to strike is denied.

night of July 16 through the morning of July 17.[105]  PSAMF ¶ 284; DRPSAMF ¶ 284.

Furthermore, Deputy Chief Cote testified that the MSP does have the ability to call

additional officers who are off duty in the event that becomes necessary.[106]  PSAMF

¶ 285; DRPSAMF ¶ 285.  Sergeant Crane also testified that it would not be proper

for Detectives Perkins and Fowler to say that they would be in the vicinity for a

particular time period and then not be there.[107]  PSAMF ¶ 271; DRPSAMF ¶ 271.

At 12:30 a.m. on July 17, Detective Perkins, Detective Fowler, Sergeant Crane,

and an additional MSP trooper went to Mr. Lord's uncle's house (which was Mr.

Lord's registered address in the sex offender registry) and were advised by Mr. Lord's

uncle that Mr. Lord had been gone for at least two weeks.[108]  DSMF ¶ 97; PRDSMF

¶ 97; PSAMF ¶¶ 245-46; DRPSAMF ¶¶ 245-46.  At around 1:00 a.m., Detective

Perkins called the BPD to confirm that they had received the "stop and hold" teletype

about Mr. Lord and to request that they send an officer to Acadia Hospital to

determine whether Mr. Lord had gone there.  DSMF ¶ 99; PRDSMF ¶ 99.

---

[105]    The Individual Officers' attempt to qualify paragraph 284 of the PSAMF is argument outside
the scope of the facts asserted in the statement, DRPSAMF ¶ 284, and as in footnote 34, supra, the
Court rejects it.  Deputy Chief Cote's testimony makes clear that Troop F was based in Houlton, *Dep.
of Cote* at 48:03-04, and the Plaintiffs do not assert in paragraph 284 that the available officers were
themselves in Houlton.  PSAMF ¶ 284.

[106]    The Individual Officers attempt to qualify paragraph 285 of the PSAMF by pointing out that
Deputy Chief Cote did not testify that other MSP officers were available, but rather that they were off
duty and would have needed to be called.  DRPSAMF ¶ 285.  The Court reviewed the cited portion of
the record, agrees with the Individual Officers, and alters paragraph 285 of the PSAMF to more
accurately reflect the record.

[107]    The Individual Officers attempt to qualify paragraph 271 of the PSAMF by stating that
Sergeant Crane only testified that it would not be proper for Detectives Perkins and Fowler to say they
would be in a place at a particular time and then not be there during that time; he did not testify that
saying they would be in a particular place gave rise to an open-ended promise to be in that place.
DRPSAMF ¶ 271.  The Court reviewed the cited portion of the record, agrees with the Individual
Officers, and alters paragraph 271 of the PSAMF to more accurately reflect Sergeant Crane's
deposition testimony.

[108]    The Plaintiffs' attempt to qualify paragraph 97 of the DSMF is argument outside the scope of
the facts asserted in the statement, PRDSMF ¶ 97, and as in footnote 34, supra, the Court rejects it.

At about 1:00 a.m. or shortly before, Detectives Perkins and Fowler met in person with Sergeant Crane in Crystal and Detective Perkins told Sergeant Crane about Brittany Irish's request for overnight security.[109]  DSMF ¶ 98; PRDSMF ¶ 98; PSAMF ¶ 247; DRPSAMF ¶ 247.  Sergeant Crane informed Detective Perkins that the MSP did not have the manpower to provide the Irishes with overnight security.[110] DSMF ¶ 98; PRDSMF ¶ 98; PSAMF ¶ 248; DRPSAMF ¶ 248.  At this time, in the area, there were the following MSP resources, not counting off-duty MSP officers or local police:

1. Sergeant Crane;
2. Detective Perkins;
3. Detective Fowler;
4. the two MSP troopers who checked on the residence of Mr. Lord's mother in Houlton (*see* DSMF ¶ 90);
5. the MSP trooper who went with Sergeant Crane, Detective Perkins, and Detective Fowler to visit Mr. Lord's uncle (*see* DSMF ¶ 97);
6. an MSP trooper and an MSP detective who were collecting evidence at a gas station dumpster (*see* PSAMF ¶¶ 253-54); and
7. the K9 trooper and dog who Perkins ordered to the Benedicta barn fire (*see* DSMF ¶ 94).

PSAMF ¶ 249; DRPSAMF ¶ 249.  When Sergeant Crane informed Detective Perkins that he did not have the manpower to provide the Irishes with overnight security,

---

[109]    The Plaintiffs refer to Brittany Irish's request for security as a "renewed" request.  PSAMF ¶ 247.  This is similar to the issue discussed in footnote 102, supra, in that a review of the record does not demonstrate that Brittany Irish made any request for protection prior to her midnight call to Detective Perkins, and Detective Perkins' statement that he would be at the Irish home cannot reasonably be interpreted as a promise to provide protection.
        The Plaintiffs' attempt to qualify paragraph 98 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 98, and as in footnote 34, supra, the Court rejects it.
[110]    The Individual Officers attempt to qualify paragraph 248 of the PSAMF by pointing out that Detective Perkins testified he could not remember Sergeant Crane's words but that he in effect said what was contained in paragraph 248 of the PSAMF.  DRPSAMF ¶ 248.  Because the Court paraphrases paragraph 248 of the PSAMF, the Court views this qualification as moot.

Detective Perkins did not advocate for this overnight security. PSAMF ¶ 250; DRPSAMF ¶ 250. Detective Perkins later testified that if security were provided, the Irish residence in Benedicta was the right place to do it. PSAMF ¶ 251; DRPSAMF ¶ 251.

At about 2:00 a.m. on July 17, having not heard from Detective Perkins or Detective Fowler since midnight, Brittany Irish called Detective Perkins again to request protection; Detective Perkins told her that he had spoken with his supervisor about this request and the MSP did not have the manpower to provide overnight security. DSMF ¶ 100; PRDSMF ¶ 100; PSAMF ¶¶ 252, 256-57; DRPSAMF ¶¶ 252, 256-57. Detective Perkins told Brittany Irish that a security detail would not be posted at her parent's residence, but that the MSP was still looking for Mr. Lord in the area.[111] DSMF ¶ 101; PRDSMF ¶ 101; PSAMF ¶ 258; DRPSAMF ¶ 258. Detective Perkins later testified that the MSP Incident Review Team report states that Brittany Irish asked for protection twice in the early morning hours of July 17. PSAMF ¶ 259; DRPSAMF ¶ 259.

Also at about 2:00 a.m., Detectives Perkins and Fowler drove together to meet two additional MSP members, Detective Jonah O'Rourke and Trooper Corey Hafford, who were at a gas station in Sherman, Maine, searching the dumpster for evidence

---

[111] Paragraph 101 of the DSMF says that "Perkins made clear to B[rittany] Irish that there would not be any overnight security at her mother's house." DSMF ¶ 101. The Plaintiffs deny paragraph 101 of the DMSF, stating that Detective Fowler testified that he heard Detective Perkins "tell Brittany Irish that [the MSP was] still looking for Lord," and that a factfinder "could infer that while MSP would not be posted right at the residence, that they would be nearby looking for Lord." PRDSMF ¶ 101. While the Court does not find this to be a proper basis for a denial, the Court reviewed the cited portions of the record and alters paragraph 101 of the DSMF to more accurately reflect the record and the reasonable inference pointed out by the Plaintiffs.

of Mr. Lord's rape of Brittany Irish.  PSAMF ¶¶ 253-54; DRPSAMF ¶¶ 253-54.  In later testimony, Detective Perkins did not answer whether he agreed that protecting the victim of a crime is more important than finding a piece of evidence from a crime, stating instead that it is "most productive in a paramilitary organization to do what you're told in your assignment and not freelance."[112]  PSAMF ¶ 255; DRPSAMF ¶ 255.

Between approximately 2:00 a.m. and 3:00 a.m. on July 17, after Detectives Perkins and Fowler left Detective O'Rourke and Trooper Hafford at the gas station dumpster to continue looking for evidence, the two drove around in different places in the vicinity hoping to find something related to the case.[113]  DSMF ¶ 102; PRDSMF ¶ 102; PSAMF ¶ 260; DRPSAMF ¶ 260.  At 3:00 a.m. on July 17, Detectives Perkins and Fowler left the area of Sherman and Crystal for home.  PSAMF ¶ 261; DRPSAMF ¶ 261.  Detective Perkins arrived at his home at 4:40 a.m. and Detective Fowler

---

[112]    Paragraph 255 of the PSAMF states that "Perkins disagrees that protecting a victim is more important than finding a piece of evidence because what 'is most productive in a paramilitary organization [is that you] do what you're told in your assignment and not freelance.'"  PSAMF ¶ 255 (alteration in original).  The Individual Officers request that the Court strike paragraph 255, arguing that Detective Perkins "did not disagree that protecting a victim is more important than finding a piece of evidence," but rather "testified that what is most productive is to do what one is told."  DRPSAMF ¶ 255.  If not stricken, the Individual Officers attempt to qualify the statement by stating that "[w]hile Perkins testified that what is more productive is to do what one is told, he did not disagree with the statement that protecting a victim is more important than finding a piece of evidence."  DRPSAMF ¶ 255.  The Court reviewed the cited portion of the record and finds that there is no basis to strike this statement, as there is record support for the quote attributed to Detective Perkins, but alters paragraph 255 of the PSAMF to more accurately reflect the record.

[113]    The Plaintiffs deny paragraph 102 of the DSMF, arguing that "[t]he record is absent of the whereabouts of Detective Perkins and Fowler after the 12:30 a.m. check for Lord at Lord's uncle's house."  PRDSMF ¶ 102.  However, the quote the Plaintiffs use in their denial from Detective Fowler's deposition testimony refutes at least a portion of the denial, making clear that between 2:00 and 3:00 a.m., Detectives Perkins and Fowler were driving around looking for evidence.  PRDSMF ¶ 102.  Additionally, paragraphs 247, 252, 253, and 254 of the PSAMF make clear that the Plaintiffs can account for Detectives Perkins and Fowler's whereabouts for a good portion of the period between 12:30 and 2:00 a.m.  The Court therefore rejects the Plaintiffs' denial of paragraph 102 of the DSMF.

arrived home at 5:05 a.m.  PSAMF ¶¶ 261-62; DRPSAMF ¶¶ 261-62.  Sergeant Crane had already left the Sherman and Crystal area to go home thirty minutes earlier, at 2:30 a.m.  PSAMF ¶ 263; DRPSAMF ¶ 263.  Sergeant Crane, Detective Perkins, and Detective Fowler did not communicate to the Irishes that they were leaving the area.[114]  PSAMF¶ 264; DRPSAMF ¶ 264.  Around 3:00 a.m., Detective O'Rourke and Trooper Hafford also left the gas station dumpster to return home.  PSAMF¶ 264; DRPSAMF ¶ 264.  At the time Detectives Perkins and Fowler left the area, Sergeant Crane did not know what MSP resources were in the vicinity of the Irish home. PSAMF ¶ 270; DRPSAMF ¶ 270.

### K.  Anthony Lord's Murderous Rampage

Between 4:00 and 4:40 a.m. on July 17, an individual named Kary Mayo reported to MSP that he had been assaulted by Mr. Lord at his residence in Silver Ridge, Maine, six miles and twelve minutes away from the Irish home in Benedicta, and that Mr. Lord beat him with a hammer and stole his truck and two guns.  PSAMF ¶¶ 266-67; DRPSAMF ¶¶ 266-67.  Sergeant Crane observed that the Mayo assault and theft took place at about 4:00 a.m., prior to the shootings that would take place at the Irish residence in Benedicta.[115]  PSAMF ¶ 268; DRPSAMF ¶ 268.  MSP trooper

---

[114]    The first sentence of paragraph 264 of the PSAMF states that the Individual Officers "did not tell the Irishes that [they] and MSP were leaving."  PSAMF ¶ 264.  The Individual Officers request that the Court strike this sentence, arguing that this portion of paragraph 264 does not have record support.  DRPSAMF ¶ 264.  The Court has reviewed the cited portions of the record and agrees that there is not explicit record support for this statement; however, the Court will not strike this statement.  Given the level of documentation of other communications between the Individual Officers and the Irishes, the lack of such documentation here and the cited portions of the record give rise to a reasonable inference that the Individual Officers did not communicate to the Irishes that they were going home.

[115]    The Individual Officers attempt to qualify paragraph 268 of the PSAMF by stating that in the cited portion of Sergeant Crane's deposition, he did not state what time the incident occurred.

Carmen Lilley, who was on call, responded to the Mayo assault and theft. PSAMF ¶ 269; DRPSAMF ¶ 269. He was also the first MSP officer to respond to the Irish home shootings. PSAMF ¶ 269; DRPSAMF ¶ 269.

In the early morning of July 17, Mr. Lord entered the Irish house, shot and killed Kyle Hewitt, shot and wounded Kimberly Irish, and abducted Brittany Irish. *JSF* ¶ 24. After Mr. Lord finished his shootings and abducted Brittany Irish for a second time, the MSP called several off-duty officers to work.[116] PSAMF ¶ 286; DRPSAMF ¶ 286. Mr. Lord was arrested on the afternoon of July 17. *JSF* ¶ 25. At no time while Brittany Irish was with Mr. Lord on July 16 or 17 did he express anger over her having gone to the police; however, Brittany Irish received a phone call from her brother shortly after Detectives Perkins and Fowler arrived at her parents' home on July 16 in which her brother told her that he had heard Mr. Lord was irate, and her understanding was that this was in reaction to the voicemail message from Detective Perkins.[117] DSMF ¶ 104; PRDSMF ¶ 104.

Detective Perkins later testified that he was skeptical of Brittany Irish as the investigation was unfolding. PSAMF ¶ 300; DRPSAMF ¶ 300. Detective Fowler did

---

DRPSAMF ¶ 268. The Court rejects this qualification. Sergeant Crane stated what time the incident occurred on the page of his deposition prior to the page cited by the Plaintiffs. *Dep. of Crane* at 42:08-10.

[116] The Individual Officers attempt to qualify paragraph 286 of the PSAMF by stating that Deputy Chief Cote did not refer to Brittany Irish's abduction as a "second abduction." DRPSAMF ¶ 286. The Court addressed whether Brittany Irish was abducted prior to this in footnotes 13 and 77, supra, and rejects this qualification.

[117] The Plaintiffs attempt to qualify paragraph 104 of the DSMF by pointing out that, separate and apart from the time Brittany Irish spent in Mr. Lord's company, he was irate upon receiving the voicemail message and knew that it was about his rape of her. PSAMF ¶ 104. The Court has inferred that Mr. Lord knew at some point that Detective Perkins' voicemail was about his rape of Brittany Irish. *See* footnote 68, *supra*. Additionally, the Court reviewed the cited portions of the record, agrees with the Plaintiffs regarding Mr. Lord having been irate, and alters paragraph 104 of the DSMF to reflect the record.

not note in his police report that he thought Brittany Irish was showing indicators that she was being deceptive or less than honest during her interview with Detectives Perkins and Fowler after creating her written report.[118]  PSAMF ¶ 301; DRPSAMF ¶ 301.   Sergeant Crane knew that there were concerns about Brittany Irish's trustworthiness because of the interview Detectives Perkins and Fowler conducted with Ms. Adams (though he did not know whether anyone inquired into whether Adams had any motive to lie) and because Detective Perkins had told Sergeant Crane that he harbored concerns about Brittany Irish's credibility.[119]  PSAMF ¶¶ 303-05; DRPSAMF ¶¶ 303-05.

Detective Perkins agreed, in his testimony, that the MSP Incident Review Team concluded in writing that beginning "on July 14 . . . Lord went on a four-day crime spree [of] murder, kidnapping, *rape*, aggravated assault, arson, burglary, theft, and various other crimes."[120]   PSAMF ¶ 306 (alterations in original); *see also*

---

[118]   The Individual Officers' attempt to qualify paragraph 301 of the PSAMF is argument outside the scope of the facts asserted in the statement, DRPSAMF ¶ 301, and as in footnote 34, supra, the Court rejects it.

[119]   Paragraph 302 of the PSAMF lists the four written statements and interviews done by Brittany Irish and refers to them as "consistent." PSAMF ¶ 302. The Individual Officers request that the Court strike this paragraph as lacking in record support. DRPSAMF ¶ 302. The Court cannot determine, based on the record citations provided, whether the statements and interviews were entirely consistent, and strikes this paragraph for failure to comply with District of Maine Local Rule 56(b) and (f).

The Individual Officers request that the Court strike the portion of paragraph 305 of the PSAMF which says that the Individual Officers had not gathered "most of the facts" for lack of record support.  DRPSAMF ¶ 305.  The Court reviewed the cited portion of the record, agrees with the Individual Officers, and strikes this portion of paragraph 305 of the PSAMF.

[120]   The Individual Officers attempt to qualify the portion of paragraph 306 of the PSAMF which states that the Incident Review Team "concluded" that Mr. Lord committed various crimes, PSAMF ¶ 306, by stating that Detective Perkins did not testify that this was a conclusion of the Incident Review Team and that the quoted statement was part of the introduction to the report by the Incident Review Team.  DRPSAMF ¶ 306.  In the Court's view, the Individual Officers are taking an overly formalistic view of the word "concluded."  The verb "conclude" is defined as "to reach as a logically necessary end by reasoning," "infer on the basis of evidence," or "to make a decision about . . . ."  *Conclude*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003).  A conclusion, as used by the Plaintiffs, does not

DRPSAMF ¶ 306. Detective Perkins did, however, still challenge Brittany Irish's credibility concerning whether she was raped, stating "I . . . disagree that this crime scene started necessarily on July 14, 2015. I would say that is debatable . . . the events [of] July 14 and July 15 are in question." PSAMF ¶ 307 (alterations in original); *see also* DRPSAMF ¶ 307. Corroborating Brittany Irish, Mr. Lord later admitted to the MSP after his July 17 arrest that he had tied up Brittany Irish on July 14 into July 15.[121] PSAMF ¶ 308; DRPSAMF ¶ 308. Detective Perkins stated to the Incident Review Team and at his deposition that he still believed Brittany Irish was not the victim. PSAMF ¶ 309; DRPSAMF ¶ 309. In written comments to the MSP Incident Review Team (to which Detective Fowler never objected), Sergeant Crane wrote, "In conclusion, it weighs heavy knowing that one of our investigations in Section 6 [a geographic area of MSP coverage], as it was ongoing, led to the tragic events that took the lives of two people and hurt so many others." PSAMF ¶¶ 129-

have to come at the end of something and does not have to be prefaced by the phrase "we conclude." Rather, the record reflects that the Incident Review Team was tasked with determining "[t]he facts of the incident" related to Mr. Lord's crime spree, and to "provide a comprehensive review of the response and performance by Maine State Police Officers." PSAMF, Attach. 5 at 2 (*MSP Incident Review*). That the Incident Review Team made the statement quoted by the Plaintiffs in the declarative (i.e. "On July 14, 2015, thirty-five-year-old Anthony Lord went on a four-day crime spree," *id.*) would allow a reasonable factfinder to infer that this was a conclusion of the Incident Review Team. On this motion for summary judgment, the Court infers this was a conclusion of the Incident Review Team.

[121] The Individual Officers request that the Court strike paragraph 308 of the PSAMF which states, "Corroborating [Brittany] Irish, and rebutting Detective Perkins, Lord later admitted to the MSP after July 17 that he had tied up [Brittany] Irish on July 14 into July 15, just as [Brittany] Irish had described to Defendants," PSAMF ¶ 308, as not supported by the cited portion of the record. DRPSAMF ¶ 308. The Individual Officers state that Detective Perkins could not remember when Mr. Lord stated that he tied up Brittany Irish but that it was around when the Plaintiffs said and that there is no support in the cited portion of the record for the statement that Mr. Lord tied Brittany Irish up "just as [Brittany] Irish had described." DRPSAMF ¶ 308. The Court reviewed the cited portion of the record and strikes the portion of paragraph 308 of the PSAMF which states that Mr. Lord tied Brittany Irish up "just as [Brittany] Irish had described" as lacking in record support but does not strike the reference to the date after which Mr. Lord made this statement. Mr. Lord was not arrested until July 17, and Detectives Perkins and Fowler did not have any contact with him prior to this date. Therefore, a reasonable factfinder could infer that Mr. Lord made this statement on or after July 17.

30; DRPSAMF ¶¶ 129-30. Deputy Chief Cote, the MSP's 30(b)(6) designee, testified that it was appropriate for the MSP to not bring its full resources to bear in the Brittany Irish investigation prior to the Benedicta barn fire.[122] PSAMF ¶ 131; DRPSAMF ¶ 131. The MSP did not believe Brittany Irish and so Detectives Perkins and Fowler did not consider her report a domestic violence complaint, but rather a false report. PSAMF ¶ 132; DRPSAMF ¶ 132.

After July 17, once Mr. Lord was in custody, an MSP K9 officer and dog were placed at the Irish house twenty-four hours a day for two days to protect the crime scene, and Mr. Lord's other girlfriend was given safe house protection, even though Mr. Lord was already in custody.[123] PSAMF ¶ 335; DRPSAMF ¶ 335. At his guilty plea, Mr. Lord admitted that he knew Brittany Irish reported his July 14 and July 15 crimes to MSP, and he did not dispute the evidentiary support for the facts that his six-month-old son had died two months prior to the events in issue and that prior to the events in issue, Brittany Irish had reported criminal conduct by Mr. Lord toward her.[124] PSAMF ¶ 336; DRPSAMF ¶ 336.

---

[122] The Individual Officers attempt to qualify paragraph 131 of the PSAMF insofar as it does not make clear that Deputy Chief Cote's testimony about appropriate resource allocation was temporally limited to the period prior to the barn fire. DRPSAMF ¶ 131. The Court reviewed the cited portion of the record, agrees with the Individual Officers, and alters paragraph 131 of the PSAMF to more accurately reflect the record.

[123] The Individual Officers request that the Court strike the statement in paragraph 335 of the PSAMF that Mr. Lord's other girlfriend received safe house protection as unsupported by the cited portion of the record. DRPSAMF ¶ 335. The Court has reviewed the cited portion of the record and the surrounding portion of the record and finds that there is record support for this statement, *Dep. of Kimberly Irish* at 96:03-25; therefore, the Court denies the Individual Officers' request to strike. The Individual Officers state that if the statement is not stricken, they admit it. DRPSAMF ¶ 335.

[124] The Individual Officers' attempt to qualify paragraph 336 of the PSAMF is argument outside the scope of the facts asserted in the statement, DRPSAMF ¶ 336, and as in footnote 34, supra, the Court rejects it.

### L.    Policies of the Maine State Police

#### 1.    Policies Related to Contacting Suspects

Depending on circumstances, it may or may not be acceptable to call a suspect on the phone and ask him to come meet with police.[125]  DSMF ¶ 105; PRDSMF ¶ 105. There is no standard of care, MSP policy or protocol, or standard promulgated by the International Associations of Chiefs of Police specifically addressing when a phone call should or should not be used to contact a suspect.[126]  DSMF ¶¶ 106-08; PRDSMF ¶¶ 106-08.  The known violent nature of a suspect and the nature of threats by a suspect against a victim (such as threats to harm her or her children) could be factors in deciding whether to leave a phone call or physically locate a suspect.[127]  PSAMF ¶¶ 311-12; DRPSAMF ¶¶ 311-12.  Conducting a criminal background check on a suspect should be the first thing an officer does because it allows the officer to learn whether the suspect is on probation and it is important to know as much as one can about a suspect.  PSAMF ¶ 332; DRPSAMF ¶ 332.  Allowing Brittany Irish to have worn a wire to meet with Lord would have put her at risk.  DSMF ¶ 111; PRDSMF ¶ 111.

---

[125]    The Plaintiffs' attempt to qualify paragraph 105 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 105; however, the Court alters paragraph 105 of the DSMF to reflect the Plaintiffs' point that if something is acceptable only some of the time, it logically must be unacceptable other times.  *Id.*

[126]    The Plaintiffs' denial of paragraph 106 and attempt to qualify paragraph 108 of the DSMF is argument outside the scope of the facts asserted in the statements, PRDSMF ¶¶ 106, 108, and as in footnote 34, supra, the Court rejects them.

  The Plaintiffs' attempt to qualify paragraph 107 of the DSMF is unsupported by the cited portion of the record, and the Court rejects it as violative of District of Maine Local Rule 56(c).

[127]    The Individual Officers attempt to qualify paragraphs 311 and 312 of the PSAMF by pointing out that the cited portions of the record establish only that these "could" be factors, not that they are factors.  DRPSAMF ¶¶ 311-12.  The Court reviewed the cited portions of the record, agrees with the Individual Officers, and alters paragraphs 311 and 312 of the PSAMF to more accurately reflect the record.

The Maine Criminal Justice Academy (MCJA) trains MSP officers to be reasonable. PSAMF ¶ 294; DRPSAMF ¶ 294. The Plaintiffs' expert witness, D.P. Van Blaricom, testified that the standard of care for the Individual Officers was that "the first priority is the victim's safety and you would do nothing that would put her safety at risk, and contacting the suspect and leaving a phone message is the last thing I would consider doing," "[y]ou'd have to take into account the consideration of the safety of the victim," and "if you're trying to safeguard the victim, you don't tip off the suspect when she's already said he'd threaten her"; he also testified that he does not know of any standard of care specifically addressing when a phone call should be used to contact a suspect as opposed to contacting the suspect in person.[128] PSAMF ¶ 313; DRPSAMF ¶ 313. Detective Fowler testified that safety of the victim is important and should be assured before there is first contact with a suspect. PSAMF ¶ 117; DRPSAMF ¶ 117.

The Director of the MCJA testified that if a victim of a rape fears for her safety or has said that the suspect told her that he will kill her or her children, he was not sure he would tell the suspect right off; rather, he would try to find the suspect and get him to a neutral place because one has to go find a domestic violence suspect. PSAMF ¶¶ 295, 310; DRPSAMF ¶¶ 295, 310. He also testified that at the very minimum, once MSP contacts a suspect, it has an obligation under domestic violence

---

[128] The Individual Officers attempt to qualify paragraph 313 of the PSAMF by making clear that when Van Blaricom was discussing a standard of care, he was not referring specifically to an existing standard of care for when to contact a suspect by phone. DRPSAMF ¶ 313. The Court reviewed the cited portions of the record, agrees with the Individual Officers, and alters paragraph 313 of the PSAMF to more accurately reflect the record.

policies to explain to the victim how to obtain a protection from abuse order.[129] PSAMF ¶ 314; DRPSAMF ¶ 314. Detective Fowler did not attempt to learn whether Brittany Irish had obtained a protection from abuse order against Mr. Lord in the past, though he has obtained this information in prior cases. PSAMF ¶ 321; DRPSAMF ¶ 321.

### 2. Policies on Protecting and Assessing the Credibility of a Purported Domestic Violence Victim

Findings made by the MSP Incident Review team showed the Brittany Irish case was both a rape claim and a domestic violence situation because of such details as Mr. Lord's strangulation of Brittany Irish with a seat belt and because she was an intimate partner of Mr. Lord's, which placed her within the household and family definition of domestic violence assault. PSAMF ¶ 121; DRPSAMF ¶ 121. Detective Perkins defines domestic violence to mean "violence that occurs between intimate partners[ and] household family members," which can include intimate partners or former sexual partners who do not live in the same household. PSAMF ¶ 122; DRPSAMF ¶ 122. A member of MSP leadership, Lieutenant Walter Grzyb, also testified that the barn burning could be considered an act of domestic violence, though he would not classify it that way.[130] PSAMF ¶ 123; DRPSAMF ¶ 123.

---

[129] The Individual Officers request that the Court strike the portion of paragraph 314 of the PSAMF which says that the Individual Officers did not explain to Brittany Irish how to obtain a protection from abuse order as unsupported by the record. DRPSAMF ¶ 314. The Court agrees and strikes this portion of paragraph 314 of the PSAMF but notes that it infers from the DSMF and PSAMF that the Individual Officers did not tell Brittany Irish how to obtain a protection from abuse order, as nothing in the record contradicts this inference.

[130] The Individual Officers attempt to qualify paragraph 123 of the PSAMF, pointing out that while Lieutenant Grzyb did testify that one could argue the barn burning was an act of domestic violence, he would not. DRPSAMF ¶ 123. The Court reviewed the cited portion of the record, agrees

According to Deputy Chief Cote, the MSP's 30(b)(6) designee, MSP officers are "always going to give the victim the benefit of the doubt." PSAMF ¶ 296; DRPSAMF ¶ 296. Detective Perkins testified that he does not remember the MSP domestic violence training which states that the credibility of a witness is never a factor in assessing whether or not a domestic violence event took place; however, when shown a state-mandated sexual assault investigation training presentation from the Maine Coalition Against Sexual Assault, he recalled that he had attended that training. PSAMF ¶¶ 297-98, 320; DRPSAMF ¶¶ 297-98, 320. This training states that "[p]rematurely judging the validity of a report may have detrimental consequences"; additionally, Detective Perkins testified that officers are trained to be careful of their skepticism about what a victim tells them because they may not be able to gather all the information they need.[131] PSAMF, Attach. 9 at 8 (*MCASA Training Program*); *see also* PSAMF ¶¶ 299, 320; DRPSAMF ¶¶ 299, 320. D.P. Van Blaricom testified that he did not know of any MSP or International Association of Chiefs of Police policy specifically addressing the extent to which police officers should provide protection for people.[132] DSMF ¶¶ 109-10; PRDSMF ¶¶ 109-10.

---

with the Individual Officers, and alters paragraph 123 of the PSAMF to more accurately reflect the record.

[131] The Individual Officers attempt to qualify the portion of paragraph 299 of the PSAMF which says that detectives "must not prematurely judge the validity of a rape report," PSAMF ¶ 299, because neither the cited training material nor Detective Perkins said that detectives "must not" do anything. DRPSAMF ¶ 299. The Court reviewed the cited portions of the record, agrees with the Individual Officers, and alters paragraph 299 of the PSAMF to more accurately reflect the record.

[132] Paragraph 109 of the DSMF states that "[t]here is no MSP policy addressing the extent to which police officers should provide protection for people." DSMF ¶ 109. The Plaintiffs attempt to deny this paragraph, pointing out that D.P. Van Blaricom did not testify to this, as asserted by the Individual Officers, but rather said that he did not know of such policies. PRDSMF ¶ 109. The Court reviewed the cited portion of the record, agrees with the Plaintiffs, and alters paragraph 109 of the DSMF to more accurately reflect the record. Paragraph 110 of the DSMF poses the same problem, and the Court alters it as well.

### 3. Maine State Police General Order M-4

M-4 is an MSP general order that is a policy for domestic violence and response to it, including investigations; it is applicable to road troopers, detectives, and all other members of the MSP. PSAMF ¶¶ 113-14; DRPSAMF ¶¶ 113-14. Though compliance with M-4 is not discretionary, members of the major crimes unit at MSP do not really abide by M-4 word for word or allow it to dictate their investigations.[133] PSAMF ¶ 115; DRPSAMF ¶ 115. Detective Fowler received all mandatory training for the M-4 policy and acknowledged that if he is at the scene of a domestic violence incident, then he has to follow the steps in the M-4 protocol and make sure that the victim feels safe; he also will stay with a victim of domestic violence at the scene of an incident if necessary.[134] PSAMF ¶¶ 116, 118-19; DRPSAMF ¶ 116, 118-19. Detective Perkins began receiving MSP training in M-4 in January 2008, and he has received continuing training on it since then; in fact, domestic violence and domestic abuse are predominant subject matters that Detective Perkins has studied as part of his training in the MSP.[135] PSAMF ¶ 316; DRPSAMF ¶ 316. In his report on

---

The Plaintiffs' qualification of paragraph 110 of the DSMF is argument outside the scope of the facts asserted in the statement, PRDSMF ¶ 110, and as in footnote 34, supra, the Court rejects them.

[133] The Individual Officers attempt to qualify paragraph 115 of the PSAMF with additional context related to the way major crimes unit officers apply M-4. DRPSAMF ¶ 115. The Court reviewed the additional context provided by the Individual Officers, which consists of portions of Deputy Chief Cote's deposition in and around the portion cited by the Plaintiffs, and adds context to paragraph 115 of the PSAMF to more accurately reflect the record.

[134] The Individual Officers attempt to qualify paragraph 119 of the PSAMF with the fact that Fowler testified "he will stay with a victim at the scene of the incident if necessary," DRPSAMF ¶ 119 (emphasis omitted), as opposed to the more general statement contained in paragraph 119 of the PSAMF, which says he "knows to stay with a [domestic violence] victim if necessary." PSAMF ¶ 119. The Court reviewed the cited portions of the record, agrees with the Individual Officers, and alters paragraph 119 of the PSAMF to more accurately reflect the record.

[135] The Individual Officers attempt to qualify paragraph 316 of the PSAMF by stating that it is domestic violence and domestic abuse—not M-4 specifically—that have been predominant subject

Brittany Irish's allegations, Detective Perkins noted the reported crime as both a rape and a domestic violence crime. PSAMF ¶ 120; DRPSAMF ¶ 120.

Brittany Irish did exactly what M-4 suggests a domestic violence victim should do by going to stay with family after learning of the fire in Benedicta, though both she and her mother, Kimberly Irish, made requests for protection indicating that they did not feel safe where they were.[136] PSAMF ¶ 322; DRPSAMF ¶ 322. Detective Fowler disagrees with the MSP Incident Review Team, who observed that the fact other resources for offering protection to the Irishes were not examined might be a deficiency. PSAMF ¶ 323; DRPSAMF ¶ 323.

M-4 says that "one of the means to prevent further abuse is by remaining at the scene of a [domestic violence] incident for as long as the officer reasonably believes that there would be an imminent danger to the safety and well-being of any person if the officer" left the scene.[137] *Dep. of Perkins* at 23:18-24. M-4 does not say that the MSP officers must protect domestic violence victims only if the MSP officers are at the actual first scene where the abuse occurred. PSAMF ¶ 329; DRPSAMF ¶ 329. Detectives Perkins and Fowler differ on the definition of "scene" in M-4, which is

---

matters Detective Perkins has studied. DRPSAMF ¶ 316. The Court reviewed the cited portion of the record, agrees with the Individual Officers, and alters paragraph 316 of the PSAMF to more accurately reflect the record.

[136] The Individual Officers request that the Court strike the portion of paragraph 322 of the PSAMF which states that "Irish and her mother were both reporting that they didn't feel safe" at Kimberly Irish's home, PSAMF ¶ 322, as unsupported by the cited portion of the record, as in his testimony, Detective Perkins denied that the Irish family reported not feeling safe. DRPSAMF ¶ 322. The Court reviewed the cited portion of the record and finds that it demonstrates that Brittany and Kimberly Irish made requests for protection which, to a reasonable factfinder, could lead to the inference that they did not feel safe where they were, at least without protection. *Dep. of Perkins* at 66:02-67:13. The Court denies the Individual Officers' request to strike.

[137] Neither party includes this fact in their statements of facts; however, the Court finds that the inclusion of this fact is necessary to provide context to paragraphs 327 through 331 of the PSAMF.

undefined.[138]    PSAMF ¶ 327; DRPSAMF ¶ 327.   While Detective Fowler uses a commonsense definition of "scene," Detective Perkins views a domestic violence scene as more dynamic and believes it can move from one place to another or that there can be more than one scene, should incidents occur in more than one place.  PSAMF ¶¶ 327-28, 330; DRPSAMF ¶ 327-28, 330.   Deputy Chief Cote, the MSP's 30(b)(6) designee, testified that Brittany Irish alleged she was kidnapped and raped multiple times in a series of separate incidents and in several locations on July 14 and 15; that Brittany Irish reported these incidents to BPD on July 15; that BPD referred the allegations to MSP on July 15 because of jurisdictional issues; and that the MSP began investigating Brittany Irish's allegations that same day.   PSAMF ¶ 331; DRPSAMF ¶ 331.

Despite Detective Perkins' testimony that M-4 and a related statute use the words "shall," which Detective Perkins understands to mean "mandatory," and "immediately," which Detective Perkins interprets as meaning "without delay," he challenged the applicability of M-4 to Brittany Irish.  PSAMF ¶ 124; DRPSAMF ¶ 124.   Detective Perkins further testified that in his application of M-4, he "stay[s] with [victims] as long as it's reasonably practical to conduct [his] investigation, as it serves the purpose of furthering [his] criminal investigation.  But yes, [he] could stay with that person for a period of time."[139]  PSAMF ¶ 125; DRPSAMF ¶ 125.  Detective

---

[138]     The Individual Officers attempt to qualify paragraph 327 of the PSAMF by asserting that there is no record support for the Plaintiffs' claim that Perkins and Fowler interpret the word "scene" "subjectively."  DRPSAMF ¶ 327.  The Court reviewed the cited portion of the record, agrees with the Individual Officers, and alters paragraph 327 of the PSAMF to more accurately reflect the record.

[139]     The Individual Officers attempt to qualify paragraph 125 of the PSAMF insofar as it asserts that Detective Perkins is testifying as to his interpretation of M-4.  DRPSAMF ¶ 125.  The Court reviewed the cited portion of the record and rejects the Individual Officers' qualification.  It seems

Perkins believes that protecting the safety of a victim is important, but only situationally so. PSAMF ¶ 126; DRPSAMF ¶ 126. Detective Perkins wrote to the MSP Incident Review Team, through an email sent to Sergeant Crane, that he and Detective Fowler had worked eighteen-hour days on July 15 and twenty-one-hour days on July 16 and then asked "to what end is an officer(s) beholden to Subsection E, paragraph 2" of M-4, which states that an officer shall stay with a victim in order to protect them. PSAMF ¶ 127; DRPSAMF ¶ 127.

Lieutenant Grzyb testified that the MSP Incident Review Team was comprised of four individuals: an MSP Lieutenant, an MSP sergeant, a local police chief, and a civilian stakeholder, and that in its recommendations, it noted possible deficiencies by the Individual Officers in the application of M-4. PSAMF ¶ 133; DRPSAMF ¶ 133. One of the possible deficiencies noted was the requirement that if an officer had reason to believe that a family or household member has been or is being abused, the officer shall immediately use all reasonable means to prevent further abuse and assist the victim.[140] PSAMF ¶ 134; DRPSAMF ¶ 134. The Incident Review Team recommended that MSP personnel in the major crimes unit should receive training to emphasize this requirement of M-4 so that it is considered in the strategy of investigating crimes and wanted to ensure that the unit got a refresher on M-4 as

---

clear that Detective Perkins is testifying to the manner in which he applies M-4 in his career. *Dep. of Perkins* at 28:06-16. "Interpretation" is defined as "the act or the result of interpreting," *Interpretation*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003), and "interpret" is defined as "to explain or tell the meaning of." *Interpret*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). The manner in which an officer applies a particular policy is necessarily an interpretation of that policy.

[140] The Individual Officers attempt to qualify paragraph 134 of the PSAMF insofar as it does not make clear that the Incident Review Team identified this as a possible deficiency rather than a definite one. DRPSAMF ¶ 134. The Court reviewed the cited portion of the record, agrees with the Individual Officers, and alters paragraph 134 of the PSAMF to more accurately reflect the record.

applied to situations that involved both gross sexual assault and domestic violence. PSAMF ¶¶ 135-36; DRPSAMF ¶¶ 135-36.

In the view of D.P. Van Blaricom, the Individual Officers violated M-4 because they did not take reasonable means to protect the victim, Brittany Irish, as required by the policy.[141]  PSAMF ¶ 128; DRPSAMF ¶ 128.  Mr. Van Blaricom also expressed the views that the Individual Officers (1) did not exercise a reasonable standard of care in investigating Brittany Irish's allegations and (2) assumed a special duty of protection to her (which they did not fulfill) because they had reason to believe Lord had burned the Irish barn and was still in the area, but they left her unprotected despite promises to the contrary.[142]  PSAMF ¶ 324; DRPSAMF ¶ 324.

### 4.  The Ontario Domestic Assault Risk Assessment

The MSP trains its officers that ODARA risk assessments are to be used only after an arrest has been made and that the purpose of the assessment is to assist bail commissioners and other officials with bail determinations by providing an assessment of the risk that the person will reoffend if released; however, nothing in the ODARA tool explicitly requires that it be used only after an arrest.[143]  DSMF

---

[141]    The Individual Officers request that the Court strike paragraph 128 of the PSAMF because they view as contradictory D.P. Van Blaricom's testimony on whether the Individual Officers violated M-4.  DRPSAMF ¶ 128.  The Court reviewed the cited portions of the record and rejects the Individual Officers' request.  The Individual Officers' request to strike is predicated on objections to Mr. Van Blaricom's credibility and reliability very similar to objections the Court previously rejected.  As the Court stated in its March 13, 2019, order on the Individual Officers' Motion to Exclude D.P. Van Blaricom, "the Court sees [the Individual Officers'] objection[] to Mr. Van Blaricom's selective use of facts . . . [as a] matter[] for cross-examination, not for wholesale exclusion."  *Order on Mot. to Exclude D.P. Van Blaricom* at 17 (ECF No. 68).  The Court includes the Plaintiffs' paragraph 128 because it is required to view disputed facts in the light most favorable to the non-movants.

[142]    The Individual Officers' attempt to qualify paragraph 324 of the PSAMF is argument outside the scope of the facts asserted in the statement, DRPSAMF ¶ 324, and as in footnote 34, supra, the Court rejects it.

[143]    Plaintiffs deny paragraph 112 of the DSMF:

¶ 112; PRDSMF ¶ 112. Detective Fowler believes the purpose of the ODARA risk assessment is for post-arrest uses such as bail and should preferably be completed at the scene of an incident and early in an investigation.[144] PSAMF ¶ 315; DRPSAMF ¶ 315. Detective Perkins received training in ODARA on December 1, 2014, about nine months before Brittany Irish's allegations against Mr. Lord. *Dep. of Perkins* at 36:18-21; PSAMF ¶ 318; DRPSAMF ¶ 318.

Separate from ODARA, in a pre-arrest domestic violence situation, MSP officers are trained to do the following: (1) obtain a prior history to see whether or not there may have been any prior incidents; (2) assess the scene; and (3) simultaneously conduct the development stage of probable cause to see whether or not there is enough

---

The purpose of risk assessment exists independent of [ODARA] and MSP officers are trained to assess propensity for recidivism and future harm of a victim using four factors. There is nothing in ODARA that says it cannot be used to assess how much victim protection may be needed in order to comply with M-4. Finally, ODARA is designed to be used "at the scene" to convey the "first-hand information and impressions" of the responding officer and to "enhance[] victim safety." Responding officers were required to make a good faith effort to use ODARA as of January 1, 2015 and had the "additional [Law Enforcement Officer] duty" to report the results to bail commissioners and the District Attorney.

PRDSMF ¶ 112 (some alterations in original) (emphasis omitted) (citations omitted). The Court notes first that the Plaintiffs do not deny that MSP teaches its troopers that ODARA may only be used after an arrest, as the Individual Officers state; in fact, the portion of the deposition of John B. Rogers, the 30(b)(6) designee for the MCJA, cited by the Plaintiffs in their denial states, in response to the question "what are students at the [MCJA] taught about contact with high-risk ODARA individuals following up on a sexual assault," that ODARA "is designed to come up with information to give to a bail commissioner . . . . after the arrest is made . . .." PRDSMF, Attach. 17 at 14:11-24 (*Dep. of Rogers*). The Court therefore rejects the Plaintiffs' denial insofar as they are denying what MSP teaches its troopers about ODARA. The Court also reviewed the other portions of the record cited by the Plaintiffs and agrees that "[t]here is nothing in ODARA that says it cannot be used to assess how much victim protection may be needed in order to comply with M-4," PRDSMF ¶ 112, and alters paragraph 112 of the DSMF to reflect that nothing in ODARA requires that it only be used post-arrest.

[144]   The Individual Officers' qualification of paragraph 315 of the PSAMF is argument outside the scope of the facts asserted in the statement, DRPSAMF ¶ 315, and as in footnote 34, supra, the Court rejects it; however, in reviewing the portions of the record cited by the Plaintiffs and the Individual Officers, the Court determines that a qualification was appropriate to make clear that Detective Fowler did not testify that ODARA should always be performed at the scene and early in an investigation, but rather that that was preferable. The Court alters paragraph 315 of the PSAMF to more accurately reflect the record.

evidence to arrest or charge someone with a particular crime.[145]  PSAMF ¶ 319; DRPSAMF ¶ 319.

### 5.    The Reasonableness Standard

In addition to M-4, the MCJA trains officers that all decisions and actions are governed by reasonableness, and that when there is no specific MSP protocol, that is the standard they are to apply.  PSAMF ¶¶ 272-73; DRPSAMF ¶¶ 272-73.  John B. Rogers, the MCJA's 30(b)(6) designee and Director of the MCJA, testified that the following conditions are factors in assessing the reasonableness of an officer's actions when a victim of domestic violence has alleged that she has been threatened with violence if she told the police about her abuse:  (1) the severity of the underlying rape; (2) whether the suspect had made threats against the life of the victim, her children, or both; and (3) whether the suspect had a prior criminal or violent history.[146] PSAMF ¶ 274; DRPSAMF ¶ 274.  Detective Perkins receives training in legal updates from the First Circuit Court of Appeals.  PSAMF ¶ 317; DRPSAMF ¶ 317.

---

[145]    The Individual Officers' attempt to qualify the portion of paragraph 319 of the PSAMF which states that officers are trained to take certain steps to "assess a suspect's propensity for harming a victim," PSAMF ¶ 319, as lacking in record support.  DRPSAMF ¶ 319.  The Court reviewed the cited portions of the record, agrees with the Individual Officers, and alters paragraph 319 of the PSAMF to more accurately reflect the record.

[146]    The Individual Officers attempt to qualify paragraph 274 of the PSAMF insofar as it says that the listed factors are "MSP training factors," PSAMF ¶ 274, as Director Rogers did not testify that MSP trains officers to consider these factors.  DRPSAMF ¶ 274.  The Court reviewed the cited portion of the record, agrees with the Individual Officers, and alters paragraph 274 of the PSAMF to more accurately reflect the record.

## III.    THE PARTIES' POSITIONS

### A.    The Individual Officers' Motion for Summary Judgment

The Individual Officers frame the Plaintiffs' Complaint as an allegation that "under principles of substantive due process, three members of the Maine State Police are responsible for the harm caused by Lord and are liable pursuant to 42 U.S.C. § 1983" because "they allegedly promised to protect the plaintiffs from Lord and because they provoked Lord by supposedly leaving him a voice mail message advising him that B[rittany] Irish was accusing him of kidnapping and sexual[] assault." *Defs.' Mot.* at 1.    The Individual Officers argue that with discovery complete, "the undisputed facts demonstrate that defendants are entitled to summary judgment" because "[d]iscovery has revealed that many of [the Plaintiffs'] allegations are demonstrably false." *Id.* at 2.    Before moving to their arguments, the Individual Officers next state their view of what they term the "[u]ndisputed [f]acts." *Id.* at 3-13 (emphasis omitted).    The Individual Officers then address each of the Plaintiffs' two arguments for liability—that the Individual Officers owed a special duty because they promised to protect the Plaintiffs and that the Individual Officers created the harm posed by Mr. Lord—as well as their views that the Individual Officers' activity did not rise to the level of conscience-shocking behavior and that the Individual Officers are entitled to qualified immunity on the Plaintiffs' claims. *Id.* at 13-25.

### 1.    The Individual Officers Did Not Owe the Plaintiffs a Special Duty

The Individual Officers assert that "[i]t is undisputed that no defendant ever made a promise to protect the [P]laintiffs." *Id.* at 14.    Even if an unidentified MSP

trooper told Kimberly Irish that MSP would take care of any trouble in the area, "it is impossible to see how such a vague statement constitutes a promise" in light of the Individual Officers' express statements that they could not provide overnight security to the Irishes. *Id.* at 14-15. Additionally, the Individual Officers point out that whoever made this statement, he or she is not one of the defendants in this case, and there is no evidence in the record that any of the Individual Officers knew this statement had been made. *Id.* at 15.

"More fundamentally," in the Individual Officers' opinion, "promises to protect do not give rise to a constitutional duty to protect." *Id.* The Individual Officers cite *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 197-201 (1989), for the proposition that the Supreme Court has rejected the argument that "a 'special relationship' is created when the State is aware that a person is in danger and proclaims its intent to protect the person." *Defs.' Mot.* at 15. Additionally, the Individual Officers cite *Rivera v. Rhode Island*, 402 F.3d 27, 37-38 (1st Cir. 2005), as foreclosing liability in the First Circuit "when state actors are aware of a private danger to a person, promise to protect the person, the person relies on the promise, and the state actors fail to keep the promise, resulting in the person's death." *Defs.' Mot.* at 15.

### 2. The Individual Officers Are Not Liable Under a State-Created Danger Theory

The Individual Officers begin by noting that the First Circuit has discussed the possible existence of the state-created danger theory, though it has never found it applicable to a particular set of facts. *Id.* at 16 (citing *Irish*, 849 F.3d at 526). While

assuming that "the First Circuit is prepared to recognize the state-created danger theory," the Individual Officers assert that "it applies only if, among other things, state actors have taken _affirmative_ acts to create or exacerbate the danger posed by third parties." *Id.* (citing *Ramos-Piñero v. Puerto Rico*, 453 F.3d 48, 55 n.9 (1st Cir. 2006) and *Rivera*, 402 F.3d at 35). Here, "the only possible affirmative act is the voice mail message Perkins left for Lord on July 16, 2015 . . .." *Id.*

In the Individual Officers' view, there "is no evidence in the record upon which a trier of fact could reasonably conclude that the message [from Perkins] was the trigger" for Lord's violent acts, *id.*; however, even if this were not the case, the message is "not the kind of affirmative action that can form the basis of a state-created danger claim" because "police do not violate principles of substantive due process when they . . . proceed with their investigations" despite the fact that a victim or witness might face some risk, and leaving the voicemail message was merely a step in Perkins' and Fowler's investigation. *Id.* at 17-18. In light of this, the Individual Officers state that "[t]he basis for the First Circuit's conclusion [in *Irish v. Maine*] that further facts [were] needed to determine [whether the state-created danger theory applies] is not clear," though it may be that the First Circuit "determined that whether a law enforcement tool can form the basis for a state-created danger claim depends to some extent on whether the tool was reasonably used." *Id.* at 18. The Individual Officers state that they "do not agree with that proposition, [but] the undisputed facts demonstrate that it was entirely reasonable for the [D]efendants to leave a message for Lord," *id.*, and then go through the ways in which the discovery

process has shown that the Individual Officers acted reasonably and that various of the First Circuit's questions in *Irish* have been answered. *Id.* at 18-21.

### 3. The Individual Officers Did Not Engage in Conscience-Shocking Behavior

The Individual Officers state that "[a]ssuming for the sake of argument that the voice mail message could form the basis for a substantive due process claim, plaintiffs still must show that the defendants' conduct was 'so egregious as to shock the conscience.'" *Id.* at 22 (quoting *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006)). In the Individual Officers' view, "[t]here is no evidence in the record from which a factfinder could reasonably find that defendants' conduct shocks the conscience," as "[t]he burden to show state conduct that 'shocks the conscience' is extremely high . . .." *Id.* (quoting *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010)).

According to the Individual Officers, while "it might shock the conscience if a police officer contacted a suspect and advised him that a specific person had made criminal allegations against him after the accuser had told the officer to not contact the suspect because it might result in harm to the accuser or her children. . . . those are not the facts here." *Id.* at 22-23. Additionally, the Individual Officers argue they had no duty to provide protection to Brittany Irish, so their declination of her request for protection cannot be conscience-shocking. *Id.* at 23.

### 4. The Individual Officers Are Entitled to Qualified Immunity

Lastly, the Individual Officers argue that "[e]ven if [the P]laintiffs could establish a substantive due process claim, the defendants would be entitled to

qualified immunity." *Id.* They say that "if there was a violation [of the Plaintiffs' substantive due process rights], the law was not clearly established, and the defendants are thus entitled to qualified immunity" because "neither the Supreme Court nor the First Circuit has ever applied the state-created danger theory or held that promises of protection give rise to a constitutional duty." *Id.* at 24-25.

## B. The Plaintiffs' Opposition

The Plaintiffs assert that the Individual Officers have not met their burden on a summary judgment motion, as the Plaintiffs "submit admissible evidence of disputed material facts concerning promises, false statements, and knowing violations of [MSP] policy and training" by the Individual Officers. *Pls.' Opp'n* at 1. The Plaintiffs allege that the Individual Officers "created and exacerbated the danger" posed by Mr. Lord "under a state-created danger theory" and point out that the Plaintiffs "deny twenty-two of [the statements in the DSMF]; qualify another fifty-two, and submit evidence creating genuine disputes as to twenty-two of the points of interest raised by the First Circuit . . .." *Id.* The Plaintiffs state that the Individual Officers "made both significant material omissions and admissions" and "incorporated rank hearsay" in the DSMF. *Id.* at 2. The remainder of the Plaintiffs' brief is split into a "Fact Argument" section and a "Legal Argument" section.

### 1. Fact Argument

#### a. New Developments

The Plaintiffs draw the Court's attention to *State v. Lord*, 2019 ME 82, 208 A.3d 781, an opinion in which the Law Court "re-states the facts to which [Lord]

agreed when he plead[ed] guilty to 'two murders and a dozen other crimes.'" *Pls.'*
*Opp'n* at 3 (quoting *Lord*, 2019 ME 89 ¶ 1). The Plaintiffs quote the Law Court's
statement that "prior to the events in issue, Lord's former girlfriend had reported
criminal conduct by Lord toward her." *Id.* (emphasis omitted) (quoting *Lord*, 2019
ME 89 ¶ 4). Therefore, the Plaintiffs view the question of whether Mr. Lord knew of
Brittany Irish's report prior to committing his various crimes on the evening of July
16 and morning of July 17 as a genuine issue of material fact. *Id.* at 3-4.

> **b.     The Individual Officers Created or Exacerbated the
> Danger Posed by Anthony Lord in Two Independent
> Ways**

The Plaintiffs make two arguments that the Individual Officers created or
exacerbated the danger posed by Mr. Lord: first, through the voicemail Detective
Perkins left for Mr. Lord, and second, through violations of MSP policy, standards,
and training. *Id.* at 4.

> **i.     Anthony Lord Knew Micah Perkins' Voicemail
> Related to Brittany Irish, and That Voicemail
> Caused His Violence**

The Plaintiffs assert that at least four facts "show that Lord knew [Perkins']
voicemail was about [Brittany] Irish; that [the Individual Officers] could foresee this;
that, as soon as Lord received [Perkins'] voicemail, he made a threat that someone
was going to die;" and that Brittany Irish's request for protection was proven to be
logical by Mr. Lord's subsequent violent actions. *Id.* at 4-5. According to the
Plaintiffs, these facts create genuine disputes over issues of material fact. *Id.* at 4.

### ii. The Individual Officers Violated Maine State Police Policy, Training, and Standards

The Plaintiffs argue that even if the Individual Officers "could establish that Lord thought [Perkins'] voicemail was not about [Brittany] Irish," the Individual Officers still "independently caused or exacerbated the danger that Lord posed . . . through [their] violations of MSP policy, MSP training, and MSP standards." *Id.* at 5. The Plaintiffs then outline the various ways in which they believe the Individual Officers violated policy, training, and standards of the MSP.

### I. Violations of M-4 and the Related Statute

The Plaintiffs quote section 4012(6) of Title 19-A of the Maine Revised Statutes, which requires that "a law enforcement officer [who] has reason to believe that a family or household member has been abused . . . shall immediately use all reasonable means to prevent further abuse" through various methods, a non-exclusive list of which follows in subsections. *Id.* at 5-6 (emphasis omitted) (quoting 19-A M.R.S. § 4012(6)). The Plaintiffs then assert that the MSP created M-4 in response to this statute and they outline the policy. *Id.* at 6. The Plaintiffs say that the evidence establishes that the Individual Officers knew of section 4012(6), M-4, and the overarching rule of reasonableness that applies to officers' actions and acted to disregard them. *Id.* at 7-8.

### II. Manner of Contacting Anthony Lord

The Plaintiffs make three separate but related arguments about the voicemail Detective Perkins left for Mr. Lord. The first is that the voicemail was a premature step in the investigation, as the Individual Officers knew that "the best time to

69

contact a suspect is when the investigation is at its end, with all facts in order," yet "multiple investigative facts were not in order" at the time Detective Perkins left a voicemail for Mr. Lord. *Id.* at 8. The Plaintiffs argue that this step constituted a violation by the Individual Officers of their training and the MSP's rule of reasonableness. *Id.*

The second argument is that MSP trains its officers that four options for contacting suspects exist and that the proper option is based on an evaluation of several factors, and yet the Individual Officers did not conduct this analysis but rather chose to call Mr. Lord for reasons of "efficiency." *Id.* at 10. In the Plaintiffs' view, this was a violation of MSP training and the rule of reasonableness and created "an independent path to state-created danger, separate from the path created by the totality of the other dozens of violations [the Individual Officers] ma[de] with deliberate indifference." *Id.* at 10-11.

The third argument the Plaintiffs make related to the voicemail is that the Individual Officers, "by training and [the rule of reasonableness], knew they had to go find Lord, but [they] repeatedly decided not to do this required act." *Id.* at 11. The Plaintiffs argue that these decisions were a violation of MSP training and the rule of reasonableness because "[e]ventually an officer may reach out by phone, but only if the phone is an officer's only avenue." *Id.*

### III. Promises and Related False Statements

The Plaintiffs contend that the Individual Officers "by law, training, and [the rule of reasonableness], knew not to make promises or false statements to Brittany

Irish or Kimberly Irish," and yet made statements and took actions that both implicitly and explicitly led the Irishes to the false impression that they had been promised protection. *Id.* at 9-10. Additionally, the Plaintiffs assert that the Individual Officers' statement to Brittany Irish that "there was no manpower available" was false. *Id.* at 9.

## IV. Failure to Ascertain Suspect Risk and Propensity for Recidivism

The Plaintiffs assert that, whether or not required to use the ODARA tool, the Individual Officers knew, based on MSP policy and training, that "they had to determine Lord's danger to [Brittany] Irish and others . . . but they repeatedly decided not to do this required act." *Id.* at 11. Even assuming ODARA was not the proper tool, the Individual Officers "knew how to assess risk and recidivism from other MSP training, and [they] knew that they still had to do it." *Id.* at 12. The Plaintiffs argue that the Individual Officers' failure to conduct such an assessment constituted a violation of MSP training and policy. *Id.*

## V. Failure to Believe Brittany Irish

The Plaintiffs represent that, based on MSP training and policy, the Individual Officers "knew they were required to believe [Brittany] Irish, as a rape and domestic violence . . . victim for investigative purposes, but . . . repeatedly decided to violate this requirement." *Id.* The Individual Officers "quickly and subjectively judged [Brittany] Irish as not credible" despite the fact that "[Brittany] Irish was providing [them] with objectively credible and corroborated facts . . .." *Id.* The Plaintiffs argue "[i]t is a reasonable inference from the above facts that [the Individual Officers]

decided, early on, to focus on proving that [Brittany] Irish was not credible, rather than investigating Lord, or his danger potential, or dedicating resources to finding him," and this was a violation of MSP policy and training. *Id.* at 12-13.

## VI. Failure to Help Brittany Irish Obtain Protection from Abuse Order

The Plaintiffs state that "at the very minimum," according to Director Rogers, the MCJA's 30(b)(6) designee, an MSP officer who contacts a suspect then has an obligation under domestic violence policies to explain to the victim how to obtain a protection from abuse order. *Id.* at 13. The Plaintiffs assert that the Individual Officers "ignored this requirement . . .." *Id.*

## VII. Failure to Respond Reasonably to Investigation Information

The Plaintiffs argue that the Individual Officers knew, due to MSP training and policy, that "they had to respond reasonably as the forty-one hour investigation developed" but "repeatedly decided to ignore this basic MSP requirement." *Id.* These failures to respond reasonably, in the Plaintiffs' view, include the Individual Officers' repeated decisions not to run a criminal background check or look into Mr. Lord's probation status, *id.* at 13-14, their repeated decisions to ignore evidence of serious threats by Mr. Lord, *id.* at 14-15, and their decision to interview non-eyewitnesses to focus their investigation on Brittany Irish rather than Mr. Lord. *Id.* at 15-16.

## VIII. Decisions Not to Actively Develop Probable Cause

The Plaintiffs contend that the Individual Officers are "required [by MSP policy and training] to actively develop probable cause in domestic violence scenes

and investigations; yet, they did not do this for several crimes relating to Lord . . .."
*Id.* at 16. According to the Plaintiffs, the Individual Officers "did not relay the confirmed evidence of breaking and entering at the first camp [in Benedicta] . . . up the MSP chain of command, causing that arrest opportunity to be squandered" and "did not develop probable cause as to the 'plethora' of [domestic violence] crimes" that can be charged in domestic violence cases. *Id.* "Separately . . ., when [the Individual Officers] left the voicemail for Lord, [they] still had not devoted investigative efforts to developing probable cause as to [Brittany] Irish's allegations of kidnapping, strangulation, and gross sexual assault, because Defendants had not yet tried to develop multiple facts, leads, and crime scenes." *Id.*

### 2. Legal Argument

The Plaintiffs organize their legal argument into three subparts: (1) that the elements for a state-created danger are met; (2) that the Individual Officers' actions shocked the conscience; and (3) that the Individual Officers are not entitled to qualified immunity.

### a. The Elements of a State-Created Danger Theory Are Met

The Plaintiffs analyze four elements of a state-created danger theory which they suggest should guide the Court's analysis, noting that "[w]hile it is an open question in this Circuit, other circuits have used four elements, some with multiple prongs, to analyze state-created danger." *Id.* at 16-17. The Plaintiffs state that they conduct their analysis "in light of both (1) [the Individual Officers'] voicemail to Lord, and (2) the totality of [the Individual Officers'] other multiple violations of the

73

[domestic violence] protection statute and M-4[,] many of them knowingly and repeatedly made." *Id.* at 17.

The first factor is that the "harm ultimately caused was foreseeable and fairly direct." *Id.* The Plaintiffs suggest that this prong has been met because "[Brittany] Irish had communicated to [the Individual Officers] in writing and orally, at least four times prior to and immediately after" the voicemail message to Mr. Lord, "that Lord had made nine threats," including multiple death, torture, and abduction threats against Brittany Irish, her children, and Hewitt, as well as a retaliation threat. *Id.* Within hours of receiving Detective Perkins' voicemail, Mr. Lord followed through on these threats. *Id.* Therefore, the Plaintiffs believe that Mr. Lord's violent acts were fairly directly precipitated by the voicemail and also a foreseeable result. *Id.*

The second factor the Plaintiffs identify is that a state actor acted with a degree of culpability that shocks the conscience. *Id.* at 18. The Plaintiffs argue that "the sheer volume and repetition of the violations, combined with . . . the uniformly deliberately indifferent manner in which Defendants made them (slowly, purposefully, knowingly, and in collaboration with each other, over forty-one hours) constitutes more than just culpability; it does shock the conscience." *Id.* The Plaintiffs further assert that it is shocking to the conscience that "instead of investigating Lord, and ascertaining and containing his danger, and instead of protecting [Brittany] Irish as required by the mandatory M-4 policy, Defendants were trying to delay action on Lord in order to build a 'false report' case against [Brittany]

Irish . . .." *Id.* (emphasis omitted). Additionally, the Plaintiffs argue it shocks the conscience that "the indifference shown by [the Individual Officers] . . . continued even as the evidence of danger to [Brittany] Irish became more obvious," and that the Individual Officers made "false statements about manpower" "and misle[d] the Irishes." *Id.*

The third factor raised by the Plaintiffs is "[a] relationship between the state and plaintiff, so plaintiff was a foreseeable victim of the defendant[s'] acts, not a member of the public in general." *Id.* at 19. The Plaintiffs argue this relationship exists here because the Individual Officers "had an ongoing mandatory duty under the MSP M-4 policy, to protect [Brittany] Irish." *Id.* "In addition to violating their legal requirement to [Brittany] Irish . . ., [the Individual Officers] affirmatively put [Brittany] Irish in a far worse place" through the voicemail message to Lord. *Id.*

The fourth and final factor suggested by the Plaintiffs is that "[a] state actor affirmatively used authority in a way that created a danger to the citizen or that rendered the citizen more in danger than had the state not acted." *Id.* The Plaintiffs assert that this prong is met because the Individual Officers "favor[ed] Lord and disfavor[ed Brittany] Irish through their dozens of investigative violations," provoked him by leaving the voicemail message, "enabl[ed] him" by not using law enforcement tools against Lord for forty-one hours, and then "abandoned the Irishes" because of a false claim that the MSP had no manpower to provide security. *Id.* at 19-20. The Plaintiffs assert that the Individual Officers acknowledged that their investigation led to the events that culminated in Lord's violent acts. *Id.* at 20.

The Plaintiffs also engage in an alternative analysis of this fourth factor "focused more heavily on the cumulative totality of [the Individual Officers'] violations, rather than just [the Individual Officers'] voicemail," arguing that by failing to act on probable cause that the Individual Officers were aware of or learn about Lord's criminal history or probation status, and instead "affirmatively" delaying the investigation and making promises to the Irishes which kept them in the "danger zone," the Individual Officers "committed multiple violations of law, policy and training, many of them knowingly and flagrantly, establishing culpability and shocking the conscience." *Id.* at 21-22. The Plaintiffs contend that the Individual Officers "misapprehend *Rivera*," by "claiming, in their brief, that necessary law enforcement tools cannot impose constitutional liability on the state." *Id.* at 22. In the Plaintiffs' view, this is incorrect, and the manner and timing of these tools' deployment can create liability. *Id.*

## b.     Shocking the Conscience/Deliberate Indifference

The Plaintiffs note that deliberately indifferent behavior may satisfy the "shock the conscience" standard. *Id.* at 22-23. They next assert that, having offered "over fifty violations of law, policy, training, and the reasonableness default rule of the MSP," it is clear from the "sheer volume and repetition of violations that occurred, and [the Individual Officers'] manifest unwillingness to revisit or mitigate any of them, and the number of hours that [they] had available to them, but misused," the Plaintiffs have satisfied the deliberate indifference standard. *Id.* at 23. The Plaintiffs argue that "the law of the First Circuit and the roadmap provided by that Court in

*Irish v. State* clearly disfavors summary judgment given the multiple issues of material fact that have been exposed in this response," and that "[a] jury should be allowed to evaluate the Defendants' conduct . . . ." *Id.* at 24.

### c.    Qualified Immunity

The Plaintiffs emphasize their allegation that the Individual Officers "violated their Fourteenth Amendment right to substantive due process by placing them in a known danger with deliberate indifference to their personal physical safety," arguing that the state-created danger theory falls within the "well established" idea that "the Constitution protects a citizen's liberty interest in his/her own bodily security." *Id.* at 24. The Plaintiffs point out that M-4 has "existed since November 2003 and its most recent iteration was adopted January 6, 2014, i.e., eighteen months before the Lord rampage." *Id.* at 25. "Likewise, the latest version of 19-A M.R.S.A. sec. 4012 was adopted in 2011." *Id.* The Plaintiffs represent that "officer decisions and acts that violate protocol and/or training may be sufficient to deny qualified immunity to officers." *Id.* (citing *Irish*, 849 F.3d at 527). The Plaintiffs state that "[n]o reasonable officer in the position of Defendants, knowing what they knew and what they must be charged with knowing, would have placed [Brittany] Irish in such obvious danger." *Pls.' Opp'n* at 25-26.

### C.    The Individual Officers' Reply

The Individual Officers argue that many of the denials and qualifications made by the Plaintiffs are improper, and that "the material facts about which there is no legitimate dispute demonstrate that [the Individual Officers] are entitled to summary

judgment." *Defs.' Reply* at 1 (emphasis omitted). The Individual Officers list and explain many of what they term the "unnecessary complications caused by plaintiffs' improper denials and qualifications of the defendants' facts," asserting that "the Court should deem admitted all of [the Individual Officers'] statements that [the P]laintiffs have improperly denied or qualified." *Id.* at 3-14.

The remainder of the Individual Officers' reply lays out the ways in which, "while there are some disputed facts, none of them is material and [the Individual Officers] are entitled to summary judgment." *Id.* at 14. With respect to when Brittany Irish reported Mr. Lord's retaliation threat to Detectives Perkins and Fowler, the Individual Officers argue that she is attempting to "muddy the waters" through (1) mischaracterizations of her deposition testimony and (2) a later-submitted affidavit that contradicts her deposition testimony. *Id.* at 14-15. However, in the Individual Officers' view, "[e]ven if [her] statements were considered, it would not matter" because Brittany Irish "did not ask Perkins and Fowler to refrain from contacting Lord until after Perkins left a voicemail message for Lord." *Id.* at 16. The Individual Officers also argue that leaving a voicemail message did not violate training, standards, or policies of the MSP. *Id.* at 17. They state that even if the best time to contact a suspect is at the end of an investigation, this is not a requirement, and the Plaintiffs are "blatantly misrepresenting the record" when they assert that contacting a suspect before the end of an investigation is a policy or training violation. *Id.*

The Individual Officers then contend that the Plaintiffs are incorrect that M-4 and section 4012 give rise to a constitutional duty to protect, arguing that "not even plaintiffs' expert appears to believe that the M-4 policy required defendants to provide protection at the Irish house," and that even if the Individual Officers did violate M-4 or section 4012, "[s]ection 1983 applies only to violations of rights secured by federal law." *Id.* at 18-19. According to the Individual Officers, "[i]n the absence of a violation of federal law, plaintiffs cannot premise their Section 1983 claim on the theory that defendants violated state law or policy." *Id.* at 19. Furthermore, the Individual Officers suggest that "the violation of state law or policy" would not "deprive the [Individual Officers] of qualified immunity or form the basis for a state-created danger claim," discussing the First Circuit's decision in *Soto v. Flores*, 103 F.3d 1056 (1st Cir. 1997). *Defs.' Reply* at 19-21. *Soto* is relevant, in the Individual Officers' view, because "it confirms that whether defendants violated the M-4 policy or state law is not relevant to the qualified immunity analysis" and "it supports application of qualified immunity to state-created danger cases in this circuit." *Id.* at 22. The Individual Officers reiterate that the First Circuit has never found the state-created danger theory applicable to "any specific set of facts." *Id.* (quoting *Irish*, 849 F.3d at 526).

The Individual Officers refute the Plaintiffs' claim that they "were required by policy and training to conduct an ODARA assessment of Lord" by stating that "[t]he uncontroverted evidence in the record is that an ODARA assessment is conducted only after an arrest decision is made." *Id.* The Individual Officers state that the

Plaintiffs are wrong to allege that the Individual Officers were required to believe Brittany Irish, arguing that the record "supports only the proposition that officers are trained to be 'careful' of being skeptical of what a victim says . . .." *Id.* at 23. Even if this were not the case, according to the Individual Officers, "a negligent investigation does not give rise to a substantive due process claim." *Id.* The Individual Officers also believe that there is no record support for the Plaintiffs' claim that training or policy suggests the Individual Officers should have run a criminal background check or discovered Mr. Lord's probation status earlier, and they make the same objection to the Plaintiffs' claim that the Individual Officers should not have taken so many steps to investigate Brittany Irish's credibility. *Id.* Moreover, in the Individual Officers' view, they "conducted the investigation under the assumption that what B[rittany] Irish said was true." *Id.*

The Individual Officers conclude by stating that "[i]n vacating dismissal of this case, the First Circuit's primary concern was apparently about the extent to which defendants violated 'established police protocol or training' when they decided to contact Lord by telephone." *Id.* at 24. This concern, the Individual Officers believe, has been addressed through discovery, which has shown that "leaving a voicemail message for Lord did not violate any established police protocol or training," and "in any event, the undisputed facts demonstrate that it was not unreasonable for defendants to contact Lord by phone." *Id.* Additionally, while "[n]either policy nor law required defendants to post a guard at the Irish's house," it would not matter even if this were not the case because "[t]here is no constitutional duty to protect a

person from private harm, and such a duty cannot be created by a state law or policy," "[n]or do promises of protection create a duty, and, in any event, no defendant ever made such a promise." *Id.* at 25.

## IV. LEGAL STANDARD

A grant of summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

Once the moving party "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 Fed. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must show "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632

F.3d 31, 35 (1st Cir. 2011), while disregarding "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini*, 909 F.3d at 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).

## V.    DISCUSSION

The Court views this motion for summary judgment as turning on: (1) whether the Plaintiffs suffered a  substantive due process violation due to the actions of the Individual Officers; (2) "whether a rational jury could say" that the Individual Officers' actions were "conscience-shocking," *Boveri v. Town of Saugus*, 113 F.3d 4, 7 (1st Cir. 1997); *see also McConkie v. Nichols*, 446 F.3d 258, 259 (1st Cir. 2006) (affirming the district court "on the ground that no reasonable factfinder could find that [the defendant's] conduct was conscience-shocking"); and (3) whether the Individual Officers are entitled to qualified immunity on the Plaintiffs' claims.  The Court addresses each in turn.

### A.    Substantive Due Process

"The due process guarantees of the Fourteenth Amendment forbid the State itself from depriving a person of life, liberty, or property, without due process of laws." *Rivera*, 402 F.3d at 33.  "In order to establish a substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property." *Id.* at 33-34.  "Second, the plaintiff must show that the deprivation of this protected right was caused by governmental conduct.  That is easily met when a government actor causes the injury, such as when police officers act under color of law." *Id.* at 34.  However, "[i]t is much more difficult when the person who inflicts

the injury is a private person," though "there are possible scenarios of government involvement with a private individual which amount to government conduct . . .." *Id.*

"[A]s a general matter, 'a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.'" *Id.* (quoting *DeShaney*, 489 U.S. at 197). This principle is not absolute: "[I]n situations in which there is a 'special relationship,' an affirmative, constitutional duty to protect may arise when the state 'so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs.'" *Id.* (quoting *DeShaney*, 489 U.S. at 200). "The Supreme Court also suggested, but never expressly recognized, the possibility that when the state creates the danger to an individual, an affirmative duty to protect might arise . . .." *Id.* at 34-35.

The threshold question, therefore, is whether the Plaintiffs have shown a deprivation of a constitutionally protected interest. While the Individual Officers have not challenged the idea that the Plaintiffs suffered such a deprivation, the answer, at least at the summary judgment stage, is a clear yes. Mr. Lord killed Kyle Hewitt, shot Kimberly Irish, and abducted Brittany Irish. The First Circuit has indicated that loss of life is a protected interest. *Id.* at 34 ("The complaint alleges that Jennifer was caused to be deprived of her life, a protected interest"). Personal injury, similarly, may constitute a deprivation of a liberty interest. *See Bordanaro v. McLeod*, 871 F.2d 1151, 1155 n.4 (1st Cir. 1989) ("This circuit has recognized that the use of excessive or unreasonable force or violence by law enforcement personnel

resulting in personal injury deprives a person of liberty without due process of law in violation of the fourteenth amendment") (citing *Voutour v. Vitale*, 761 F.2d 812, 818 (1st Cir. 1985)).[147]  Lastly, although there is no First Circuit law directly on point, abduction would seem an obvious deprivation of liberty.

The second question, then, is whether "the deprivation of this protected right was caused by governmental conduct." *Rivera*, 402 F.3d at 34.  The Court views the Plaintiffs as having laid out two theories for connecting the actions of the Individual Officers to the deprivation of these rights: first, that the voicemail the Individual Officers left for Mr. Lord exacerbated the danger faced by the Plaintiffs; and second, that various violations of training and policy by the Individual Officers (including the voicemail) in the aggregate exacerbated the danger faced by the Plaintiffs. *Pls.' Opp'n* at 4-5.  Both theories are founded on the doctrine of state-created danger.[148]

---

[147]    The Court regards the state-created danger claim here as roughly paralleling an excessive force claim.  The Plaintiffs are alleging that they were subjected to injury by the actions of the Individual Officers, and neither the Plaintiffs nor the Individual Officers allege that there is any countervailing governmental interest that the Court must weigh against the Plaintiffs' injury in determining whether they suffered a violation of their rights.

[148]    The First Circuit has not yet adopted or set out a test for a state-created danger theory, so the Court evaluates the tests put forward by its sister circuits.  As the Plaintiffs note, the elements of a state-created danger claim in the Third Circuit are:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Sanford v. Stiles*, 456 F.3d 298, 304-05 (3d Cir. 2006); see also *Pls.' Opp'n* at 17-20.

This test is similar to the one used by the Sixth Circuit, which requires that a plaintiff seeking application of the theory establish:

> (1) affirmative acts by the state that "create or increase the risk that an individual will be exposed to private acts of violence;"

84

(2) that the state's actions placed the victim "specifically at risk, as distinguished from a risk that affects the public at large;" and

(3) that the state knew or "clearly should have known that its actions specifically endangered an individual."

Estate of Barnwell by S.C.B. v. Grigsby, 681 Fed. App'x 435, 443 (6th Cir. 2017) (quoting Peete v. Metro. Gov't of Nashville and Davidson Cty., 486 F.3d 217, 223 (6th Cir. 2007)).

In the Seventh Circuit, a plaintiff must show three things:

(1) that the state . . . by its affirmative acts, created or increased a danger that [the victim] faced;

(2) that [the state's] failure to protect [the victim] from danger was the proximate cause of her injury; and

(3) that [the state's] failure to protect [the victim] shocks the conscience.

D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015).

The Tenth Circuit requires a plaintiff to "meet all elements of a six-part test":

(1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way;

(2) plaintiff was a member of a limited and specifically definable group;

(3) defendant['s] conduct put plaintiff at substantial risk of serious, immediate, and proximate harm;

(4) the risk was obvious or known;

(5) defendants acted recklessly in conscious disregard of that risk; and

(6) such conduct, when viewed in total, is conscience shocking.

Estate of B.I.C. v. Gillen, 710 F.3d 1168, 1173 (10th Cir. 2013) (quoting Christiansen v. City of Tulsa, 332 F.3d 1270, 1281 (10th Cir. 2003)).

The Eighth and Ninth Circuits are also in general accord. See Hernandez v. City of San Jose, 897 F.3d 1125, 1133 (9th Cir. 2018) (requiring a plaintiff seeking to apply the state-created danger theory to show that a government employee "affirmatively place[d] the plaintiff in a position of danger" through an affirmative act which "create[d] an actual, particularized danger, and the ultimate injury to the plaintiffs must be foreseeable," in addition to showing that "[t]he employees . . . acted with deliberate indifference to a known or obvious danger" (internal citations omitted) (internal quotation marks omitted)); Fields v. Abbott, 652 F.3d 886, 891 (8th Cir. 2011) (stating that to succeed on a state-created danger theory, a plaintiff "must prove (1) that she was a member of 'a limited, precisely definable group,' (2) that the municipality's conduct put her at a 'significant risk of serious, immediate, and proximate harm,' (3) that the risk was 'obvious or known' to the municipality, (4) that the municipality 'acted recklessly in conscious disregard of the risk,' and (5) that in total, the municipality's conduct 'shocks the conscience'" (quoting Hart v. City of Little Rock, 432 F.3d 801, 805 (8th Cir. 2005))).

The Second, Fourth, and D.C. Circuits appear to view the theory somewhat differently. In the Second Circuit, liability will lie on a state-created danger theory where the state has "affirmatively created or enhanced the danger of private violence" through either affirmative conduct that encourages violence or "repeated, sustained inaction by government officials, in the fact of potential acts of violence . . . rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement" of violence by the perpetrator. Okin v. Vill. of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 428 (2d Cir. 2009). In the Fourth Circuit, "a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission." Doe v. Rosa, 795 F.3d 429, 439 (4th Cir. 2015). In the District of Columbia, the analysis is in two parts: "(1) has there been an affirmative act by Defendants to create or increase the danger that resulted in harm to Plaintiffs and, if so, (2) does that act shock the conscience?" Briscoe v. Potter, 355 F. Supp. 2d 30, 43 (D.D.C. 2004) (stating the test for "the theory of State Endangerment" "in light of" Butera v. District of Columbia, 235 F.3d 637 (D.C. Cir. 2001)).

The Second Circuit test appears to be an outlier in requiring condonation of violence—whether implicit or explicit—by the state before liability arises. The most common test, in the Court's analysis

### 1.     The Voicemail

The Plaintiffs' argument on this issue can be summarized as follows:  Before the Individual Officers left a voicemail for Mr. Lord, Brittany Irish informed them that Mr. Lord had threatened her and her children with violence if she went to the police about his rape of her.   PSAMF ¶¶ 153, 159; *see also* footnote 30, *supra*. Knowing of these threats, the Individual Officers called and left a voicemail message for Mr. Lord anyway.  DSMF ¶ 64; PSAMF ¶ 189.   Whether immediately or soon thereafter, Mr. Lord figured out that the voicemail message was related to Brittany Irish and flew into a rage, stating that someone was going to die that night, assumedly by his hand.  DSMF ¶¶ 67-68, 86; PSAMF ¶¶ 207, 212; *see also* footnote 68, *supra*.  Informed of this renewed threat, the Individual Officers refused Brittany Irish's request for protection.  *Pls.' Opp'n* at 4-5, 20.  Following this refusal, Mr. Lord carried out his threat, inflicting significant harm on the Plaintiffs.  *Id.* at 4.

Under the Third Circuit's test, the Court agrees with the Plaintiffs that this theory presents triable issues of fact as to whether Detective Perkins' voicemail to Mr. Lord created or exacerbated the danger faced by the Plaintiffs.  With regard to foreseeability and directness, Brittany Irish had warned the Individual Officers that Mr. Lord had threatened her and her children with violence if she went to the police. Additionally, Detective Perkins himself testified that it is logical (and therefore foreseeable) for a suspect who committed a rape to connect the dots between that

and as the Plaintiffs assert, *Pls.' Opp'n* at 17, appears to be variations of the elements laid out by the Third Circuit.  Therefore, for the purposes of evaluating the Plaintiffs' state-created danger theory on this motion for summary judgment, the Court adopts the Third Circuit's test.  The Court separately discusses the "shocks the conscience" element of this test.

crime and a call received from the MSP the next day. PSAMF ¶ 193. Mr. Lord's statement that he was going to "kill a fucker," made within hours of his receiving the voicemail from Detective Perkins, *id.* ¶ 212, gives rise to a powerful inference that the link between Mr. Lord's receipt of the voicemail and his later violence was direct.

Regarding the element of a "relationship between the state and the plaintiff," *Sanford*, 456 F.3d at 304, the Plaintiffs argue that "the required relationship existed under state statute and MSP policy," as the Individual Officers "had an ongoing mandatory duty under the MSP M-4 policy[] to protect [Brittany] Irish." *Pls.' Opp'n* at 19. They also argue that the Individual Officers "affirmatively put [Brittany] Irish in a far worse place" by leaving the voicemail for Mr. Lord, making her "a foreseeable victim," and that the Individual Officers "admi[tted] that [Brittany] Irish was in fact worthy of special protection." *Id.* The Individual Officers counter that they did not violate M-4 or a state statute, but that even if they had, a "violation of state law or policy [cannot] . . . form the basis for a state-created danger claim." *Defs.' Reply* at 19. For this latter point, the Individual Officers cite the First Circuit's decision in *Soto*, a case decided on qualified immunity grounds. *Id.* at 21-22 (citing *Soto*, 103 F.3d at 1065).

The Individual Officers misconstrue this element of the state-created danger theory by focusing on whether M-4 or state law "[g]ive [r]ise to a [c]onstitutional [d]uty to [p]rotect." *Def.'s Reply* at 18 (emphasis omitted). They are not wrong that neither M-4 nor state law creates a constitutional duty to protect, but the focus of the inquiry here is not on a relationship created by state law. Rather, this element

requires only that "some sort of relationship exist between the state actor and the plaintiff such that the plaintiff was a foreseeable victim of the state actor's conduct," and not "a 'special relationship,'" which is a component of "an entirely separate theory on which to base a substantive due process claim . . .." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 247 and n.57 (3d Cir. 2016). The element is satisfied here because the Individual Officers knew Mr. Lord had threatened Brittany Irish with violence, knew that Mr. Lord had threatened Kyle Hewitt, PSAMF ¶¶ 182, 184, and should have known that if Mr. Lord became violent, close family or friends of Brittany Irish (such as her mother, Kimberly Irish) might be with her when Mr. Lord found her or could themselves be targets.

The fourth element, an affirmative act that created or exacerbated a danger to the Plaintiffs, *Sanford*, 456 F.3d at 305, is also met. Leaving the voicemail constituted an affirmative act by Detective Perkins, at least arguably with Detective Fowler's assent, and as the Court has discussed, there is a clear issue of fact as to whether receipt of the voicemail led to Mr. Lord's violence. The Individual Officers argue that "[s]eeking to interview an alleged perpetrator of a sexual assault is . . . a 'necessary law enforcement tool,'" *Defs.' Mot.* at 18, and that as with taking the witness statement in *Rivera*, it "cannot be the basis to impose constitutional liability on the state." *Id.* at 17 (quoting *Rivera*, 402 F.3d at 37); *see also id.* at 18 (stating that the Individual Officers do not agree that "whether a law enforcement tool can form the basis for a state-created danger claim[] depends to some extent on whether the tool was reasonably used").

The Court disagrees with the Individual Officers' broad reading of *Rivera* as imposing an absolute bar on imposition of constitutional liability based on law enforcement tools used in the course of an investigation. It is true that, as in *Rivera*, the mere fact that the Individual Officers wanted to interview Mr. Lord cannot be the basis for liability, but that is not an accurate interpretation of the Plaintiffs' argument. The Plaintiffs seek to impose liability for the act of choosing to contact Mr. Lord in a particular time, manner, and context. *Pls.' Opp'n* at 22. In *Rivera*, by contrast, the plaintiff sought to impose liability for "the state's two actions in identifying [the plaintiff] as a witness and taking her witness statement in the course of investigating a murder . . .." 402 F.3d at 37. There, the plaintiff complained of the use of an investigative tool; here, the Plaintiffs complain of the manner in which such a tool was used. The two situations are not comparable, particularly in light of the First Circuit's statement in *Irish* that the Individual Officers' similar argument at the motion to dismiss stage "fail[ed] to take into account the <u>manner</u> in which the officers tried to interview the suspect—at the very outset of the investigation, before any other precautions had been taken, and despite being warned by the complainant about the suspect's violent tendencies." 849 F.3d at 526 (emphasis added).

### 2. Other Violations of MSP Policy, Training, and Standards

The Plaintiffs argue in the alternative that, "assuming *arguendo* that [the Individual Officers] could establish that Lord thought [their] voicemail was not about [Brittany] Irish, [they] independently caused or exacerbated the danger that Lord posed, specifically through" their violations of MSP policy, training, and standards.

*Pls.' Opp'n* at 5.  Because the Court agrees with the Plaintiffs that the voicemail alone creates a triable issue of fact on a state-created danger theory, the Court need not reach this alternative theory; however, for the sake of completeness, the Court includes a brief discussion.

The Individual Officers' violations asserted by the Plaintiffs are:  (1) violations of M-4 and state law related to not "us[ing] all reasonable means to prevent further abuse"; (2) calling Mr. Lord on the phone early in the investigation without analyzing the relevant factors or physically searching for Mr. Lord first; (3) promising protection to the Irishes; (4) not using the ODARA tool or otherwise assessing the risk posed by Mr. Lord; (5) not believing Brittany Irish; (6) not helping Brittany Irish obtain a protection from abuse order; (7) not responding reasonably to new information received during their investigation; and (8) not actively developing probable cause to arrest Mr. Lord.  *Pls.' Opp'n* at 5-16.  With the exception of promises of protection allegedly made to the Irishes and the voicemail, which the Court has discussed, none of these violations constitutes an affirmative act that could give rise to liability under a state-created danger theory.  Based on the Court's analysis, all the circuits that have adopted the state-created danger theory require an affirmative act or a degree and pattern of inaction that rises to the level of an affirmative act.  *See* footnote 148, *supra*.  There does not appear to be such a pattern here.[149]  The record makes clear

---

[149]    As the Court concludes that the Individual Officers' affirmative acts in placing the voicemail message and making promises of protection are sufficient to fit within the state-created danger doctrine, it is not technically necessary to rule on whether the Plaintiffs have demonstrated a pattern of inaction that would also fit within the doctrine.  As noted further on, this evidence is in any event relevant to the shocks the conscience standard.  Further, the Court resolves this dispositive motion on qualified immunity grounds.  If this case returns to the First Circuit and if the First Circuit overrules the Court on qualified immunity, it should be clear that the Court is not ruling that the pattern of

90

that the Individual Officers conducted an investigation and, once it became reasonably clear that Mr. Lord was acting violently, took actions to find him, including using dogs and putting out a statewide teletype.

This does not mean that there are no circumstances when law enforcement promises of protection—if made in combination with other danger-creating acts— could provide support for a finding of liability under a state-created danger theory if the promises increased the risk that a plaintiff would be harmed, such as by causing a person to stay in a place dangerous to them. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006) (noting that a promise made by a police officer to a victim that police would patrol the neighborhood made the victim more vulnerable to danger that the officer had already created by making it more likely she would stay home); *see also Rivera*, 402 F.3d at 37 (noting that promises of protection from the state may induce a victim "into a false sense of security, into thinking she had some degree of protection from the risk," but that "<u>merely</u> rendering a person more vulnerable to risk does not create a constitutional duty to protect" (emphasis added)); *but see Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 925 (10th Cir. 2012) (arguing that "*DeShaney*'s facts stalwartly suggest assurances of protection from the State do not constitute affirmative conduct sufficient to invoke the state-created danger theory of constitutional liability").

However, the Individual Officers made no such promises here. The Court has discussed the lack of record evidence for any claim by the Plaintiffs that the

---

inaction theory would be disallowed at trial or that evidence of inaction would be inadmissible for other purposes.

Individual Officers made a promise of protection to Brittany or Kimberly Irish. *See* footnotes 102 and 104 *supra*. Though someone from MSP did make a promise of protection to Kimberly Irish, albeit a very general one, *see* footnote 104, *supra*, the Plaintiffs do not allege either that this person was one of the Individual Officers or that the Individual Officers knew such a promise had been made.

While these examples of inaction by the Individual Officers do not independently give rise to a state-created danger theory of liability, they are relevant to the Court's consideration of the "shocks the conscience" standard. *See Irish*, 849 F.3d at 528 (stating that "[i]f discovery reveals that the officers' actions violated accepted norms of police procedure," this may "directly speak to whether the officers acted in deliberate indifference to [Brittany] Irish's safety, so much so that their conduct shocks the conscience").

## B.      Shocking to the Conscience

For a substantive due process violation to exist under a state-created danger theory, the actions of the state actor "must shock the conscience of the court." *Rivera*, 402 F.3d at 35. "The burden to show state conduct that 'shocks the conscience' is extremely high, requiring 'stunning' evidence of 'arbitrariness and caprice' that extends beyond '[m]ere violations of state law . . .' to 'something more egregious and more extreme.'" *Gloria*, 593 F.3d at 80 (some alterations in original) (quoting *DePoutot v. Raffaelly*, 424 F.3d 112, 119 (1st Cir. 2005)). "[C]onduct *intended* to injure in some way *unjustifiable* by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Rivera*, 402 F.3d at 36 (alteration

in original) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).  However,

"whether behavior is conscience shocking varies with regard to the circumstances of

the case," and "[i]n situations where actors have an opportunity to reflect and make

reasoned and rational decisions, deliberately indifferent behavior may suffice to

'shock the conscience.'"  *Id.*  The First Circuit suggested that in this case, deliberate

indifference may suffice to show conscience-shocking behavior; therefore, that is the

standard the Court will use.[150]  *Irish*, 849 F.3d at 528 ("If discovery reveals that the

officers' actions violated accepted norms of police procedure or that they acted despite

foreseeing the harm to Irish, it may strengthen the plaintiffs' argument that the

officers exacerbated the danger that Lord posed.  It may also directly speak to

whether the officers acted in deliberate indifference to Irish's safety, so much so that

their conduct shocks the conscience").

　　　The level of deliberate indifference required to shock the conscience is specific

to the circumstances of a case.  *See Lewis*, 523 U.S. at 850 (stating that "[d]eliberate

indifference that shocks in one environment may not be so patently egregious in

another").   In the Third Circuit, where the state-created danger doctrine is

established, caselaw has identified "three potential levels of culpability," *Kedra v.

Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017), required for a finding that state action

shocks the conscience: (1) in "'hyperpressurized environment[s] requiring a snap

---

[150]　　The Court also independently believes deliberate indifference to be the proper standard. Whatever level of exigency the Individual Officers might have been operating under once Mr. Lord was implicitly notified of the MSP's investigation, there was no such urgency before the Individual Officers left a voicemail message for Mr. Lord.  It would beg the question to argue that allegedly deliberately indifferent acts taken by state actors created an emergency which rendered application of the deliberate indifference standard improper.

judgment,' an official must actually intend to cause harm in order to be liable," *id.* (alternation in original) (quoting *Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015)); "[i]n situations in which the state actor is required to act 'in a matter of hours or minutes,'" the Third Circuit requires "that the state actor 'disregard a great risk of serious harm,'" *id.* (quoting *Sanford*, 456 F.3d at 310); "[a]nd where the actor has time to make an 'unhurried judgment[],' a plaintiff need only allege facts supporting an inference that the official acted with a mental state of 'deliberate indifference.'" *Id.* (some alterations in original) (quoting *Sanford*, 456 F.3d at 309).

The Court finds that a reasonable jury could find that Detective Perkins and Detective Fowler's (but not Sergeant Crane's) action in leaving a voicemail for Mr. Lord was deliberately indifferent to the point of being conscience-shocking in light of the actions they took before and after leaving a voicemail for Mr. Lord. In so finding, the Court is aware of the First Circuit's admonition in *Gloria* that "[t]his circuit has never found on the facts of a case that deliberately indifferent behavior was sufficiently conscience-shocking to violate a plaintiff's substantive due process rights." 593 F.3d at 80 n.4.

The facts of this case, however, are different from those in the prior cases of the First Circuit discussing the state-created danger theory, and the Court regards these facts as more egregious. In *Rivera*, the affirmative acts alleged by the plaintiff were that the defendants encouraged or required her to testify as a witness and then promised her protection, which they did not deliver, and she was shot and killed by the half-brother of the person against whom she was to testify. 402 F.3d at 32, 37.

The defendants knew that the plaintiff was receiving threats, *id.* at 31, but they did not affirmatively make clear to the person or people threatening her that she would testify. Rather, the deceased's status as a witness would have been discovered by the person against whom she was testifying in the normal course of his criminal prosecution. *See id.* at 38 n.11 (noting that "the danger to [the plaintiff], in the absence of these false assurances, would still have been evident" and that "[s]he would still have been identified by the police department as a witness to the murder; she would still have given a statement to the police about what she saw; she would still have, at the request of the deceased's family, given a second statement and identified [the person against whom she was to testify]; and the state would have still issued a subpoena for her to testify before the grand jury and at the trial"). The danger, in other words, was inherent in the deceased's position as a state's witness and existed regardless of the actions taken by the defendants. By contrast, had Detectives Perkins and Fowler waited to contact Mr. Lord or chosen another means to make that contact, the danger created by the voicemail message would not have existed.

Two other First Circuit cases analyzing the "shocks the conscience" standard in the context of a state-created danger theory are equally differentiable. *Vélez-Díaz v. Vega-Irizarry*, 421 F.3d 71 (1st Cir. 2005), for instance, deals with a cooperating witness who was working with the defendants to set up transactions of controlled substances and firearms when he was killed. *Id.* at 73-74. The First Circuit, while leaving open whether actions taken by the state as to cooperating witnesses might

ever shock the conscience, ruled that there was not a conscience-shocking affirmative act in the situation where state actors merely do not provide sufficient protection to a cooperating witness, stating that "[t]here are risks inherent in being a cooperating witness, but the state does not create those dangers, others do, and the witness voluntarily assumes those risks." *Id.* at 81.

In *Lockhart-Bembery v. Sauro*, 498 F.3d 69 (1st Cir. 2007), the plaintiff "alleged a violation of her Fourteenth Amendment substantive due process rights on a state-created danger theory" when an officer "instructed her to move her car or it would be towed, she did so, and she was injured." *Id.* at 71. The First Circuit found that the plaintiff could not show that the officer's actions created the danger, stating that "[t]he location of plaintiff's car posed a risk to others; it had to be moved. She recognized the risk herself. She had the choice of moving it herself or having the police tow it. She chose to move it herself . . . ." *Id.* at 77. Because the Circuit found the officer's actions reasonable, it also stated that the plaintiff "fail[ed] to meet the shock-the-conscience test." *Id.* at 78. Both of these cases lack the sort of affirmative act at issue here, where an officer did not merely sit back as the Plaintiffs experienced danger, but actually caused that danger independent of decisions made by the Plaintiffs.

The facts here are closer to those in *Soto*. In *Soto*, a woman suffering abuse from her husband reported his abuse to the police despite his past threats to "kill her and other members of her family if she went to the police." 103 F.3d at 1059. She communicated those threats to the police, who proceeded to tell her husband that she

had reported him. *Id.* at 1060-61. The next day, her husband killed both of their children and himself. *Id.* at 1061. The First Circuit "cho[]se not to reach" the question of "[t]he scope of any permissible section 1983 action based on a state-created danger theory," resolving the case instead on qualified immunity grounds. *Id.* at 1064. *Soto*, the First Circuit case presenting the most factual overlap with the instant case, is a notable outlier: a case in which the First Circuit specifically did not hold that state actions did not rise to the level of a state-created danger or did not shock the conscience.

The Individual Officers state that "[a]rguably, it might shock the conscience if a police officer contacted a suspect and advised him that a specific person had made criminal allegations against him after the accuser had told the officer to not contact the suspect because it might result in harm to the accuser or her children." *Defs.' Mot.* at 22-23. The Individual Officers contend that "the Court does not need to decide this issue because those are not the facts here," *id.* at 23, and insofar as they are pointing out factual dissimilarities from their own hypothetical, they are correct that those are not the facts.

However, the dissimilarities are, in the Court's view, small and beside the point. It is true that Detective Perkins did not tell Mr. Lord that Brittany Irish had made criminal allegations against him in the voicemail; but as Detective Perkins himself agreed in his testimony, it is logical that someone who had committed a rape the day before receiving a phone call from the MSP would connect the dots between the rape and the law enforcement voicemail. PSAMF ¶ 193.

The proposition that Mr. Lord thought that the voicemail was about a law enforcement investigation into his son's death is beside the point. At the very least, what Mr. Lord thought about the voicemail presents a genuine issue of material fact which must be resolved by a jury. The voicemail was not from Detective Pickering, the detective assigned the investigation into Mr. Lord's son's death, but from a new detective. Moreover, Mr. Lord proceeded on his criminal rampage not against the individual under investigation for his son's death, but against Brittany Irish, her boyfriend, and her mother. If Mr. Lord's reaction to the voicemail breaks the chain of causation between the voicemail and the Plaintiffs' injuries and death, Detectives Perkins and Fowler must make that case to a jury. For purposes of this analysis, the Court views the record in the light most favorable to the non-movants, which includes the proposition that the voicemail alerted Mr. Lord that Brittany Irish had complained about his rape to the MSP.

Additionally, even if Mr. Lord were unable to connect these dots due to the ongoing investigation into his son's death (a proposition the Court finds doubtful, *see* footnote 68, *supra*), there is no evidence in this record that either Detective Perkins or Detective Fowler knew about a MSP investigation into the death of Mr. Lord's son when they left the voicemail message. Based on this record, this is not a fact Detectives Perkins and Fowler could have known, as up to that point they had sought no background information on Mr. Lord, and thus it does not affect the analysis of whether their actions were conscience-shocking. What they did know when Detective Perkins left the voicemail is that Brittany Irish had alleged that she had been raped

by Mr. Lord the previous evening; that Mr. Lord had threatened Brittany Irish and her children with violence if she reported him to the police and had made more general threats against Kyle Hewitt; and that to the extent their investigation had yielded concrete results, those results were consistent with Brittany Irish's allegations; yet Detective Perkins, with Detective Fowler's acquiescence, went ahead with leaving a voicemail for Mr. Lord that as good as let him know Brittany Irish had indeed gone to the police, despite his threat.

The other dissimilarity from the Individual Officers' hypothetical is that Brittany Irish did not tell Detectives Perkins and Fowler not to leave a voicemail message prior to Detective Perkins leaving the message, and only stated the concern that Mr. Lord might not answer his phone. DSMF ¶ 58. However, it strikes the Court that it was not Brittany Irish's responsibility to anticipate the danger a call to Mr. Lord might create, but rather Detectives Perkins and Fowler's duty. Crime victims are not experts in proper law enforcement investigative techniques; state police detectives are. Viewing the facts in the light most favorable to the Plaintiffs, Brittany Irish had suffered an excruciating and traumatic twenty-four hours; she was being interviewed at MSP offices by MSP officers whom she had known for only a short period of time and who were asking her for Mr. Lord's cellphone number. The Individual Officers cannot successfully argue, on a motion for summary judgment, that her lack of objection at this time and in this context amounted to considered acquiescence to Detective Perkins calling Mr. Lord and leaving a voicemail message, alerting him to her criminal complaint.

It is true that Detectives Perkins and Fowler had reasons to question Brittany Irish, from her text messages to Mr. Lord to their interview with Ms. Adams; however, it is also true that, at the point Detective Perkins left the voicemail, Detectives Perkins and Fowler had already discovered at least one of the Benedicta camps Brittany Irish described and had confirmed that there had been a break-in, presenting powerful evidence that Brittany Irish was indeed being truthful. Regardless, doubts—even reasonable ones—about a victim's credibility cannot absolve an officer from the responsibility at least to consider the likely consequences of his actions if those doubts later prove unfounded.[151] There is no evidence that Detectives Perkins and Fowler did so here.

To the contrary, again viewing the facts in the light most favorable to the Plaintiffs, Detectives Perkins and Fowler allowed their skepticism of Brittany Irish's credibility to affect their investigation and their later responses to her pleas for protection. Assuming that Mr. Lord had not committed crimes against Brittany Irish, there may have been no harm in leaving a voicemail message for him to contact the state police. But to draw this conclusion discounts Brittany Irish's allegations of criminal conduct against Mr. Lord and her concerns about his potential violence. It also runs hard against multiple law enforcement policies that strongly caution the state police to believe and protect the accuser immediately after a complaint.

Law enforcement investigation into alleged sexual assaults is a sensitive and fraught business. Having experienced trauma, sexual assault victims may

---

[151] Perkins had in fact received training to this effect. *See* PSAMF ¶¶ 296-99.

misremember details, may improperly blame themselves for the attack, and, as may be the case here, even after the attack may have conflicting feelings about the attacker. If the victim has given law enforcement a reasonable basis to conclude that the attacker is violent and represents a present and imminent threat of physical harm against her and her family, law enforcement should take this risk into account in its approach to the alleged attacker. As just noted, what may well have occurred here is that the Detectives allowed their skepticism about Brittany Irish's truthfulness (a truthfulness that seems later to have been largely corroborated) to affect their approach to Mr. Lord. For a sexual assault victim, the price of being traumatized by the assault and thus less than wholly and entirely consistent cannot be that law enforcement invites retribution.[152]

The deliberate indifference exhibited by Detectives Perkins and Fowler in leaving the voicemail is further underscored by their subsequent actions. Once Brittany Irish called to tell them the Irishes' barn was burning down, PSAMF ¶ 207, Detectives Perkins and Fowler were on notice that Mr. Lord was following through on his threat of violence and that the Irishes were the object of his wrath. That they did not take even basic steps to protect the Plaintiffs at least suggests that they simply were not concerned about the Plaintiffs' safety—a degree of indifference that,

---

[152] The Court is also troubled by the notion that if Brittany Irish was deemed not credible in her complaint against Anthony Lord, she somehow forfeited protection from his threatened violence. The notion that police protection against a future crime depends upon law enforcement's assessment of the credibility of the complaint of a past one strikes the Court as a non-sequitur. In fact, if law enforcement concluded that the complaint was false, informed the alleged perpetrator of the false complaint, and knew that the alleged perpetrator had a violent temper, it would seem the complainant would be in greater danger, having registered a non-credible complaint of a criminal act against a violent, but innocent, party.

given the circumstances, was reckless, callous, or both. That they presented Brittany Irish's request for protection to Sergeant Crane and he turned down the request does not insulate them; there were many other steps they could have taken to assure the Plaintiffs' safety without any expenditure of MSP resources. Even suggesting that the Plaintiffs spend the night out of harm's way, such as in a motel or with a family friend, might have prevented the tragedy.

Instead, Detectives Perkins and Fowler chose not to ask Sergeant Crane about Brittany Irish's request for an hour after she made it and did not communicate to her that the request had been denied until an hour after the denial, when she called them. While the government "must perform a triage among competing demands," even "where [it] is aware of specific dangers," *Ramos-Piñero*, 453 F.3d at 54, even the most generous assessment of Detectives Perkins' and Fowler's actions would suggest that, knowing about the threat posed by Mr. Lord, they would do something—anything— to mitigate that threat. They did not do so, in at least arguable violation of section 4012(6) and M-4's requirement that they take reasonable steps to prevent further abuse.

The bar for finding that action shocks the conscience is high but not insurmountable. In *Doe1 v. Bos. Pub. Sch.*, No. 17-cv-11653-ADB, 2019 WL 1005498 (D. Mass. Mar. 1, 2019), a district court case applying the "shocks the conscience" test on a post-*Irish* motion to dismiss, two female students were sexually assaulted by another student at their school, despite the school having known he had assaulted two fellow students earlier that year, and then were left in the same classroom with

him, despite the female students having reported his assaults and threats of violence to the school. *Id.* at *1-2. A teacher who sought to report one of the assaults was discouraged from doing so and retaliated against when she did. *Id.* at *5. One of the students was later re-assaulted by the same student. *Id.* at *2. The district court found that the alleged actions of the defendants were sufficiently conscience-shocking to survive a motion to dismiss on a state-created danger theory because the assaults the school knew about were "not sudden or isolated and school staff had an opportunity to reflect and make reasoned and rational decisions in response . . .." *Id.* at *5. The district court cautioned that "affirmative action (rather than inaction) by school officials [was] essential to its holding," and stated that if following discovery there was no evidence of the affirmative acts alleged by the plaintiffs, the court would "revisit this finding on summary judgment." *Id.* Here, discovery has revealed evidence of the affirmative act alleged by the Plaintiffs—namely, that Detectives Perkins and Fowler left a voicemail message for Mr. Lord implicitly informing him that Brittany Irish had gone to the police, despite being aware he had threatened her if she did so.

Similarly, in *Okin*, the Second Circuit, ruling on an appeal from a grant of summary judgment, found that the plaintiff "raise[d] a genuine issue of material fact as to whether the defendants' affirmative creation or enhancement of the risk of violence to [the plaintiff] shock[ed] the conscience." 577 F.3d at 431. The plaintiff in *Okin* reported multiple violent assaults by her boyfriend to the police, who did not arrest him or interview him at any length despite her requests that he be arrested.

*Id.* at 420-26.  The plaintiff filed a claim, alleging that, "[b]y failing to arrest or even interview" her boyfriend, the defendants "endangered her by emboldening" her boyfriend.  *Id.* at 426.  The Second Circuit found that "a reasonable view of the evidence" that police implicitly encouraged the plaintiff's boyfriend's domestic violence supported the inference that this conduct "r[o]se to the level of affirmative conduct that created or increased the risk of violence to the victim."  *Id.* at 430.  Moreover, the Second Circuit found the defendants' actions sufficiently conscience-shocking to survive summary judgment because as "domestic violence is a known danger that the officers were prepared to address upon the expected occurrence of incidents, the officers who responded to [the plaintiff]'s complaints had ample time for reflection and for deciding what course of action to take in response to domestic violence."  *Id.* at 432.  The same consideration applies here: Detectives Perkins and Fowler were in the midst of an investigation of rape by an intimate partner and had ample time to consider the risks to Brittany Irish posed by leaving a voicemail for Mr. Lord.[153]

Furthermore, the First Circuit's language in *Irish* supports a finding that this conduct shocks the conscience:  the Circuit stated that "[i]f discovery reveals that the officers[] . . . acted despite foreseeing the harm to [Brittany] Irish, it may strengthen

---

[153]     The resolution of *Kennedy*, 439 F.3d 1055, also supports a finding that the Plaintiffs have sufficiently alleged conscience-shocking behavior to survive summary judgment.  In *Kennedy*, the Ninth Circuit affirmed a denial of summary judgment to the defendant, stating that, "[v]iewing the facts in the light most favorable to [the plaintiff], we find that, if accepted as true, they are sufficient to establish that [the defendant] acted deliberately and indifferently to the danger he was creating" where the plaintiff repeatedly warned the defendant about a third party who later harmed her and asked that she be contacted before the defendant contacted the third party, after which the defendant notified the third party first, promised protection to the plaintiff, and then did not provide that protection.  *Id.* at 1065.

the plaintiffs' argument that the officers exacerbated the danger that Lord posed" and "may also directly speak to whether the officers acted in deliberate indifference to [Brittany] Irish's safety, so much so that their conduct shocks the conscience." 849 F.3d at 528. The First Circuit also focused in on the timing of the decision to leave the voicemail, noting that Detectives Perkins and Fowler acted "despite the fact that they were at the very outset of an investigation into allegations of violent assault, rape, and threats to kill." *Raymond v. Me. Sch. Admin. Dist. 6*, No. 2:18-cv-00379-JAW, 2019 WL 2110498, at *8 (D. Me. May 14, 2019) (quoting *Irish*, 849 F.3d at 527).[154] Discovery has shown that Detectives Perkins and Fowler did indeed act despite being aware of the potential for harm to Brittany Irish and despite acting quite early in the investigative process, and in light of the First Circuit's language on these points, the Court cannot grant summary judgment on the ground that Perkins' and Fowler's actions did not shock the conscience.

While the Court finds that the Plaintiffs have made out a sufficient case that Detectives Perkins and Fowler's actions were conscience-shocking, they have not done so as to Sergeant Crane. There is no allegation that Sergeant Crane knew about the voicemail before it was left for Mr. Lord; in fact, the record suggests he did not learn about it until approximately three hours later. *PASMF* ¶ 218. It is not

---

[154]     The importance of this timing point is underscored by the deposition testimony of both Detective Perkins and Detective Fowler, who both agreed that the best time to contact an offender is at the end of an investigation, once all the facts are in order. PSAMF ¶¶ 276-77; DRPSAMF ¶¶ 276-77. The facts here were not all in order. At the point they left the voicemail, Detectives Perkins and Fowler were not even aware that Mr. Lord was on probation—a fact that could have been quickly ascertained and which would have provided the detectives with new tools to aid in their investigation, such as the advice of Mr. Lord's probation officer and a lower standard for detention of Mr. Lord.

conscience-shocking for a superior officer to entrust an investigation to his subordinates and rely on their updates.

## C.    Qualified Immunity

"[T]he qualified immunity inquiry is a two-part test.  A court must decide: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  "[T]he second, 'clearly established' step of the qualified immunity analysis . . ., in turn, has two aspects." *Id.* at 269.  First, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," *id.* (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); second, the Court must ask "whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Id.*

### 1.    Settled Law Within the First Circuit

The Court begins with the premise that neither the Supreme Court nor the First Circuit has adopted the state-created danger theory as "clearly settled law." *Soto*, 103 F.3d at 1064.  In 1989, the United States Supreme Court held in *DeShaney* that "a state's failure to protect an individual against private violence generally does not constitute a violation of the Due Process Clause, because the Clause imposes no duty on the state to provide members of the general public with adequate protective services." *Ramos-Pinero*, 453 F.3d at 52 n.6 (characterizing *DeShaney*, 489 U.S. at

194-97).  In *Irish*, the First Circuit reiterated that *DeShaney* "suggested, but never expressly recognized, the possibility that when the state creates the danger to an individual, an affirmative duty to protect might arise."  849 F.3d at 525 (quoting *Rivera*, 402 F.3d at 34-35).

Turning to the First Circuit, the *Soto* Court affirmed that "in 1991 the First Circuit had not yet addressed the issue of state-created danger."  103 F.3d at 1065. In its 1997 *Soto* opinion, the First Circuit wrote that "we cannot extract a clearly established right from a somewhat confusing body of caselaw through the use of hindsight, or 'permit claims of qualified immunity to turn on the eventual outcome of a hitherto problematic constitutional analysis.'"  *Id.*  (quoting *Martinez v. Colon*, 54 F.3d 980, 989 (1st Cir. 1995)).  The *Soto* Court concluded that "in 1991, 'the contours of the right were [not] sufficiently plain that a reasonably prudent state actor would have realized not merely that his conduct might be wrong, but that it violated a particular constitutional right.'"  *Id.* (quoting *Martinez*, 54 F.3d at 988).

Taking *Soto* as the benchmark for the state of the law in the First Circuit as of 1991, the First Circuit has not yet recognized state-created danger as a valid basis to assert a constitutional violation against the government.  *See Gloria*, 593 F.3d at 79 n.3; *Ramos-Pinero*, 453 F.3d at 55, n.9; *Rivera*, 402 F.3d at 37-38.[155]  Put another way, as the First Circuit wrote in this case, "[w]hile this circuit has discussed the

---

[155]    At oral argument, counsel for Plaintiffs mentioned the case of *Marrero-Rodríguez v. Municipality of San Juan*, 677 F.3d 497 (1st Cir. 2012), asking why the First Circuit reversed the dismissal of a substantive due process claim in that case if the state-created danger theory did not exist in the Circuit; however, *Marrero-Rodriguez* is not a state-created danger case and does not impact the Court's qualified immunity inquiry.

possible existence of the state-created danger theory, we have never found it applicable to any specific set of facts." *Id.* at 526.

The clearest indication that the First Circuit may be willing to formally adopt the state-created danger theory is *Irish* itself. If the First Circuit had previously resolved that it would not adopt state-created danger as a viable constitutional theory, it could have affirmed this Court's earlier dismissal of the complaint because further action would be futile. Instead, the First Circuit suggested that law enforcement compliance with department protocol might make it easier for the Individual Officers to assert qualified immunity. *Id.* at 528. The negative implication is that if the officers had failed to follow protocol, it might be more difficult for them to assert qualified immunity, which presupposes the availability of the state-created danger theory.

But this Court can only go so far in reading tea leaves from First Circuit opinions. Settled law requires stronger stuff. If the law in the First Circuit is to change, it is the First Circuit, not this Court, that must change it.

### 2. Settled Law in the Absence of Supreme Court and First Circuit Authority

Law may be clearly established in the First Circuit even in the absence of an opinion from the First Circuit or the Supreme Court. *See Wilson v. Layne*, 526 U.S. 603, 617 (1999) (stating that a constitutional right is clearly established if there are "cases of controlling authority in the[] jurisdiction at the time of the incident which clearly established the rule" or if there is "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful");

108

*McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016) (stating that the First Circuit has "looked to the case law of sister circuits in determining whether a right was clearly established"); *Maldonado*, 568 F.3d at 271 ("We reject the Mayor's argument that this law was not clearly established because *this* court had not earlier addressed the questions of effects and seizure. Against the widespread acceptance of these points in the federal circuit courts, the Mayor's argument fails. These are principles of law, and the law was sufficiently recognized by courts to be clearly established").

In the absence of a decision in the First Circuit, however, it is hard to conclude that the doctrine of state-created danger is clearly established given that other circuits have considered and rejected it. *See Cook v. Hopkins*, No. 19-10217, 2019 WL 5866683, at *5 (5th Cir. Nov. 8, 2019) (stating that "this circuit does not recognize the state-created danger theory and we decline to do so today"); *Beltran v. City of El Paso*, 367 F.3d 299, 307 (5th Cir. 2004) ("This court has consistently refused to recognize a 'state-created danger' theory of § 1983 liability even where the question of the theory's viability has been squarely presented"); *Vaughn v. City of Athens*, 176 Fed. App'x 974, 976 n.1 (11th Cir. 2006) (reiterating that "this Court has written that the 'special relationship' and 'state created danger' doctrines no longer are valid"); *White v. Lemacks*, 183 F.3d 1253, 1257-59 (11th Cir. 1999).

As earlier discussed, a significant majority of circuit authority accepts the state-created danger theory. *See Hernandez*, 897 F.3d at 1133 (9th Cir.); *Estate of Barnwell*, 681 Fed. App'x at 443 (6th Cir.); *E. Porter Cty.*, 799 F.3d at 798 (7th Cir.); *Doe*, 795 F.3d at 439 (4th Cir.); *Estate of B.I.C.*, 710 F.3d at 1173 (10th Cir.); *Fields*,

652 F.3d at 891 (8th Cir.); *Okin*, 577 F.3d at 428 (2d Cir.); *Sanford*, 456 F.3d at 304-05 (3d Cir.); *Butera*, 235 F.3d at 637 (D.C. Cir.).  But, in the absence of First Circuit authority, it is not within this Court's purview to select between the majority and minority rules.  Moreover, if the Court were to adopt the majority view, it raises the question of which majority view.  As the Second Circuit has written, "in various courts the term 'state created danger' can refer to a wide range of disparate fact patterns." *Pena v. Deprisco*, 432 F.3d 98, 108 (2d Cir. 2005); *see also* footnote 148, *supra* (describing the multiple circuit formulations).  To extrapolate whether the First Circuit will adopt the majority rule, which among the majority formulations the First Circuit will adopt, and to apply the selected formulation to the facts in this case is a bridge too far.

In short, while a "consensus . . . of persuasive authority," *Wilson*, 526 U.S. at 617, requires something less than the express agreement of every circuit, *see Maldonado*, 568 F.3d at 271 (finding law clearly established where three other circuits had so found and no circuit had held otherwise), the Court is unaware of a circumstance where the First Circuit has found that a constitutional right was clearly established despite there being (1) no prior ruling on point within the First Circuit, and (2) a split on the issue among the remaining circuits.  As the state-created danger doctrine was not clearly established at the time of the acts by the Individual Officers, they are entitled to qualified immunity.[156]

---

[156]    Because the Court grants the Individual Officers qualified immunity based on the first subpart of the "clearly established" inquiry, it does not reach the second subpart.

The Plaintiffs argue that "it is well established that the Constitution protects a citizen's liberty interest in his/her own bodily security," and that the state-created danger theory is clearly established under this principle. *Pls.' Opp'n* at 24-25. This argument, however, confuses the qualified immunity analysis. The Court is compelled by Supreme Court precedent not to "define clearly established law at a high level of generality," but rather to examine "whether the violative nature of particular conduct is clearly established." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (emphasis omitted) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 742 (2011)). It is true that the Constitution protects one's interest in one's bodily integrity and security, but that is not relevant to the more specific question of whether the state-created danger doctrine—the vehicle the Plaintiffs use to bring their claim—was clearly established during the Individual Officers' investigation.

### 3. Violation of State Law and Policy

The Plaintiffs have one more arrow in their quiver. They argue that the Individual Officers violated both state statute, 19-A M.R.S. § 4012, and state policy, M-4. *Pls.' Opp'n* at 5-8, 24-26. Section 4012 of title 19-A requires that when a law enforcement officer has "reason to believe that a family or household member has been abused, the officer shall immediately use all reasonable means to prevent further abuse," including "[a]rresting the abusing party . . .." The Plaintiffs say that in response to the statute, the MSP established M-4, "a standing order entitled 'Maine State Police Policy Regarding Response to an Investigation of Domestic Violence Incidents." *Pls.' Opp'n* at 6. This MSP policy generally tracks section 4012 in

requiring a trooper to use "all reasonable means to prevent abuse." *Id.* (quoting M-4). The Plaintiffs contend that the Individual Defendants violated the spirit and specific provisions of section 4012 and M-4. Tying the asserted violations of state law and policy to qualified immunity, the Plaintiffs argue that "[t]he existence of M-4 is highly relevant to the 'sufficiently clear' prong of this qualified immunity claim," as "officer decisions and acts that violate protocol and/or training may be sufficient to deny qualified immunity to officers." *Id.* at 25 (citing *Irish*, 849 F.3d at 528).

This argument is not correct. As the Individual Defendants point out, § 1983 "applies only to violations of rights secured by federal law." *Defs.' Reply* at 19; 42 U.S.C. § 1983 ("deprivation of any rights, privileges, or immunities secured by the Constitution and laws"). "The first inquiry in any § 1983 suit . . . is to isolate the precise constitutional violation with which [the defendant] is charged." *Manuel v. City of Joliet*, 137 S. Ct. 911, 925 (2017) (quoting *Baker v. McCollan*, 443 U.S. 137, 140 (1979)). Thus, as the Supreme Court has explained, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker*, 443 U.S. at 144 n.3); *see also Drumgold v. Callahan*, 707 F.3d 28, 49 n.13 (1st Cir. 2013) ("The threshold question in a § 1983 suit is whether there has been a violation of a federally secured right"). Even assuming the Individual Officers violated a state statute, a state policy, or both, the Plaintiffs must tie these state law violations to the violation of a federally secured right and, absent the Individual Officers' violation of

a clearly established right, the Plaintiffs lack a precondition to a successful § 1983 claim.

The First Circuit's opinion in *Irish* does not contradict this long-established limitation to § 1983 actions. The First Circuit in *Irish* states only that "violation of protocol and training is relevant . . . to the . . . qualified immunity inquir[y]," 849 F.3d at 528, which is different from saying that such violations would be sufficient to find that the Individual Officers were not entitled to qualified immunity. As the Individual Officers point out, the First Circuit has indicated in *Soto* that such violations are not, on their own, sufficient to resolve the qualified immunity question. *See Defs.' Reply* at 20-21 ("First, the court rejected the wife's argument that the defendants were not entitled to qualified immunity because they knew or reasonably should have known that they were violating Law 54. Citing *Davis* [*v. Scherer*], 468 U.S. [183,] 193-95[ (1984)], the court held that even if defendants knowingly violated Law 54, that would 'not resolve the qualified immunity question,' and that instead the focus is on 'whether there is clearly settled law on the constitutional violation at issue'" (quoting *Soto*, 103 F.3d at 1064)). The Individual Officers are correct that "whether [they] violated the M-4 policy or state law is not relevant to the qualified immunity analysis," *Defs.' Reply* at 22, because "[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Soto*, 103 F.3d at 1064 (quoting *Davis*, 468 U.S. at 194).

### D. Summary

The Court finds that, on the record before it, taking all inferences reasonably supported by that record in favor of the non-moving parties, the Plaintiffs have established genuine issues of material fact as to whether, due to a danger created or exacerbated by Detectives Perkins and Fowler but not Sergeant Crane, they suffered violations of their rights to substantive due process. However, the Court also concludes that the state-created danger doctrine was not clearly established in the First Circuit and elsewhere at the time of the alleged constitutional violations and grants summary judgment to all the Individual Officers on the basis of qualified immunity.[157]

---

[157] The terrible circumstances of this case give the Court pause as to whether the rationale underlying the doctrine of qualified immunity should be reexamined. Recently, qualified immunity has come under judicial and academic scrutiny. *See, e.g.*, *Zadeh v. Robinson*, 928 F.3d 457, 474 (5th Cir. 2019) (Willett, J., concurring in part and dissenting in part) (reaffirming his "broader conviction that the judge-made immunity regime ought not to be immune from thoughtful reappraisal"); *Russell v. Wayne Cty. Sch. Dist.*, No. 3:17-CV-154-CWR-JCG, 2019 WL 3877741, at *2 (S.D. Miss. Aug. 16, 2019); *Ventura v. Rutledge*, 398 F. Supp. 3d 682, 697 n.6 (E.D. Cal. 2019); *Kong ex rel. Kong v. City of Burnsville*, No. 16-cv-03634 (SRN/HB), 2018 WL 6591229, at *17 n.17 (D. Minn. Dec. 14, 2018); *Manzanares v. Roosevelt Cty. Adult Det. Center*, 331 F. Supp. 3d 1260, 1294 n.10 (D.N.M. 2018) ("Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive"); *Thompson v. Clark*, No. 14-CV-7349, 2018 WL 3128975, at *11 (E.D.N.Y. June 26, 2018) ("The Supreme Court's recent emphasis on shielding public officials and federal and local law enforcement means many individuals who suffer a constitutional deprivation will have no redress"); Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 YALE L.J. 2, 9-10, 26, 76 (2017); Judge Stephen R. Reinhardt, *The Demise of Habeas Corpus and the Rise of Qualified Immunity*, 113 MICH. L. REV. 1219 (2015); Joanna C. Schwartz, *Police Indemnification*, 89 N.Y.U. L. REV. 885, 912-913 (2014).

As the facts in this case demonstrate, these issues are complicated. The primary culprit is Anthony Lord, not Detective Perkins, not Detective Fowler. Despite the Court's conclusions about some of the Detectives' conduct, it is also true that Detectives Perkins and Fowler did not ignore Brittany Irish's complaint and actively investigated her allegations into the very early hours of the morning. Further, the Court acknowledges that members of the public cannot expect the state or local police to act as a private security force, and there must be limits as to when upset citizens may force officers to trial because of something the officers did or did not do in the line of duty. Even if individual officers rarely personally pay damage awards, the filing of a claim can have repercussions against the officers' careers and the prospect of a lawsuit may affect the willingness of officers to take risks for public safety that the public wants them to take.

Whatever the end result of this lawsuit, the Court acknowledges that the Plaintiffs suffered a horrific tragedy at the hands of Anthony Lord—and the role of Detectives Perkins and Fowler in setting in motion Mr. Lord's violent rampage is a genuine issue of material fact that a factfinder would resolve, but for qualified immunity. Mr. Lord shot and killed Kyle Hewitt, shot and wounded Kimberly Irish, and abducted Brittany Irish in exactly the circumstances that Brittany Irish warned the Maine State Police against.

A result of this opinion may be to frame the issue for appeal, if the Plaintiffs wish to return to the First Circuit. The Court found that the Plaintiffs raised genuine issues of material fact as to whether Detectives Perkins and Fowler acted with deliberate indifference but can go no further in establishing that their actions implicate a federally-recognized right. This is because it is beyond the role of this trial court to announce a breakthrough in First Circuit precedent. Whether the First Circuit wishes to adopt the state-created danger theory, whether the First Circuit

---

Even so, the current law of qualified immunity—in the Court's mind—has it upside down, with the governmental entity and supervisors rarely facing liability and the front-line, lowest-level employees more directly exposed. This model contrasts with the principles of tort law where the employer is generally responsible for the tortious actions of an employee performed within the scope of employment. Using police as an example, the Court accepts as a premise that there will be an irreducible percentage of law enforcement interactions with the public that will result in potential claims with and without proper police work. Except where the actions of the officer were beyond the scope of employment, if the governmental entity, not the governmental employee, were legally responsible, the risk of harm from governmental actions could be distributed among the public at large, as occurs for privately insured employers, rather than placed on the individual governmental employee. The solutions are not easy and may be impossible given the current state of law at the federal level, particularly in light of the Eleventh Amendment; however, public skepticism of the adequacy of internal discipline proceedings and the need in cases of extreme untoward conduct to provide a mechanism for redress and individual deterrence suggest a new regime is necessary, perhaps with state legislation.

The nub of the problem is that the summary disposition of this case will deprive the Plaintiffs of their day in court and runs counter to a fundamental and ancient precept of our legal system: "[W]here there is a legal right, there is also a legal remedy." *Marbury v. Madison*, 5 U.S. 137, 163 (1803) (quoting 3 WILLIAM BLACKSTONE, COMMENTARIES *23).

deems this case an appropriate one to do so, and whether the First Circuit could or would make such a ruling retroactive to this case are all questions beyond this Court's reach.

## VI.    CONCLUSION

The Court GRANTS the Individual Officers' Motion for Summary Judgment (ECF No. 80) and orders the Clerk to enter judgment in favor of the Defendants and against the Plaintiffs' Second Amended Complaint (ECF No. 38).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of February, 2020