# United States Court of Appeals
## For the First Circuit

No. 20-1208

BRITTANY IRISH, individually and as Personal Representative of
the Estate of Kyle Hewitt; KIMBERLY IRISH,

Plaintiffs, Appellants,

v.

DETECTIVE JASON FOWLER; DETECTIVE MICAH PERKINS; SERGEANT DARRIN
CRANE,

Defendants, Appellees,

and

STATE OF MAINE; STATE POLICE OF THE STATE OF MAINE; JOHN DARCY;
ANDREW LEVESQUE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Selya, and Barron,
Circuit Judges.

Scott J. Lynch, with whom Lynch & Van Dyke, P.A. was on brief,
for appellants.
Christopher C. Taub, Assistant Attorney General, with whom
Aaron M. Frey, Attorney General, was on brief, for appellees.

---

November 5, 2020

---

LYNCH, **Circuit Judge**.  In this opinion, we hold on these facts that a viable substantive due process state-created danger claim has been presented against two Maine State Police ("MSP") officers, and that it was error to grant the officers qualified immunity.  Under the state-created danger substantive due process doctrine, officers may be held liable for failing to protect plaintiffs from danger created or enhanced by their affirmative acts.  In doing so, we for the first time join nine other circuits in holding such a theory of substantive due process liability is viable.

This § 1983 action arises out of the attacks, murder, and rapes committed in July 2015 by Anthony Lord against appellants Brittany Irish ("Irish") and those close to her.  After actions and inactions by the defendant officers, Lord murdered Irish's boyfriend Kyle Hewitt, shot Irish's mother Kimberly Irish, and then kidnapped Brittany Irish for about nine hours and raped her.

The suit asserts that Lord's rampage was triggered by a voicemail left on Lord's cellphone by defendant MSP Detectives Micah Perkins and Jason Fowler, the officers investigating Irish's criminal complaint that Lord had abducted, threatened, and raped her two days earlier.  Before the detectives checked Lord's criminal record or made any effort to find Lord in person, Detective Perkins left a voicemail identifying himself as a state police officer and asking Lord to call him back.

- 3 -

The plaintiffs seek relief based on the state-created danger doctrine. The plaintiffs argue that the detectives created and enhanced the danger to them and then failed to protect them in the face of Lord's escalating threats.

This court had earlier vacated the dismissal of these claims for failure to state a claim. Irish v. Maine, 849 F.3d 521, 523 (1st Cir. 2017) ("Irish I"). After remand and the completion of extensive pretrial discovery, the defendants moved for summary judgment and the district court held that a jury could find that the defendant officers violated the plaintiffs' constitutional rights. Irish v. Fowler, 436 F. Supp. 3d 362, 364 (D. Me. 2020). It granted summary judgment to the officers on the grounds of qualified immunity. Id. We describe the district court's rulings later.

We affirm the district court's holding that a jury could find that the officers violated the plaintiffs' substantive due process rights. We reverse the grant of defendants' summary judgment motion on qualified immunity grounds.

### I. Statement of Facts

On defendants' motion for summary judgment, we read the facts in the light most favorable to the plaintiff. Stamps v. Town of Framingham, 813 F.3d 27, 30 (1st Cir. 2016).

We supplement our description of the facts in Irish I with the district court's comprehensive statement of the facts.

- 4 -

### The Events Underlying Plaintiffs' Claims

At approximately 11:13 AM on July 15, 2015, Britany Irish reported to the Bangor Police Department that Anthony Lord, a former lover, had kidnapped and raped her repeatedly on the night of July 14, including at two vacant camps near Benedicta, Maine. The Bangor Police Department referred her to the MSP. MSP Sergeant Darrin Crane assigned Detectives Perkins and Fowler to the case and told the detectives that Lord was a registered sex offender. Around 2:00 PM, Sergeant Crane forwarded the detectives a copy of Brittany Irish's statement to the Bangor Police Department. The statement said that Lord had threated to "cut her from ear to ear."

Brittany Irish met with the detectives at 3:05 PM and again at 4:34 PM. At the 3:05 meeting, she told the detectives that she was "scared that Anthony Lord would become terribly violent if he knew [Irish] went to the police." The detectives told Irish that because of Lord's repeated threats, they "recommended not letting [Lord] know . . . reports had been made [to the police]." Indeed, they instructed her to "continue talking to [Lord] as if nothing happened" until the detectives could get Lord's statement. Irish also told the detectives that she had moved her children to Hewitt's mother's house in Caribou, Maine, for their safety. That evening, the detectives found evidence corroborating Irish's allegations against Lord at one of the vacant camps near Benedicta.

On July 16, Irish made a second written statement to the detectives which said that Lord had threated to "cut [her] from ear to ear," to abduct Irish's children, to abduct and "torture" Hewitt to find out "the truth" about what was happening between Irish and Hewitt, to kill Hewitt if Hewitt was romantically involved with Irish, and to weigh down and throw Irish into a lake.

Despite these repeated death and other threats and their knowledge that Lord was a registered sex offender, the defendants did not, as was customary, check the sex offender registry to find Lord's address or run a criminal background check. Such searches would have revealed that he was on probation and had an extensive record of sexual and domestic violence. The detectives did not contact Lord's probation officer at this time or request a probation hold, which could have been used to detain Lord and is simpler to obtain than an arrest warrant.

Her written statement in hand, the detectives interviewed Irish again on July 16. Despite their earlier statement to her, they told her that they planned to call Lord to get his statement. At 6:17 PM on July 16, Detective Perkins called Lord while Detective Fowler listened.[1] When Lord did not answer, Detective Perkins did not hang up. Rather, he left a voicemail for Lord on his cellphone. In that voicemail, Detective Perkins

---

[1] At no point has the defense tried to distinguish between the two officers as to plaintiffs' claims.

identified himself as a state police detective and asked Lord to return his call. Detective Perkins did not ask Lord to come meet with him. At that point, the defendants had made no effort to locate Lord, much less to apprehend him. Detective Perkins admitted that, if Lord had committed the original assault against Irish, it would be "logical" that Lord would determine that the phone call was related to the rape and kidnapping of Brittany Irish.

At 8:05 PM on July 16 -- about an hour and forty-five minutes after he had left the voicemail -- Detective Perkins received notice of a "possible suspicious" fire in Benedicta, the town where the detectives had found evidence that Lord had raped Irish at a vacant camp. Believing that Lord may have set the fire, the detectives drove to the site of the fire. At 9:24 PM, Brittany Irish called the detectives and told them it was her parents' barn, roughly fifteen feet from their home, which was on fire. Irish also told the detectives that someone had heard Lord say as he left his uncle's house (in Crystal, Maine) earlier that evening that "I am going to kill a fucker." Irish told the detectives that she was afraid for her children's safety, planned to stay at her mother's home in Benedicta, and would meet the detectives there.

The detectives first began the search for Lord at 10:05 PM, almost four hours after leaving the voicemail. They arranged

a state-wide teletype for a "stop and hold" of Lord. Detective Perkins added a "use caution" warning to the teletype, which warned officers that Lord could be dangerous and to take precautions.

Sergeant Crane joined the search at about 10:00 PM. Around 10:35 PM, Sergeant Crane sent two MSP troopers to Lord's mother's house in Houlton, Maine, which is about forty miles from Benedicta. Those officers did not call Lord's mother's house but chose to drive there. There is no evidence that these officers ever left Houlton or came to Benedicta to help look for Lord.

The defendant detectives arrived at the scene of the barn fire around 10:36 PM. Detective Perkins requested a K-9 unit to be dispatched to the scene.

Shortly thereafter, Irish received a phone call from her brother, who told her that Lord, upon receiving the voicemail, was irate and said that "someone's gonna die tonight." Irish immediately told the detectives about this death threat and asked for protection. The officers left the scene and no officer remained to protect her and the others.

At 11:38 PM, the detectives finally requested a criminal background check and learned Lord's criminal record.

At 11:49 PM, the detectives first contacted Lord's probation officer, who attempted to reach Lord and told the detectives that Lord's last known residence was at his uncle's property in Crystal, Maine.

- 8 -

Around midnight, Brittany Irish contacted Detective Perkins and asked again for an officer to come to her mother's residence. Detective Perkins understood that she wished for an officer to protect her and her family in the event that Lord returned to her mother's house. Detective Perkins did not relay the request to his superior at this time, and no officers were sent there.

Instead, at 12:30 AM on July 17, four officers, including Crane, Fowler, and Perkins, went to Lord's uncle's house in Crystal, Maine, about twenty miles from Benedicta, to look for Lord. They did so despite having been told that Lord had left his uncle's house earlier that evening and their suspicions Lord had set the fire in Benedicta. No explanation was given for why they did not call the uncle to see if Lord was there.

At about 1:00 AM, Crane, Fowler, and Perkins met in a parking lot in Crystal, where Detective Perkins finally told Sergeant Crane about Irish's request for protection. Sergeant Crane told the detectives he would not provide protection to the plaintiffs because they did not have "the manpower." The detectives did not tell Irish about this decision until an hour later. They had three hours earlier, however, alerted all officers to the fact that Lord was considered dangerous. At about the same time as this parking lot meeting, Detective Perkins requested that the Bangor Police Department send an officer to Acadia Hospital in

- 9 -

Bangor to look for Lord. The request was not that the officer simply call the hospital to find out if Lord was there. There is no evidence as to whether the state police could have requested the Bangor police to provide protection to Irish.

Around 2:00 AM, not having received any response to her request for protection, Irish again called Detective Perkins. Detective Perkins, for the first time, told her that his supervisor had denied the request an hour earlier. He said the police would continue looking for Lord.

Also around 2:00 AM, Detectives Perkins and Fowler met Detective Jonah O'Rourke and Detective Trooper Corey Hafford at a gas station in Sherman, Maine, about ten miles from the Irish home, to search the dumpster for evidence of the original rape. Not one of these four officers was sent to protect Irish at her mother's home.

Around 2:30 AM, Sergeant Crane went home. An investigator from the fire marshal's office remained near the scene of the fire until approximately 2:30 or 3:00 AM. The officers who were searching near the Sherman gas station left the area around 3:00 AM. Also around 3:00 AM, the detectives left the area.

Sergeant Crane admitted that he did not believe there were any state police resources in the area between 3:00 and 4:00 AM. No one told the plaintiffs that the detectives, let alone all police units, had left the area.

Around 3:00 or 4:00 AM, Kimberly Irish, Brittany Irish's mother, contacted the MSP through their "800 number." She said that she would like to come with Brittany and Hewitt in her car to the MSP parking lot to remain there overnight for protection. An unidentified MSP employee advised her not to come to the station, that leaving her house "would be a dangerous mistake," and that the MSP had "officers in the vicinity" who could respond quickly to any problems that arose. A jury could find that these statements were not true, and that each piece of that advice was relied on by the plaintiffs and increased the risk to them. Kimberly Irish never saw any police presence near her residence, despite keeping watch through the night.

Between 4:00 and 4:40 AM on July 17, Kary Mayo, a resident of Silver Ridge, Maine, reported that someone had attacked him with a hammer and stolen his truck and guns just six miles (and twelve minutes) from the Irish home. An officer responded out of Houlton. The state police did not notify the plaintiffs of that nearby attack (which was committed by Lord).

Within about an hour, Lord drove Mayo's truck to the Irish home. Lord fired one round with Mayo's shotgun at the front door to break the lock, which hit Brittany Irish in the arm. The door remained locked, so Lord kicked down the door. Lord entered the house, saw Hewitt on the couch, and shot Hewitt nine times while Brittany Irish watched. Brittany ran from the room and into

- 11 -

Case: 1:05-cv-00508-JAW  Document 66  Page 12  Filed 01/05/20  Page 12 of 34  PageID #: 7244

the bathroom to hide.  Kimberly Irish had already been in the bathroom brushing her teeth.  They unsuccessfully attempted to lock the door.  With the help of her mother, Brittany Irish had climbed partway through the bathroom window to escape when Lord came through the bathroom door. Kimberly Irish pushed Brittany the rest of the way through the bathroom window, and Brittany started running. Lord fired twice as Brittany was escaping and struck Kimberly in the arm.

Moments later, Brittany Irish was able to jump into the truck of Carleton Eddy, a passing motorist.  Lord saw her get into the truck and managed to jump into the bed of the truck as Eddy began to pull away.  From the bed of the truck, Lord shot Eddy three times in the neck and then pulled Brittany out of the truck and took her back to the pickup truck he had stolen from Mayo. They drove away. The police did not free Irish or apprehend Lord until around 2:00 PM on July 17, about nine hours after the shooting.[2]

_____

[2]    The police first found Lord and Irish at 5:41 AM, but Lord escaped by repeatedly shooting at the pursuing officers, threatening to kill Brittany if the police did not back off, and driving onto an "impassable" road.

Around 6:20 AM, Lord and Irish arrived at a woodlot in Lee, Maine.  Lord and Irish encountered Kevin Tozier and Clayton McCarthy, and Lord asked them if he could borrow one of their cellphones.  One of the men lent his cellphone to Lord. Tozier noticed Irish's wound and asked about it. Lord responded by fatally shooting Tozier in the chest several times. As McCarthy ran away, Lord shot him too.

- 12 -

Only after Lord's capture did the MSP post an officer at the Irish home. They did so for two days to protect the crime scene.

### Evidence as to Proper Police Practices

There is evidence that the detectives failed to follow proper MSP procedure and state law in several respects.

The parties agree that the optimal time to contact an offender is at the end of an investigation, once all the facts are in order. Specifically as to sexual assault charges, the Director of Training for the Maine Criminal Justice Academy, which trains MSP officers, testified that the reasonableness of an officer's response to a report of sexual assault depends on the severity of the underlying assault, whether the suspect has made threats against the victim, whether the suspect has been convicted of a felony, and whether the suspect has a violent history.

The plaintiffs' expert, D.P. Van Blaricom, explained that there is a standard of care "that the first priority is the victim's safety and you would do nothing that would put her safety at risk." He concluded that the defendants violated this standard

---

Lord then stole a pulp truck, abandoned it in Haynesville, Maine, stole an ATV, and travelled with Irish to Weston, Maine. In Weston, he stole a Ford F-150 truck and drove to Houlton. At some point during this flight, Lord raped Irish again. The police finally apprehended Lord around 2:00 PM when his uncle reported that Lord was in Houlton.

of care in their investigation. In his expert report, Van Blaricom stated that "[a]fter a report of kidnapping and sexual assault, the first priority is to locate the suspect and take him into custody." He testified that "if you're trying to safeguard the victim, you don't tip off the suspect when she's already said he'd threaten her," and "contacting the suspect and leaving a phone message is the last thing I would consider doing." Instead, "[t]he suspect is typically the last to be interviewed," and "[w]anting to 'hear his side of the story' at the outset is fundamentally dysfunctional and a poor investigative practice." In his expert opinion, the first police contact with Lord, given the circumstances, should have been an arrest.

Van Blaricom also testified that "[t]he first thing you do when you've got a suspect is run a criminal history" because it is "absolutely fundamental . . . to know as much as you can about your suspect." The defendants admit that a criminal background check is "fundamental" and is the first thing officers should do when they have identified a suspect. The officers here did not perform a background check until after the barn fire. This was long after leaving a voicemail message asking Lord to contact the detectives.

Officers of the MSP, including the defendant detectives, are trained on the proper response to domestic violence complaints as set forth in Maine statute, Me. Stat. tit. 19-A § 4012, and

MSP's "DV Policy M-4" ("M-4"). M-4 instructs that an officer "is to try to determine" whether the suspect has a history of domestic violence. Maine law and Section E of M-4 both state that an "officer shall immediately use all reasonable means to prevent further abuse." Me. Stat. tit. 19-A, § 4012(6). This includes "[r]emaining on the scene [of a domestic violence incident for] as long as the officer reasonably believes there is a danger to the physical safety of that person without the presence of a law enforcement officer." Id. § 4012(6)(A). M-4 adds that "[i]n circumstances in which it is necessary for a DV victim to temporarily or permanently leave a location where he or she has been living, [an officer shall] assist[] the DV victim in locating lodging with family, friends, in public accommodations, or at a DV shelter/safe home."

## II. District Court Opinion

The district court concluded that the plaintiffs had presented triable issues of fact as to whether Detectives Fowler and Perkins had violated the plaintiffs' substantive due process rights under a state-created danger theory and whether the detectives' actions "shock[ed] the conscience."[3]  Irish, 436 F. Supp. 3d at 423-24, 428.

---

[3]     The district court also entered summary judgment in favor of Sergeant Darrin Crane, and plaintiffs do not appeal that portion of the district court order.

The district court began by acknowledging that the plaintiffs have suffered constitutional deprivations of life and liberty. Id. at 414. In its grant of summary judgment on the ground of qualified immunity, the court used the Third Circuit state-created danger test laid out in Sanford v. Stiles, 456 F.3d 298, 304-05 (3d Cir. 2006). Irish, 436 F. Supp. 3d at 413 n.148. The court made three essential holdings. First, it held that the plaintiffs had presented sufficient evidence for a jury to find that the voicemail was an affirmative act that had enhanced the danger to the plaintiffs. Id. at 415-16. Next, because the detectives had time to make unhurried judgments, the plaintiffs needed to show that the defendants had acted with deliberate indifference to show conscience-shocking behavior. Id. at 418. Finally, the court determined that a reasonable jury could find that leaving the voicemail was "deliberately indifferent to the point of being conscience-shocking in light of the actions [the detectives] took before and after leaving a voicemail for Mr. Lord." Id. at 419.

As to qualified immunity, the court reasoned that the existence of the state-created danger doctrine was not clearly settled law in the First Circuit because this court had never found the theory applicable to the specific facts presented by the case before it. Id. at 425. Recognizing that a consensus of persuasive authority from other circuits was sufficient to clearly establish

the doctrine, it nevertheless declined to hold that the doctrine was clearly established. <u>Id.</u> at 426.  That was because in its view, the Fifth and Eleventh Circuits had rejected the state-created danger theory, and it was "not within [the district court's] purview to select between the majority and minority rules" or "which among the majority formulations . . . [to] adopt."  <u>Id.</u>

The plaintiffs have appealed.  The defendant officers have not appealed.

### III. Contours of the State-Created Danger Doctrine

We review a district court's grant of summary judgment de novo.  <u>López-Santos</u> v. <u>Metro. Sec. Servs.</u>, 967 F.3d 7, 11 (1st Cir. 2020).  In doing so, we read the facts in the light most favorable to the non-moving party (here, the plaintiffs), granting all reasonable inferences in their favor.  <u>Id.</u>

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  While the Supreme Court has said that in general, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," <u>DeShaney</u> v. <u>Winnebago Cnty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 197 (1989), it has also suggested that when the state creates the danger to an individual, an affirmative duty to protect might arise. <u>See id.</u> at 201 ("While the State may have been aware

- 17 -

of the dangers that [the plaintiff] faced in the free world, it
played no part in their creation, nor did it do anything to render
him any more vulnerable to them.").

Nine other circuits have since recognized the state-
created danger doctrine. See Okin v. Vill. of Cornwall-on-Hudson
Police Dep't, 577 F.3d 415, 428 (2d Cir. 2009); Sanford, 456 F.3d
at 304-05; Doe v. Rosa, 795 F.3d 429, 439 (4th Cir. 2015); Jane
Doe v. Jackson Loc. Sch. Dist. Bd. of Educ., 954 F.3d 925, 932
(6th Cir. 2020); D.S. v. E. Porter Cnty. Sch. Corp., 799 F.3d 793,
798 (7th Cir. 2015); Fields v. Abbott, 652 F.3d 886, 891 (8th Cir.
2011); Kennedy v. City of Ridgefield, 439 F.3d 1055, 1066 (9th
Cir. 2006); Estate of B.I.C. v. Gillen, 710 F.3d 1168, 1173 (10th
Cir. 2013); Butera v. District of Columbia, 235 F.3d 637, 652 (D.C.
Cir. 2001).

The circuits that recognize the doctrine uniformly
require that the defendant affirmatively acted to create or
exacerbate a danger to a specific individual or class of people.
See, e.g., Sanford, 456 F.3d at 304; Kennedy, 439 F.3d at 1061-
64. Each circuit requires that the defendant's acts be highly
culpable and go beyond mere negligence.[4] See, e.g., Butera, 235

---

[4] Most circuits require that the defendant's actions
"shock the conscience." The Ninth Circuit does not use the phrase
"shock the conscience" as it has opined that the phrase "sheds
more heat than light on the thought process courts must
undertake in cases of this kind." Kennedy, 439 F.3d at 1064-65 (quoting
L.W. v. Grubbs, 92 F.3d 894, 900 (9th Cir. 1996)). That court

F.3d at 651; see also Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 (1998) ("[T]he substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" (quoting Collins v. City of Harker Heights, 503 U.S. 115, 128 (1992))). The plaintiff also must show a causal connection between the defendant's acts and the harm. See, e.g., Sanford, 456 F.3d at 304-05; Fields, 652 F.3d at 891.

This circuit has repeatedly outlined the core elements of the state-created danger doctrine as they have been articulated in other circuits. This court has stated that in order to be liable under the state-created danger doctrine, the defendant must "affirmatively act[] to increase the threat to an individual of third-party private harm." Coyne v. Cronin, 386 F.3d 280, 287 (1st Cir. 2004); see also Ramos-Piñero v. Puerto Rico, 453 F.3d 48, 55 n.9 (1st Cir. 2006); Rivera v. Rhode Island, 402 F.3d 27, 37 (1st Cir. 2005). A government official must actually have created or escalated the danger to the plaintiff and the plaintiff cannot have "voluntarily assume[d] those risks." Vélez-Díaz v. Vega-Irizarry, 421 F.3d 71, 81 (1st Cir. 2005). The danger cannot be

---

requires that the defendant act with at least deliberate indifference to a "known or obvious danger." Id. at 1062, 1064-65.

"to the general public," it must be "specific" in some "meaningful sense" to the plaintiff. Ramos-Piñero, 453 F.3d at 54. The official's acts must cause the plaintiff's injury. Rivera, 402 F.3d at 37-38. The defendant's actions must "shock the conscience," and where a state actor had the "opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'"[5] Id. at 35-36; see also Irish I, 849 F.3d at 526. To show deliberate indifference, the plaintiff "must, at a bare minimum, demonstrate that [the defendant] actually knew of a substantial risk of serious harm . . . and disregarded that risk." Coyne, 386 F.3d at 288. In evaluating whether the defendant's actions shocked the conscience, we also consider whether the defendants violated state law or proper police procedures and training. See Irish I, 849 F.3d at 528; Marrero-Rodríguez v. Municipality of San Juan, 677 F.3d 497, 500-02 (1st Cir. 2012).

    Our decision in Rivera v. Rhode Island, which predates the defendant officers' conduct here, provided this circuit's most comprehensive exposition of the state-created danger doctrine and its elements. See 403 F.3d at 34-38.

---

[5]    The defendants do not argue in their brief that the plaintiffs must show more than deliberate indifference to make their claim.

In _Rivera_, Charles Pona and his associates repeatedly threatened to kill fifteen-year-old Jennifer Rivera if she testified at Pona's murder trial. _Id._ at 31. She told the police about these threats many times, and they promised to protect her. _Id._ at 31-32. An associate of Pona shot and killed Rivera the day before she was scheduled to testify. _Id._ at 32. Rivera's mother, Iris Rivera, brought a § 1983 claim against the officers investigating the murder under the state-created danger doctrine. _Id._ at 33-35. This court reviewed the contours of the doctrine as described above, and then held that Iris Rivera had not made out a viable state-created danger claim against the defendant officers because the acts taken by defendants were essential to the investigation and performed appropriately. _Id._ at 37. This case presents different facts that require us to recognize the state-created danger doctrine and conclude that a reasonable jury could find that a claim has been validly presented on this evidence.

We now state the necessary components for the viability of such a claim. In order to make out a state-created danger claim in the First Circuit, the plaintiff must establish:

> (1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
> (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;

- 21 -

(3) that the act or acts caused the plaintiff's harm;
and

(4) that the state actor's conduct, when viewed in total,
shocks the conscience.

> (i) Where officials have the opportunity to make
> unhurried judgments, deliberate indifference may
> shock the conscience, particularly where the state
> official performs multiple acts of indifference to
> a rising risk of acute and severe danger.  To show
> deliberate indifference, the plaintiff must, at a
> bare minimum, demonstrate that the defendant
> actually knew of a substantial risk of serious harm
> and disregarded that risk.

> (ii) Where state actors must act in a matter of
> seconds or minutes, a higher level of culpability
> is required.

We apply this test to the two issues before us.

### IV. Substantive Due Process Violation

We agree with and do not restate the district court's
reasoning that a jury could find the plaintiffs' substantive due
process rights were violated.

The defendants argue, as though context does not matter,
that Rivera established that the use of basic law enforcement
investigative tools cannot ever serve as the affirmative act

underlying a state-created danger claim. <u>Rivera</u> established no such thing; rather it held only that the use of law enforcement tools in that case did not provide an adequate basis for the state-created danger claim there. <u>See</u> <u>id.</u> at 37. That was because interviewing and subpoenaing Jennifer Rivera were both necessary steps of the investigation that could not reasonably be avoided and were performed appropriately. <u>See</u> <u>id.</u> Here the claim is not that the defendants should not have contacted Lord at all, but that the manner in which the officers did so -- despite having been warned about Lord's threats of violence and their own acknowledgement that contacting him would increase the risks to Irish and her family -- was wrongful.

The defendants next argue that the officers' violations of state law and MSP policy cannot serve as the basis of a state-created danger claim. That is not the plaintiffs' argument. The plaintiffs' argument is that these violations are, at the very least, relevant to determining the conscience-shocking nature of the defendants' conduct and the qualified immunity inquiry. The plaintiffs' position is well based on our prior opinions of which the defendant officers had notice. Those opinions are described below.

The defendants also argue that no jury could find the officers' conduct shocked the conscience. We rely on the district

court's reasoning as to why that argument fails.  See Irish, 436
F. Supp. 3d at 419-24.

## V. Qualified Immunity

Government officials sued in their individual capacities
are immune from damages claims unless "(1) they violated a federal
statutory or constitutional right, and (2) the unlawfulness of
their conduct was 'clearly established at the time.'" District of
Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v.
Howards, 566 U.S. 658, 664 (2012)).  The defendants' argument turns
on the clearly established prong.

The test to determine whether a right is clearly
established asks whether the precedent is "clear enough that every
reasonable official would interpret it to establish the particular
rule the plaintiff seeks to apply" and whether "[t]he rule's
contours [were] so well defined that it is clear to a reasonable
officer that his conduct was unlawful in the situation he
confronted."  Id. at 590 (internal quotation marks and citations
omitted).

A rule is clearly established either when it is "dictated
by 'controlling authority' or 'a robust "consensus of cases of
persuasive authority."'"  Id. at 589-90 (quoting Ashcroft v. al-
Kidd, 563 U.S. 731, 741-42 (2011)).  A "robust consensus" does not
require the express agreement of every circuit.  Rather, sister
circuit law is sufficient to clearly establish a proposition of

law when it would provide notice to every reasonable officer that his conduct was unlawful. See Wilson v. Layne, 526 U.S. 603, 616-18 (1999); Wesby, 138 S. Ct. at 589-90.

"[T]he salient question . . . is whether the state of the law [at the time of the defendants' conduct] gave [them] fair warning that their alleged treatment of [the plaintiffs] was unconstitutional." Hope v. Pelzer, 536 U.S. 730, 741 (2002); see also Rainsberger v. Benner, 913 F.3d 640, 652 (7th Cir. 2019) ("[T]he relevant question is what a well-trained officer would have thought about the lawfulness of that action." (emphasis in original)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope, 536 U.S. at 741; see also Taylor v. Riojas, No. 19-1261, 2020 WL 6385693, at *2 (Nov. 2, 2020) (holding that qualified immunity should not be granted when "any reasonable officer should have realized that [the conduct at issue] offended the Constitution"); Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 377-78 (2009); Brosseau v. Haugen, 543 U.S. 194, 199 (2004) ("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law."); Browder v. City of Albuquerque, 787 F.3d 1076, 1082-83 (10th Cir. 2015) ("[T]he more obviously egregious the conduct in light of prevailing constitutional principles, the less

- 25 -

specificity is required from prior case law to clearly establish the violation." (citations omitted)).

The Supreme Court has established that cases involving materially similar facts are not necessary to a finding that the law was clearly established. Hope, 536 U.S. at 741. The circuits have followed that rule. See Suboh v. Dist. Att'y's Off. of Suffolk Dist., 298 F.3d 81, 94 (1st Cir. 2002); Dean for & on behalf of Harkness v. McKinney, 976 F.3d 407, 418 (4th Cir. 2020); Cantu v. City of Dothan, 974 F.3d 1217, 1232 (11th Cir. 2020); Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002); Williams v. Strickland, 917 F.3d 763, 770 (4th Cir. 2019); Browder, 787 F.3d at 1082-83.

A defendant's adherence to proper police procedure bears on all prongs of the qualified immunity analysis. Irish I, 849 F.3d at 527-28.[6] When an officer violates the Constitution, state law, of course, provides no refuge. A lack of compliance with state law or procedure does not, in and of itself, establish a constitutional violation, but when an officer disregards police

---

[6]   Defendants' argument that the violations of proper police procedure and state law are "not relevant to the qualified immunity analysis" is both incorrect and troubling. The defendants' argument is tantamount to saying that violations of state law and proper police procedures have no bearing on whether a reasonable officer would know his conduct was unlawful. Such an argument is pernicious; the driving principle behind it would encourage government officials to short-cut proper procedure and established protocols.

procedure, it bolsters the plaintiff's argument both that an officer's conduct "shocks the conscience" and that "a reasonable officer in [the officer's] circumstances would have believed that his conduct violated the Constitution." Stamps, 813 F.3d at 32 n.4 (quoting Jennings v. Jones, 499 F.3d 2, 20 (1st Cir. 2007)); see also id. (collecting cases); Marrero-Rodríguez, 677 F.3d at 502 (stating that defendant's "violation of several training protocols" weighed in favor of plaintiffs' claim); Dean, 976 F.3d at 416-17 (relying on officer's violation of training, department policy, and state law to hold that a reasonable jury could conclude that officer's conduct was conscience shocking).

The defendants' main argument is that because this circuit to date has not recognized the state-created danger doctrine, the law was not clearly established. That is simply incorrect. The Supreme Court has stated that clearly established law can be dictated by controlling authority or a robust consensus of persuasive authority. Wesby, 138 S. Ct. at 589-90; see also McCue v. City of Bangor, 838 F.3d 55, 64 (1st Cir. 2016) (stating that the agreement of four circuits was sufficient to establish threshold for excessive force); Maldonado v. Fontanes, 568 F.3d 263, 270-71 (1st Cir. 2009) (holding that a consensus of three circuits was sufficient to establish that the killing of a pet was a seizure within the meaning of the Fourth Amendment). The widespread acceptance of the state-created danger theory,

described above, was sufficient to clearly establish that a state official may incur a duty to protect a plaintiff where the official creates or exacerbates a danger to the plaintiff.

The defendants' reliance on Soto v. Flores, 103 F.3d 1056 (1st Cir. 1997), is also misplaced. In Soto, this court concluded that the state-created danger doctrine was not clearly established. Id. at 1065. The broad acceptance of the doctrine "militate[d] in favor of finding that there [was] clearly established law in this area," but two circumstances prevented the court from holding that the law was clearly established. Id. First, the court noted that at the time of the defendants' conduct in Soto, the First Circuit had never "discuss[ed] the contours of [the state-created danger] doctrine." Id. Second, the court relied on the fact that while the Third Circuit had then recently "comprehensively described" the state-created danger theory, the history of the doctrine was "uneven," and that only "more recent judicial opinions . . . ha[d] begun to clarify the contours" of the doctrine. Id. All of this had changed by the time Detective Perkins left the voicemail for Anthony Lord. By July 2015, this court had discussed state-created danger doctrine at least a dozen times, even if it had never found it applicable to the facts of a specific case. And our sister circuits' law developed as well in the decades since Soto.

The officers argue that because the Fifth and Eleventh Circuits have rejected the state-created danger doctrine,[7] the doctrine cannot be clearly established. Again, as a proposition of law this is wrong. A circuit split does not foreclose a holding that the law was clearly established, as long as the defendants could not reasonably believe that we would follow the minority approach. See Pro v. Donatucci, 81 F.3d 1283, 1292 (3d Cir. 1996). After Rivera, the defendants could not reasonably have believed that we would flatly refuse to apply the state-created danger doctrine to an appropriate set of facts.

Rivera was a critical warning bell that officers could be held liable under the state-created danger doctrine when their affirmative acts enhanced a danger to a witness. This court did not simply dismiss Rivera's claim without analysis, as would have been appropriate if the state-created danger doctrine could never apply to any set of facts in this circuit. Instead, Rivera outlined the elements of the state-created danger doctrine and performed a nuanced analysis of why each particular action of the

---

[7]     We disagree with the defendants that the Fifth and Eleventh Circuits have rejected the state-created danger doctrine. Though the Eleventh Circuit no longer has a discrete "state-created danger," it also does not bar recovery in cases like this one. See Waddell v. Hendry Cnty. Sheriff's Off., 329 F.3d 1300 1305-06 (11th Cir. 2003). And the Fifth Circuit has not explicitly foreclosed the possibility that it might recognize the doctrine in the future. See Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys, 675 F.3d 849, 865-66 (5th Cir. 2012) (en banc).

defendants was not the type of affirmative act covered by the doctrine.  402 F.3d at 36-38.  <u>Rivera</u> warned that if an officer performed a <u>non-essential</u> affirmative act which enhanced a danger, a sufficient causal connection existed between that act and the plaintiff's harm, and the officer's actions shocked the conscience, the officer could be held liable for placing a witness or victim in harm's way during an investigation.

Defendants also argue that they are immune from suit because no factually similar cases alerted them that their conduct was impermissible.  This too is incorrect.  As we have just said, a general proposition of law may clearly establish the violative nature of a defendant's actions, especially when the violation is egregious.  See <u>Hope</u>, 536 U.S. at 741; <u>Dean</u>, 976 F.3d at 417 ("That there is little precedent imposing liability under these specific circumstances does not necessarily mean that an officer lacks notice that his conduct is unlawful.").  Not only is the argument wrong, but its premise is wrong; there are factually similar earlier cases.  Both were decided after <u>Soto</u>.

In 2006, the Ninth Circuit faced a similar case.  In <u>Kennedy</u> v. <u>City of Ridgefield</u>, Kimberly Kennedy reported that her thirteen-year-old neighbor, Michael Burns, had molested her nine-year-old daughter.  439 F.3d at 1057.  Kennedy told the police that Burns was violent and that she was afraid of how Burns would respond to the allegations.  <u>Id.</u> at 1057-58.  The police promised

to warn Kennedy before contacting Burns.  Id. at 1058.  Instead, the investigating officer told Burns's mother about the allegations against her son fifteen minutes before telling Kennedy that he had contacted the Burns family.  Id.  The officer promised to but did not provide protection that night.  Id. Early the next morning, burns broke into Kennedy's house and shot both her and her husband while they slept.  Id.  The Ninth Circuit held that there was a triable issue of fact as to whether the officer had violated Kennedy's substantive due process rights under the state-created danger theory.  Id. at 1067.  The officer had "created an actual, particularized danger Kennedy would not otherwise have faced."  Id. at 1063.  Going to the Burns residence prematurely and reassuring Kennedy with false promises of increased security were acts of deliberate indifference.  Id. at 1064-65.  The Ninth Circuit also held that the law was clearly established.  Id. at 1066-67.

Another factually similar case was decided by the Seventh Circuit in 1998.  In Monfils v. Taylor, 165 F.3d 511 (7th Cir. 1998), Thomas Monfils tipped off the police that his co-workers intended to steal property from their workplace.  Id. at 513.  Despite Monfils' pleas to keep the recording of his tip secret, the police released the recording to one of his co-workers, Keith Kutska.  Id. Monfils had warned the police that Kutska was "known to be violent," "crazy," and "a biker type with nothing to

lose" and that Monfils "was afraid that . . . [Kutska] would 'take him out.'" Id. at 513-14. Kutska murdered Monfils shortly after the police released the recording. Id. at 515. Relying on a Sixth Circuit case, Kallstrom v. City of Columbus, 136 F.3d 1055 (6th Cir. 1998), in which a city was held liable under the state-created danger doctrine for releasing the contact information of undercover police officers, the Seventh Circuit concluded that the defendant officer was not entitled to qualified immunity on the state-created danger claim. Monfils, 165 F.3d at 516, 518.

These cases gave the defendants notice that they could be held liable for violating the Due Process Clause if, after receiving a report of criminal activity, they effectively alerted the suspect that he was under investigation in a manner that notified the suspect who the reporting individual was, despite knowing that the suspect was likely to become violent toward that person. Monfils, 165 F.3d at 513-18. The officers were also on notice that failing to take steps to mitigate the danger they had created and misleading the victim about the level of police protection she had could likewise give rise to a constitutional violation under the state-created danger doctrine. Kennedy, 493 F.3d at 1063-65.

On this record, a reasonable jury could conclude that as much occurred here. The plaintiffs allege that the defendants, even in the face of Irish's expressed fear that Lord would react

- 32 -

violently, contacted him in a manner that a reasonable jury could find notified him that Irish had reported him to the police. The plaintiffs also allege that the defendants failed to convey her request for protection to their superiors for several hours and further failed to inform her in a timely fashion that the request had been denied. A jury could also conclude that the defendants played a role in the decision to withdraw all resources from the area without telling the plaintiffs that they had done so, thereby allowing the plaintiffs to believe more protection was available than was actually true. Finally, the defendants' apparent utter disregard for police procedure could contribute to a jury's conclusion that the defendants conducted themselves in a manner that was deliberately indifferent to the danger they knowingly created, and that they thereby acted with the requisite mental state to fall within the ambit of the many cases holding that a violation of the Due Process Clause requires behavior that "shocks the conscience." See, e.g., Kennedy, 439 F.3d at 1064-65; Rivera, 402 F.3d at 37-38; Coyne, 386 F.3d at 288. Whether the jury will or should conclude as much is, of course, not a question for this court, but it was clearly established in July 2015 that such conduct on the part of law enforcement officers, if it occurred, could give rise to a lawsuit under § 1983.

**VI.**

For the reasons stated above, we <u>reverse</u> the grant of summary judgment, <u>affirm</u> the district court's conclusion that a jury could conclude that defendants violated plaintiffs' substantive due process rights, and <u>remand</u> for further proceedings consistent with this opinion. Costs are award to the appellants.